

**Seyfarth Shaw LLP**
Seaport East
Two Seaport Lane, Suite 1200
Boston, Massachusetts 02210-2028
**T** (617) 946-4800
**F** (617) 946-4801

rfisher@seyfarth.com
T (617) 946-4996

www.seyfarth.com

January 7, 2026

**VIA E-MAIL**

Arbitrator Mary Jane Tufano
c/o The Labor Relations Connection, Inc.
P.O. Box 333
Sandwich, MA 02563

Re:    HGSU-UAW Local 5118 and Harvard University

Dear Arbitrator Tufano:

As you know, this Firm represents the President and Fellows of Harvard College ("Harvard" or the "University"). Thank you for the opportunity to present our position statement regarding why this dispute is not arbitrable and why a court rather than an arbitrator is empowered to decide the question of arbitrability. As described below, the parties' collective bargaining agreement has expired. As such, Harvard has no obligation to arbitrate the dispute underlying the HGSU-UAW Local 5118's ("the Union") grievance. To the extent that the Union believes that it nonetheless can arbitrate this dispute, the law is clear that a court decides whether this case is arbitrable. Respectfully, you do not have the authority to hear this dispute or even to decide whether you can hear this dispute.

BACKGROUND

The dispute underlying the grievance relates to the circumstances under which students may unionize under the National Labor Relations Act ("the Act"). In August 2016, the National Labor Relations Board held in *Columbia University*, 364 NLRB No. 90 (2016), that graduate students who have a common law employment relationship with their university were employees under the NLRA and could organize. To be employees, the students must perform work for the university in exchange for compensation. However, the NLRB recognized that students who received a stipend to support their own academic endeavors and provided no benefit to a university were not employees under the Act.

Two months after *Columbia*, the Union here filed a petition to represent certain students at Harvard. An initial election was held in November 2016 in the following unit:

All students enrolled in Harvard degree programs employed by the Employer who provide instructional services at Harvard University, including graduate and undergraduate Teaching Fellows (teaching assistants, teaching fellows, course assistants); and all students enrolled in Harvard degree programs (other than undergraduate students at Harvard College) employed by the Employer who serve as Research Assistants (regardless of funding sources, including those



> compensated through Training Grants). This unit includes students employed by Harvard University and enrolled in the Harvard Graduate School of Arts and Sciences, Harvard Business School, the Division of Continuing Education, Harvard Graduate School of Design; Harvard Graduate School of Education, the Harvard John A. Paulson School of Engineering and Applied Sciences, the John F. Kennedy School of Government at Harvard University, Harvard Law School, Harvard Divinity School, Harvard Medical School, the Harvard T.H. Chan School of Public Health, and Harvard College[.]

*See* Order, attached hereto at Exhibit A.  The Union lost the initial election and filed objections to the conduct of the election.  On July 7, 2017, the Regional Director issued a decision, directing a second election.  *See* Exhibit B.

A second election was held in April 2018.  The Regional Director defined those students eligible to vote as the following (which is largely identical to unit eligible to vote in the first election):

> All students enrolled in Harvard degree programs employed by the Employer who provide instructional services at Harvard University, including graduate and undergraduate Teaching Fellows (teaching assistants, teaching fellows, course assistants); and all students enrolled in Harvard degree programs (other than undergraduate students at Harvard College) employed by the Employer who serve as Research Assistants (regardless of funding sources, including those compensated through Training Grants). This unit includes students employed by Harvard University and enrolled in the Harvard Graduate School of Arts and Sciences, Harvard Business School, the Division of Continuing Education, Harvard Graduate School of Design; Harvard Graduate School of Education, the Harvard John A. Paulson School of Engineering and Applied Sciences, the John F. Kennedy School of Government at Harvard University, Harvard Law School, Harvard Divinity School, Harvard Medical School, the Harvard T.H. Chan School of Public Health, and Harvard College who were employed by the Employer during the payroll period ending March 12, 2018.

The Union won this second election.

The parties entered into an initial collective bargaining agreement, which expired on June 30, 2021.  The Recognition clause in that agreement (Article 1) described the unit covered by the agreement as following:

> As reflected in the National Labor Relations Board Case 01-RC-186442, the University recognizes the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW), and its Local Union, Harvard Graduate Students Union-UAW Local 5118 (HGSU-UAW Local 5118), as the exclusive bargaining representative for employees in the bargaining unit. The bargaining unit shall include all students enrolled in Harvard degree programs employed by Harvard University who provide instructional services at Harvard University, including graduate and undergraduate Teaching Fellows (teaching



assistants, teaching fellows, course assistants) and all students enrolled in Harvard degree programs (other than undergraduate students at Harvard College) employed by Harvard University who serve as Research Assistants (regardless of funding sources, including those compensated through Training Grants). This bargaining unit includes students employed by Harvard University and enrolled in the Harvard Graduate School of Arts and Sciences, Harvard Business School, the Division of Continuing Education, Harvard Graduate School of Design, Harvard Graduate School of Education, the Harvard John A. Paulson School of Engineering and Applied Sciences, the John F. Kennedy School of Government at Harvard University, Harvard Law School, Harvard Divinity School, Harvard Medical School, the Harvard T.H. Chan School of  Public Health, and Harvard College. Excluded: All undergraduate students serving as research assistants and all other employees, guards and supervisors as defined in the Act.

*See* Exhibit C.  Thus, the Recognition language required a student to be employed by Harvard to be in the bargaining unit and covered by the collective bargaining agreement.

In 2021, the parties entered into a second collective bargaining agreement.  *See* Exhibit D.  The parties made no changes to the Recognition clause.  *Id.*  The contract had an expiration date of June 30, 2025.  Article 6 of the Agreement is Grievance and Arbitration.  It defines a grievance as "any dispute concerning the interpretation, the application, or claimed violation(s) of a specific provision(s) of this Agreement.  *Id.*, Art. 6.  A grievance that is not resolved at the grievance steps may be submitted to arbitration.  *Id.*  Article 34 of the collective bargaining agreement, entitled "No Strike/No Lockout," states in pertinent part that "[d]uring the term of this Agreement or any extension thereof the Union, its representatives, agents, and unit members will not call, condone, or engage in a strike, sympathy strike, slowdown, or withholding of grades or academic evaluations by SWs."  *Id.*, Art. 34.

While that second contract was in force, a union sought to represent graduate students on fellowships at the Massachusetts Institute of Technology.  In March 2023, the Regional Director for Region 1 of the NLRB dismissed the petition.  *See* Exhibit E.  The Regional Director held that the "petitioned-for graduate fellows are not employees because they do not perform work controlled by the Employer in exchange for compensation. Rather, they perform research (or, occasionally, teach) to further their own academic purposes and are provided with funding to do so regardless of whether their activities also benefit the Employer."  *See id.*, p. 2.  The union appealed that determination to the NLRB.  The NLRB did not issue a decision on the appeal for more than a year, until July 17, 2024.  The NLRB held, "the Regional Director . . . correctly found that the record shows that most of the fellows 'must meet no employment responsibilities or service requirements to receive or maintain their fellowship awards.' Accordingly, the Regional Director properly dismissed the petition."  *See* Exhibit F.

In light of the NLRB's affirmance of the dismissal of the petition in *MIT*, Harvard reviewed whether there were students who received stipends but did not have a corresponding service requirement to the University, such as by serving as a Teaching Fellow or Research Assistant, and who were mistakenly included in the bargaining unit.  Harvard typically sends appointment letters on or about July 1, so the timing of the NLRB's decision in *MIT* meant that many appointments had already been made for the 2024-25 academic year.



On June 30, 2025, the Agreement expired, and the parties did not agree to an extension.

On July 1, 2025, Harvard announced that graduate students who did not in fact have a common law employment relationship with the university, meaning that they performed work for the university in exchange for compensation, were being removed from the bargaining unit, as they were not employees under the Act.  This specifically impacted students who received stipends without any corresponding service commitment. The Union posted on its website that this occurred "[j]ust one day after HGSU's contract expired."  *See* Exhibit G.

On July 21, 2025, the Union filed the grievance underlying this matter.  *See* Exhibit H.  In its grievance, the Union acknowledged that Harvard implemented the decision at issue on July 1, alleged that it did not know of the decision until July 2 and that Harvard supplied it a list of impacted students on July 3, 2025.  On October 14, 2025, the Union filed its demand for arbitration, again acknowledging that Harvard implemented the decision underlying the grievance on July 1, 2025.  *See* Exhibit I.

During the grievance process, Harvard repeatedly asserted that the grievance was not arbitrable.  When the Union filed a demand for arbitration, Harvard informed the Labor Relations Connection that the grievance was not arbitrable and that any dispute about arbitrability was to be decided by a court, not an arbitrator.  Further, Harvard specifically noted that the LRC's rules provided that arbitration was only permissible where there was an agreement to arbitrate the dispute and that there was no such agreement here, as the contract had expired.  Nonetheless, the LRC, through its counsel, provided the following response:

> As the neutral grievance/arbitration administrator, The LRC does not make substantive or legal decisions regarding these disputes between the parties.  As such, given that the parties provided in their collective bargaining agreement that The Labor Relations Connection was chosen as the arbitration administrator, The LRC has no choice but to move forward with the appointment of an arbitrator under The Labor Relations Connection's rules. The substantive decision as to whether the grievance is arbitrable and should or can be decided by the arbitrator or whether this decision should be determined by a court with jurisdiction, is a substantive matter which is outside The Labor Relations Connection's limited jurisdiction.   Obviously, the parties are free to pursue any legal remedies that might affect this decision and The Labor Relations Connection will comply with whatever decision is imposed [sic] the parties.

*See* Exhibit J.  Thus, the LRC's decision to appoint an arbitrator was not a decision that the grievance is arbitrable or that the arbitrator was empowered to decide arbitrability.

ARGUMENT

The Union's grievance is not arbitrable and to the extent that the Union claims that it is, a court, not an arbitrator, decides that question.  Respectfully, the LRC had no authority to appoint an arbitrator in this matter, and Harvard does not otherwise agree to arbitrate this dispute.



The Supreme Court has long recognized that the agreement to arbitrate disputes is the *quid pro quo* for the union's agreement to a no-strike clause. *See Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 567 (1960). While the expiration of a collective bargaining agreement does not bar arbitration of disputes that arose before expiration, *see, e.g.*, *Steelworkers v. Enterprise Car*, 363 U.S. 593 (1960), the Supreme Court has made clear that an employer has no obligation to arbitrate post-expiration disputes except under very limited circumstances. In *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190 (1991), the Supreme Court rejected the notion that an employer had a duty to arbitrate a post-expiration layoff decision. It explained that "the object of an arbitration clause is to implement a contract, not to transcend it" and that its prior decision in *Nolde Bros.* "does not announce a rule that post-expiration grievances concerning terms and conditions of employment remain arbitrable." 501 U.S. at 205. In *Nolde Bros. v Bakery Workers*, 430 U.S. 243 (1977), the Court held that an employer had a duty to arbitrate a dispute over whether it owed severance pay pursuant to a term of the expired collective bargaining agreement. In *Litton*, the Court explained that the "*Nolde Bros.* presumption is limited to disputes arising under the contract. A post-expiration grievance can be said to arise under the contract only where it involves facts and occurrences that arose before expiration, where an action taken after expiration infringes a right that accrued or vested under the agreement, or where, under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement." 501 U.S. at 205-06. The Court rejected a broader reading of *Nolde Bros.* as "fail[ing] to recognize that an expired contract has, by its own terms, released all its parties from their respective contractual obligations, except obligations already fixed under the contract but as yet unsatisfied" and that "terms and conditions [of employment] no longer have force by virtue of the contract." *Id.* at 206.

Further, the majority in *Litton* rejected the notion that an arbitrator, rather than a court, should decide whether a post-expiration dispute is arbitrable. Citing to its decision in *AT&T Technologies, Inc. v. CWA*, 475 U.S. 643 (1986), the Court explained that "we refuse to apply th[e] presumption [of arbitrability] wholesale in the context of an expired bargaining agreement, for to do so would make limitless the contractual obligation to arbitrate" and instead the Court held that "we must determine whether the parties agreed to arbitrate this dispute." 501 U.S. at 209. Ultimately, the Court in *Litton* concluded that the underlying dispute about layoffs did not involve any vested right under the contract and was not arbitrable. The Court explained that it could not infer any intent to freeze a particular order for layoffs or vest any contractual right at expiration. 501 U.S. at 210.

*Litton* compels the conclusion that only a court is empowered to determine whether the Union's grievance is arbitrable. During our conference call, the Union did not claim otherwise. Instead, the Union's only argument was that Harvard can run to court if it wants a court to decide the issue. But Harvard neither brought this grievance nor filed it for arbitration. While the Union throws around that Harvard has money at its disposal, the notion that Harvard should have to incur the expense of court litigation because the Union disregarded the law must be rejected. Harvard has not agreed to arbitrate this dispute and has repeatedly objected to the appointment of an arbitrator. Respectfully, the arbitrator should take no action on this matter. If the Union believes that this case is arbitrable, it can seek to compel arbitration in court, if it so chooses.



Regardless, *Litton* also confirms that the underlying grievance is not arbitrable.  The collective bargaining agreement has expired and the grievance arose after contract expiration.  The Union's grievance and demand for arbitration concede that Harvard implemented its decision after the collective bargaining agreement expired.[1]  The Union is not bound by the no-strike clause, and accordingly, Harvard has no duty to arbitrate this dispute.

During our conference call, the Union suggested that its grievance somehow arose under the expired collective bargaining agreement because Harvard planned its decision to remove stipendees before expiration.  This cannot be viewed as a serious argument.  The Union does not and cannot contend that Harvard implemented any decision prior to July 1.  Prior to that date, Harvard concedes for purposes of this position statement that it investigated the impact of the *MIT* decisions and analyzed whether non-employees had been mistakenly included in the bargaining unit.  But that does not mean Harvard made the decision before it did.  Put differently, until July 1, nothing was final.

Basic logic underscores that this must be correct and refutes the Union's argument.  Consider an employer's investigation into a disciplinary issue.  The employer investigates the allegations, determines what discipline, if any, should issue, and plans to implement that decision (such as by scheduling a disciplinary meeting or preparing a final paycheck in the case of a decision to terminate).  Regardless of how much planning went into the decision, until the employer actually issues the discipline, there is no discipline and nothing for the union to grieve.  So too with the decision here.[2]

Nor does the grievance involve some sort of vested right, like the severance pay provision at issue in *Nolde Brothers*.  The expired collective bargaining agreement only covers students who are employed by Harvard, not all students.  In fact, the parties recognized that time spent on academic expectations is not covered by the collective bargaining agreement (*see* Article 16) and understood that students might enter and exit the bargaining unit.  *See* Exhibit D, Art. 18 (requiring the University to supply the Union with weekly lists of bargaining unit members).  Put simply, non-employees are not included in the bargaining unit, and Harvard's removal of such non-employees cannot be viewed as implicating any vested right.

Furthermore, the issue underlying the dispute is whether certain students are employees within the meaning of the Act and thus whether they are members of the bargaining unit.  That necessarily implicates statutory policy that is outside an arbitrator's purview.  *See, e.g.*, *Marion Power Shovel Co., Inc.*, 230 NLRB 576, 577-78 (1977) (determinations of statutory policy are

---

[1] During the parties' conference call with you, the Union falsely ascribed some ill motive to the timing of Harvard's actions.  However, the Union again ignores the law.  The NLRB has taken the position that an employer may not make mid-term modifications to a bargaining unit.  *See, e.g.*, *Arizona Elec. Power*, 250 NLRB 1132, 1132-33 (1980).  While Harvard submits that the stipendees were never employees in the first place and thus could not be in the bargaining unit, the Union could have filed an unfair labor practice charge if the University had removed them from the bargaining unit during the term of the contract.

[2] This is consistent with the language in the expired contract that a grievance must be filed within 30 business days "after the event" or after the grievant shall become aware of "the event."  The "event" is the implementation of a decision, not its planning.



"matters for decision of the Board rather than an arbitrator").  Whether Harvard was correct that the decisions in *MIT* clarified when a student is or is not an employee is a matter for the NLRB.

In this respect, the fact that this grievance is not arbitrable does not leave the Union without any recourse.  While Harvard submits that the removal of the non-employee stipendees was a permissive subject of bargaining, to the extent that the Union contends otherwise, it can file an unfair labor practice charge.[3]  Alternatively, it can file a unit clarification petition with the NLRB that the stipendees should be included in the bargaining unit.

However, this grievance cannot proceed in arbitration.  The Supreme Court's decision in *Litton* is consistent with its longstanding view that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960). The parties' collective bargaining agreement has expired, and Harvard has not otherwise agreed to arbitrate this dispute.

For these reasons, this matter should be closed or in the alternative, stayed unless and until a court compels arbitration of this dispute.  Harvard reserves all legal rights and does not waive any objections to the LRC's appointment of an arbitrator by submitting this position statement.

Very truly yours,

SEYFARTH SHAW LLP

Robert A. Fisher

cc: Patrick Bryant

Enclosures

---

[3] During the call, the Union claimed that Harvard did not respond to a request for information about the July 1 decision relating to stipendees. Harvard refutes that allegation, but regardless, the Union's recourse here too is an unfair labor practice charge.

# EXHIBIT A

Form NLRB-707
(4-2015)



**United States of America
National Labor Relations Board**

# NOTICE OF ELECTION



PURPOSE OF ELECTION:  This election is to determine the representative, if any, desired by the eligible employees for purposes of collective bargaining with their employer.  A majority of the valid ballots cast will determine the results of the election.  Only one valid representation election may be held in a 12-month period.

SECRET BALLOT:  The election will be by SECRET ballot under the supervision of the Regional Director of the National Labor Relations Board (NLRB).  A sample of the official ballot is shown on the next page of this Notice. Voters will be allowed to vote without interference, restraint, or coercion.  Electioneering will not be permitted at or near the polling place. Violations of these rules should be reported immediately to an NLRB agent. Your attention is called to Section 12 of the National Labor Relations Act which provides:  ANY PERSON WHO SHALL WILLFULLY RESIST, PREVENT, IMPEDE, OR INTERFERE WITH ANY MEMBER OF THE BOARD OR ANY OF ITS AGENTS OR AGENCIES IN THE PERFORMANCE OF DUTIES PURSUANT TO THIS ACT SHALL BE PUNISHED BY A FINE OF NOT MORE THAN $5,000 OR BY IMPRISONMENT FOR NOT MORE THAN ONE YEAR, OR BOTH.

ELIGIBILITY RULES:  Employees eligible to vote are those described under the VOTING UNIT on the next page and include employees who did not work during the designated payroll period because they were ill or on vacation or temporarily laid off, and also include employees in the military service of the United States who appear in person at the polls.  Employees who have quit or been discharged for cause since the designated payroll period and who have not been rehired or reinstated prior to the date of this election are *not* eligible to vote.

SPECIAL ASSISTANCE: Any employee or other participant in this election who has a handicap or needs special assistance such as a sign language interpreter to participate in this election should notify an NLRB Office as soon as possible and request the necessary assistance.

PROCESS OF VOTING: Upon arrival at the voting place, voters should proceed to the Board agent and identify themselves by stating their name.  The Board agent will hand a ballot to each eligible voter.  Voters will enter the voting booth and mark their ballot in secret.  DO NOT SIGN YOUR BALLOT.  Fold the ballot before leaving the voting booth, then personally deposit it in a ballot box under the supervision of the Board agent and leave the polling area.

CHALLENGE OF VOTERS: If your eligibility to vote is challenged, you will be allowed to vote a challenged ballot. Although you may believe you are eligible to vote, the polling area is not the place to resolve the issue.  Give the Board agent your name and any other information you are asked to provide.  After you receive a ballot, go to the voting booth, mark your ballot and fold it so as to keep the mark secret.  DO NOT SIGN YOUR BALLOT.  Return to the Board agent who will ask you to place your ballot in a challenge envelope, seal the envelope, place it in the ballot box, and leave the polling area.  Your eligibility will be resolved later, if necessary.

AUTHORIZED OBSERVERS: Each party may designate an equal number of observers, this number to be determined by the NLRB.  These observers (a) act as checkers at the voting place and at the counting of ballots; (b) assist in identifying voters; (c) challenge voters and ballots; and (d) otherwise assist the NLRB.

---

WARNING: This is the only official notice of this election and must not be defaced by anyone.  Any markings that you may see on any sample ballot or anywhere on this notice have been made by someone other than the National Labor Relations Board, and have not been put there by the National Labor Relations Board.  The National Labor Relations Board is an agency of the United States Government, and does not endorse any choice in the election.

Form NLRB-707
(4-2015)



**United States of America**
**National Labor Relations Board**

# NOTICE OF ELECTION

## <u>VOTING UNIT</u>



<u>**EMPLOYEES ELIGIBLE TO VOTE:**</u>
**All students enrolled in Harvard degree programs employed by the Employer who provide instructional services at Harvard University, including graduate and undergraduate Teaching Fellows (teaching assistants, teaching fellows, course assistants); and  all students enrolled in Harvard degree programs (other than undergraduate students at Harvard College) employed by the Employer  who serve as Research Assistants (regardless of funding sources, including those compensated through Training Grants).  This unit includes students employed by Harvard University and enrolled in the Harvard Graduate School of Arts and Sciences, Harvard Business School, the Division of Continuing Education, Harvard Graduate School of Design; Harvard Graduate School of Education, the Harvard John A. Paulson School of Engineering and Applied Sciences, the John F. Kennedy School of Government at Harvard University, Harvard Law School, Harvard Divinity School, Harvard Medical School, the Harvard T.H. Chan School of Public Health, and Harvard College who were employed by the Employer during the payroll period ending October 15, 2016.**

<u>**EMPLOYEES NOT ELIGIBLE TO VOTE:**</u>
**All undergraduate students serving as research assistants, and all other employees, guards and supervisors as defined in the Act.**

**The parties have agreed that doctoral students who have been been employed in the bargaining unit for at least one semester during the past academic year and who are not currently in their Dissertation Completion year (or final year of their program) may vote subject to the Board's challenge procedures.**

WARNING: This is the only official notice of this election and must not be defaced by anyone.  Any markings that you may see on any sample ballot or anywhere on this notice have been made by someone other than the National Labor Relations Board, and have not been put there by the National Labor Relations Board.  The National Labor Relations Board is an agency of the United States Government, and does not endorse any choice in the election.

Form NLRB-707
(4-2015)



# United States of America
## National Labor Relations Board
# NOTICE OF ELECTION

## DATE, TIME AND PLACE OF ELECTION



| | | |
|---|---|---|
| WEDNESDAY, NOVEMBER 16, 2016 | 10:00AM-2:30PM AND 4:30PM-8:00PM | HARVARD UNIVERSITY'S CAMBRIDGE CAMPUS PARLOR ROOM OF THE PHILLIPS BROOKS HOUSE CAMBRIDGE, MA |
| WEDNESDAY, NOVEMBER 16, 2016 | 10:00AM-2:30PM AND 4:30PM-8:00PM | LONGWOOD CAMPUS HARVARD'S DENTAL SCHOOL RESEARCH AND EDUCATION BUILDING (REB) ROOM 106 OF THE MEDICAL SCHOOL BOSTON, MA |
| THURSDAY, NOVEMBER 17, 2016 | 10:00AM-2:30PM AND 4:30PM-8:00PM | HARVARD UNIVERSITY'S CAMBRIDGE CAMPUS PARLOR ROOM OF THE PHILLIPS BROOKS HOUSE CAMBRIDGE, MA |
| THURSDAY, NOVEMBER 17, 2016 | 10:00AM-2:30PM AND 4:30PM-8:00PM | LONGWOOD CAMPUS HARVARD'S DENTAL SCHOOL RESEARCH AND EDUCATION BUILDING (REB) ROOM 106 OF THE MEDICAL SCHOOL BOSTON, MA |
| THURSDAY, NOVEMBER 17, 2016 | 10:00AM-2:00PM | HARVARD BUSINESS SCHOOL BATTEN HALL ROOM 150 BOSTON, MA |

**EMPLOYEES ARE FREE TO VOTE AT ANY TIME THE POLLS ARE OPEN.**

**Voters will be required to show their Harvard student identification card or another form of identification in order to be permitted to vote.**

**The Ballots will be comingled and counted on Friday, November 18, 2016 starting at 9:00 a.m. in the Auditorium located in the lobby of the Thomas P. O'Neill, Jr. Federal Building, 10 Causeway Street, Boston, Massachusetts.**

WARNING: This is the only official notice of this election and must not be defaced by anyone.  Any markings that you may see on any sample ballot or anywhere on this notice have been made by someone other than the National Labor Relations Board, and have not been put there by the National Labor Relations Board.  The National Labor Relations Board is an agency of the United States Government, and does not endorse any choice in the election.                                                  Page 3 of 5

Form NLRB-707
(4-2015)



# United States of America
# National Labor Relations Board

# NOTICE OF ELECTION





WARNING: This is the only official notice of this election and must not be defaced by anyone.  Any markings that you may see on any sample ballot or anywhere on this notice have been made by someone other than the National Labor Relations Board, and have not been put there by the National Labor Relations Board.  The National Labor Relations Board is an agency of the United States Government, and does not endorse any choice in the election.

Form NLRB-707
(4-2015)



**United States of America
National Labor Relations Board**

# NOTICE OF ELECTION



## RIGHTS OF EMPLOYEES - FEDERAL LAW GIVES YOU THE RIGHT TO:

- **Form, join, or assist a union**
- **Choose representatives to bargain with your employer on your behalf**
- **Act together with other employees for your benefit and protection**
- **Choose not to engage in any of these protected activities**
- **In a State where such agreements are permitted, the Union and Employer may enter into a lawful union-security agreement requiring employees to pay periodic dues and initiation fees. Nonmembers who inform the Union that they object to the use of their payments for nonrepresentational purposes may be required to pay only their share of the Union's costs of representational activities (such as collective bargaining, contract administration, and grievance adjustment).**

## It is the responsibility of the National Labor Relations Board to protect employees in the exercise of these rights.

The Board wants all eligible voters to be fully informed about their rights under Federal law and wants both Employers and Unions to know what is expected of them when it holds an election.

If agents of either Unions or Employers interfere with your right to a free, fair, and honest election the election can be set aside by the Board. When appropriate, the Board provides other remedies, such as reinstatement for employees fired for exercising their rights, including backpay from the party responsible for their discharge.

## The following are examples of conduct that interfere with the rights of employees and may result in setting aside of the election:

- **Threatening loss of jobs or benefits by an Employer or a Union**
- **Promising or granting promotions, pay raises, or other benefits, to influence an employee's vote by a party capable of carrying out such promises**
- **An Employer firing employees to discourage or encourage union activity or a Union causing them to be fired to encourage union activity**
- **Making campaign speeches to assembled groups of employees on company time, where attendance is mandatory, within the 24-hour period before the polls for the election first open or the mail ballots are dispatched in a mail ballot election**
- **Incitement by either an Employer or a Union of racial or religious prejudice by inflammatory appeals**
- **Threatening physical force or violence to employees by a Union or an Employer to influence their votes**

## The National Labor Relations Board protects your right to a free choice.

Improper conduct will not be permitted. All parties are expected to cooperate fully with this Agency in maintaining basic principles of a fair election as required by law.

Anyone with a question about the election may contact the NLRB Office at **(617)565-6700** or visit the NLRB website **www.nlrb.gov** for assistance.

WARNING: This is the only official notice of this election and must not be defaced by anyone. Any markings that you may see on any sample ballot or anywhere on this notice have been made by someone other than the National Labor Relations Board, and have not been put there by the National Labor Relations Board. The National Labor Relations Board is an agency of the United States Government, and does not endorse any choice in the election.

# EXHIBIT B

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 01**

**PRESIDENT AND FELLOWS OF**
**HARVARD COLLEGE,**

     **EMPLOYER**

 **and**             **Case  01-RC-186442**

**HARVARD GRADUATE STUDENTS**
**UNION – UAW (HGSU-UAW),**

     **PETITIONER**

## DECISION AND DIRECTION OF SECOND ELECTION

   Pursuant to a Stipulated Election Agreement between President and Fellows of Harvard College (Harvard or Employer), and Harvard Graduate Students Union – UAW (Union or Petitioner), an election was conducted on November 16 and 17, 2016[1] among a unit of Harvard student employees.  The tally of ballots showed that of the approximately 3,556 eligible voters, 1272 cast ballots for the Petitioner, 1456 cast ballots against representation, and there were 314 challenged ballots, a determinative number.

   The Petitioner and the Employer each timely filed an objection.  Following a hearing on the challenged ballots and the objections, the hearing officer issued a report in which he recommended that certain challenges be sustained and others overruled, that both objections be sustained and that, if a revised tally of ballots does not result in the Petitioner receiving a majority of valid votes case, the result of the election be set aside and a new election directed.  The hearing officer additionally explained his rationale for granting at hearing Petitioner's Petition to Revoke Subpoena and denying Employer's Offer of Proof.  The Employer filed exceptions and a brief regarding some of the challenges, the Petitioner's objection,[2] and the denial of its Subpoena and Offer of Proof; the Petitioner filed a brief in answer to the Employer's exceptions.

   I have carefully reviewed the hearing officer's rulings made at the hearing and find that they are free from prejudicial error.  Accordingly, they are hereby affirmed, as discussed below.  I have considered the Employer's exceptions to the hearing officer's rulings on Petitioner's objection and challenged ballots, the Employer's supporting brief

---

[1] All dates hereinafter are in 2016 unless otherwise indicated.

[2] Neither party filed an exception to the hearing officer's ruling regarding the Employer's objection.  Accordingly, the hearing officer's findings and conclusions thereto are hereby affirmed.

President and Fellow of Harvard College
Case 01-RC-186442

and the Petitioner's answering brief, and I affirm the hearing officer's findings, conclusions and recommendations only to the extent consistent with this decision.

Background

The Employer operates a large university with many schools, departments and programs.  About 7,000 students are enrolled in undergraduate degree programs and 15,000 in graduate degree programs.

On October 21, 2016, the parties entered into a Stipulated Election Agreement (Election Agreement) which includes in part 5, titled "UNIT AND ELIGIBLE VOTERS," the following unit description:

> All students enrolled in Harvard degree programs employed by the Employer who provide instructional services at Harvard University, including graduate and undergraduate Teaching Fellows (teaching assistants, teaching fellows, course assistants); and all students enrolled in Harvard degree programs (other than undergraduate students at Harvard College) employed by the Employer who serve as Research Assistants (regardless of funding sources, including those compensated through Training Grants). This unit includes students employed by Harvard University and enrolled in the Harvard Graduate School of Arts and Sciences, Harvard Business School, the Division of Continuing Education, Harvard Graduate School of Design; Harvard Graduate School of Education, the Harvard John A. Paulson School of Engineering and Applied Sciences, the John F. Kennedy School of Government at Harvard University, Harvard Law School, Harvard Divinity School, Harvard Medical School, the Harvard T.H. Chan School of Public Health, and Harvard College, excluding all undergraduate students serving as research assistants, and all other employees, guards and supervisors as defined in the Act.

Part 5 includes the following payroll cutoff date:

> Those eligible to vote in the election are employees in the above unit who were employed during the **payroll period ending Saturday, October 15, 2016,** including employees who did not work during that period because they were ill, on vacation, or were temporarily laid off.

Part 5 also includes the following provision, referred to herein as the "look back formula":

> The parties have agreed that doctoral students who have been been [repetition in original] employed in the bargaining unit for at least one semester during the past academic year and who are not currently in their

President and Fellow of Harvard College
Case 01-RC-186442


Dissertation Completion Year (or final year of their program) may vote subject to the Board's challenge procedures.


## I.     <u>THE CHALLENGES</u>

The 314 challenged ballots fall into several categories:  64 challenged ballots that the parties resolved during the hearing;[3] 125 ballots cast by individuals whose names appeared on a challenge list and regarding which the parties stipulated satisfied the Election Agreement's look back formula criteria; [4] thirteen ballots cast by individuals whose names appeared on the challenge list and who were first year graduate students during the Fall 2016 semester, which the parties reduced to nine;[5] four individuals whose names did not appear on the voter list or challenge list and who the Petitioner contends should be included in the look back voters; [6] 22 Teaching Assistants[7] and nine Technical Assistants[8] in the Graduate School of Design (GSD); six first year graduate

---

[3] The parties resolved 28 challenges for inclusion (Anastasia Aguiar, Munazza Alam, Christopher Anderson, Heather Artinian, Regan Bernhard, Sarah Blum-Smith, Sergine Brutus, Yin Kwan Chung, Martha Elmore, Yipei Guo, Christopher Healy, Bobby Herrera, Jordan Hoffman, Jeongho Kim, Malcolm Lavoie, Rebecca Mandt, Brian Marinelli, Samantha Molsberry, Kenta Mosallanejad, Casey Petroff, Madonna Ramp, Kristofer Rhude, Ben Sherwood, Niharika Singh, Margaret Torrence, Alix Winter, Yanwen Xie, and Xiaolin Zhuo).  The parties resolved 36 challenges for exclusion (Alexander Bell, Aaron Bembenek, Chelsea Boccagno, Jeremy Bowles, Eugenia Chan, Ruth Chang, Lucy Chen, Colin Conwell, Maria Devlin, Hannah Goldberg, Krista Goldstine-Cole, Max Goplerud, Florian Hase, Payton Jones, Emile Josephs, Niangiao Ju, Do Yoon Kim, Taehoon Kim, Won Lee, Andrew Lewis, Jacob Maat, Adam Mastroianni, Caitlin McMurtry, Elizabeth Miller, Brian Oco, Anthony Otay Hernandez, Harris Pirie, Leyla Tarhan, Jacqueline Trudeau, Christine Twicken, Ruben Van Genugten, Tatiana Webb, Georgia Whitaker, Yau Yam, and William Yuan); rulings to overrule the challenges of ballots cast by Amy Chandran, Dalia Deak, Barbara Dickerman, Danube Johnson, Anna Stansbury, Benjamin Green, Renugan Raidoo, Andreja Siliunas and Yevgeniy Zhuravel; rulings to sustain the challenges of ballots cast by Ryan Gelly, Jonathan Haefner and Hans Pech).

[4] Megan Bailey, Jonathan Baker, Eli Schachar Banks, Seth Berliner, Jean Biniek, Laura Blattner, Valentin Bolotnyy, James Bondarchuk, Vitaly Bord, Colin Bossen, Shawna Brown Leung, Joan Chaker, Emily Chan, Rohit Chandra, Juan Chauvin Rodriguez, Brian Chen, David Choi, Matthew Clair, John Coglianese, Gwendolyn Collaco, Karen Connor McGugan, Oren Danieli, Jamie Daw, Julian De Freitas, Charlene Deming, Ellora Derenoncourt, Alicia DeSantola, Kyle Dillon, Stefan Dimitriadis, Katherine Donato, Samuel Ewing, Jacob Fay, Dena Fehrenbacher, Jessica Fei, Kelley Fong, Lindsey Franklin, Zuzanna Fuchs, Andrew Garin, Madeleine Gelblum, Blyth George, Mary Gorski, Jesse Gubb, Emma Harrington, Andrew Hillis, Nathaniel Hipsman, Mark Hirschboeck, Robert Holland, Polina Ivanova, Yizhou Jin, Madeleine Joseph, Ha Ryong Jung, Yosub Jung, Ariella Kahn-Lang, Gurnasheen Kalkat, Jennifer Kao, Helen Kim, Barbara Kiviat, Samuel Klug, Dominika Kruszewska, Ohchan Kwon, Amanda Lamothe-Cadet, Frank LaNasa, Regina Larrea Maccise, Audrey Latura, Eben Lazarus, Wei Fu Li, Gordon Liao, Weiling Liu, Yueran Ma, Luca Maini, Camran Mani, Patricia Marechal, Justin Martin, Timothy Matthews, Bryan McAllister-Grande, Elizabeth Mishkin, Eduardo Montero, Emerson Morgan, Farida Mortada, Joshua Olszewski-Jubelirer, Kevin Pan, Abbey Parker Stockstill, Cassandra Peitzman, Elizabeth Phillips, Cynthia Pollard, Katherine Prater, Ana-Maria Raclariu, Natalie Ramirez, Alexis Redding, Brianna Rennix, Whitney Robles, Alexandra Rodman, Jared Rosenfeld, Nicholas Roth, Elizabeth Santorella, Phillip Saynisch, Peter Schmidt, Priya Shanmugam, Andy Shi, Jee Eun Shin, Clinton Smith, Lauren Stanley, Rachel Steely, Kimberly Stevens, Daniel Svirsky, Mike Teodorescu, Neil Thakral, Kai Thaler, Lee Ling Ting, Imani Tisdale, Margaret Troyer, Cori Tucker-Price, Julian Urrutia, Gia Velasquez, Kate Vredenburgh, Lydia Walker, Micah Walter, Stella Wang, Yong Wang, Anna White-Nockleby, Luke Willert, Joshua Yardley, Darrick Yee, Anna Yermakova, Maxwell Yurkofsky, Mengdie Zhao, and Christina Zlogar.

[5] The parties resolved for exclusion four challenges in this group, leaving the following nine unresolved: Amy Chandran, Dalia Deak, Barbara Dickerman, Danube Johnson, Anna Stansbury, Ryan Gelly, Jonathan Haefner, Hans Pech and Lisa Simon.

[6] Benjamin Green, Renugan Raidoo, Andreja Siliunas and Yevgeniy Zhuravel.

[7] Michael Chieffalo, Omar De La Riva, Siobhan Feehan, John Going, Benjamin Halpern, David Hamm, Christopher Haverkamp, Dana Kash, Claire Jing Kuang, Ana Mayoral Moratilla, Katherine Miller, Niki Murata, Matthew Okazaki, Daniel Quesada Lombo, Christopher Reznich, Stuart Ruedisueli, Anne Schneider, Keith Scott, Jonah Susskind, Matthew Wong, Lindsay Woodson, and Eric Zuckerman.

[8] Georgios Avramides, Benjamin Bromberg Gaber, Shani Cho, Diana Jih, Young Eun Ju, Milos Mladenovic, Cara Roberts, Scott Smith, and Humbi Song.

President and Fellow of Harvard College
Case 01-RC-186442

students in the Department of Organismic and Evolutionary biology (OEB); [9] seventy-five other graduate students,[10] including two employed by Harvard Art Museums,[11] whose names did not appear on the voter list or the challenge list.  Each group is discussed below.[12]

In this decision, I will address the disposition of ballot challenges first, then discuss the hearing officer's ruling on the Petition to Revoke Subpoena and Offer of Proof, and will finally treat Petitioner's objection.

A.     Resolved Challenges

The hearing officer recommended overruling the 28 challenges the parties agreed to include in the ballot count and sustaining the 36 challenges the parties agreed to exclude.  I affirm the hearing officer's recommended rulings.

B.     Look Back Challenges

1.     Look Back Formula Background

An overview of Harvard's academic structure is important to understand the characteristics of the disputed "look back" group of voters.  The Graduate School of Arts & Sciences (GSAS) is the only school at Harvard that awards Doctor of Philosophy (Ph.D.) degrees. GSAS partners with 16 other programs outside GSAS to confer doctoral degrees.  The disputed look back classification largely consists of students pursuing Ph.D. programs offered either solely by or in partnership with GSAS.

Doctoral students finance their studies through financial aid and stipends from various sources.  To satisfy degree requirements and in exchange for their stipends, GSAS students take classes, teach, and engage in laboratory and/or research work. Typically, students in the Sciences Division at GSAS primarily engage in laboratory or research work, while students in the GSAS Division of Humanities and the Division of Social Sciences teach courses.  Harvard guarantees four semesters of teaching to most doctoral students studying in the Arts & Humanities and Social Sciences Divisions of

---

[9] Jennifer Austiff, Isabel Baker, Abigail Burrus, Anju Manandhar, Rebecca Wolf, and Tianzhu Xiong.

[10] Hena Ahmed, Adriana Altamirano, Sara Arfaian, Eun Se Baik, Pooja Bakhai, Adria Boynton, Jeremy Burke, Nicholas Campos, Gabriella Chavez, Aubrey Clark, Lars Clark, Hannah Cohen, Hannah Cory, Byron Davies, Christina Desert, Ruodi Duan, Maria Duarte, Alexander Duffy, Aileen Fitzke, Jeremy Fix, Emma Foley, Emma Goldhammer, Matthew Griffith, Sinn Won Han, John Harpham, Ernest Hartwell, Ghazal Jafari, Jessica Jean-Francois, Rutdow Jiraprapasuke, Kutay Karatepe, Smriti Khanal, Yusung Kim, Dustin Klinger, Yurina Kodama, Amy Koenig, Caroline Laurent, Soo Mi Lee, Yijing Lu, Marek Majer, Marisa Mandabach, Camran Mani, Jonathan Mason, Jared McCormick, Alexandra McDowell, Gregoire Menu, Amanda Miller, Jason Nemirow, Felipe Oropeza, Samuel Parker, Pooja Paul, Casey Peterson, Julian Pokay, Tony Qian, Brendan Roach, Whitney Robles, Yoshini Rupasinghe, Mira Schwerda, Armaan Siddiqui, Rephael Stern, Galen Stolee, Weifeng Sun, Aleksy Tarasenko-Struc, Susan Taylor, Jessica Tollette, Catherine Tsai, Alexis Turner, Gabriel Unger, Rachel Van Horn, Daniel Volmar, Xingyi Wang, Dorothy Wei, Matt Whittaker, Han Zhang, Yingshuo Zhang, and Yueron Zhang.

[11] Camran Mani and Whitney Robles.

[12] The hearing officer's enumeration of challenged voters actually tallies 318, which differs from the tally of 314.  I do not find this variance to be of consequence.

- 4 -

President and Fellow of Harvard College
Case 01-RC-186442

GSAS.  All doctoral students may apply for Dissertation Completion Fellowships for their final year.  Harvard does not permit students who receive these fellowships to hold employment, including instructional positions, during the term of their fellowship.  These students are expressly excluded under the Election Agreement's look back formula.

As anticipated pursuant to the Election Agreement, the Employer challenged all the ballots cast by students who met the criteria of the look back formula.  The Employer argued that there was no pattern or cycle that would predict whether students who were not serving in a bargaining unit position as of the fall of 2016 but had done so during the prior academic year were likely to return to a bargaining unit position at a later point during their enrollment.  The Employer alternatively challenged ballots cast by students who had completed their guaranteed teaching semesters, claiming that students who have completed the four semesters of teaching and did not work during the fall of 2016 have likely reached the end of their graduate student teaching, given the exclusion for students in their final year.

The hearing officer, however, found both that an eligibility formula was required for the proposed unit and that a modified version of the Election Agreement's look back formula should apply to the bargaining unit.  The hearing officer's formula, referred to herein as the "modified look back formula," provides:

Eligible to vote are:

(1) all unit employees who held a bargaining unit position during the payroll period ending October 15, 2016, including employees who did not work during that period because they were ill, on vacation, or were temporarily laid off; or
(2) doctoral students who were employed in the bargaining unit during the 2015-2016 academic year, and who were not, during the Fall 2016 semester, in their Dissertation Completion year (or final year of their program); or
(3) doctoral students who were employed as Teaching Fellows during the Fall 2016 semester, but whose employment in that regard concluded before November 16, 2016, and who were not, during the Fall 2016 semester, in their Dissertation Completion year (or final year of their program).

The modified look back formula changed the look back length of service in paragraph (2) from "at least one semester" to "employed in the bargaining unit during the 2015-2016 academic year" and added paragraph (3).  For the reasons discussed below, I affirm the hearing officer's finding that an eligibility formula that looks back to employment in the prior academic year is appropriate; however, I disagree with the hearing officer's substitution of the modified look back formula for the formulation articulated by the parties in their election agreement.

President and Fellow of Harvard College
Case 01-RC-186442

### 2.   Applicability of a look back eligibility formula.

Based on his review of the record, the hearing officer found many situations in which a semester or academic year without employment in instruction or research is both preceded and followed by such employment.  Examples include students who study abroad during their graduate studies and students who continue to teach after having exhausted their guaranteed teaching options.  The hearing officer also found that not all students with teaching appointments have full-semester assignments.  In particular Teaching Fellows occasionally work less than a full semester, and certain courses in the Graduate School of Design are split into two "modules" or sections, while other assignments end before the semester is over.  The Employer does not except to these findings.

I agree with the hearing officer that *Columbia University,* 364 NLRB No. 90 (2016), provides the basis for a look back eligibility formula for Harvard.  In *Columbia University*, which held that "student assistants who have a common-law employment relationship with their university are statutory employees under the Act," Id., slip op. at 2., the Board recognized the need for an eligibility formula because students with "intermittent semester appointments, may not be eligible to vote under the Board's traditional eligibility date approach."  Id., slip op. at 21.  The Board remanded the case to the Regional Director to "establish an appropriate voting eligibility formula."  By Supplemental Decision and Direction of Election,[13] the Regional Director of Region 2 ordered an election according to the following eligibility formula:

> All unit employees who:
> (1) hold an appointment or a training grant in a unit position in the fall semester 2016, or
> (2) are course assistants, readers or graders who are on the casual payroll and who worked 15 hours per week or more in the fall semester 2016, or
> (3) have held a unit position for either the fall, spring and summer terms during the prior academic year.

Eligibility formulas include employees who are not on the payroll at the election date but have a "past history of employment that would tend to signify a reasonable prospect of future employment."  Id., slip op. 22 (2016) (footnote omitted).  The Board has a long-established practice of devising eligibility formulas in varying fields, including education, to account for the vagaries of unique employment situations[14] so as to

---

[13] 02-RC-143012 (October 31, 2016).

[14] *See Daniel Construction Co.*, 133 NLRB 264 (1961), as modified in 167 NLRB 1078 (1967), and *Steiny & Co.*, 308 NLRB 1323 (1992) (together, the construction industry); *American Zoetrope Productions,Inc.,* 207 NLRB 621, 623 (1973) (entertainment productions); *DIC Entertainment, L.P.*, 328 NLRB 660 (1999), enfd. 238 F.3d 434 (D.C. Cir. 2001) (entertainment productions); *The Julliard School*, 208 NLRB 153, 155 (1974) (musical engagements); *Avis Rent-A-Car System, Inc., Rent-A-Car Division*, 173 NLRB 1368, 1369 (1968) (auto shuttlers); *Saltwater, Inc.*, 324 NLRB 343 (1997) (groundfish and shellfish observers); *C. W. Post Center*, 198 NLRB 453, 454-455 (1972) (adjunct professors); *Berlitz School of Languages of America*, 231 NLRB 766, 767 (1977) (on-call teachers); *University of San Francisco*, 265 NLRB 1221, 1224 (1982) (clinical teaching assistants).

President and Fellow of Harvard College
Case 01-RC-186442

"permit optimum employee enfranchisement and free choice, without enfranchising individuals with no real continuing interest in the terms and conditions of employment offered by the employer." *Trump Taj Mahal Casino*, 306 NLRB 294, 296 (1992), enfd. 2 F.3d 36 (3d. Cir. 1993).

The hearing officer cited the uncontroverted evidence of students who exercise Harvard's offer of four semesters of teaching in a pattern other than the preferred third and fourth year sequence, students who return to teaching after completing their four teaching semesters to support his conclusion that an eligibility formula is appropriate for Harvard. He rejected the Employer's argument that students who have completed their four semesters of teaching should be carved out, citing further evidence of Harvard's demand for doctoral students to fill teaching positions. The hearing officer assented to the look back formula's exclusion of students in their final or Dissertation Completion year, observing that such students are in their last year and therefore unlikely to have a reasonable likelihood of future employment in the bargaining unit.

The Employer excepts to the hearing officer's finding that any type of look back eligibility formula is appropriate for Harvard graduate students. The Employer argues that graduate student employment is unlike that of construction workers or adjunct faculty in that it "is not recurrent, cyclical, or periodic" and the likelihood of future employment steadily decreases with each semester.

The Employer's argument does not take into account the record evidence that students leave bargaining unit work and then return during later semesters, thereby creating a continuing interest in the bargaining unit work. Accordingly, I affirm the hearing officer's finding that an eligibility formula that looks back to prior employment is appropriate.

### 3.      The Modified Look Back Formula.

The hearing officer's report states that the parties disagreed as to the meaning of "at least one semester" in the Election Agreement's look back formula, with the Employer contending it means a full semester and the Petitioner's assertion that it requires only that some work be performed during a semester. Based on this disagreement and record evidence that bargaining unit work includes appointments that last less than a full semester due to shorter course or module length, the hearing officer found that a formula allowing any length of employment in the prior academic year was the appropriate formula. Using the same reasoning, the hearing officer added paragraph 3, to include students who were employed for part of the Fall 2016 semester.

The Employer excepts to the hearing officer's modified look back formula on the grounds that the parties agreed to the definition of potential look back voters who would be subject to challenge, and that agreed-upon definition must be enforced. I sustain the Employer's exception.

President and Fellow of Harvard College
Case 01-RC-186442

No party points to any record evidence of a different interpretation of the phrase "at least one semester." The Petitioner in its opening statement repeats the phrase without comment (Tr. 17), and later continues to state, "[s]o if someone has worked for a semester in the past year, then they should be counted as eligible." (Tr. 20) Certainly on its face, in the context of an institution that operates largely on a semester basis, and lacking any clarifying words, the plain meaning of the phrase is that one semester means a complete semester. The only indication of a different interpretation appears in Petitioner's post-hearing brief, where it argues that a challenged student who worked less than a full semester in the prior academic year should be eligible.

Well established Board principles call for enforcing stipulated election agreement provisions that are not inconsistent with any statutory provision or established Board policy and where the intent is unambiguous. *Caesar's Tahoe*, 337 NLRB 1096, 1097 (2002). If the stipulation is ambiguous, the Board determines the parties' intent through the application of normal contract interpretation methods, including examination of extrinsic evidence. *Id.* Here, the Employer's intent is undisputed and the Petitioner's intent is clarified in its opening statement noted above. The intent of both parties is that the look back formula requires employment for a full semester. The post-election realization that some students were disenfranchised by the formula does not constitute ambiguity. The parties could easily have articulated eligibility for any student who had worked any portion of a semester in the previous year, but they agreed to "at least one semester." Accordingly, I find the look back formula requires a full semester of employment to establish eligibility.

### 4.    Challenged Ballots Cast Pursuant to Look Back Formula

The Employer challenged 125 individuals[15] pursuant to the look back formula. During the hearing, the parties stipulated that these individuals met the election agreement's look back formula criteria. Having ruled that the modified look back eligibility formula applies to the unit, and given that the modified formula is broader than the agreement's formula, the hearing officer overruled the 125 challenges. The Employer excepted to the hearing officer's modified look back formula and in doing so, excepted to the overruled 125 challenges. For the reasons discussed above, affirming the applicability of the Election Agreement's look back formula, I now affirm the hearing officer's ruling to count the 125 look back challenged ballots based on the formula adopted by the parties in the Stipulated Election Agreement.

---

[15] The individuals are named in footnote 4.

President and Fellow of Harvard College
Case 01-RC-186442

> 5.    <u>Nine individuals whose names appeared on the challenge list and who were first year doctoral program students during the Fall 2016 semester</u>

a.    At the election, nine first year doctoral program students, whose names appeared on the challenge list as look back voters, voted under challenge.  During the 2015-2016 academic year, five of the individuals had been students in master's degree programs and also employed as Research Assistants, Teaching Fellows or Teaching Assistants.[16]  The Employer claimed that only students enrolled in doctoral programs during the previous academic year should be included in the look back group, while the Petitioner claimed that the look back group includes students who were doctoral students at the time of the election and performed bargaining unit work during the previous academic year.  The hearing officer adopted the Petitioner's reasoning, found that the formula did not require the exclusion of these voters and recommended that the challenges be overruled.  The Employer filed no exceptions.  Although I have rejected the hearing officer's modified look back formula, the modifications have no bearing on the question presented by these challenges.  Accordingly, I affirm the hearing officer's recommendation to overrule the challenges of the five students.

b.    Three students[17] voted who were not enrolled in a degree program during the 2015-2016 academic year, became enrolled starting in Fall 2016, yet held teaching or research positions before they were enrolled.  The parties disagreed over whether the students must have commenced their programs when they worked during the prior academic year to be eligible under the look back formula.  The hearing officer ruled that the students were not eligible because they did not satisfy the unit description requirements that they be both enrolled and performing research or instructional work.  Neither party filed exceptions.  I note that this recommendation did not rely on the modified look back formula and I affirm the hearing officer's recommendation to overrule the challenges of these three students.

c.    Another student[18] had been enrolled in a graduate program through the 2014-2015 academic year, was not enrolled, but was employed as an instructor during the 2015-2016 academic year.  The parties agreed the student was not eligible.  The hearing officer concluded that because the student was not enrolled in a degree program during the look back period, she did not meet the eligibility formula.  I agree and sustain the challenge.

---

[16] These five students are Amy Chandran, Dalia Deak, Barbara Dickerman, Danube Johnson and Anna Stansbury.

[17] Ryan Gelly, Jonathan Haefner, Hans Pech.

[18] Lisa Simon.

President and Fellow of Harvard College
Case 01-RC-186442

      6.    <u>Four individuals who did not appear on either list, disputed as look back eligible.</u>

    a.    Another student[19] who voted under challenge had performed bargaining work during the prior academic year and was on a leave of absence for the 2016-2017 academic year.  The parties disagreed over whether the leave of absence rendered the student unenrolled and ineligible.  Relying on Board law that employees on leaves of absence are permitted to vote in Board elections absent evidence they do not intend to return,[20] the hearing officer recommended overruling this challenge.  Neither party filed exceptions.  Again, here the hearing officer did not rely on the modified look back formula.  Accordingly, I affirm the hearing officer's recommendation to overrule this challenge.

    b.    One student[21] who voted under challenge performed research during the spring 2016 semester but was not listed on Harvard's payroll until April 2016.  The hearing officer concluded that the evidence showed the student had performed work during the entire semester, and based on Board law that lack of proper paperwork does not exclude voters who work during the requisite timeframe,[22] recommended overruling the challenge.  Neither party filed exceptions.  Again, here the hearing officer did not rely on the modified look back formula.  Accordingly, I affirm the hearing officer's recommendation to overrule this challenge.

    c.    Two students[23] who voted under challenge were employed during the spring 2016 semester but did not work the complete semester.  The hearing officer recommended overruling these challenges based on the modified look back formula.  Because I have determined that the modified look back formula is not applicable, I do not accept the recommendation to overrule the challenges on this basis.  However, the hearing officer found independent grounds for counting Siliunas's ballot.  Record evidence showed Siliunas worked a total of 61 hours during the semester, compared with 75 hours worked by Renugan Raidoo, deemed eligible above, who had worked a complete semester.  Neither party filed exceptions.  I affirm the recommendation to overrule the Siliunas ballot challenge.

---

[19] Benjamin Green.

[20] *Air Liquide America Corp.,* 324 NLRB 661, 663 (1997).

[21] Renugan Raidoo.

[22] *Concrete Form Walls, Inc.*, 346 NLRB 831, 833-834 (2006); *Dyncorp/Dynair Services, Inc.*, 320 NLRB 120 (1995) ("'working' is "the actual performance of bargaining unit work.").

[23] Andreja Siliunas and Yevgeniy Zhuravel.

President and Fellow of Harvard College
Case 01-RC-186442

    7.      <u>Graduate School of Design (GSD)</u>

The Employer challenged ballots cast by twenty-two GSD students holding the position title Teaching Assistant (TA)[24] and nine holding the position title Technical Assistant.[25]  The hearing officer recommended overruling the TA challenges and sustaining the Technical Assistant challenges.  The Employer excepted to the TA recommendation only.  I affirm the hearing officer on both counts.  Below I review only the contested recommendation, concerning the TAs.

The hearing officer report reviews testimony from GSD's Administrative Dean for Academic Services Jacqueline Piracini that the TAs provide logistical support for faculty with these duties:  maintenance of the course-specific website for the class, copying of handouts, preparation of course materials, and generally serving as a conduit between the course's instructor and students taking the class in question.  GSD on-line and print TA guides state TAs "may not assign grades or serve as substitute instructors."  Piracini testified that faculty provide day-to-day supervision of TAs, she does not observe TAs and that her awareness of TA activities is limited to complaints from students that TAs were attempting to teach them.  GSD Executive Director Patricia Roberts testified that 29 of the 116 TAs were enrolled in the classes in which they served as TAs and that she believed TAs provided technical instruction and not "pedagogical" instruction.  In an e-mail that Roberts sent to GSD students shortly before the election, she stated that at GSD TAs do not provide instructional services, they provide administrative services.

The hearing officer report reviews testimony from three GSD TAs, Jonah Susskind, Christopher Reznich, and Stuart Gavin Ruedisueli.  Susskind testified that he served as the sole TA for a professor in a course titled, "Ecologies, Techniques, and Technologies."  He helped develop the curriculum and added workshops to the course; during one of the course's first sessions, the professor introduced Susskind as being available to answer questions throughout the course, Susskind held regular weekly office hours and he assisted students individually during the course workshops.  Susskind was also a TA, along with lead TA Reznich, who were among five TAs for a studio course taught by multiple professors.  The studio course met for five and one-half hours twice a week.  Lead TA Reznich attended pre-term workshops held by a professor in which he remained during the afternoons to answer student questions.  Susskind and Reznich both taught tutorials during the semester in which they taught software applications needed for the studio courses.  Ruedisueli served as a TA for two courses.  In one, the professor wanted at least one TA to attend each lecture and identified the TAs as resources for students with questions.  Ruedisueli testified that

---

[24] Michael Chieffalo, Omar De La Riva, Siobhan Feehan, John Going, Benjamin Halpern, David Hamm, Christopher Haverkamp, Dana Kash, Claire Jing Kuang, Ana Mayoral Moratilla, Katherine Miller, Niki Murata, Matthew Okazaki, Daniel Quesada Lombo, Christopher Reznich, Stuart Ruedisueli, Anne Schneider, Keith Scott, Jonah Susskind, Matthew Wong, Lindsay Woodson, and Eric Zuckerman.

[25] Georgios Avramides, Benjamin Bromberg Gaber, Shani Cho, Diana Jih, Young Eun Ju, Milos Mladenovic, Cara Roberts, Scott Smith, and Humbi Song.

President and Fellow of Harvard College
Case 01-RC-186442

TAs were responsible for grading assignments and quizzes and for assisting the professor in grading exams.

The hearing officer also relied on testimony from two other students from other schools, whom the parties stipulated were eligible voters. Susanne Schlossberg, a second-year student at the law school, served as a "Teaching Assistant" for one course. She did not attend the classes or assign grades. She completed draft assignments and gave the professor feedback on their suitability, drafted model answers, commented on student assignments, held office hours and held one-on-one sessions with students. Thomas Trail, a second-year student in the Kennedy School of Government, served as a "Course Assistant" for two courses. He handled course logistics, including organizing a field trip and assisting students with presentation set-up, led review sessions with the professor, held office hours to answer questions and uploaded material onto the course's website. He did not present material to the class, grade submissions or comment on papers.

The parties disagreed that the TAs provided instructional services.

The hearing officer applied the Board's disputed classification test,[26] and found that the Election Agreement was ambiguous regarding the requirement that a teaching assistant provide "instructional services." To determine the parties' intent as to "instructional services," the hearing officer referenced the *Columbia University* unit description, noting it was undisputed that the parties sought to create a similar unit. The hearing officer found the description of "course assistants" in the *Columbia University* unit to be similar to the duties the student TA witnesses described, and on that basis recommended their inclusion in the count.

The hearing officer also cited testimony of specific instructional services the TAs provide. He rejected the Employer's distinction between "technical" and "pedagogical" as lacking an evidentiary basis. He noted the conflict between TA testimony that they assisted with grading and the GSD publications stating TA do not grade, crediting the TA testimony as to practice over the evidence as to policy.[27] Finally, the hearing officer found that the TA tasks were at least equivalent to those of the law school and government school assistants, whom the parties had previously stipulated for inclusion in the unit, and who testified at the hearing.

The Employer excepts to the hearing officer's conclusion that TAs provide instructional services and are therefore eligible voters. The Employer does not except to the hearing officer's findings of fact regarding TA duties; rather, it claims that the hearing officer erred by crediting "anecdotal testimony" from TAs over unrebutted documentary evidence and senior administrative witnesses. The Employer faults the

---

[26] *See Bell Convalescent Hospital*, 337 NLRB 191 (2001); *Caesar's Tahoe*, 337 NLRB 1096, 1097 (2002).

[27] *See Luck Cab Company*, 360 NLRB 271, 272 (2014) (rejecting evidence of handbook provisions in light of contrary evidence of actual practice); *Avante at Wilson, Inc.*, 348 NLRB 1056, 1057-1058.

President and Fellow of Harvard College
Case 01-RC-186442

hearing officer's report for not considering the unrebutted evidence that about 25% of the TAs were enrolled in the very courses in which they served as TAs. The Employer further claims that TAs are not analogous to *Columbia University* course assistants who have some grading responsibilities and because on remand, the Regional Director limited course assistants to those who worked at least 15 hours per week. Finally, the Employer rejects the finding that TAs are equivalent to the law school and government school assistants.

The Employer's exceptions do not support rejection of the hearing officer's recommendation. The hearing officer correctly placed more weight on the first-hand experiences of actual TAs than on documents describing policy and witnesses lacking direct knowledge of the TAs actual duties. I note that the Employer did not call any witnesses who were the TAs' direct supervisors or any GSD course students. As to the *Columbia University* course assistants' minimum hour requirement, while that may be a *Columbia University* eligibility requirement,[28] there is no such hours requirement anywhere in the parties' Election Agreement. Similarly, there is no disqualification in the Election Agreement of teaching assistants who simultaneously are enrolled in the course. Finally, comparison to the duties of other eligible voters is a legitimate method for determining the eligibility of disputed voters. For these reasons, I affirm the hearing officer's findings regarding GSD TAs and overrule these challenges.

### 8.    Department of Organismic and Evolutionary Biology (OEB)

The Employer challenged ballots cast by six first-year OEB graduate students who voted but were not on the eligible voter or challenged voter list. The hearing officer recommended overruling the challenges and the Employer filed exceptions. I affirm the hearing officer's reasoning and adopt his findings and recommendation.

The hearing officer reviewed undisputed evidence of the unique nature of OEB. It is an interdisciplinary Department that conducts project–based research. Unlike other science departments at Harvard, OEB has no laboratory rotation.[29] Instead, students are matched with a professor or laboratory when admitted rather than later in their studies. OEB funds students for their first six years and does not permit first-year students to teach.

The hearing officer's report reviewed testimony regarding OEB first-year students' activities. OEB Executive Director Rebecca Chetham testified that first-year OEB students take varying number of prescribed courses, most between three and five courses, depending on the student's academic background, attend social functions and

---

[28] The hours requirement appears in the Regional Director's eligibility formula, presented in the Supplemental Decision and Direction of Election, dated October 31, 2016. The parties' Election Agreement, dated October 21, 2016, clearly predates this eligibility requirement.

[29] In other departments, students begin with laboratory rotations and are later assigned to a particular laboratory. It is undisputed that while a student is in laboratory rotations, the student is not eligible for the bargaining unit.

President and Fellow of Harvard College
Case 01-RC-186442

generally get to know the department.  She testified to limited direct knowledge of first year student activities, describing her knowledge of the particular work they perform as "informal" and that her knowledge was limited generally to departmental compliance and travel issues.

Two OEB students, Jennifer Austiff and Zachary Morris, described their own first-year experiences and those of classmates.  Austiff is a first year student who came to the program to work with a particular advisor.  In Fall 2016, she was one of three students in that advisor's lab.  During her first semester, in addition to taking four courses, she assisted a fourth-year graduate student with an experiment and she expected to continue to assist that graduate student.  All 12 students in her first-year cohort were working in advisor's labs in collaboration with other laboratory members.  Morris was a fourth year student who started in the spring semester, having already completed a master's degree.  He took only two prescribed courses his first semester.  He began working another graduate student's project in his advisor's lab toward the end of his first semester and that project was ultimately published with Morris listed as a co-author.  It was common for first-year students to assist in current projects while developing their own dissertation topic and some faculty had first-year students perform short-term projects to familiarize the students with the particular laboratory.

The Employer challenged these first-year voters on the grounds that they were generally not performing laboratory work; rather, they focused on coursework and social acclimatization.  The Petitioner contended that these students perform research work in the dissertation advisor's laboratory and should be included in the bargaining unit.

The hearing officer determined that the Election Agreement was ambiguous as to whether to include first-year OEB students, noting the absence of language regarding first-year graduate students.  Therefore, he concluded the issue was whether these OEB students worked as research assistants in accordance with the parties' intent.  The extrinsic evidence included evidence that upper-class OEB students whose titles were listed as having "no formal business title; performing research"[30] were included in the eligible voter list.  The hearing officer concluded that holding the title of "Research Assistant" per se was not a requirement of the Election Agreement.

The hearing officer did not question the credibility of Executive Director Chetham's testimony; however, he gave it little weight due to her admitted lack of direct knowledge of individual first-year student activities.  Instead, he gave more weight to the OEB students' testimony, noting that they testified with particularity, in contrast to Chetham's more generalized testimony, and that the Employer offered no rebuttal testimony to the student testimony.  He found that the student testimony established that first-year students are commonly engaged in research work that would otherwise qualify them for inclusion in the bargaining unit, noting there was insufficient

---

[30] 46 OEB students listed as "no formal business title; performing research" are included in the eligible voter list.

President and Fellow of Harvard College
Case 01-RC-186442

particularized evidence that any of the six first-year students were not engaged in research work during the Fall 2016 semester.

The Employer excepts to the hearing officer's reliance on student testimony, which it faults as "anecdotal" and unrepresentative of first-year students overall, at the expense of the executive director's testimony.  The Employer points to the lack of any departmental requirement that research be performed in exchange for the stipend, the testimony of the number of prescriptive courses most first-year students take and that students were merely familiarizing themselves with laboratories in their first year.  The Petitioner answers that the Employer sets a higher standard for OEB first-year students than other graduate students engaged in research, noting that both parties had testified that the test for unit inclusion as a science research assistant was that the graduate student had been assigned to and was conducting research in the advisor's lab.  Moreover, more senior OEB students were included regardless of their funding source.

The Employer carries the burden of proof to establish that these students are not eligible.  *Golden Fan Inn*, 281 NRLB 226, 230 fn. 24 (1986) ("A party seeking to exclude an individual from voting has the burden of establishing that the individual is, in fact, ineligible to vote.").  As the hearing officer correctly concluded, the Employer's reliance on general testimony from a witness who admittedly lacked first-hand knowledge of individual first-year student activities is accorded less weight in the face of specific testimony from actual students, including a current first-year student.[31]  None of the student testimony was rebutted.  I find that the Employer failed to meet its burden and adopt the hearing officer's recommendation to overrule the challenges to the first-year OEB students.

### 9.   Harvard Art Museum Interns

Of the remaining 75 challenges, according to the hearing officer's report, the Petitioner did not dispute the Employer's position that 73 voters were not eligible, and the Petitioner contended that two voters, Whitney Robles and Camran Mani (referred to herein as the Museum Interns), were eligible.  The hearing officer recommended overruling the challenges to the Museum Interns.  In addition, the hearing officer found that the evidence supported his conclusion that three others of the 73 voters, Hannah Cohen, Maria Duarte and Emma Goldhammer were eligible, notwithstanding that neither party advocated for their inclusion.  Of these three voters, the hearing officer found one, Cohen, to be eligible based on paragraph 3 of the modified eligibility formula.[32]  Having determined not to accept the modified look back formula, I sustain the challenge to Cohen.  I now turn to the Museum Interns.

---

[31] I note that the executive director's testimony that the first-year students focus on course work, taking three to five courses is undercut by Austiff's testimony that she took four courses her first semester and worked in her advisor's lab.  There was no evidence that course work prevented students from engaging in laboratory research.

[32] Paragraph 3 makes eligible Teaching Fellows whose Fall, 2016 employment ended earlier in the semester, before the election date.

President and Fellow of Harvard College
Case 01-RC-186442

> a.  Graduate Student Intern

Camran Mani is a fifth-year graduate student in the History of Art and Architecture program who was employed as a graduate student intern at the Harvard Art Museums Materials Lab.  The hearing officer found that the Election Agreement was ambiguous in that it does not include "graduate student intern" as included in or excluded from the bargaining unit.  The hearing officer found that the extrinsic evidence establishes that the parties intended to include all enrolled graduate students receiving compensation for instructional or research work at Harvard, thereby presenting the issue of whether Mani was engaged in instructional work.

The hearing officer relied on the following evidence to find that Mani's activities constituted instructional work as intended by the parties.  Mani worked 2/5 time, equivalent to a Teaching Fellow,[33] his pay stub listed him as a "Teaching Fellow," he was supervised by Professor Brewer and assisted Brewer in an undergraduate course Brewer taught in the Materials Lab, an educational arm of the Harvard Arts Museum.  Mani attended all class sessions, set up materials for the class, went through exercises with students, answered student questions, helped develop the syllabus, revised homework assignments, uploaded course documents.  He did not grade student work.  Aside from Brewer's course, he set up tools for a class open to the public that met about seven times and researched the history of techniques being taught in that class.

The Employer excepts to the hearing officer's finding, arguing that Mani's instructional duties were "incidental," unlike those of Teaching Fellows and other positions in the bargaining unit, and did not qualify as "instructional services" as intended by the parties.  The Employer further notes the lack of evidence that any Teaching Fellows assisted with classes open to the public and that Mani acknowledged he was an intern, not a Teaching Fellow.  The Petitioner answers that the Employer does not dispute the factual findings and points to no evidence of any hourly or percentage threshold for instructional services.

I affirm the hearing officer's findings and conclusions.  Mani's duties related to Brewer's course are clearly instructional, particularly when compared to others stipulated or ruled to be eligible.  That Mani's duties as intern also concerned a course open to the public is immaterial, given the Election Agreement's requirement, "instructional services at Harvard University," without distinction between courses open to the public or to Harvard students.[34]  Accordingly, the challenge to Mani is overruled.

---

[33] Teaching Fellow is one of the titles expressly named in the Election Agreement as included in the bargaining unit.

[34] I also note that the evidence suggests the bulk of Mani's time was devoted to Professor Brewer's course.  Nevertheless, as the Petitioner points out, the Election Agreement does not establish a minimum hours requirement for instructional services, even assuming only those services provided to Harvard students qualify.

- 16 -

President and Fellow of Harvard College
Case 01-RC-186442

b.        Curatorial Intern

The Employer challenged the ballot cast by Whitney Robles, a third-year student in American Studies who worked at the Harvard Art Museum as a "curatorial intern."  As with Mani, the hearing officer found the Election Agreement to be ambiguous, having no reference to "curatorial intern."  In the Robles case, however, the question was whether Robles was engaged in research work within the meaning of the Election Agreement. Based on the evidence of Robles' duties, the hearing officer concluded she was eligible. The Employer excepted.  I affirm the hearing officer's conclusion.

Robles testified that her position was for a 2/5 time commitment and she was supervised by the Museum curator.  She spent the bulk of her time as curatorial intern researching and drafting research memos on the histories of objects to be displayed in a certain forthcoming exhibition.  Harvard retains such research memos on file for use by future researchers.

The hearing officer noted that the term "research assistant" had been used "generously" by the parties throughout the election process and the only limitation in the Election Agreement to researchers is that they may not be undergraduate students. Moreover, Robles' research, retained by Harvard and available for future research, contributed to the "institutional knowledge of the Employer."  Based on these considerations, the hearing officer found that Robles' position as curatorial intern qualified her to vote in the election.

The Employer excepts, arguing that the hearing officer created an overly broad standard for Research Assistant that would encompass all graduate students and noting that Robles' research memos were unpublished.  The Petitioner observes that the Employer does not except to the finding that Robles performed research work, just that the research did not qualify because it was not published.  In addition, fears of an all-encompassing standard are addressed by the Election Agreement's compensation requirement.

I find that the hearing officer's conclusion is based on the evidence and that Robles meets the elements of unit eligibility:  a graduate student conducting research for compensation.  The Employer's proposed publication requirement appears nowhere in the Election Agreement and is cited during the hearing as evidence of research, not a required element of qualifying research.  I overrule the challenge and include Robles' ballot in the count.

## II.    RULINGS AT HEARING:  PETITION TO REVOKE SUBPOENA, OFFER OF PROOF

The Petitioner's Objections alleged that the Employer failed to substantially comply with the Board's voter list requirements due to, in part, the omission of a potentially determinative number of individuals.  In connection with the Petitioner's

President and Fellow of Harvard College
Case 01-RC-186442

objection, the Employer served upon the Petitioner a subpoena seeking documents related to whether the Union was prejudiced by list deficiencies and to whether the Union raised concerns about the voter list before the election.  Petitioner filed a petition to revoke the Employer's subpoena, alleging that prejudice to the Union was irrelevant.  I referred the petition to revoke to the hearing officer for ruling.  After receiving briefs from both parties, the hearing officer granted the petition to revoke subpoena during the hearing, stating his reasoning on the record and providing further analysis in his report.  For the same reasons, the hearing officer rejected the Employer's offer of proof at the hearing.  The Employer excepts to the grant of the petition to revoke subpoena and the denial of its offer of proof as unsupported by Board law.  For the reasons set forth below, I affirm the hearing officer's rulings.

The hearing officer rejected the Employer's argument that prejudice was relevant to the Petitioner's objection.  While prejudice to the union in *Excelsior*[35] cases is relevant to failings such as one-day delay in receipt of list,[36] four-day late submission,[37] and refusal to provide temporary physical addresses,[38] the "Board has consistently viewed the omission of names as more serious than inaccuracies in addresses" because "[t]he omission of names from an *Excelsior* list is far more likely to frustrate the Board's purposes…."  *Women in Crisis Counseling,* 313 NLRB 589 (1993).  As to the question of prejudice to the union where names are omitted from the eligibility list, the Board reaffirmed in *Thrifty Auto Parts,* 295 NLRB 1118, 1118 (1989), that "issues of a union's actual access to employees, or the extent to which employees from the *Excelsior* list are aware of the election issues and arguments, **are not litigable** matters in applying the *Excelsior* rule when there are omissions from the eligibility list." (emphasis added)  With such a failure to supply a substantially complete eligibility list, the Board "**presumes that** [the deficiency] **has a prejudicial effect on the election**, *without inquiry* into the question of whether the union may have obtained … addresses of eligible employees or whether omitted employees might have garnered sufficient information about the issues to make an intelligent choice."  Id*., 295 NLRB at 1118 (1989) (emphasis added).  This principle is reiterated in citations to *Thrifty Auto Parts* by Board decisions *Mod Interiors, Inc.,* 324 NLRB 164, 164 (1997) and *Automatic Fire Sys.*, 357 NRLB 2340 (2012).

The Employer excepts to the hearing officer's ruling to grant the petition to revoke subpoena on the grounds that the hearing officer incorrectly applied a standard of admissibility rather than relevance.  The standard for revocation of a subpoena appears in 29 C.F.R. §102.66(f):  a hearing officer "shall revoke [a] subpoena if, in his opinion, the evidence whose production is required does not relate to any matter under investigation or in question in the proceedings…."  The Employer points to a portion of

---

[35] *Excelsior Underwear Inc.*, 156 NLRB 1236 (1966).

[36] *Taylor Publishing Co.*, 167 NLRB 228, 228-229 (1967).

[37] *Program Aids Company, Inc.*, 163 NRLB 145, 146 (1967).

[38] *LeMaster Steel Erectors,* 271 NRLB 1391 (1984).

President and Fellow of Harvard College
Case 01-RC-186442

the hearing officer's statement at the hearing in which he explained his reason for revoking the subpoena with reference to admissibility.  The hearing officer, earlier in his explanation, clearly stated his reliance on the relevance principle articulated in *Thrifty Auto Parts* to find that the subpoena seeks documents that go toward the non-relevant consideration of the Union's actual access to employees and the extent of employee awareness of issues and arguments (Tr. 787-788).  In view of the Board's declaration that issues of actual employee knowledge or actual union access to employees are not litigable, the Employer's subpoena could not lead to relevant evidence.

The Employer excepts to the hearing officer's reliance on *Thrifty Auto Parts* as an error of law in rejecting its offer of proof.[39]  The Employer argues that the hearing officer applied outdated law in a "mechanical" fashion.  The Employer claims that *Thrifty Auto Parts* is no longer Board precedent in light of subsequent decisions in which the Board has held it will consider prejudice to a union in deciding whether to direct a new election, even where there are omissions from the *Excelsior* list.  The cases the Employer cites do not, however, support its position.  *Avon Products, Inc.*, 262 NRLB 46 (1982), cited by the Employer, not only pre-dates *Thrifty Auto Parts*, it concerns a highly unusual set of facts.  In *Avon*, the Board ordered the election set aside because it found that omitted names were due to the Board's "own procedural oversight"[40] and not any error on the part of the employer and that the petitioner had suffered substantial prejudice.  Further, based on the number of omissions (292) alone, the Board was compelled to "find that the Petitioner suffered substantial prejudice." Id. at 48.  The Employer cites *Keeler Brass Automotive Group*, 301 NLRB 769 (1991), a post-*Thrifty Auto Parts* decision, as support for its claim that evidence of prejudice to the union is relevant.  However, the Board in *Keeler Brass Automotive Group* granted the union's request to withdraw its election petition, rendering the underlying ALJ decision on the *Excelsior* list issue moot.[41]

The hearing officer correctly rejected the Employer's argument, raised post-hearing and again now in its exceptions, that *Woodman's Food Markets*, 332 NLRB 502 (2000), changed Board law on the question of relevance.  The Employer contends that *Woodman's* established a broader analysis for voter list deficiency issues to include whether the other party was prejudiced, and in so doing overturned *Thrifty Auto Parts* with respect to the non-litigability of prejudice where names are omitted from the voter list.  Until *Woodman's*, absent a showing of bad faith by the employer, the Board

---

[39] Employer's offer of proof detailed anticipated testimony regarding, among other issues, the Union's electronic and physical access to students on campus, and the Union's activities on campus.  The hearing officer stated that he applied the same reasoning to the offer of proof as to the subpoena, that, in short, the Board does not permit the hearing officer to look into whether or not actual prejudice occurred.  See Tr. 1187.

[40] The Employer had fully complied with the *Excelsior* requirements before the election.  One day before the election, the Board granted a request for review of a Decision and Direction of Election, and rather than stay the election, eight months after the election the Board found that some 292 employees had been erroneously excluded from the unit.

[41] The ALJ dismissed the union's *Excelsior* list omissions objection in part because the union had and used means of communication with employees other than mailings from the *Excelsior* list.  Aside from being moot, this ALJ decision alone is of no precedential value.

President and Fellow of Harvard College
Case 01-RC-186442

measured substantial compliance with *Excelsior* requirements generally by considering the size of the percentage of names omitted from the total electorate, even if a small percentage of omitted names were determinative.  Id*.,* 322 NRLB at 504.  *Woodman's* broadened the analysis by adding the consideration of "other factors as well, including whether the number of omissions is determinative, …,  and the employer's explanation for the omissions."  Id*.*  The Employer, in my view, misreads *Woodman's*.  The Board did not open the door to consideration of actual prejudice; instead, it increases the likelihood that prejudice will be presumed by expanding the situations in which the Board may find *Excelsior* lists to be deficient.  "Obviously, the potentially prejudicial effect on the election is most clear where the number of omissions may have compromised the union's ability to communicate with a determinative number of voters." Id*.* at 504.

The Employer also cites *Tractor Co.*, 359 NLRB 603 (2013), a post-*Woodman's* decision, as support for its position that *Woodman's* now allows consideration of prejudice where voters are omitted.  The Employer asserts that in *Tractor Co.*, the Board held that the union was not prejudiced by omissions, overturning the hearing officer's conclusion that "the omissions sufficiently prejudiced the election so that a second election was required."  I do not agree with the Employer's view of the Board's holding.  The Board overruled the hearing officer's conclusion cited above, then applied the three *Woodman's* factors, and relying "most importantly" on the fact that omissions were not determinative, found the employer had substantially complied with the *Excelsior* requirements.  Id*.*

Not only does *Woodman's* not upset in any way *Thrifty Auto Parts*, its non-litigable rule is a logical outgrowth of prior decisions, beginning with *Excelsior* itself.  The *Excelsior* rule, requiring employers to provide an eligible voter list, rests on a rejection of the argument that unions could reach prospective voters by means other than the employer's voter list.  156 NLRB at 1241.  In *Murphy Bonded Warehouse*, the Board affirmed a hearing officer's ruling that the employer was not permitted to litigate the union's need for the *Excelsior* list by producing evidence of its ability to communicate with employees.  180 NLRB 463, 464 (1969).  The Board decided *Sonfarrel, Inc.* in 1971, a case which *Thrifty Auto Parts* and later cases frequently cite.  In *Sonfarrel, Inc.*, 188 NLRB 969, 970 (1971), the Board first articulated its non-litigation rule regarding prejudice:

> We shall therefore presume, as the *Excelsior* case intended, that the Employer's failure to supply a substantially complete eligibility list had a prejudicial effect upon the election, without inquiry into the question of whether the Union might have obtained some additional names and addresses of eligible employees prior to the election or whether the omitted employees might have garnered sufficient information about the issues to have made an intelligent choice.

The Board further stated,

- 20 -

President and Fellow of Harvard College
Case 01-RC-186442

> To look beyond the question of the substantial completeness of the lists, however, and into the further question of whether employees were actually "informed' about the election issues despite their omission from the list would spawn an administrative monstrosity.

Id.

The Employer finally argues there is no logical distinction between cases where the Board reviews prejudice resulting from incorrect names and addresses and cases dealing with omissions.  In essence, the Employer seeks to change established Board law.  As the hearing officer stated, I am obligated to follow Board law.

With respect to the Employer's subpoena request no. 4, correspondence from the Union to Harvard in which the Union raised concerns or objections to the voter list prior to the election, I affirm the implied revocation of this element.[42]  As discussed further below in connection with the omission of certain Harvard Medical School PhD students, the Employer relied on *Keller Brass Automotive* for the proposition that the union has an obligation to raise omission concerns pre-election.  This issue was referenced by the ALJ decision, which, as discussed above, was rendered moot by the Board's approval of withdrawal of the election petition, and has no precedential value.  The Employer has cited no case law to support the relevance of its request no. 4.  Therefore, the request is not relevant to the hearing and is properly revoked.

## III.    OBJECTIONS

The Employer and the Petitioner each filed one election objection.

The Employer objected to a ballot which the Board agent ruled void.  The hearing officer recommended the objection be sustained and the Petitioner filed no exception.  I affirm the hearing officer's recommendation for the reasons stated in his report.

The Petitioner objected on the grounds that the Employer "failed to substantially comply with the Board's Excelsior rule, 29 C.F.R. § 102.62(d), by failing to provide an accurate list of all eligible voters."  The Employer excepted to the hearing officer's recommendation to sustain the objection.  To the extent described below, I agree with and affirm the hearing officer's recommendation.

The Union's campaign at Harvard began at least one and one-half years before the November 16 – 17 election.  Just days after the Board, on August 23, issued *Columbia University*, Harvard contacted the Union and the two parties met on September 9.  The Union expressed its desire to represent a unit similar to that reviewed in *Columbia University*.  The Petitioner filed its petition on October 18, the

---

[42] The hearing officer's report does not expressly address this request.

President and Fellow of Harvard College
Case 01-RC-186442

parties signed a Stipulated Election Agreement, and I approved the Election Agreement on October 21.

Paragraph 6, "VOTER LIST," of the Election Agreement provided:

Within 2 business days after the Regional Director has determined that there is a sufficient showing of support for an election to proceed,[43]… the Employer will provide to the Regional Director and the Petitioner a voter list with [required information] of all eligible voters.  The Employer must also include, in a separate section of that list, the same information for those individuals whom the parties have agreed should be permitted to vote subject to challenge….

By mid-September, the Employer had begun to assemble its voter list.  Meredith Quinn, Harvard's Chief of Staff in the Office of the Provost led a team of administrators to compile a list of eligible voters.  To prepare the list, on September 12, she contacted "point people" from each of Harvard's schools and requested names of all students performing teaching and research work, how they were compensated, the duration of the assignment, the hours worked per week and the PeopleSoft code for each job title.  Each school determines how to process its appointments and designate its student employees.  The PeopleSoft system is a human resources system that reflects any payment from Harvard to any individual, including graduate student stipends and payments to faculty, staff and administrators.  Because of its breadth, it could not be relied on alone to produce the voter list.  The Employer's systems were not designed to distinguish between doctoral students in the sciences who were on a laboratory rotation versus assigned to a permanent laboratory, and so the Employer attempted to identify in the different schools when students moved into their fixed, assigned laboratory phase.

The Employer submitted a Voter List and Challenged Voter List on November 1, 2016, and on November 4, 2016, the Employer submitted a "supplemental" Voter List and Challenged Voter List.  The November 4 list Voter List contains 3,556 names and the Challenged Voter List contains 386 names.  The November 4 Challenged Voter List contains the names of students whom the Employer determined met the Election Agreement's look back formula, and whose ballots were automatically subject to challenge.  It is the November 4 lists together (referred to hereinafter as the "Voter List") that are the subject of the Petitioner's objection.  Between November 4 and the election, the parties corresponded about certain groups of graduate students who did not appear on the Voter List, but the Employer made no changes to the Voter List.

The hearing officer examined a number of categories of students whose names did not appear on the Voter List.  By the hearing officer's analysis, a total of 535 names

---

[43] The parties by agreement altered the voter list production requirement of Section 102.62 of the Board's Rules and Regulations, "within 2 business days after the approval of an election agreement…."

President and Fellow of Harvard College
Case 01-RC-186442

were improperly omitted from the Voter List.  Those 535 individuals constituted 8.37% of the unit[44] and were far more than the election tally's 184-vote margin in favor of the Employer.

The hearing officer's report included the following table of eligible voters whom the Employer omitted from its Voter List:

| Category | Voters | Non-Voters | Total |
|---|---|---|---|
| Individuals Meeting the Look Back Criteria | 18 | N/A | 18 |
| Teaching Assistants in the GSD | 21 | 94 | 115 |
| First and Second-Year Students Assigned to Fixed Labs in the Division of Medical Science | 96 | 24 | 120 |
| First-Year Students in the OEB Department | 6 | 6 | 12 |
| Retroactive Appointments | 102 | 73 | 175 |
| Post-Election, Pre-Hearing Resolved Challenged Ballots | 67 | N/A | 67 |
| Stipulated Eligible in this Proceeding | 23 | N/A | 23 |
| Individuals with Challenged Ballots Deemed Eligible | 5 | N/A | 5 |
| **Total** | | | **535** |

The Employer argues that only the 120 first and second-year Division of Medication Science (DMS) students could be true omissions for the purposes of an *Excelsior* analysis and disputes the inclusion of the other categories on the grounds that the omissions should be excused.  Below I review each category of omitted graduate students and determine whether they count as omissions for the purpose of determining substantial compliance with *Excelsior*.

Individuals Meeting the Look Back Criteria

This group consists of 14 individuals the parties stipulated were eligible to vote subject to challenge.  The hearing officer included another four individuals whom he determined were eligible under the modified look back formula.  I have already determined that the Election Agreement's look back formula applies to this election petition.  Therefore, only the 14 stipulated individuals are properly included in the omissions count.

Teaching Assistants in the GSD

As discussed above, the hearing officer determined, and I have affirmed, that the GSD TAs are eligible voters.  The hearing officer rejected the Employer's defense that it

---

[44] The hearing officer misstates the formula used by the Board as the sum of the number of persons appearing on the combined voter lists and the omissions, divided by the omissions.  The correct formula is number of omissions divided by the sum of the combined voter lists and the omissions.  *Texas Christian University*, 220 NLRB 396, 397 fn.7 (1975).  Using the hearing officer's numbers the percentage is 11.95% (535 omissions divided by sum of 3556 voting list, 386 challenged voter list and 535 omissions).

President and Fellow of Harvard College
Case 01-RC-186442

used good faith when it decided to exclude these students.[45]  The hearing officer noted, and I agree, that the issue is not one of good or bad faith, but rather, that the Employer purposely chose to exclude these students.  The Employer further argues that the hearing officer's "call" was close as to whether the students were engaged in instructional activities, and so the Employer should not be penalized for reaching a different conclusion.  That argument overlooks that the Employer could have added to the challenged voter list all students whose eligibility it thought was a close call.

### First and Second-Year Students Assigned to Fixed Labs in the Division of Medical Science (DMS)

Between the election and the hearing, the parties resolved for inclusion 96 first and second-year students from the DMS who voted under challenge.  Another 24 first and second-year DMS students were not on the Voter List and did not vote.  The Employer conceded that these DMS omissions were due to an internal "miscommunication" when it assembled the voter list, and argues that absence of bad faith should excuse the omission, again citing *West Coast Meat Packing*.  In response, the Petitioner asserts that the error was not inadvertent.  The hearing officer, relying on a similar type of error in *Woodman's*, found the error did not excuse the omission.  In *Woodman's*, the employer incorrectly interpreted the payroll eligibility requirement and its payroll department may have committed errors.  The Board held that although the conduct did not fall to the level of bad faith, it showed "a lack of diligence and due care" and therefore was an insufficient legal justification for the omissions.  *Woodman's* at 505.  The Employer also asserts that the hearing officer's improper evidentiary rulings prevented the Employer from presenting evidence that the DMS students were fully informed of the election issues.  Having affirmed the hearing officer's rulings, I need not address this argument.[46]  For the reasons stated in the hearing officer's report, I affirm the inclusion of these DMS students in the omissions count.

### First-Year Students in the OEB Department

OEB first-year students are discussed above in the challenges, where I affirm the hearing officer's finding that they are eligible voters.  Although the Employer took exception to the hearing officer's recommendation to overrule the OEB first-year challenges, the Employer did not except to their inclusion in the omissions count.  I affirm the hearing officer's finding that they are improperly omitted voters for the same reasons as with the GSD and DSM students.

---

[45] The Employer relies on *West Coast Meat Packing Co.*, 195 NLRB 37 (1972) for the proposition that where the employer omitted names in a good faith belief they were not eligible, with 4% omissions and 22% incorrect addresses, the employer substantially complied with *Excelsior* rule.  However, *West Coast Meat Packing Co.* is one of many pre-*Woodman* decisions that, in the absence of employer bad faith, the Board's analysis focused on the number of errors, not the employer's good faith effort.

[46] The Employer also argues that, based on the record evidence, the Union was aware of this omission before the election and yet failed to raise it with the Employer's, citing *Keeler Brass Auto. Group*, 301 NLRB at 775 for the proposition that the Board's dismissal of an objection was due in part to the union failing to complain about omissions it knew of until after the election.  As discussed above, the Board's action in *Keeler* mooted the underlying ALJ decision, on which the Employer relies.

President and Fellow of Harvard College
Case 01-RC-186442

Retroactive Appointments

Of the 265 challenges that the parties resolved for inclusion before the hearing, 102 fell into the Retroactive Appointments category.  Based on Chief of Staff Quinn's testimony, cited in the hearing officer's report, these students started work before the October 15 cut-off date but processing their paperwork was delayed.[47]  Quinn also testified that there were another 73 similarly situated individuals who had not voted. The hearing officer noted evidence of the Employer's PeopleSoft website that contained a "how-to" guide with instructions for entering payments into PeopleSoft for individuals "whose retroactive pay relates solely to unpaid hours from prior periods."  The hearing officer cited two examples of retroactive appointments[48] whose challenged ballots he found to be eligible.  The hearing officer also cited testimony by Dean for Admissions and Financial Aid, Graduate School of Arts and Sciences, Mohan Boodram, that the Institute of Quantitative Social Science often kept students in open, multi-year employment appointments despite not actively having a paid work assignment, in order to avoid the delay in processing employment paperwork for student employees.  From this evidence, the hearing officer concluded that the Employer had knowledge of the existence of retroactive appointments.  He determined that failing to take steps to locate the retroactive appointments was comparable to the employer oversights that the *Woodman's* Board found did not excuse omissions.

In its exception, the Employer disputes the hearing officer's finding that Harvard did not exercise a "reasonable amount of diligence."  The Employer contends that although Harvard was generally aware of processing delays, the hearing officer did not have grounds to find that Harvard should have been able to identify these students. The Employer highlights that it had only ten days to create the voting list and restates the administrative complexities associated with these students.  Because the hearing officer relied on record evidence that the Employer knew of the existence of retroactive appointments, I affirm the finding that the omissions are not excusable.

The Employer also claims that the hearing officer relied on evidence that the Employer agreed to *count* these retroactive appointment ballots as evidence that the Employer agreed they were *eligible*, despite the absence of any evidence from the Petitioner regarding these individuals.  The Employer notes testimony from Quinn that the Employer's agreement to resolve ballots for inclusion was not based on an investigation of each retroactive appointee who voted, but because "the right thing to do would be to allow their votes to count in a good faith effort to keep things moving along." (Tr. 1262-1263)  The Employer asserts that it should not now be punished for agreements made to help streamline the election resolution process.

---

[47] There is no evidence the delays were deliberate.

[48] Renugan Raidoo and Emma Goldhammer.

President and Fellow of Harvard College
Case 01-RC-186442

The record facts indicate the Employer did agree the voters were eligible. According to the Employer's Statement of Position Concerning Challenged Ballots (Jt. Ex. 2),

> On December 22, 2016, after prolonged efforts … to resolve the status of numerous voters who cast provisional challenged ballots because they did not appear on the voter list, the Region counted the votes that the parties **agreed were eligible**. (emphasis provided)

Moreover, the Employer offered no evidence that the Employer resolved challenges without prejudice or otherwise reserved any rights to later dispute eligibility.  The Board includes voluntarily resolved challenges in its omissions count.  *See Woodman's*, 332 NLRB 503, 503 (2000) (four resolved challenges included in the omissions); *EDM of Texas*, 245 NLRB 934, 940 (1979) (six resolved challenges included in the omissions count).

Accordingly, I concur with the hearing officer that the 102 retroactive appointments which the Employer voluntarily resolved for inclusion should be included in the omissions count.[49]  Based on the admission that another 73 individuals were similarly situated, I affirm the hearing officer's finding regarding those individuals.

<u>Post-Election, Pre-Hearing Resolved Challenged Ballots</u>

Sixty-seven individuals whose names were not on the Voting List cast ballots under challenge that the parties later resolved for inclusion in the count, based on the individual circumstances of each individual.  The Employer excepts to their inclusion in the omissions count on the grounds that the Petitioner presented no evidence regarding the circumstances of these individuals and the Employer, in resolving the challenges for inclusion, never agreed they were eligible.  For the reasons noted above regarding the retroactive appointments, I affirm the inclusion of these 67 individuals.

<u>Stipulated Eligible in this Proceeding</u>

The parties stipulated during the hearing that 28 individuals were eligible to vote. Five of the individuals already appeared on the Challenged Voter List, leaving 23 to be included in the omissions count.  Neither party excepted to the inclusion of these 23 individuals.  Accordingly, I affirm their inclusion in the omission count.

---

[49] The Employer's attempts to resolve many of the challenges before the hearing are commendable, however, they do not take precedence over the requirement to protect employees' Section 7 rights.  I also note that removing these voters from the omission list would not change the outcome.

President and Fellow of Harvard College
Case 01-RC-186442

### Individuals with Challenged Ballots Deemed Eligible

In this final category appear five omitted individuals who voted under challenge and whose challenges the hearing officer overruled.[50]  Neither party excepted to the inclusion of these five individuals in the omissions count.  However, having sustained the challenge to Hannah Cohen, whose inclusion was based on the modified look back formula, I do not include this individual.  Accordingly, I affirm the hearing officer's inclusion of four of these five individuals in the omission count.

### Total Omitted Voters

Having affirmed all the hearing officer's findings regarding categories of omitted voters, except the five individuals deemed eligible under the modified look back formula, I find that the number of omitted voters is 530.  This number is 11.85% of the total electorate, 4472.

### Employer's compliance with *Excelsior* requirements

The hearing officer concluded that the Employer did not substantially comply with the voter list requirement and recommended that the Petitioner's objection be sustained. He based his conclusion on the number of omissions exceeding the determinative number of votes, the significant percentage that the omissions were of the electorate,[51] combined with the Employer's failure to present a substantial justification for its omissions.  The hearing officer noted that while the Board post-*Woodman's* no longer considers only the percentage of omissions as justification for setting aside an election, the Board has considered similar omission percentages as sufficient grounds, citing *Thrifty Auto Parts*, 295 NLRB at 1118 (9.5 percent omission rate was sufficient to set aside election).  The hearing officer relied on the *Woodman's* decision in which a 6.8 percent omission rate, combined with determinative omissions[52] and lack of justification for the omissions were sufficient to direct a new election.  332 NLRB at 505.

The hearing officer carefully reviewed the developing law as to voting list requirements.  The so-called *Excelsior* rule, requiring the employer to produce employee information before an election, became codified and implemented as Section 102.62(d) of the Board's Rules and Regulations.

> (d) *Voter list*. Absent agreement of the parties to the contrary specified in the election agreement or extraordinary circumstances specified in the direction of election, within 2 business days after the approval of an election agreement…or issuance of a direction of election…the employer

---

[50] The five individuals are the two museum interns Camran Mani and Whitney Robles, and graduate students Hannah Cohen, Maria Duarte and Emma Goldhammer.

[51] As discussed above, the hearing officer understated the percentage of omissions at 8.37%, compared with nearly 12%.

[52] *Woodman's* had the narrowest of possibly determinative omissions:  one.

President and Fellow of Harvard College
Case 01-RC-186442

> shall provide to the regional director and the parties named in the agreement or direction of list of the full names [and other information] of all eligible voters. The employer shall also include in a separate section of that list the same information for those individuals whom the parties have agreed should be permitted to vote subject to challenge…

Before *Woodman's*, the Board generally decided voter omission objections based on the percentage of the unit omitted.  *Woodman's*, as discussed above, broadened the factors to include whether the omissions were determinative and the employer's explanation.

The Employer, in its exceptions, contends that the 8.37% error rate is not high enough, absent a finding of bad faith, to warrant a finding that the Employer did not substantially comply with the *Excelsior* rule.  The Employer relies on cases that may all be distinguished because they do not involve determinative omissions, they include determinative omissions but pre-date *Woodman's,* or the omissions rate is smaller than here.[53]

The Employer argues that the hearing officer erred in finding it did not substantially comply with voting list requirements by failing to give consideration to factors other than the percentage of omissions, citing the Board's consideration of the employer's explanation for its omissions, *Woodman's* at 332 NLRB at 504, and *Automatic Fire Systems*, supra, 357 NLRB at 2341.  The Employer relies on a defense that it operated in good faith in the face of limited time, unit size, decentralized operations and a payroll system not designed to segregate the individuals the Employer needed to identify.  The Employer further argues that it exercised a reasonable amount of diligence in compiling its voter list, citing testimony of several senior administrators.

I agree with the hearing officer that there was no legal justification for the Employer's omissions.  As discussed above, the hearing officer found that the Employer knew of the different categories of omitted employees and could have taken steps to examine those individuals more closely, or, included them on the challenged voter list. The complaint regarding new law and lack of time is unpersuasive.

Having affirmed the hearing officer's omissions count, with the exception of five individuals,[54] for the foregoing reasons, I affirm the hearing officer's finding that the Employer failed to substantially comply with the voter list requirement.  I adopt the

---

[53] The Board found the employer substantially complied with *Excelsior* in these pre-*Woodman's* cases with the noted characteristics: *Texas Christian Univ.* 220 NRLB 396 (1975) (18% incorrect addresses, 3% omissions, omissions not determinative); *Telonic Indus., Inc.,* 173 NLRB 588 (1968) (less than 4% omissions, determinative); *Kentfield Med. Hosp.*, 219 NLRB 174 (1975) (6% error rate combining omission and incorrect addresses, determinative omissions), cited by *Woodman's* as an example of misapplication of *Excelsior* rule.  In *Keeler Brass Auto. Group*, 310 NLRB 769 (1991), the Board mooted the ALJ decision on determinative omissions by its approval of Union's request to withdraw the election petition.  The post-*Woodman's* decision *Tractor Co.*, 359 NLRB 603 (2013) concerned15.4% rate of omissions that was not determinative.

[54] Thus, the omissions count drops from 535 to 530.

President and Fellow of Harvard College
Case 01-RC-186442

recommendation that the eligible challenged ballots be counted, and if a revised tally of ballots reveals that the Petitioner has not received a majority of votes cast, I direct that the election be set aside and a new election be run.

## IV.   CONCLUSION

### A.   Ruling on Challenges, Hearing Rulings and Objections

Based on the above, and having carefully reviewed the entire record, the hearing officer's report and recommendations, and the exceptions and arguments made by the parties, I affirm the hearing officer's findings and adopt his conclusions as to the challenges, hearing rulings and objections, to the extent described above.

IT IS HEREBY ORDERED that the ballots whose challenges I have overruled be opened and counted, that the ballot previously ruled void by a Board agent in the initial tally of ballots be included as a "No" vote in a revised tally of ballots, and that, if a revised tally of ballots does not result in the Petitioner receiving a majority of the valid votes cast, the results of the November 16 and 17, 2016 election is set aside and a new election shall be conducted.

## DIRECTION OF SECOND ELECTION

In the event a revised tally does not result in the Petitioner receiving a majority of valid votes cast, the National Labor Relations Board will conduct a second secret ballot election among the employees in the same unit as in the first election.  Employees will vote whether or not they wish to be represented for purposes of collective bargaining by Harvard Graduate Students Union – UAW.  The date, time and place of the election will be specified in the Notice of Second Election that will issue shortly following a revised tally.  That Notice shall also contain the following language:

## NOTICE TO ALL VOTERS

The election conducted on November 16 and 17, 2016 was set aside because the National Labor Relations Board found that the Employer's failure to provide a complete Voter List interfered with the employees' exercise of a free and reasoned choice.  Therefore, a new election will be held in accordance with the terms of this Notice of Second Election.  All eligible voters should understand that the National Labor Relations Act, as amended, gives them the right to cast their ballots as they see fit and protects them in the exercise of this right, free from interference by any of the parties.

Eligible to vote in the second election are those employees in the unit who were employed during the payroll period ending immediately before the date of the Notice of Second Election, including employees who did not work during that period because they

President and Fellow of Harvard College
Case 01-RC-186442

were ill, on vacation, or temporarily laid off.  Also eligible to vote are doctoral students who have been employed in the bargaining unit for at least one semester during the past academic year and who are not currently in their Dissertation Completion Year (or final year of their program).  Employees engaged in any economic strike, who have retained their status as strikers and who have not been permanently replaced are also eligible to vote.  In addition, in an economic strike which commenced less than 12 months before the date of the first election, employees engaged in such strike who have retained their status as strikers but who have been permanently replaced, as well as their replacements are eligible to vote.  Unit employees in the military services of the United States may vote if they appear in person at the polls.

Ineligible to vote are: (1) employees who have quit or been discharged for cause since the designated payroll period; (2) striking employees who have been discharged for cause since the strike began and who have not been rehired or reinstated before the election date; and (3) employees who are engaged in an economic strike that began more than 12 months before the date of the first election and who have been permanently replaced.

Voters will be required to show their Harvard student identification card or another form of identification in order to be permitted to vote.

**Voter List**

Within two business days after the issuance of the Notice of Second Election, the Employer must provide to the Regional Director and the parties named in the decision an alphabetized list of the full names, work locations, shifts, job classifications, and contact information (including home addresses, available personal email addresses, and available home and personal cell telephone numbers) of all eligible voters, accompanied by a certificate of service on all parties.  When feasible, the Employer must electronically file the list with the Regional Director and electronically serve the list on the other parties.

The list must be accompanied by a certificate of service showing service on all parties.  **The Region will no longer serve the voter list.**  The Employer's failure to file or serve the list within the specified time or in the proper format is grounds for setting aside the election whenever proper and timely objections are filed.  However, the Employer may not object to the failure to file or serve the list in the specified time or in the proper format if it is responsible for the failure.

Unless the Employer certifies that it does not possess the capacity to produce the list in the required form, the list must be provided in a table in a Microsoft Word file (.doc or docx) or a file that is compatible with Microsoft Word (.doc or docx).  The first column of the list must begin with each employee's last name and the list must be alphabetized (overall or by department) by last name.  Because the list will be used during the election, the font size of the list must be the equivalent of Times New Roman

President and Fellow of Harvard College
Case 01-RC-186442

10 or larger.  That font does not need to be used but the font must be that size or larger.  A sample, optional form for the list is provided on the NLRB website at www.nlrb.gov/what-we-do/conduct-elections/representation-case-ruleseffective-april-14-2015.

When feasible, the list shall be filed electronically with the Region and served electronically on the other parties named in this decision.  The list may be electronically filed with the Region by using the E-filing system on the Agency's website at www.nlrb.gov.  Once the website is accessed, click on **E-File Documents**, enter the NLRB Case Number, and follow the detailed instructions.

No party shall use the voter list for purposes other than the representation proceeding, Board proceedings arising from it, and related matters.

### Notice Posting

The Employer must post copies of the Notice of Election in conspicuous places, including all places where notices to employees in the unit are customarily posted, at least 3 full working days prior to 12:01 a.m. on the day of the election which will be set forth in the Notice of Second Election, and must also distribute the Notice of Election electronically to any employees in the unit with whom it customarily communicates electronically.  The Employer's failure to timely post or distribute the election notices is grounds for setting aside the election if proper and timely objections are filed.  However, a party is stopped from objecting to the nonposting or nondistribution of notices if it is responsible for the nonposting or nondistribution.

## IV.    REQUEST FOR REVIEW

Pursuant to Section 102.69(c)(2) of the Board's Rules and Regulations, any party may file with the Board in Washington, DC, a request for review of this decision.  The request for review must conform to the requirements of Sections 102.67(e) and (i)(1) of the Board's Rules and must be received by the Board in Washington by **July 21, 2017.**  If no request for review is filed, the decision is final and shall have the same effect as if issued by the Board.

A request for review may be E-Filed through the Agency's website but may not be filed by facsimile.  To E-File the request for review, go to www.nlrb.gov, select E-File Documents, enter the NLRB Case Number, and follow the detailed instructions.  If not E-Filed, the Request for Review should be addressed to the Executive Secretary, National Labor Relations Board, 1015 Half Street SE, Washington, DC 20570-0001.  A party filing a request for review must serve a copy of the request on the other parties and file a copy with the Regional Director.  A certificate of service must be filed with the Board together with the request for review.

President and Fellow of Harvard College
Case 01-RC-186442


Dated:  July 7, 2017

John J. Walsh, Jr., Regional Director
National Labor Relations Board, Region 01
Thomas P. O'Neill Jr. Federal Building
10 Causeway Street, Room 601
Boston, MA 02222

- 32 -

# EXHIBIT C

**This is the full draft of the Tentative Agreement. This is a redlined version of the TA in comparison to the 2020 Collective Bargaining Agreement. Additions to the 2020 CBA are <u>underlined</u> in red. Deletions to the 2020 CBA are ~~struck through~~ in red.**

**TABLE OF CONTENTS**

**ARTICLE**

ARTICLE 1    RECOGNITION (No Change)
ARTICLE 2    TITLES AND CLASSIFICATIONS (No Change)
ARTICLE 3    EMPLOYMENT APPOINTMENT LETTER (Changed)
ARTICLE 4    EMPLOYMENT APPOINTMENT SECURITY (Changed)
ARTICLE 5    JOB POSTING (Changed)
ARTICLE 6    GRIEVANCE AND ARBITRATION (No Change)
ARTICLE 7    NON-DISCRIMINATION, HARASSMENT, AND ABUSE OR INTIMIDATION
ARTICLE 8    ACADEMIC RETALIATION (Changed)
ARTICLE 9    INTELLECTUAL PROPERTY, SCHOLARLY AND RESEARCH MISCONDUCT (Changed)
ARTICLE 10  HEALTH AND SAFETY (Changed)
ARTICLE 11  TRAINING (Changed)
ARTICLE 12  EMPLOYMENT RECORDS (No Change)
ARTICLE 13  INTERNATIONAL STUDENT WORKER RIGHTS AND WORK AUTHORIZATION (Changed)
ARTICLE 14  TAX ASSISTANCE (No Change)
ARTICLE 15  WORKSPACE AND MATERIALS
ARTICLE 16  WORKLOAD (No Change)
ARTICLE 17  MANAGEMENT RIGHTS (No Change)
ARTICLE 18  UNION ACCESS AND RIGHTS (Changed)
ARTICLE 19  DISCIPLINE AND DISCHARGE (No Change)
ARTICLE 20  COMPENSATION (Changed)
ARTICLE 21  HEALTH AND DENTAL INSURANCE (Changed)
ARTICLE 22  CHILD CARE FUND (Changed)
ARTICLE 23  FAMILY FRIENDLY BENEFITS (Changed)
ARTICLE 24  LEAVE PROVISIONS (Changed)
ARTICLE 25  HOLIDAYS, PERSONAL DAYS, AND VACATION (Changed)
ARTICLE 26  PARKING AND TRANSIT (Changed)
ARTICLE 27  TRAVEL (No Change)
ARTICLE 28  EMERGENCY GRANT (Change)
ARTICLE 29  EMPLOYEE ASSISTANCE PROGRAM (No Change)
ARTICLE 30  UNION-MANAGEMENT COMMITTEE (No Change)
ARTICLE 31  UNION SECURITY (Changed)
ARTICLE 32  NO STRIKE/NO LOCKOUT (No Change)
ARTICLE 33  SEVERABILITY (No Change)
ARTICLE 34  DURATION (Changed)

ARTICLE XX LEGAL EXPENSE FUND (New)
ARTICLE XX HOURLY SW ACCESS TO BENEFIT POOLS (New)
APPENDIX: Side Letters

# ARTICLE 1

# RECOGNITION

As reflected in the National Labor Relations Board Case 01-RC-186442, the University recognizes the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW), and its Local Union, Harvard Graduate Students Union-UAW Local 5118 (HGSU-UAW Local 5118), as the exclusive bargaining representative for employees in the bargaining unit. The bargaining unit shall include all students enrolled in Harvard degree programs employed by Harvard University who provide instructional services at Harvard University, including graduate and undergraduate Teaching Fellows (teaching assistants, teaching fellows, course assistants) and all students enrolled in Harvard degree programs (other than undergraduate students at Harvard College) employed by Harvard University who serve as Research Assistants (regardless of funding sources, including those compensated through Training Grants). This bargaining unit includes students employed by Harvard University and enrolled in the Harvard Graduate School of Arts and Sciences, Harvard Business School, the Division of Continuing Education, Harvard Graduate School of Design, Harvard Graduate School of Education, the Harvard John A. Paulson School of Engineering and Applied Sciences, the John F. Kennedy School of Government at Harvard University, Harvard Law School, Harvard Divinity School, Harvard Medical School, the Harvard T.H. Chan School of Public Health, and Harvard College.  Excluded: All undergraduate students serving as research assistants and all other employees, guards and supervisors as defined in the Act.

# ARTICLE 2

# TITLES AND CLASSIFICATIONS

**Section 1.**  As of the effective date of this Agreement, all Student Workers (SW) performing duties below shall be placed into titles and pay classifications based on the nature of duties and eligibility as follows:

2

**Salary/Stipended Positions**

| Title | Pay Classification | Pay Code | Duties | Eligibility |
|---|---|---|---|---|
| Research Assistant 1 | Article 20, Sections 2.A and 2.H | GSU001 | Performs research (including scientific rotations) under the supervision of faculty/principal investigator/museum curator | Harvard enrolled graduate students. |
| Research Assistant 2 | Article 20, Section 2.B and 2.H | GSU002 | Research Assistant 1 with a teaching position (research duties adjusted accordingly). | Harvard enrolled graduate students. |
| Teaching Fellow 1 | Article 20, Section 2.C | GSU003 | Provides instructional services which may include teaching, grading, coaching and/or other academic support services. | Harvard enrolled graduate students teaching at all schools and units. Undergraduate students teaching at all schools and units except the College. |
| Teaching Fellow 2 | Article 20, Section 2.C | GSU004 | Head TF is a Teaching Fellow 1 who in addition leads other TFs | Harvard enrolled graduate students teaching at all schools and units. Undergraduate students teaching at all schools and units except the College. |
| Pedagogical Fellow | Article 20, Section 2.C | GSU005 | Provides instructional services including but not limited to consulting with TFs, leading pedagogy seminars and workshops and developing resources/providing pedagogical | Harvard enrolled graduate students. Prior Teaching Fellow experience. |

3

| | | | support and guidance on teaching and professional development (currently based at the Bok Center) | |
| Instructional Fellow | Article 20, Section 2.C | GSU006 | Leads course and is sole instructor/lecturer teaching outside of DCE. | Harvard enrolled graduate student. |
| Course Assistant 1 | Article 20, Section 2. C | GSU007 | Performs instructional support not including classroom or lab section time | Harvard enrolled undergraduate students. |
| Course Assistant 2 | Article 20, Section 2. C | GUS008 | Performs instructional support, plus classroom or lab section time. | Harvard enrolled undergraduate students |

**Hourly Positions**

| **Title** | **Pay Classification** | **Pay Code** | **Duties** | **Eligibility** |
|---|---|---|---|---|
| Hourly Research Assistant | Article 20, Sections 3.A and 3.C | GSU009 | Performs research under faculty/principal investigator supervision | Harvard enrolled graduate students. |
| Hourly Teaching Fellow | Article 20, Sections 3.A and 3. B | GSU010 | Provides instructional services including but not limited to teaching, grading, and/or other academic support services. | Harvard enrolled graduate students teaching at all schools and units. Undergraduate students teaching at all schools and units except the College. |

4

| | | | | |
|---|---|---|---|---|
| Hourly Course Assistant 1 | Article 20, Sections 3.A and 3. B | GSU011 | Performs instructional support, not including classroom or lab section time | Harvard enrolled undergraduate students |
| Hourly Course Assistant 2 | Article 20, Sections 3.A and 3. B | GSU012 | Hourly CA 1 plus classroom or lab section time. | Harvard enrolled undergraduate students |

## Division of Continuing Education Positions

| Title | Pay Classification - | Pay Code | Duties | Eligibility |
|---|---|---|---|---|
| DCE Lecturer/ Instructor | Article 20, Section 2.E | GSU013 | Leads course and is sole lecturer/instructor at DCE. | Harvard enrolled graduate and undergraduate students. |
| DCE Teaching Fellow | Article 20, Section 2.E | GSU014 | Provides instructional services which may include teaching, grading, and/or other academic support services at DCE. | Harvard enrolled graduate and undergraduate students. |
| DCE Head Teaching Fellow | Article 20, Section 2. E | GSU015 | Coordinates Teaching Fellows, performs administrative instructional support; does not include teaching sections. Head Teaching Fellow may also hold a Teaching Fellow Position. | Harvard enrolled graduate and undergraduate students. |

5

| DCE Course Assistant | Article 20, Section 2.E | GSU016 | Performs instructional support at DCE. | Harvard enrolled graduate and undergraduate students. |
|---|---|---|---|---|

**Section 2**. In courses that do not have a Head TF, faculty may designate a Teaching Fellow 1 with additional administrative duties.   Such designation will come with additional compensation.

**Section 3**. The University shall appoint the SW to the highest title and pay classification for which they are qualified based on the duties of their appointment and their eligibility. If the SW's duties change during their appointment the University may move a SW to a title with a higher pay classification. A SW may request to be moved to a lower pay classification.

**Section 4.** No modifications or deletions shall be made to the bargaining unit pay classifications and job titles in Section 1 unless they are agreed to by both parties.

**Section 5**. Definitions:

Rotation - Most commonly found in programs within the natural sciences, a rotation is a period of time, commonly shorter than a semester, in which a Ph. D student conducts research within an individual faculty member's research group. Within an academic year a student would perform multiple rotations within different faculty lab groups, most commonly within the student's academic program. The intent of a rotation is to assist the student and potential faculty advisor determine if the lab/research group is best suited to the student's doctoral research.

**Section 6.** It is not the intent of this article to convert previously salaried/stipended positions to hourly positions.  Such modifications shall not be made unless agreed to by both parties.

## ARTICLE 3

## EMPLOYMENT APPOINTMENT LETTER

**Section 1.** Prior to the start of the appointment, the University shall provide an employment appointment letter to salaried SWs, sent via email to the SW's email address. This letter shall be sent within a reasonable period of time in advance of the appointment starting date, preferably no later than 60 (sixty) days prior to the commencement of employment, recognizing that some

departments and units may not be in a position to send such a letter that early due to uncertain enrollments or funding or other legitimate reasons. In such cases, the department or unit will send out the letter as soon as reasonable prior to the commencement of the SW's work.

SWs employed on an hourly basis will receive an employment appointment letter prior to the commencement of their work or as soon thereafter as is reasonable under the circumstances.

An example appointment letter is provided in Appendix XX, the use of which shall be optional by departments.

**Section 2.** The letter of employment appointment shall include the following information:

1. Employment appointment title(s).
2. Effective starting date of the employment appointment and, if known, the termination date for the appointment.
3. The Employment unit contact and the faculty member(s) or the supervisor(s) to whom the SW will report.
4. For teaching appointments, the name of the course; the approximate number of students for which the SW will be responsible; a description of the required duties, including but not limited to: leading sections, holding office hours, grading assignments, attending lectures, etc. If known at the time of the employment appointment letter, any scheduled meetings or trainings and other duties as assigned.
5. For research appointments, a brief description of the required research or lab duties, including but not limited to: writing code, performing experiments, maintaining equipment, teaching and mentoring lab members and other duties as assigned. If known at the time of the employment appointment letter, any scheduled meetings or trainings; and procedures for evaluation, if any.
6. For all other employment appointments, a brief description of required duties; including required meetings and trainings; and procedures for evaluation, if any.
7. Work location (i.e. which campus and, if known, building and room). For appointments where a remote work assignment has been approved prior to the commencement of work, the work location shall be listed as "remote."
8. Expected work schedule, including course meeting times and locations, if applicable. The parties recognize schedules and locations may change prior to the start of the semester or term. Where applicable for hourly SWs, any cap on the number of hours and the estimated average number of hours expected per week.
9. Pay classification as described in Article 2, Titles and Classifications.
10. Amount of compensation or hourly pay rate.
11. Benefits related to this employment appointment, if different from those described elsewhere in this contract.
12. Response requirements, if any.
13. A statement that the position is covered by this collective bargaining agreement and a link to this Agreement.
14. Union mailing address, phone number, and website address

7

If any of this information is not known at the time of notification, the SW will be informed as soon as is reasonable under the circumstances.

**Section 3.**  All employment appointment letters will include a FERPA Communication and FERPA Release Form, either in paper format or a format where the Form can be completed and submitted to the University electronically, as set forth in Article 18, Union Access and Rights.

## ARTICLE 4

## EMPLOYMENT APPOINTMENT SECURITY

**Section 1.**  For teaching appointments outside the guaranteed admissions offer period, if a Teaching Fellow's assigned course or section is cancelled due to insufficient enrollment or any other reason after the formal acceptance of a written employment appointment pursuant to Article 3, Employment Appointment Letter, or after the start of the appointment period, the department or unit shall notify the Teaching Fellow as soon as practicable. In such cases, the Teaching Fellow shall be offered an available alternative section that the Teaching Fellow is qualified to teach and that has not been assigned to another Teaching Fellow or other individual, or where appropriate an equivalent RA position for which the Teaching Fellow is qualified. However, if no other course or RA assignment can be made and the course or section is finally cancelled, the Teaching Fellow shall be paid 70% 20% of the compensation they would have received had the course or section not been cancelled. If the cancellation results in loss of bargaining unit membership, the Teaching Fellow will nevertheless have access to the insurance pools, emergency pool and child care pool  established under this Agreement for the remainder of the semester.

**Section 2.**  If a Research Assistant I or II has their appointment end during their employment appointment period through no fault of the SW, such as may be caused in some circumstances by the unexpected due to the departure of the faculty member to whom the SW is assigned or other circumstances where the appointment is ended  by the University prior to its completion, and except in cases of discharge pursuant to Article 19, the University department, program, or employing unit will work with the SW and endeavor to find work for the remainder of the 10 or 12 month employment appointment. Such replacement work is not guaranteed, however.

If no other appointment can be made, the Research Assistant, for the remainder of their 10 or 12 month appointment, shall be paid at least 75% of the remaining balance of the total compensation they would have received had their appointment not ended.  If the cancellation results in loss of bargaining unit membership, the Research Assistant will nevertheless have access to the insurance pools, emergency pool and child care pool established under this Agreement for the remainder of their appointment.

However, in cases where the Research Assistant chooses to leave their appointment due to their allegations of discrimination or harassment or abusive/intimidating behavior, and pursues formal or informal resolution of such allegations pursuant to Article 7 and/or under University policies,

8

the department, program or employing unit will, as a supportive measure pending resolution or dismissal of the claim, either find replacement work for the Research Assistant or will provide continued compensation to the Research Assistant for the balance of the appointment.

## ARTICLE 5

## JOB POSTING

Section 1. Certain positions that would be in the bargaining unit if filled by a Harvard student are filled in the following manner:

A.      To fulfill a commitment of support made to a Harvard student at the time of admission; or
B.      As part of an existing or past teaching, research, or advisor/advisee relationship between a faculty member and a candidate for a position.

In cases where such positions are not filled in the aforementioned manner they will be considered "open positions" and the University will encourages, but will does not require, employing units to post open positions on the central website described below. Between October 1 and December 31, 2022, the Union Management Committee will schedule a time to review and discuss the utilization of the web site and its effectiveness thus far. However, such discussions shall not require any particular changes during the life of the Agreement unless otherwise agreed. Nothing in this article prohibits an employing unit from advertising an open position in a location other than the common central website. The University encourages, but does not require, employing units to hire Harvard students over other candidates.

Section 2. Within a reasonable amount of time which shall not exceed one (1) year after the effective date of this Agreement, absent extraordinary circumstances, the University agrees to developThe University shall maintain a common central website to host open positions as defined above. The University will issue periodic notices to employing units informing them of the website location and posting process. The University shall notify the Union of the address of the website within thirty (30) calendar days of ratification of this agreement.

Section 3. When posting an open position, the employing unit will specify whether the posting will be open for a specified period of time (e.g., 14 calendar days) or an unspecified period of time (e.g., until filled).

Section 4. Postings should provide the following information regarding the open position:

A.   Position title and classification [per Article 2, Titles and Classifications]
B.   Starting date of the position and, if known, the termination date for the position;
C.   Supervisor and/or supervisory unit;
D.   The assigned course or lab assignment where applicable;
E.   Brief description of the required duties;
F.    Basic and preferred qualifications;

9

G.   Work location (Cambridge campus, Longwood campus, other location);
H.   Expected pay rate or range;
I.    Expected pay frequency;
J.    Expected work schedule;
K.   A statement that the position is covered by this collective bargaining agreement if filled by a Harvard student;
L.   Information about how to apply for the position;
M.   Deadline for applying;
N.   Statement on non-discrimination.

## ARTICLE 6

## GRIEVANCE AND ARBITRATION

**Section 1**. A SW, a group of SWs, or the Union who have a complaint may process a grievance in accordance with the procedure outlined in this Article. A grievance is any dispute concerning the interpretation, the application, or claimed violation(s) of a specific provision(s) of this Agreement.

**Section 2**. Initial Oral Discussion

A.      In order to facilitate a timely resolution on a SW, group of SWs, or the Union's complaint(s), the SW, group of SWs, or the Union are encouraged, but not required, to discuss the problems with the immediate supervisor or faculty member to whom they report. The SW or group of SWs shall have the right to union representation for such informal discussions as well as throughout any formal grievance procedure steps.

The parties are encouraged to attempt to resolve the problems informally but if they are unable or choose not to do so, a SW, group of SWs or the Union may file a grievance under Section 4 below.  The timeline set forth in Section 3 for filing a grievance is not tolled by any informal discussions that may have taken place under this section.

B.   Mutual resolutions of the complaint at the initial oral discussion shall be in writing, and although final, shall not be precedential nor inconsistent with this Agreement.

**Section 3**.  Any formal grievance must be filed at Step One of this Article within thirty (30) business days after the event, or after the grievant should have become aware of the event, giving rise to the grievance.  A SW who is required by their employment or by their academic duties to be temporarily away from the Harvard campus may file their grievance within thirty (30) business days following their return to campus.

**Section 4**. Grievance Process

Step 1.

10

A.        The Step 1 grievance shall be in writing and state pertinent facts of the case as clearly and concisely as possible, the provision(s) of the Agreement alleged to have been violated; and a statement of the desired outcome. This written grievance shall be submitted to the appropriate department chair or comparable director in units with no department chair for resolution in accordance with this Article. If a SW or group of SWs files the grievance without the Union, the University will notify the Union of such filing.

B.        Within five (5) business days of receipt of the Step 1 grievance, the department chair, director or designee shall meet with the grievant(s) and the Union representative where the grievance will be presented in an effort to resolve the grievance.

C.        The department chair, director or designee shall have five (5) business days to provide a written response to the grievance.

D.        Mutual resolutions of the grievance at Step 1, although final, shall not be precedential. If the mutual resolution is between a SW or group of SWs without the Union being involved, then such resolution shall also not be inconsistent with this Agreement.

E.        If the grievance is against the Department Chair, or comparable director in units with no department chair, Step 1 may be filed with the relevant Dean or designee.

Step 2

A.        In the event the response to the Step 1 Grievance is unsatisfactory, the Union may appeal the grievance to the Dean of the School or designee within ten (10) business days of receiving the written response.  The Dean or designee shall conduct a meeting to resolve the dispute within ten (10) business days of the receipt of the grievance.  However, if the grievance is filed at Step 1 to the Dean or designee per paragraph E, the Union may appeal the grievance to the Provost.

B.        The Dean or designee or Provost or designee shall provide the Union with a written response within ten (10) business days of the meeting.

Step 3. Arbitration

A.        A grievance not resolved at Step 2 may be appealed to arbitration by the Union provided the Union gives written notice to the University within thirty (30) business days of the Step 2 denial by the Dean or designee or Provost or designee. Only the Union may process a grievance to arbitration. The Union will request a list from the American Arbitration Association or the Labor Relations Connection within fifteen (15) business days from its notice of appeal to the University and selection shall be made in accordance with the voluntary labor arbitration rules of that body.

B.        Arbitration will be conducted in accordance with the rules of the American Arbitration Association or the Labor Relations Connection.

C.        Each party shall bear the expense of preparing and presenting its own case.  The compensation, fees, and expenses of the Arbitrator shall be borne equally by the Union and the University.  If the parties agree to have the hearing transcribed, the parties will share equally in the cost of the transcription.

D.        Unless otherwise mutually agreed, each arbitration hearing shall deal with no more than one (1) grievance.

E.        The Arbitrator shall have no power to add to, subtract from, modify or disregard any of the provisions of this Agreement. The Arbitrator shall have no jurisdiction or authority to issue

11

any award changing, modifying, or restricting any action taken by the University on matters reserved to the University's discretion as per Article 17 (Management Rights) unless those actions are restricted by other terms of this Agreement

F.        The decision of the arbitrator shall be final and binding on the parties, although each side retains whatever rights it has under state or federal law to challenge the decision and award.

G.        The arbitrator shall render a decision on the grievance within 30 calendar days of the close of the hearing, or the filing of briefs, whichever is later.

**Section 5**: Time Limits

A.        Absent extraordinary circumstances, failure by the SW, group of SWs or the Union to comply with the time limitations of this Article at any of the Steps, including the initial filing of the grievance, shall constitute a forfeiture of the right to pursue the grievance and shall preclude any further processing of the grievance.

B.        Unless the parties have agreed in writing to a specific extension of time, any grievance or demand for arbitration which is not filed at each Step within the time limits contained herein shall be deemed waived and there shall be no further processing of the grievance or any arbitration thereon.

C.        Failure by the University at any Step to communicate its response within the specified time limits shall permit the Union to proceed to the next Step.

D.        All time limits herein may be extended by mutual agreement expressed in writing.

**Section 6**.  The filing or pendency of a grievance under the provisions of this Article shall not prevent the University from taking the action complained of, subject, however, to the final decision of the Arbitrator.

**Section 7.**  Unless otherwise stated in writing by the University and Union, any mutual resolution of grievances at any step shall not be precedential nor inconsistent with this Agreement.

**ARTICLE 7**

**NON-DISCRIMINATION, HARASSMENT, AND ABUSE OR INTIMIDATION**

Section 1.  Prohibition of Discrimination, Harassment and Abusive or Intimidating Behavior

A.        Harvard University provides equal opportunity in employment for all qualified persons and shall not discriminate against any SW on the basis of race, color, religion, caste, creed, sex, sexual orientation, marital status, parental status, pregnancy and

12

pregnancy-related conditions, gender identity, gender expression, genetic information, national origin, ancestry, age, veteran status, military service, physical or mental disability, political beliefs, union activity or membership, or membership in other protected status under Massachusetts, federal or local law, or any University Policy.

B.        The University shall not tolerate abusive or intimidating behavior by individuals who hold supervisory authority over SWs.

C.        For purposes of this Article, the term "caste" is defined as a system of rigid social stratification characterized by hereditary status, endogamy and social barriers sanctioned by custom, law, or religion, that originated in South Asia.

Section 2.  Definitions of Sexual and Gender-Based Harassment and Other Sexual Misconduct and Abusive or Intimidating Behavior

A.    Sexual and Gender-Based Harassment and Other Sexual Misconduct

Consistent with the University's policies on sexual harassment and other sexual misconduct and/or discrimination for students, faculty, staff and other Harvard appointees, Harvard University is committed to maintaining a safe and healthy educational and work environment in which no member of the University community is, on the basis of sex, including sexual orientation, or gender identity or expression, excluded from participation in, denied the benefits of, or subjected to discrimination in any University program or activity. Gender-based and sSexual harassment, including sexual violence, areis a form of sex-discrimination in that they deny or limit it denies an individual's equal access to the ability to participate in or benefit from University's programs or activities.

1.    Sexual harassment is unwelcome conduct of a sexual nature, including on the basis of sex, including sexual orientation and gender identity. Sexual harassment includes unwelcome sexual advances; requests for sexual favors; and other verbal, nonverbal, graphic, or physical conduct of a sexual nature or based on sexual orientation or gender identity or expression, that satisfies one or more of the following ;when:(1) submission to, or rejection of, such conduct is made either explicitly or implicitly a condition of an individual's employment or academic standing or is used as the basis for employment decisions or for academic evaluation, grades, or advancement (quid pro quo); or (2) such conduct interferes with or limits a person's ability to participate in, or benefit from, the University's education or work programs or activities (hostile environment). A hostile environment can be created by persistent or pervasive conduct or by a single severe episode. (1) an employee of the University either explicitly or implicitly conditioning the provision of an aid, benefit, or services of the University, such as an individual's employment or academic standing (for example, academic evaluation, grades, or advancement) on an individual's participation in unwelcome sexual conduct(quid pro quo); quid pro quo sexual harassment can occur whether a person resists and suffers the threatened harm, or the person

13

submits and avoids the threatened harm. Both situations could constitute discrimination on the basis of sex; or (2) unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the University's education or work programs or activities; or (3) sexual assault, dating violence, domestic violence, and stalking.

Quid pro quo sexual harassment can occur whether a person resists and suffers the threatened harm, or the person submits and avoids the threatened harm. Both situations could constitute discrimination on the basis of sex.

The University is completing the development of an updated definition of consent based on the Title IX Advisory Committee's recommendations. Until the University has enacted this update, consent is defined in the University's Interim Title IX Sexual Harassment Policy and Interim Other Sexual Misconduct Policy.

2.    Gender-based harassment is verbal, nonverbal, graphic, or physical aggression, intimidation, or hostile conduct based on sex, sex-stereotyping, sexual orientation or gender identity, but not involving conduct of a sexual nature, when such conduct is sufficiently severe, persistent, or pervasive that it interferes with or limits a person's ability to participate in or benefit from the University's education or work programs or activities. For example, persistent disparagement of a person based on a perceived lack of stereotypical masculinity or femininity or exclusion from an activity based on sexual orientation or gender identity also may violate this Policy.

Other sexual misconduct is unwelcome conduct on the basis of sex, including sexual orientation and gender identity or expression. Other sexual misconduct includes unwelcome sexual advances; requests for sexual favors; and other verbal, nonverbal, graphic, or physical conduct of a sexual nature or based on sexual orientation or gender identity or expression, that satisfies one or more of the following: (1) an employee of the University either explicitly or implicitly conditioning the provision of an aid, benefit, or services of the University, such as an individual's employment or academic standing (for example, academic evaluation, grades, or advancement) on an individual's participation in unwelcome sexual conduct(quid pro quo), which may occur whether a person resists and suffers the threatened harm or the person submits and avoids the threatened harm; or (2) unwelcome conduct determined by a reasonable person to be so severe, persistent, or pervasive that it effectively denies a person access to the University's education or work programs or activities (hostile environment).

B.        Abusive or intimidating behavior (power-based harassment) by individuals who hold supervisory authority over SWs, when such conduct interferes with or limits a person's ability to participate in, or benefit from their employment at the University is prohibited.

14

~~It is the intent of the University to establish University-wide policies and procedures to deal with abusive behavior and to form a Working Group to define such behavior in more detail and establish policies and procedures to address such misconduct and the handling of complaints over such misconduct.~~

Section 3. Sexual Harassment and ~~Gender-Based Harassment~~ Other Sexual Misconduct Training.

A.      It is the policy of the University to provide educational, preventative and training programs regarding sexual ~~or gender-based harassment~~ and other sexual misconduct; to encourage reporting of incidents; to prevent incidents of ~~sexual and gender-based harassment~~ other sexual misconduct from denying or limiting an individual's ability to participate in or benefit from the University's programs or activities; to make available timely services for those who have been affected by discrimination; and to provide prompt and equitable methods of investigation and resolution to stop discrimination, remedy any harm, and prevent its recurrence.

B.      Consistent with current policy, all faculty, staff and students are required to take on-line training in sexual harassment and other sexual misconduct as determined by the University. The content and delivery of the training is reserved to and determined by the University. However, the Union is free at any time to offer suggestions on how such training can be improved.

Section 4.  Right to notice and representation

A.    SWs are free to have a Union representative accompany them in preliminary discussions about possible incidents of harassment and discrimination if they so choose.

B.    SWs have the right to be accompanied by a Union representative at any and all steps of the formal complaint procedures regarding any complaints of any type of alleged discrimination or harassment under Section 1 of this Article.

C.    The University shall notify any SW complainant in a University complaint procedure that the Office of Dispute Resolution (or any similar University office that might conduct investigations) has an investigatory role and, as such, does not represent the SW.

D.    The University shall also provide any SW complainant in a University Complaint procedure with a letter from the Union, incorporated herein as Appendix A, outlining the various avenues of recourse (including the ability to pursue a resolution through the Department of Education Office of Civil Rights), right to Union representation and contact information for the union.

E. SWs may consult with advisors of their choice, including an attorney, at any point in the formal/informal University resolution process. The University will notify SWs that they may consult with advisors (including an attorney), and the names of potential advisors (including attorneys). SWs have the right to have an advisor or attorney present in conversations with investigators.
-

15

F. The University will report to the Union, once a year, ~~summaries of violations of the non-discrimination and harassment policy involving SWs, the department or the school of the complainant and the respondent, and the academic year in which the report was made~~ de-identified data on allegations of violations of university-wide non-discrimination and harassment policies that resulted in formal complaints and involved SWs, including: complaint allegations by category; the University status of the parties (i.e. undergraduate student, graduate student, faculty member, staff member, post-doc, or third party); the status of the investigation and, where applicable, outcome of responsibility findings; if known, whether either party had an attorney as a personal advisor; and the academic year in which the complaint was made. The University will provide an annual list of individuals who are eligible to serve on hearing and appeals panels, and where applicable, the number of panels on which each served in the prior academic year.

G.    During the life of this Agreement, should the Department of Education issue new formal rules under its Title IX authority that require the University to modify its current Title IX policies and procedures, the University will notify the Union in advance of finalizing any such changes and provide an opportunity for the Union to meet and discuss in good faith the proposed changes.

The University will give the Union an opportunity to endorse recommendations on any such changes and provide an opportunity for the Union to meet and discuss changes in advance of implementing any such changes.

Section 5. Recourse

A.   Processes

1. A SW's complaint of discrimination based on union activity or membership shall be handled through the Grievance and Arbitration Procedure in Article 6 of this Agreement. A grievance alleging such discrimination based on union membership or activity may not include additional allegations of other forms of discrimination or abusive behavior as defined under this Article.

2.    All other SW complaints regarding discrimination or harassment in employment under this Article, as well as complaints regarding abusive or intimidating behavior that does not violate a discrimination policy will be processed in accordance with the internal policies and procedures developed by the University or the individual schools. Such claims ~~under Section 1 and 2 of this Article~~ shall not be processed under Article 6, Grievance and Arbitration, other than the exception noted below in Section C. (2-6)  below.

3.    Under no circumstances should a SW in any of the Schools of the University be pressured by Title IX Resource Coordinators or staff or any other University officials to accept informal resolution of their complaint or ~~interim~~supportive measures, in place of filing a formal complaint. Pressure to

16

accept informal resolution may include (but is not limited to) telling the SW they will not win a formal resolution, providing misinformation about the formal resolution process, and telling the complainant that the resolution process will harm the academic opportunities of the respondent. Discussing in good faith the pros and cons of various approaches shall not be considered pressure to accept informal resolution. SWs are free to file a formal complaint at any time if they so choose.

4.    A SW also may contact the US Department of Education's Office for Civil Rights (OCR) or any state or federal agency that has jurisdiction over claims of discrimination.

B.   Internal University Processes for Claims of Sexual Harassment and Other Sexual Misconduct

1.    Complaints by SWs regarding sexual and gender-based harassment in employment shall be processed in accordance with the University's ~~Sexual and Gender-Based Harassment Policy dated February 10, 2017~~ Interim Title IX Sexual Harassment Policy that addresses sexual conduct that falls within the parameters of Title IX and occurred after August 14, 2020; the Interim Other Sexual Misconduct Policy that addresses sexual conduct that falls outside the jurisdiction of the Interim Title IX Sexual Harassment Policy and occurred on or after August 14, 2020; the Sexual and Gender-based Harassment Policy that address sexual harassment and other sexual misconduct occurring before August 14, 2020 and after September 1, 2014 and other applicable University policies and related procedures, all of which may be amended from time to time by the University. The policies and procedures can be found on the Office of Gender Equity website: https://oge.harvard.edu/policies-procedures

These policies also provide definitions for terms such as Sexual Harassment, ~~Unwelcome Conduct and Gender-Based Harassment~~ Other Sexual Misconduct and Consent.

2. The University encourages any SW to contact one of the School or Unit Title IX Resource Coordinators, ~~or the University Title IX Office~~or the Office of Gender Equity or ODR staff about any incidents of possible sexual ~~or gender-based~~ harassment or other sexual misconduct and to learn about the options that are available to the SW if they wish to pursue that matter. Members of the bargaining unit are also free to have a Union representative accompany them in such discussions if they so choose.

17

3.    SWs may file formal complaints or seek informal resolution of violations of the University's policies on sexual ~~and gender-based~~ harassment or other sexual misconduct and/or discrimination. There is no time limit for the filing of such a complaint under University policies or procedures. However, SWs are encouraged to file complaints as soon as reasonably possible. Such claims shall not be processed under Article 6, Grievance and Arbitration.

4. Both the respondent and the complainant may appeal any final decision of the Investigative Team ~~to the Title IX Officer or designee who will in turn address the appeal to a standing committee of faculty and administrators~~ under the Sexual and Gender-Based Harassment Policy or the Interim Other Sexual Misconduct Policy or Hearing Panel's determination regarding responsibility under the Interim Title IX Sexual Harassment Policy or Interim Other Sexual Misconduct Policy (the latter in the case of consolidated allegations) to the Office for Gender Equity within one week of the date of the notice of dismissal or the determination. The Office of Gender Equity will assign the appeal to a panel drawn from a pool of trained faculty and administrators. All members of the ~~standing committee~~ appeals pool receive trauma-informed training from the Director of the Office of Dispute Resolution or designee, including training on the nature of sexual ~~or gender-based~~ harassment or other sexual misconduct and all relevant Title IX policies and procedures as well as the appeals process.

Impartial and unbiased panels of three members shall be drawn in each case from the standing committee.

Potential appeals panel members are provided with the names and affiliations of the individuals in the appeal and are asked to review to determine whether they have a potential conflict of interest. If so, they are removed from consideration for the appeals panel, and another member of the standing committee is selected for consideration. If there are any questions regarding conflicts of interest, the Office of General Counsel is engaged to help in a determination.

Both the complainant and respondent will be notified as to who will sit on the appeals panel. If a complainant or respondent believes that a particular member of the proposed appeals panel has a conflict of interest and cannot fairly sit upon the panel, such objection should be raised with the University Title IX Coordinator or designee and such objection will be considered in good faith. If the proposed panel

18

member is removed, another member of the standing committee will be selected in their place.

5.    Grounds for appeal shall be:

a.    A procedural ~~error occurred, which may change~~ irregularity that affected the outcome of the decision; ~~or~~

b.    The appellant has ~~substantive and relevant~~ new ~~information~~ evidence that was not reasonably available at the time the ~~investigation~~ decision regarding responsibility or dismissal was made and that may change the outcome of the decision ~~could affect the determination~~;

c.    The University Title IX Coordinator, School or unit Title IX Resource Coordinator, Investigative Team or Hearing Panel had a conflict of interest or bias for or against complainants or respondents generally or the individual Complainant or Respondent that affected the outcome of the matter; or
d.    On the record as a whole, no reasonable Hearing Panel or Investigative Team could have reached the same determination regarding responsibility.

The decision of the Appeals Panel shall be the final decision.

6.    Mediation. Following completion of the Appeals process by a SW, if the Union is dissatisfied with the final decision of the University and contends that it violates a provision of the collective bargaining agreement, the Union may take the matter to mediation by serving notice on the University within 15 days of the final decision of the Appeals Panel. As the parties to the mediation, the Union and University shall meet to mutually select a mediator. The Union and the University will split the costs of mediation evenly.

An individual SW shall not have the right to invoke mediation.

Any such mediation will be between the Union and the University. Any action arising from a mediated agreement may not include remanding the matter or imposing a remedy that would make the University and parties to the underlying claim repeat the investigatory, adjudication, and appeal process. Any mediated agreement shall not impose anything on, or with respect to, the other party or parties from the underlying claim.

19

C. Process for Other forms of discrimination and abusive or intimidating behavior

1. If a SW has an allegation and/or allegations of harassment or discrimination in employment that are not covered, in part or in whole, by the Interim Title IX policy, the Interim Other Sexual Misconduct Policy, or the Sexual and Gender-based Harassment Policy, or if a SW has an allegation of abusive or intimidating behavior in employment, they must pursue such claims in accordance with School or University policy and procedures which may be amended from time to time by the University.

2. Complaints by SWs regarding other forms of abusive or intimidating behavior in employment should be directed to the Dean of Students or their designee and will be investigated in accordance with any School policies and procedures.

For allegations of other forms of discrimination (besides those covered, in part or in whole, by the Interim Title IX policy, the Interim Other Sexual Misconduct Policy or the Sexual and Gender-based Harassment Policy), or for allegations of abusive or intimidating behavior under this Article, and only after exhausting the School or University policy and procedures other than appeal, the SW who disagrees with a decision related to a claim of discrimination or abusive or intimidating behavior in which they are either a Claimant or Respondent may either

(1) pursue an appeal through the School or University appeal procedures on any of the grounds provided for in the School or University procedures, or

(2) pursue a grievance under Article 6, Grievance and Arbitration, as modified below.

3. The two possible bases for a grievance under Article 6, Grievance and Arbitration, shall be:

A)   whether the investigator(s) or decision-makers(s) involved in the initial determination of the claim had a conflict of interest or bias for or against the complainant(s) or respondent(s) such that a reasonable person would conclude it influenced the outcome of the claim to the detriment of the SW; or

B)   whether the grievant has new evidence that was not reasonably available at the time the decision regarding responsibility or dismissal was made that could affect the determination.

20

4. Power of the Arbitrator

A. In cases involving allegations of conflict of interest or bias, and for the sake of all parties, the arbitrator will be asked to avoid an outcome that would make the University and parties repeat the investigatory and adjudication process unless no other remedy will address the arbitrator's findings.  Apart from ordering a new process for the grievant's claim, if the arbitrator finds there was a conflict or bias sufficient to influence the underlying decision to the detriment of the SW, the arbitrator may award a make whole and/or compensatory remedy to benefit the SW but shall have no power to impose any penalties on the other party or parties from the underlying claim. The arbitrator shall not be authorized to award punitive or emotional distress damages nor may the arbitrator award attorney's fees.

B. In cases involving allegations that the grievant has new evidence that was not reasonably available at the time the decision regarding responsibility or dismissal was made and that could affect the determination, the arbitrator's sole power if they agree with the grievant's position will be to remand the matter back to the University for consideration of the new evidence.

C. In all grievance cases, the arbitrator shall have no power to substitute their judgment for that of the University decision-makers with regard to findings of discrimination or abusive or intimidating behavior or lack thereof.

5. If the SW files such a grievance under Article 6, Grievance and Arbitration, any deadlines by which the other party or parties to the underlying claim must file an appeal will be tolled until resolution of the grievance. Any such grievance will be between the Union and the University.  The Union shall bear the burden of proof in the grievance process.

6.  Under no circumstances may the SW pursue both an appeal and a grievance option, except as noted in (b) below.

a) If the SW chooses to file a grievance under Article 6, Grievance and Arbitration, the SW must file such grievance within one week of the date of the final determination (other than appeal) of the internal University or School procedure. The grievance shall be filed at Step 2 (Dean's level). The Union shall decide within ten (10) business days of the Step 2 response whether to process such grievance to arbitration.  If the Union decides to pursue arbitration, the decision of the arbitrator shall be the

21

final decision, subject to whatever rights either party may have under state or federal law to challenge the decision and award.

b) If the Union decides not to pursue arbitration, the SW may file an internal appeal instead.  In this event, the SW must file a notice of appeal consistent with the University's or School's appeal procedures within one week of the date of the notification that the Union will not pursue arbitration.

c) If the SW pursues an internal appeal, either initially or after a decision by the Union not to pursue arbitration, the decision of that appeal shall be the final decision.

7.    Mediation. Following completion of the internal Appeals process by a SW, if the Union is dissatisfied with the final decision of the University and contends that it violates a provision of the collective bargaining agreement, the Union may take the matter to mediation by serving notice on the University within 15 days of the final decision of the Appeals Panel.  As the parties to the mediation, the Union and University shall meet to mutually select a mediator. The Union and the University will split the costs of mediation evenly.

An individual SW shall not have the right to invoke mediation.

Any such mediation will be between the Union and the University. Any action arising from a mediated agreement may not include remanding the matter or imposing a remedy that would make the University and parties to the underlying claim repeat the investigatory, adjudication, and appeal process. Any mediated agreement shall not impose anything on, or with respect to, the other party or parties from the underlying claim.

D.         While the University is developing university-wide procedures for all forms of harassment, discrimination and abusive or intimidating behavior, nNothing in this Article shall preclude an individual School from establishing or following local procedures crafted to address sexual and genderidentity-based harassment, discrimination and abusive or intimidating behavior.

E.         InterimSupportive measures.  Supportive measures are individualized supports to help those who may have experienced incidents of sexual harassment or other sexual misconduct, participate in campus life at Harvard and continue with their work or studies.  Supportive measures may be implemented at any time, including but not limited to during the

22

pendency of a formal complaint investigation or informal report. During the processing of complaints of any harassment and/or discrimination defined in Section 1, the University shall promptly provide, as appropriate, ~~interim~~ supportive measures to individuals involved in a formal complaint or informal report. Possible ~~interim~~supportive measures may include, but not be limited to: no-contact orders; change to a different workstation or schedule for the SW; leave time; suspension of respondent without loss of pay while investigating the complaint; change of supervisor, unit, department, or position appropriate for the SW, provided that the change is voluntary and equitable; provision for medical services; provision for escort services. None of these measures shall result in loss of pay for the complainant, or for the respondent (if the respondent is a SW), except if a complainant or respondent chooses to take voluntary leave of absence and such leave is approved, that leave will be unpaid.

F.         Non-Retaliation. Filing a complaint in good faith of sexual harassment ~~and gender-based harassment~~ or other sexual misconduct and/or discrimination, other forms of discrimination, or abusive or intimidating behavior or cooperating in an investigation shall be a protected activity. Retaliatory actions against any SW for initiating or otherwise participating in such protected activities shall be expressly forbidden.

Retaliation against an individual for raising an allegation, for cooperating in an investigation of such a complaint, or for opposing discriminatory practices is prohibited.

Knowingly or deliberately providing false or misleading information in any investigation is also prohibited.

G.         Discipline. Sanctions for any respondent found to have violated policy shall be handled in accordance with the appropriate disciplinary procedures of the School or unit depending on whether the respondent is a student, faculty member, staff or other University appointee. Disagreement with the severity of any imposed sanction cannot be raised or contested in any way by the complainant.

H.         It is understood that the determination of appropriate penalties for SWs, faculty, staff or other University appointees of the University found to have engaged in prohibited conduct under this Article or related policies is handled at the School level and in accordance with School policies and procedures. A SW who is disciplined for engaging in conduct prohibited under this Article or related policies may grieve the level of discipline imposed but neither the SW nor the Union may dispute the factual findings in the investigatory report.

Section 6.  Pregnancy and Lactation. The University shall provide reasonable accommodations for pregnancy or pregnancy-related conditions (examples include but are not limited to, morning sickness and lactation) unless to do so would impose an undue hardship on the University. Examples of such accommodations include, but are not limited to, a modified work schedule; more frequent restroom, food, or water breaks; providing equipment for seating; limits on lifting; more frequent or longer paid or unpaid breaks; time off, with or without pay, to attend to a pregnancy-related complication; private non-bathroom space for expressing breast milk; and

assistance with manual labor. No such accommodations can result in decreased pay or benefits for the SW.

The University provides many lactation rooms across the University. Any nursing SW or their spouses/partners who are breastfeeding can register to use a Harvard lactation room. Locations of such lactation rooms can be found on the HARVie website.

Section 7.  Bathroom Equity. The University will work with local facilities management to label existing gender-neutral bathrooms in office, classroom and lab buildings. Gender-neutral bathrooms shall be posted on a central website. The University will not prevent SWs from using a workplace bathroom appropriate to the SW's gender identity.

Section 8.  Gender Identity. The University shall respect the SW's decision to choose to discuss their own sexual orientation, gender identity, or gender expression openly, or to keep that information private.

Upon request from the SW, the University will work to update aspects of a SW's employment record to reflect a change in name or gender. University and department-level records should accurately reflect SW pronouns and honorifics.  If an error is found in this regard, it will be promptly corrected when brought to the attention of the department.

Section 9.  Disability. Upon request from a SW with a disability, the University shall engage in an interactive process and will provide reasonable accommodation to enable the SWs with disabilities to perform the essential functions of their job, consistent with state, federal and local law as well as the University's policies.

Section 10.  Prayer Space. The University shall maintain a central website with the location and hours of all known prayer spaces on campus.

Section 11. Medical Confidentiality. In accordance with the requirements of HIPAA and FERPA, the University shall respect the highly confidential status of all SWs' medical records maintained by the University, including those that contain information about their transgender status (such as the sex they were assigned at birth).

**Article  8**

**Academic Retaliation**

**Section 1.** The parties recognize that it is conceivable that retaliation against a SW for exercising a right under this Agreement takes an academic form and is prohibited in the strongest terms. The University shall not retaliate against a SW in an academic form for exercising a right under this Agreement or participating in any investigation or proceeding arising under this Agreement. Academic retaliation can target grades, academic assessments, recommendation letters, or the denial of some academic opportunity.

**Section 2.** Claims of academic retaliation may not be processed through the standard Grievance and Arbitration provisions of this Agreement. Accordingly, a SW with such a claim may instead

24

~~pursue such matters through internal school policies and procedures, or, in the absence of any such policies or procedures, through a direct discussion with the Dean of the School. The University will ensure that within one year of ratification of this Agreement, e~~Each School has ~~such~~ a local policy and procedure in place for handling ~~such~~ academic retaliation matters, and ~~that~~ the Union will be provided with a copy of ~~such policy~~these policies. Accordingly, a SW with a claim of academic retaliation may pursue such a claim through the applicable internal school policy and procedures.

The schools shall have **six (6) months** from the date of ratification of this Agreement to ensure that such internal school policies and procedures require that:
1. a written decision be rendered and provided to the SW and
2. there is a way for a SW to appeal or otherwise raise concerns with an initial decision by the University, on the basis of a procedural irregularity that affected the outcome of the decision; new evidence that was not reasonably available at the time the determination was made and that could affect the outcome of the decision; or the investigator or decisionmaker had a conflict of interest or bias for or against the complainant or respondent that affected the outcome of the matter.

**Section 3.** The SW shall have the right to a HGSU-UAW student representative or UAW representative at any and all steps of the handling of such matters.

**Section 4.** It is understood that SWs may also have access to certain government agencies, both state and federal, and can file claims with those agencies regarding such claims.

## ARTICLE 9

## INTELLECTUAL PROPERTY, SCHOLARLY AND RESEARCH MISCONDUCT

**Section 1**. SWs are covered by and subject to the University's policies and procedures on Intellectual Property and Scholarly and Research Misconduct, as may be amended from time to time. There is one University-wide policy on Intellectual Property at Harvard ("Statement of Policy in Regard to Intellectual Policy"), which applies to all faculty, students, and staff. Scholarly and research misconduct policies at Harvard are School-based. Issues and disputes arising under such policies are not subject to the Grievance and Arbitration provisions of this Agreement. Complaints regarding intellectual property or scholarly and research misconduct are processed in accordance with University or School policies and related procedures, which may be amended from time to time by the University or the School. SWs shall be entitled to Union representation during any investigation of a misconduct allegation.

**Section 2.** The University shall not engage in any form of retaliation against a SW who engages in any good faith effort to assert rights under the Intellectual Property policy or who otherwise participates in any investigation into alleged scholarly misconduct by other faculty, students or University appointees.

25

 **Section 3**.  The University will promptly provide the Union with a copy of any ~~future~~ changes to the University's Statement of Policy in Regard to Intellectual Property and any University-wide Research Integrity/Misconduct policies. <u>The current Intellectual Property Policy and all current Scholarly and Research Misconduct policies from the Schools are posted on the website of the Office of the Vice Provost for Research (vpr.harvard.edu)</u>

<u>The University will ensure that any School's Scholarly and Research Misconduct Policy makes it clear as to how disputes or reporting matters are processed under their policy.</u>

The University will ensure that ~~within one year of ratification of this Agreement~~ <u>by September 1, 2021</u>, each School has such a local policy in place for handling such matters and that the Union is provided with a copy of such policy.

Section 4. ~~Within 90 days of ratification, t~~<u>T</u>he University will maintain a reasonable "plain-language" summary of the University's "Statement of Policy in Regard to Intellectual Property" ~~for distribution to SWs~~ <u>on an appropriate website with notice to the Union as to its location. The Union is also free to post the plain language summary on its own web site.</u> ~~Any such~~ <u>The Intellectual Property Policy</u> summary is only for general guidance and ~~shall~~<u>does</u> not serve as a substitute for the actual Policy itself; in all cases, the language of the Policy itself will govern. <u>Any SW with a question about the plain-language summary or the policy itself or with a question or concern about an invention or a copyright issue may contact the Office of Technology Development (otd@harvard.edu). Additional information as to how Harvard protects and commercializes Intellectual Property can be found on the OTD website. (otd.harvard.edu)</u>

## ARTICLE 10

## HEALTH AND SAFETY

**Section 1.**  SWs will be provided with a safe University workspace and will not be required to work in conditions that pose an unnecessary threat to their health and safety. <u>No SW will be required to act, nor will any SW act, in a manner which constitutes an unnecessary health or safety hazard.</u> Towards that end, the University has policies in place to provide such a safe workplace; will maintain such policies during the life of this Agreement; and may improve such policies at its discretion. The University shall observe all applicable health and safety laws and regulations and will take all reasonable steps necessary to assure SW health and safety. Such reasonable steps shall include but not be limited to providing training in the safe and proper use of equipment necessary for the work.

**Section 2**. If a SW works outside of University workspaces, <u>other than local remote home locations,</u> prior to the beginning of the assignment the University shall:

    A.        Provide the SWs with information about Global Support Services, if SWs have work that takes them outside the United States. <u>SWs will receive this information as soon as possible and no later than 14 days before travel dates.</u>  SWs should consult with

26

the University's Global Support Services prior to undertaking such work for information and advice about risks and safety.

B.        Provide SWs performing field work in the United States information relevant to the safe performance of such work.

C.        Make SWs aware of all available resources they may need for the successful completion of the work assignment, including how to access or obtain these resources in the location of the work assignment.

**Section 3**.  Adequate first aid equipment will be provided in appropriate locations.  The University shall provide first aid information and training at no cost for all SWs in workplaces that involve the use of or exposure to hazardous materials or who work in a hazardous environment.

**Section 4**. The University shall supply and maintain all equipment, tools, materials, and personal protective equipment (PPE) to SWs needed to carry out job duties safely, including but not limited to protective safety glasses as may be required by applicable occupational safety regulations, University policy, or Standard Operating Procedures. The health and safety committee referenced in Section 8 may also make recommendations related to the supply and maintenance of all equipment, tools, materials, and personal protective equipment (PPE) for SWs. Such recommendations shall be considered by the University taking into account relevant factors, including cost, and shall not be unreasonably denied.

A SW may request prescription safety glasses from their supervisor, who shall consider such a request in good faith and decide whether or not to grant the request taking into account relevant factors including cost.

**Section 5**.  For a SW with a disability as defined by the Americans with Disabilities Act, the University will provide reasonable accommodations that do not pose an undue hardship to the University.

**Section 6**.  Workplace and Workstation Evaluations shall be provided by the University upon the request of either a SW, a group of SWs or a supervisor who believes that the nature of the work or workplace is exposing the SW(s) to health-related problems.

The nature of these evaluations will be determined based on the work location (i.e. remote or on campus), as agreed upon by the SW and supervisor or employing unit. While these are normally campus-based work station evaluations, a SW may request that Environmental Health & Safety (EH & S) conduct a virtual ergonomic review, and such request will be granted, consistent with EH & S and school policies and practices.

Such evaluations should involve experts such as occupational hygienists, occupational physicians, occupational health and safety professionals and/or environmental health and safety professionals, who shall make recommendations to the University to eliminate the problem or the

27

risk of the health-related problem(s). The University shall <u>consider the recommendations in good faith and will</u> make reasonable efforts to implement those recommendations <u>that are approved by local program administrators, which, if necessary, will include reimbursing a SW to implement approved recommendations to the workplace. A SW will not be reimbursed for implementation recommendations that the local program administrators did not previously approve.</u> The University will also make reasonable effort to incorporate currently accepted ergonomic practices and guidelines into new and existing workplace and workstation designs.

**Section 7.**   Consistent with University procedures, the University will provide advance notice to affected SWs and other University building occupants for asbestos removal project(s) in their immediate work area.

**Section 8.**   The parties to this Agreement pledge themselves to a cooperative effort in the area of health and safety founded upon good faith communication and discussion of problems, solutions, and prevention. Accordingly, the University and the Union agree that, at least twice per contract year and additionally if mutually agreeable or if a health and safety issue is identified by a SW, an equal number of representatives of the Union and University will meet at a mutually agreeable time and place as a health and safety committee to discuss matters relating to health and safety of SWs in the workplace. Union representatives shall not suffer any loss of compensation to attend such meetings. <u>Such meetings shall not constitute nor be used for the purpose of negotiations or discussions of any active grievance.</u>

<u>The University shall endeavor to have representatives qualified to speak on the topics of interest at the meeting when the parties agree in advance on a particular agenda item for such meetings.</u>

<u>The parties agree that workplace health and safety include concerns regarding mental health and may implicate racial justice issues. The parties recognize that such issues are also being discussed, and will continue to be discussed, on a University-wide basis during the life of this Agreement and may result in specific recommendations for change and accordingly are beyond the health and safety committee's authority to resolve.</u>

**Section 9.**   In cases of injury to a SW while at work, the SW shall assist their Supervisor to file an Incident Report as soon as possible in accordance with University procedures. The SW shall file a Worker's Compensation claim in accordance with University procedures and state law. The determination of Worker's Compensation will be made via the University third-party workers comp administrator.

**Section 10**.   SWs shall adhere to all health and safety policies and procedures and shall perform their duties in a safe manner, using appropriate health and safety equipment provided by the University in accordance with standard operating procedures. Should a SW become aware of conditions they believe to be unhealthy or dangerous to their health and safety, the SW shall report the condition immediately to the supervisor or the Harvard Environmental Health and Safety Department who shall take corrective action. In cases where there is an imminent danger to the SW, they shall not resume their work until appropriate corrective action is taken. The University shall not retaliate against any SW for such reporting. The University shall respond to

reports within 30 days, either by confirming receipt of the report or by describing any corrective action(s).

## ARTICLE 11

## TRAINING

**Section 1.** The University shall provide any training that it determines necessary in order for the SW to fulfill their work duties at no cost to the SW. All such training shall be considered mandatory and shall be considered part of the required workload of the SW and shall, correspondingly, be listed among other work duties on the SW's appointment letter(s) to the extent such trainings are known at the time of the issuance of such letters.

**Section 2.** If a SW identifies additional training that can enhance their work, they may propose such training to the University for good-faith consideration. If approved, such trainings will be at no cost to the SW and shall be considered part of the required workload of the SW.

**Section 3.** For these trainings, Tthe University will determine the content and delivery of the trainings. The Union-Management committee may make recommendations to the University to address other training concerns brought to its attention by SWs or regarding the content and delivery of training related to workplace conditions. The University will give such recommendations good-faith consideration.

**Section 4**. The University shall notify all SWs of training and orientation required as part of their appointment notification or as soon as practicable once such new or additional training is set.

**Section 5. Anti-bias Trainings**

In keeping with the University's commitment to combatting racism, at least once for the duration of this contract, SWs and their faculty or staff supervisors are encouraged to avail themselves of the existing training courses and others that may be developed that address how to recognize and combat racism, ableism, bias, discrimination and harassment.

For these courses and any other trainings, the University will determine the content and delivery of such courses and trainings. However, the Union-Management Committee (UMC) shall be provided the opportunity to review the current training courses and give feedback on the content and delivery of the current and future training options. Such feedback will be considered in good faith by the University. The UMC shall meet within 90 days after ratification to discuss existing training courses, possible refinements to those courses and suggestions for additional courses and related contract  implementation issues.

## ARTICLE 12

## EMPLOYMENT RECORDS

29

**Section 1.**  Employment records shall include records documenting a SW's employment, such as appointment letters, payroll records, disciplinary action, and Q and other work evaluations or their equivalent.  A SW's coursework or academic progress or other academic records shall not be considered employment records.

**Section 2**.   Upon request, SWs and the Union shall be notified as to the location(s) of the employment records of the SWs.

**Section 3.**  SWs shall have the right to examine and copy all employment records. The University shall make such records available within a reasonable time, but no later than five (5) business days after a SW's request to review such records.

 **Section 4.**   SWs shall have the right to request removal or correction of any factually incorrect material from their employment record. The University shall correct any such factual errors or shall remove the factually incorrect material within seven (7) business days of the SW's request.

SWs shall also have the right to request in writing removal of inappropriate material from their employment record which will include an explanation as to why it should be removed. The University shall consider such a request, but shall not be obligated to remove such a document. SWs shall be notified of the University's decision and if it is a denial, the University shall include in the notice a written statement explaining the reason(s) for such denial.

SWs shall have the right to attach a statement in response to any employment record. The statement shall be included when the employment record is transmitted to a third party so long as the original material that was the subject of the statement remains in the SW's employment record.

**Section 5**.  Grievance documents and related materials involving a SW shall not be considered employment records. No reference to any grievances shall be placed in an individual's employment record.

**Section 6**.  SWs shall be notified within seven (7) business days of any information to the extent that the information is, has been used or may be used, to negatively affect the SW's qualification for employment, promotion, transfer, additional compensation or the possibility that the SW will be subject to disciplinary action. However, such information shall not include course work or academic progress or other academic records.

**Section 7**.  All employment records shall remain confidential. Neither the University nor the Union shall make any material public without the SW's written consent, unless due to subpoenas or other legal process.

**Section 8**.  Rights established in this article are conferred on SWs and former SWs regardless of current employment status. Former SWs shall have the right to file a grievance alleging violation of this article pursuant to Article 6, Grievance and Arbitration, within the timeframe set forth in

30

the Grievance and Arbitration article. The University shall be obligated to keep employment records for a period of time consistent with the University's General Records Schedule.

## ARTICLE 13
## INTERNATIONAL STUDENT WORKER RIGHTS AND WORK AUTHORIZATION

Section 1. While the University does not offer legal advice to SWs, Harvard International Office can advise a SW generally on visa issues as they relate to the academic and/or employment relationship with the University. Harvard International Office shall maintain a list of attorneys and agencies for referral, including pro-bono agencies, if a SW has a complex immigration issue or if the SW is in need of immigration advice that is not related to the SW's academic and/or employment relationship with the University. Legal fees if the SW retains such an attorney would be borne by the SW and may be reimbursed under the International Student Worker Assistance Fund in Section 2 if the legal matter involves an immigration issue that directly affects the SW's ability to work at the University.

Additionally, HIO shall invite immigration attorneys to visit campus (Cambridge and Longwood), either in-person or virtually, once each semester to discuss H visas and green cards. The University agrees to take reasonable efforts to record any such presentation for additional viewing and/or, in its sole discretion, make available live streaming, provided that the immigration attorney(s) consent(s) to such recording.

Section 2. International Student Worker Assistance Fund.

Effective upon ratification, the University shall establish an International Student Worker Assistance Fund in the amount of $30,000 for each fiscal year of this Agreement. SWs who are resident or non-resident aliens for tax purposes may apply for reimbursement of immigration and legal expenses if the legal matter involves an immigration issue that directly affects the SW's ability to work at the University.

Distribution of any funds shall be made in accordance with procedures, policies and requirements established by the Union, subject to approval by the University.

Unexpended funds may not be rolled over from one year to the next for the duration of this Agreement.

Section 3.  Immigration Leave.  Salaried SWs shall have a right to five (5) paid business days of leave per year in order to attend visa and immigration proceedings and any other related matters for the SW and the SW's family as defined in Section 2 of Article 24, Leave Provisions SWs employed on an hourly basis may also be absent for the same purposes but without pay without loss of pay if the attendance at the immigration proceeding occurs during hours when the SW is required to be working.

31

A SW may request additional days off from their supervisor(s), who may approve these on a discretionary basis.

Section 4.  In cases where a SW is unable to return to the United States as a result of their immigration status, and for reasons outside of their reasonable control (*e.g.,* administrative processing), the University shall undertake reasonable efforts to arrange for the SW to perform their duties outside the U.S. until such time as either the SW can no longer work effectively by remote or is not making sufficient academic progress to maintain student (and thus SW) status. Any determination regarding such academic progress is not grievable.  This section does not preclude a School from categorizing certain work that a SW could do as only being performed on-campus. Additionally, permission to work remotely shall be reviewed periodically every two weeks, at which time a SW must obtain reauthorization for an additional two weeks.

Section 5.  If the University is not able to lawfully employ or continue to employ a SW as a result of the SW's immigration status, the University agrees to meet with the Union and the SW to discuss potential re-employment into their prior position or another position if their previous position is unavailable. The University agrees to make reasonable efforts to re-employ the SW as soon as possible after that person obtains work authorization or immigration status that lawfully permits them to work as a SW.  Such timing of re-employment shall depend on several academic factors, which are not grievable, including the academic calendar. The timing of re-employment may also depend on other factors such as the availability of lab space and research funding.

Section 6.  Issues surrounding immigration and visa status that may affect SWs can be appropriate topics for the Union-Management Committee. In addition, to assure effective support services, foster good communications and better understanding between the University and its international graduate employees, the University shall convene two meetings yearly between the University and the Union that will include staff from the HIO.

Section 7. Within three (3) months of the ratification of this Agreement, the University shall establish The University shall maintain, until September 30, 2021 or until final recommendations are made, a University-wide Working Group with representatives from various constituencies, including at least 2 members of the HGSU-UAW, to evaluate the English-language needs of SWs, and the availability and the effectiveness of resources currently available such as the English Language Program, the Center for Writing and Communicating Ideas, and the Professional Communication Program for International Teachers and Scholars at the Bok Center. SWs who are members of the Working Group will be provided release time to attend meetings of the Group without loss of pay.

The Working Group will produce a list of recommendations to improve ESL services at the University including but not limited to enhancing post-ELP resources, access to ELP or equivalent programs at all Schools, and affordable proof-reading resources for teaching and research work products before the dissolution of the working group. The University will also provide these recommendations to the Union.

Section 8. Except as required by law, legal process, or regulations governing the administration of F-1 student and J-1 exchange visitor programs, the University shall not disclose any SW's

32

<u>immigration information or personal information including, but not limited to: temporary or permanent home address, contact information, workplace, or work schedule to any government entity.</u>

## ARTICLE 14

### TAX ASSISTANCE

**Section 1**. The Harvard International Office (HIO) offers resources to assist international student workers with their tax issues. For as long as such programs exist, HIO will continue to offer web-based tax software designed exclusively for international students, scholars, and their dependents who are non-residents for tax purposes. If such programs cease to exist, the University will notify the Union and, upon request of the Union, discuss possible alternatives to such programs.

## ARTICLE 15

### WORKSPACE, REMOTE WORK, AND MATERIALS

Section 1.  To carry out assigned duties as determined by the University, the University shall provide SWs, at no cost to the SW, reasonable access to University services, materials, and facilities necessary to carry out such duties, including but not limited to: desk space (individual or shared), after-hours and weekend building access, library privileges, studio space, storage space, campus mail, office supplies including chalk and dry-erase markers, office equipment, basic software and hardware, basic lab equipment, grading software, and audio/visual presentation equipment.

Section 2.   Nothing in Section 1 precludes the University or the supervisor from determining what specific software and hardware, lab equipment, grading software, and audio/visual presentation equipment are best suited or adequate to carry out assigned duties. However, the University shall consider in good faith any SW request for such specific equipment or materials not provided pursuant to Section 1 by the University. If a faculty member denies such a request, the SW may discuss the denial with the department chair or supervisor.

33

Section 3. To the extent available and consistent with the requirements of the departments or employing unit, SWs shall also have access to computers with internet access and printers.

Section 4.  With the supervisor's or employing unit's advance approval, the University shall reimburse SWs for required job-related materials, equipment, and services that are not otherwise provided to the SW by their department, including materials needed in on-campus spaces and, when approved, remote work locations. Requests for approval shall not be unreasonably denied.

Section 5.   If a SW's University work location is to be moved or if there is a substantial alteration of the SW's work space, the SW will be notified at least thirty (30) days before the move or alteration. In circumstances where it is not possible to provide thirty (30) days' notice, notice shall be given as soon as possible.

Section 6.  In the performance of their duties, SWs will have access to available University private space to advise students.

Section 7. Remote work

When requested by the SW and approved by the SW's supervisor or employing department/unit, or when required by the University, SWs may work remotely, which includes work from home.

In such cases, the University reserves the right to set the parameters for remote work by a SW, and the SW shall be subject to any procedures, restrictions, limitations and other guidelines on remote teaching and learning and remote work that may be set by the University in a given case. The supervisor or employing department/unit head will discuss such matters with the SW in advance of the start of remote work and may recommend additional guidelines for particular situations.

Any remote work arrangement may be terminated at the sole discretion of the University at any time with reasonable notice to the employee taking into account the supervisor's or employing department/unit's needs and the SW's remote situation. Such reasonable notice shall normally be no less than 30 calendar days, instructional or research work needs permitting.

In the case of a SW working remotely, the SW may request assistance from the HUIT Service Desk or from the local School IT help desk with regard to internet access in accordance with University procedures.

The SW and the supervisor or employing department/unit shall discuss what particular University services, materials, and facilities necessary to carry out assigned duties the SW shall receive, at no cost to the SW, when working remotely, pursuant to Sections 1 and 2 of this Article. Computer and printer equipment, when not otherwise available to the SW, may be provided after review on a case by case basis at the University's discretion. Ownership of any equipment that may be provided to a SW working remotely remains with the University.

34

A SW working remotely shall have the ability to request reimbursement for work-related materials consistent with Section 4 above and consistent with any University policies on expenses reimbursements.

Also, the SW will have access to Workers Compensation in the case of work-related injury that arises out of and is in the course of University employment and shall proceed in accordance with Section 9 of Article 10, Health and Safety.

## ARTICLE 16

## WORKLOAD

Section 1. The University maintains the right to define academic expectations and degree requirements. This Agreement should not in any way be construed as imposing a limit on the amount of this work necessary for a student to make satisfactory academic progress toward their degree. The parties agree that it is in the interest of the University and the student worker to define a SW's workload to be commensurate with the SW's appointment, title/classification, and compensation as well as their ability to make academic progress required by their program. Such workload is outlined below.

Section 2. Salaried / stipended appointments.  For all such appointments, the University will not require more than an average of twenty (20) hours per week of effort for students in their roles as student workers over the course of their employment appointment period where the appointment period is a traditional semester (fall/spring), academic year, or calendar year.

The time spent by a student worker on their academic efforts associated with degree requirements and academic expectations are not part of this collective bargaining agreement.

Teaching Fellows or other salaried SWs with instructional assignments shall not be required to take on a workload of more than two course sections per semester.  Minimum compensation rates for such work are set out in Article 20, Compensation.  As noted in that Article, each School may increase compensation beyond minimum teaching rates depending on, among other things: degree of difficulty of the course or section; class size; degree of independence and accountability for the SW; frequency of meetings; attendant course advising; and any oversight responsibilities.

For purposes of this Agreement, the workload of salaried/stipended Research Assistants (RA1 and RA2 in Article 2, Titles and Classifications), are the efforts they are expected to make to contribute toward support of general functions and activities within a research lab or program. These students are also expected to engage in course work, teaching, and/or research that will contribute to degree requirements, all of which are academic efforts that are not part of this collective bargaining agreement.  The combination of these efforts generally reflects a full-time commitment.

35

Section 3.  Hourly SWs. SWs who are working on an hourly basis may have a variable number of hours of work that may be assigned during all or part of their appointment period, but in no event shall any SW be required to work more than an average of twenty (20) hours per week over the course of their employment appointment period where the appointment period is a traditional semester (fall/spring), academic year, or calendar year. When possible, such hours should be memorialized in writing by the supervisor when the assignment is made. When an appointment letter for an hourly SW sets the number of hours, such SWs will not be required to work more hours than may be specified in the appointment letter. Hourly SWs will not be required to work any hours for which they are not paid. Hourly SWs will be paid for all hours worked.

Section 4.  Workload assigned to any graduate SW under this Article is separate from the academic requirements associated with thesis and dissertation research that is expected pursuant to 300-level course work or its equivalents in other Schools. As previously stated, the University maintains the right to define academic expectations and degree requirements.

Section 5.  While the parties recognize that the content of work assigned to SWs may vary from week to week, SWs shall not be assigned job duties that cannot be reasonably performed within the workload average in Section 2, Section 3 or Section 7 of this Article.  Additionally, the University shall provide SWs with a reasonable amount of time in which to complete job duties, taking into consideration the relevant surrounding circumstances.  The workload must align with the levels of compensation presented in Article 20, Compensation, and Article 2, Titles and Classifications.

Section 6.  A SW who anticipates that their workload will exceed the workload average stated in Section 2, Section 3 or Section 7 of this Article or a SW who otherwise has concerns about the nature or amount of their employment workload may bring such concerns to their immediate supervisor. The supervisor shall discuss any such concerns with the SW and, as warranted, may make adjustments to workload requirements or compensation. If the SW is not satisfied with such discussions, or if they believe they have been misclassified or that their job duties are not commensurate with their employment appointment letter, they may file a grievance under Article 6, Grievance and Arbitration, over such matters.

Section 7.  Other appointment periods.
A.      Intersession and other similar shortened periods.  The parties recognize that, in addition to the more typical appointments of a traditional semester (fall/spring), academic year, or calendar year, a SW may be offered an appointment to work during an intersession or other similar shortened period. By design, such appointments may involve a more intense workload each week than typically associated with semester-long appointments. Therefore, the twenty (20) hour average in Section 2 and Section 3 shall not apply to such appointments. Rather, the University will not require more effort for students in their roles as student workers than is specified in the job posting and/or appointment letter.
B.      Summer.  The parties recognize that summer appointments are also different than the more typical appointments of a traditional semester (fall/spring), academic year or calendar year. Therefore, the twenty (20) hour average in Section 2 and Section 3 shall not apply to summer

36

appointments.  Rather, the University will not require more effort for students in their roles as student workers than is specified in the job posting and/or appointment letter.

Section 8.  Any work assignment, required training, orientation, required meetings, required conferences, required office hours shall be included in the total workload for the appointment period. Hourly employees who participate in any job training or work orientation will be paid for their time at their normal hourly rate. Hours spent on individually assigned special preparation for teaching sections shall also be included in the total workload for the appointment period.

Section 9.  Required meetings will be held during the normal work hours at the SW's workplace, or at another location on campus with advance notice, or at another appropriate location with advanced notice to the SW.

Section 10.  In the case of a change of a SW's job assignment, any work completed in the original assignment will count toward the workload for the semester.


## ARTICLE 17
## MANAGEMENT RIGHTS

Section 1. All management functions, rights, and prerogatives, that have not

been expressly modified or restricted by a specific provision of this Agreement, are retained and vested exclusively in the University and may be exercised by the University at its sole discretion. Such management functions, rights, and prerogatives include the right:

A.   to determine, establish, direct, and control the University's mission, objectives, priorities, organizational structure, programs, services, activities, operations and resources;
B.   to recruit, appoint and transfer unit members and to determine and modify the size and composition of the work force;
C.   to determine or modify the qualifications and responsibilities of unit members;
D.   to direct, assign, schedule and otherwise supervise unit employees:
E.   to train unit members subject to Article 11, Training;
F.   to establish new job classifications within the unit, subject to any restrictions in Article 2, Titles and Classifications;
G.   to establish and modify standards of conduct and to discipline or discharge unit members for just cause subject to Article 19, Discipline and Discharge;
H.   to establish and modify the processes and criteria by which unit members will be evaluated in their work performance;
I.    to establish and modify rules, regulations and policies;
J.    to alter, extend, or discontinue existing equipment, facilities, and location(s)

of operations;

37

K.    to determine the academic calendar each year;
L.   to determine class and section size;
M.   to subcontract all or any portion of any operations;
N.   to take such action as is necessary to maintain the University's efficiency

and effectiveness, including determining the means, methods, personnel, budgetary and financial procedures by which the University's programs, services, and operations are to be conducted.

O.   to determine and modify tuition and fees for all programs in which unit members are based and all matters affecting financial aid;
P.   to determine and modify policies and financial costs and charges associated with University housing;
Q.   to determine and modify what benefits will be offered to students, including health, dental, vision and other medical insurance and prescription drug policies, and to determine the student costs for such coverage;
R.   to select all insurance carriers and to change carriers from time to time;

Section 2. Other questions of academic judgment and decision-making shall remain in the University's sole discretion and over which the University has no obligation to bargain. These include, but are not limited to, judgments and decisions regarding all matters affecting:

A.   student admissions:
B.   academic standards, and unit members' progress as students, including but not limited to the completion of degree requirements;
C.   who is taught, what is taught, how it is taught and who does the teaching;
D.   research methodology and materials;
E.   external grants including application, selection, funding, administration, usage, accountability and termination;
F.   the creation, elimination or modification of courses and curriculum;
G.   instructional methods;
H.   the content of courses, instructional materials, the nature and form of assignments required including examinations and other work;
I.   grading policies and practices;
J.   all other academic policies, procedures, rules and regulations in regard to unit members' status as students, including, but not limited to, all questions of academic standing, intellectual integrity, and any matter relating to academic progress in a University educational program;

Section 3. Any exercise of management rights shall be consistent with the terms and conditions of this Agreement. No action taken by the University with respect to a management or academic right shall be subject to the Grievance and Arbitration Procedures unless the exercise of such right violated an expressly written provision of this Agreement.

38

Section 4. The above enumeration of management and academic rights is not exhaustive and does not exclude other management or academic rights not specified above. The University, in not exercising any function hereby reserved to it in this Article, or in exercising any such function in a particular way, will not be deemed to have waived its right to exercise such function or preclude the University from exercising the same in some other way.

## ARTICLE 18

## UNION ACCESS AND RIGHTS

**Section 1**

    A.   To the extent permitted by the Family Educational Rights and Privacy Act (FERPA), the University will provide to the Union a weekly electronic file containing the following directory information for each SW in the bargaining unit:

    Name
    Net ID
    Permanent and local street address, city, state, zip code,
    Job title
    Date of birth
    Place of birth
    Dates of employment
    Dates of enrollment
    Anticipated or actual date of graduation
    Enrollment status
    Department mail code
    The Directory Email address
    The Directory Telephone number
    Employing department or program
    Department or program in which SW is enrolled
    Position classification

    This listing shall be provided to the Union at no cost. If the SW affirmatively consents to the disclosure of such information to the Union as provided for in Section B. below, the University will also include the SW's rate of pay for all pay codes. However, the rate of pay will be reported on the same basis as the pay period.

    This listing shall include all SWs who were in the bargaining unit at any point in the intervening time since the production of the prior listing. If any item on this list is unavailable at the time of delivery, every effort shall be made to include this information in future lists.

    B.   Additional non-directory information; FERPA Communication and FERPA Release.

39

Within, or as an enclosure to each SW's appointment letter, the University shall provide a FERPA Communication and a FERPA Release Form as described below, either in paper format or a format where the Form can be completed and submitted to the University electronically, or if a paper form is sent, scanned and returned electronically. The initial version of the FERPA Communication and the FERPA Release form, and any changes to either document, shall be shared with the Union prior to its initial dissemination.

1. The FERPA Communication will include, at minimum, the following information:

   a. The Union is the SW's exclusive bargaining representative;

   b. The Union has a legal obligation to represent the SW when they are engaged in bargaining unit work and that to do so, the Union may need certain information about its unit members so that it is properly prepared to enforce the collective bargaining agreement, which covers pay and other terms and conditions of employment;

   c. In order to avoid any conflict between the Union's right to access this information under the National Labor Relations Act, and FERPA, which regulates the disclosure of certain information in a SW's student records, the SW will be asked to complete and sign the FERPA Release Form and return the form along with all other on-boarding paperwork, such as an I-9, etc.; and,

   d. Contact information of both the Union and the University for the SW to raise any questions about the FERPA Communication and FERPA Release Form and/or how the information shared with the Union may be used.

2. The FERPA Release Form will contain, at minimum, the following:

   a. An option for the SW to waive their privacy rights under the Family Education Rights and Privacy Act (FERPA) and affirm their consent to release non-directory information that may be sought by the Union for representational purposes and to which the Union would ordinarily be entitled under the National Labor Relations Act. This option will be accompanied by a statement that the Union, if provided access to such information by the SW, may use such information only for the purposes for which the disclosure was made and may not disclose the information to any other party without the prior consent of the SW.

   b. An option for the SW to decline to waive their privacy rights under FERPA.

    c.      Information about how a student may change their selection in the future.

    3.   In cases related to Article 19, Discipline and Discharge, if the SW has not permitted the disclosure of their non-directory information to the Union, the University, in accordance with the provisions of that Article, will inform the SW that they are entitled to Union representation, and the University shall give the SW the opportunity to voluntarily sign a FERPA Release Form.

    4.   The Union agrees that it will not re-disclose any personally identifiable information that it receives pursuant to this article without the prior consent of the SW.

**Section 2**.  Union representatives shall be provided reasonable access to the University mail systems, including e-mail.

**Section 3.**  Following ratification and approval by the parties, the University shall publish the Agreement on a designated website.

**Section 4**. Recognizing the mutual benefit of the work done by SWs on the administration of the benefit pools, the University will provide the Union with $64,482 per fiscal year which the Union may distribute to SWs who administer the benefit pools on behalf of the Union. In the Union's discretion, they may use some of the funds for purchase of any software or other technical tools to aid in the administration of the funds. This amount shall increase each year according to the salaried percentage increase for that year.

**Section 5.** At the beginning of each academic year, the Union shall furnish the University with a written list of ~~up to ten (10)~~ officers and other authorized representatives and shall update the list when changes occur. The University shall deal with such individuals as representatives of the Union for purposes of investigating, presenting and settling grievances in accordance with the provisions of the collective bargaining agreement.

Upon securing permission (such permission shall not be unreasonably delayed or denied) from a supervisor, such representatives shall be permitted reasonable release time to investigate, present and process grievances on University property during regular working hours without suffering a loss of pay.

Such activities cannot take place while a SW involved is conducting a class nor can such activities disrupt University operations.

~~Hourly SWs may also serve as one of the ten (10) Union representatives but shall not receive any release time.~~

41

The question of possible release time for any future collective bargaining will be left to the parties to address prior to the beginning of such negotiations.

**Section 6.** Except for classrooms while class is in session and certain research labs or other areas designated by the relevant academic department, Institutional Animal Care and Use Committee, or the Environmental Health & Safety department as restricted due to safety concerns, provided that such designation shall not be made in a manner that discriminates against the Union. Union representatives, including International Union, UAW, shall have access to all SW workspaces on University premises to conduct any necessary Union business but only after advanced notice to the supervisor. Under no circumstances shall Union representatives interfere with programs, operations or the work of SWs or other University employees.

**Section 7. Orientation**

~~If a School or University Department holds any orientation(s) at which SWs are expected to attend, in order to address SWs that are present, the University will provide the Union with advance notice of any such orientations. In such cases, a School or Department will reserve a given period of time within which there will be both a School and Department orientation for SWs as well as time for the Union to introduce itself to SWs. During this period, at a time designated by the University, Union representatives will be permitted up to thirty (30) minutes to present information about the Union to the SWs. The Union shall promptly notify the University as to whether it wishes to use such time.~~

~~The Union is free to distribute a packet of Union materials to SWs at such orientations during its thirty (30) minutes.~~

> **A.   Notice**. To allow the Union time to address current and potential SWs, the University will provide the Union one week advance notice of any orientation(s):
>
> > a.        for incoming PhD students
> >
> > b.        pertaining to bargaining unit positions at a School, Department, Program or other employing unit
>
> The parties will draft a template notice that the University shall provide to Schools, Departments, Programs and other employing units on a semester basis (see Appendix ___).
>
> The Union-Management Committee will work in good-faith to create a list of such orientations for current and potential SWs. The list will be reviewed and updated on at least a yearly basis.
>
> **B.   **The Union shall be provided up to thirty (30) minutes included within the orientation schedule or program. The Union shall promptly notify the University as to whether it wishes to use such time.

If, for any reason, the Union is not scheduled for an orientation time-slot with adequate notice, the relevant employing unit shall convene an additional union orientation session for their current and potential SWs during the semester.

**C.    Materials**. The Union is free to distribute a packet of Union materials at orientations. The University will include union materials (see Appendix XXX) in informational packet(s), if any, to incoming graduate students eligible for bargaining unit employment and alongside the appointment letter for other SWs.

**Section 7.**  The University agrees to furnish conference and/or meeting rooms (physical and virtual) at no cost for Union meetings upon prior request by the Union, on the same basis as recognized student organizations within a given school. The Union acknowledges that certain spaces on campus may require that a fee be paid by the Union consistent with what other recognized student organizations within a given school must pay. The Union agrees to comply with all University regulations and policies regarding the reservation and use of such facilities.

**Section 8.**  The Union shall have access to designated space on existing bulletin boards in University departments Schools, Departments, Programs, Institutes, and Centers that employ SWs. All postings by the Union shall be done in accordance with University policies regarding access and approval required for bulletin board use on the campus.

**ARTICLE 19**
**DISCIPLINE AND DISCHARGE**

**Section 1.**  SWs shall not be disciplined, suspended, or discharged from employment without just cause. Discharge, for purposes of this Agreement, shall mean the termination of a SW's employment appointment prior to the expiration of that appointment.

 Discipline as used in this Article refers to adverse employment actions taken based on job-related misconduct or job-related poor/non-performance,  and not to determinations by the University to dismiss a SW from the University or take an adverse action against a SW for academic reasons, including but not limited to grades, academic assessments, and authorship decisions or for non-job-related disciplinary reasons.  The Union acknowledges that an individual who ceases to be a graduate student cannot continue to serve as a SW.

**Section 2.**  Neither Discipline nor Discharge includes the non-reappointment of a SW or the failure to offer an employment appointment to a SW, nor does it include performance evaluations or performance.

**Section 3**. Prior to invoking suspension or discharge under this Article. the University shall:
1. Notify the SW (and Union pursuant to Section 12 of this Article) in writing about the proposed suspension or discharge. Such notice of intent shall state the reasons for the proposed suspension or discharge, including the nature of the alleged violation, level of intended discipline, and notice of the right to a hearing.   The notice shall also contain a statement indicating that as a member of the bargaining unit, the SW has the right to

43

contact their Union and to have Union representation, along with contact information to reach a Union representative.

1.    Hold a disciplinary hearing with the SW, and the SW's supervisor or designee no sooner than seven (7) business days after the written notification is received by the SW.

1.    During the hearing, the SW shall be provided the opportunity to respond to the alleged violations.

1.    The SW shall have a right to a union representative, who shall be afforded the opportunity to represent and speak on behalf of the SW at the hearing.

A decision on suspension or discharge will be made within a reasonable time following the conclusion of the hearing. The Union will receive a copy of the final disciplinary action in accordance with Section 12 of this Article.

**Section 4**.  Prior to invoking discipline of a lower level than suspension or discharge, the University shall notify the SW (and Union pursuant to Section 12 of this Article) in writing. The written notice shall state the reasons for the proposed discipline, including the nature of the alleged misconduct or poor/non-performance; a brief statement of relevant facts; the level of intended discipline.

The notice shall also contain a statement indicating that as a member of the bargaining unit, the SW has the right to contact their Union and to have Union representation, along with contact information to reach a Union representative.

The Union may request additional information regarding the proposed discipline in accordance with the relevant case law under the National Labor Relations Act.

The University shall take any response by the SW into account before issuing any final disciplinary action. The Union will receive a copy of the final disciplinary action in accordance with Section 12 of this Article.

**Section 5.**  There shall be no increase in the assigned level of discipline from the written notice of intent.

**Section 6**.  The University may place a SW on paid administrative leave without prior notice, in order to investigate allegations of misconduct or dereliction of duty which, in the judgment of the University, warrant immediately relieving the SW from all work duties and/or require removing the SW from the premises.

A.    The SW (and Union pursuant to Section 12 of this Article) will be notified, as soon as practicable, in writing when a SW is being placed on paid administrative leave. The written notice shall state the reason the SW was placed on paid administrative leave. The notice shall also contain a statement indicating that as a member of the bargaining unit, the SW has the right to contact their Union and to have Union representation, along with contact information to reach a Union representative.

B.    Paid administrative leave is neither discipline nor discharge.

44

C.      At the conclusion of an investigation of an SW placed on administrative leave, where the University elects not to take disciplinary action, the SW (and Union pursuant to Section 12 of this Article) will be provided with a notification that the investigation is completed and that no discipline will be imposed.

D.      The University will place a record of administrative leave in the SW's employment record only if disciplinary action is taken. The University will transfer records of such administrative leave to a third party only if required by law or regulation.

**Section 7.**  In the event that a SW is discharged, the SW shall be notified in writing as soon as practicable.  In accordance with Section 12 of this Article, the Union shall also receive a copy of such written notice within three (3) business days of the discharge.

 **Section 8**.  SWs who are disciplined or discharged shall be entitled to file a grievance against the disciplinary action at Step 2 of the Grievance Procedure within twenty (20) business days of the action.  If the Union subsequently files for arbitration, the parties agree to use best efforts to secure an arbitration date as expeditiously as possible.

**Section 9.**  If during the disciplinary hearing referred to in Section 3, the charges are dismissed, any material concerning the dismissed charges shall be removed from the SW's employment record. If any subsequent grievance results in a favorable decision for the grievant, then any material concerning the discipline shall not be considered part of the SW's employment record nor shall it be transferred to any third party unless required by law or regulation.

**Section 10**.  As an alternative or in addition to issuing disciplinary action, the University may recommend reasonable remedial measures when appropriate. Such remedial measures must be rehabilitative rather than punitive and at no cost to the SW.

**Section 11**.  The University and the Union shall maintain the confidentiality of all disciplinary actions except on a need-to-know basis or consistent with FERPA to the extent it applies.

**Section 12.**  Notification to the Union.  If the SW has consented to disclosure of non-directory information as provided in Article 18, Union Access and Rights, the University shall copy the Union on written notification to the SW regarding disciplinary matters outlined in this Article.  If the SW has not previously consented to such disclosure, the University shall supply a waiver form, accompanying any disciplinary notification, for the SW's consideration that, if signed, would allow written notice to be provided to the Union.


# ARTICLE 20

## COMPENSATION

**Section 1**.  It is understood that the Union has no authority, nor shall the University be obligated, to negotiate over stipends for graduate students, including the stipends of bargaining unit members, nor shall the University be obligated to negotiate over any other financial matters for

graduate students who are not members of the bargaining unit. The provisions of this Article only apply when a student is working as a member of the bargaining unit.

**Section 2**.  Compensation for salaried SWs.

    A.   Research Assistant 1 –

A Research Assistant 1-- A graduate student usually appointed on an annual basis for a 12-month period to perform research work under the supervision of a faculty/principal investigator**.** The parties understand that the work of a Research Assistant is a blend of academic and employment endeavors and that clear separation of each is difficult. The stipend that such an RA receives could be characterized as financial assistance or compensation or both. Thus, it is understood that for this category of SW and for purposes of this Agreement only, the stipend offered by the University is the functional equivalent of a salary and will be referred to as such in this Article only.

    The minimum salaries for all such SWs in FY ~~2020~~21 were:

| | | | |
|---|---|---|---|
| Life Sciences | 12 months | ~~$39,528~~ $40,632 |
| Physical Sciences | 12 months | ~~$37,932~~ $39,000 |
| Other | 12 months | ~~$35,676~~ $36,672 |

10 month or shorter appointments for these ~~two~~three levels are pro-rated accordingly.

The above rates will increase by a total of 5.0% effective July 1, 2021 (3% plus a one-time 2% base salary additional adjustment.)

The rates will increase by a total of 4.0% effective July 1, 2022 (3% plus a one-time 1% base salary additional adjustment.)

The rates will increase by 3.0% effective July 1, 2023.

The rates will increase by 3.0% effective July 1, 2024.

Accordingly, the minimum pay rates for FY 22-25 will be as follows:

| | | FY22 | FY23 | FY24 | FY25 |
|---|---|---|---|---|---|
| Life Sciences | 12 months | $42,660 | $44,376 | $45,696 | $47,076 |

46

| | | | | | |
|---|---|---|---|---|---|
| Physical Sciences | 12 months | $40,956 | $42,588 | $43,860 | $45,180 |
| Other | 12 months | $38,508 | $40,044 | $41,244 | $42,480 |

B.   Research Assistant 2 –

A Research Assistant 2 -- In addition to their research work, a graduate student who also has a teaching assignment.

Provided such a teaching appointment is approved by their faculty advisor, the SW will have an appropriate adjustment in their research workload. If in discussions with the faculty advisor and/or principal investigator such an adjustment is not possible or not mutually desirous, the Research Assistant II will receive additional compensation in accordance with department or program guidelines.

The minimum salaries for Research Assistants 2 will be the same as for Research Assistants 1.

C.   Teaching Fellows

1. There are four types of salaried teaching fellows (TFs) throughout the University who perform instructional duties:

1.   Teaching Fellow 1
2.   Teaching Fellow 2
3.   Instructional Fellow
4.   Pedagogical Fellow

General descriptions of the duties and eligibility for such positions are found in Article 2, Titles and Classifications and Article 16, Workload. More particularized duties may be found in individual employment appointment letters.

2.  Teaching Fellow categories when the TF is teaching a single standard University course or section under the direction of a full-time faculty member or when teaching a course independently. Compensation may be pro-rated for courses that run for less than a full semester.

The minimum pay rates for FY ~~2020~~21 were as follows:

47

|  | Junior rate | Senior rate |
|---|---|---|
| Teaching rate A | ~~$3,400~~ $3,598 | ~~$3,400~~ $3,598 |

The minimum rate for any Teaching Fellow in the School of Public Health or any SW teaching in the School of Public Health.

Effective on July 1, 2021 Teaching Rate A will be eliminated Teaching Fellows in the School of Public Health will receive compensation commensurate with Teaching Rate B.

| Teaching rate B | ~~$4,920~~ $5,058 | ~~$5,520~~ $5,675 |
|---|---|---|

The minimum rate for Teaching Fellow I or Pedagogical Fellow or a CA 1 or CA 2 for teaching a section in any School or College that usually although not always accompany lectures given by faculty members.

A Teaching Fellow 2 (Head Teaching Fellow) does not have section teaching responsibilities. Teaching Rate B is the rate for a Teaching Fellow 2. If a TF2 were to also lead a section, they would receive an additional TF1 appointment and be paid the TF1 compensation in addition to the TF2 compensation.

| Teaching rate C | ~~$9,840~~ $10,116 | ~~$11,040~~ $11,349 |
|---|---|---|

The minimum rate for any Instructional Fellow. An Instructional Fellow has primary instructional responsibilities for a course, under the supervision of a faculty member.

The above FY 21 rates will increase by a total of 5.0% effective July 1, 2021 (3% plus a one-time 2% base salary additional adjustment.)

The rates will increase by a total of 4.0% effective July 1, 2022 (3% plus a one-time 1% base salary additional adjustment.)

The rates will increase by 3.0% effective July 1, 2023.

The rates will increase by 3.0% effective July 1, 2024.

Accordingly, the minimum teaching rates for FY 22-25 will be as follows:

| Teaching rate B | Junior rate | Senior rate |
|---|---|---|
| FY 22 | $5,310 | $5,960 |

48

| | | |
|---|---|---|
| FY 23 | $5,525 | $6,195 |
| FY 24 | $5,690 | $6,385 |
| FY 25 | $5,860 | $6,575 |

| **Teaching rate C** | **Junior Rate** | **Senior Rate** |
|---|---|---|
| FY 22 | $10,620 | $11,920 |
| FY 23 | $11,045 | $12,395 |
| FY 24 | $11,380 | $12,765 |
| FY 25 | $11,720 | $13,150 |

Except as minimally provided above, variation between and within Teaching Rates B and C will be determined by each School. While the School must pay the minimum rates above, the School has the discretion to pay more than this rate based on a variety of factors. In deciding whether more than the minimum should be paid, the School shall take into account various factors including but not limited to degree of difficulty of the course or section; class size; degree of independence and accountability for the SW; frequency of meetings; attendant course advising; and any oversight responsibilities. Such determination shall not be grievable.

Each School is required to publish which rate applies for particular courses and particular teaching activities.

All such rates may be pro-rated accordingly for courses with less than a full semester's (term's) duration.

3. The Senior Rates will be applied for any Ph. D SW who has successfully completed their first two years of their Ph. D program. The Junior Rates will be applied for all other SWs. The parties agree that there are currently some situations where a School has stated in writing that it will pay the Senior Rate to SWs who would ordinarily be paid at the Junior Rate. Those situations will continue during the life of this Agreement. Determination of successful completion of the first two years is based on academic progress and is not grievable.

4. In courses that do not have a TF 2, faculty may, but are not required, to designate a TF 1 to carry out some additional administrative duties. If such duties are beyond the scope of the appointment, additional compensation will be provided to the SW.

5. For SWs within their admissions offer period, (normally, in their third and fourth year of graduate work), the minimum rates described above for teaching will be considered compensation and will be separately paid to the SW. However, such compensation is not an addition to the SW's stipend. During the admissions offer period, the total amount of funding to the SW, including the compensation for teaching, will be equal to the amount specified in the admissions offer letter.

D. Other Teaching Rates

Full-time graduate students teaching in any School of the University will be paid under the Junior or Senior Teaching Rates B or C categories in Section C above, except for Lecturer/Instructors, Teaching Assistants and Salaried Course Assistants in the Division of Continuing Education (DCE).

Nothing shall preclude the University from paying higher compensation rates in its discretion.

E.  Division of Continuing Education (DCE)

As an exception to the rates in Section C above unit members teaching in DCE were paid at the following minimum compensation rates depending on title during ~~FY20 and shall be set at the same minimum rates for~~ FY 21

| | |
|---|---|
| DCE- Lecturer/instructor | $7800 per 4 credit course |
| DCE- Teaching Assistant | $3900 per 4 credit course |
| DCE- Head Teaching Assistant | $1950 for such work |
| DCE- Salaried Course Assistant | $850 per 4 credit course |

The above FY 21 rates will increase by a total of 5.0% effective July 1, 2021 (3% plus a one-time 2% base salary additional adjustment.)

The rates will increase by a total of 4.0% effective July 1, 2022 (3% plus a one-time 1% base salary additional adjustment.)

The rates will increase by 3.0% effective July 1, 2023.

50

The rates will increase by 3.0% effective July 1, 2024.

Accordingly, DCE rates for FY 22-25 will be:

|  | FY 22 | FY 23 | FY24 | FY 25 |
|---|---|---|---|---|
| DCE- Lecturer/instructor | $8190 | $8518 | $8774 | $9037 |
| (4-credit course) | | | | |
| DCE- Teaching Assistant | $4095 | $4259 | $4387 | $4519 |
| (4-credit course) | | | | |
| DCE- Head Teaching Asst. | $2048 | $2130 | $2194 | $2260 |
| (For such work) | | | | |
| DCE- Salaried Course Asst. | $893 | $928 | $956 | $985 |
| (per 4 credit course) | | | | |

F.        Other instructional work besides teaching.  It is understood that programs may offer differing amounts of compensation for other instructional work besides teaching a course or section of a course, such as tutoring, thesis advising, leading practicums and other instructional work.

The rates for these appointments will be dependent on the duration and scope of the work. Work expectations, anticipated time commitments, and rate of pay must be detailed and explicit in the employment appointment letter, and such expectations should not reasonably imply an hourly wage less than the minimum hourly rate specified in this agreement. Any increase to those expectations will require additional compensation.

G.        The teaching rates delineated in Section C. above for teaching courses includes, in addition to class time, preparation, grading, meeting with and advising students on course work and all other matters attendant to teaching the course. No additional compensation is paid for any such attendant work other than the course rate except as provided in Section C. d. above.

H.        Limited Research Assistant Appointments

SWs may have short duration, limited scope salaried research assistant appointments. These appointments may be for work that is not directly related to

51

the student's academic endeavors. The rates for these appointments will be dependent on the duration and scope of the work. Work expectations, anticipated time commitments, and rate of pay must be detailed and explicit in the employment appointment letter and such expectations should not reasonably imply an hourly wage less than the minimum hourly rate specified in this agreement. Any increase to those expectations will require additional compensation.

**Section 3**.    Compensation for Hourly SWs

A.  It is recognized that hourly rates of pay for hourly Research Assistant, Course Assistants, hourly Teaching Fellows and other hourly workers vary greatly throughout the University. Some Schools have specific rates of pay for their hourly workers. Some hourly rates vary depending on the amount of available funds in a faculty member's grant.

B.  However, all hourly SWs who perform instructional ~~work (e.g. Course Assistants)~~ or research work regardless of School will receive at least the minimum hourly rate of pay of $20.00 effective July 1, 2021 ~~$17.00 per hour effective July 1, 2020 or upon ratification of this Agreement, whichever comes last~~. This minimum rate will be raised to $20.50 per hour on July 1, 2022 and to $21.00 per hour on July 1, 2023.

C.  ~~All hourly SWs who perform research work (e.g. hourly Research Assistant) will receive at least the minimum hourly rate of pay of $16.00 per hour effective July 1, 2020 or upon ratification of this Agreement, whichever comes last.~~ Where a School has a publicized standard hourly rate of pay that exceeds ~~$16 per hour (or $17 per hour for instructional work)~~ $20.00 the minimum per hour rate for FY 22, the University agrees that for the life of this Agreement, such standard hourly rate will not be reduced below what it was in FY ~~20~~21.

**Section 4**.  A SW shall be paid on a timely basis, in accordance with the University's normal business operations, for the teaching and other compensable duties they performed, provided the SW has submitted to the University, in a timely fashion, all documentation or information necessary for the processing of said payment. In no case shall a SW be paid less frequently than on a monthly basis.

**Section 5**.  If the University, in error, overpays wages to a SW in a given pay period, the University, once it discovers the error, will promptly notify the SW of the amount of the overpayment and the date on which the overpayment occurred. In such a case, the University and the SW will work out a repayment plan for the overage. If they wish, the SW may seek the help of the Union in negotiating over the repayment plan. Such repayment plan shall be consistent with applicable federal and state wage law.

52

In cases of overpayment, the University will not put a registration hold on student transcripts and records while repayment is pending.

If the University, in error, underpays a student worker, it shall promptly correct the error and pay any back wages owed.

SWs shall endeavor to report to the University any possible overpayments, or underpayments, so they may be corrected as soon as possible.

The University will process any retroactive checks no later than 90 business days from ratification of this Agreement.

## ARTICLE  21

### HEALTH AND DENTAL INSURANCE

**Section 1.**  All students are required to participate in the Harvard University Student Health Plan or to otherwise be covered by a health insurance program. The University will continue for the life of this Agreement to provide individual coverage at no premium cost to the student for all GSAS Ph. D student workers as may be guaranteed in their offer letter.

**Section 2**.  Nothing in this Agreement shall affect the University's right to modify the plan or plan design or premium rates or to change insurance carriers or administrators in its discretion.

**Section 3.** ~~Effective July 1, 2020, or upon ratification of this Agreement, whichever comes last,~~ The University shall maintain~~establish~~ a SW Health Insurance Premium Support Fund ~~in the amount of $325,000 for FY 21 but pro-rated for the balance of FY21 based on the date of ratification~~. Salaried SWs and eligible hourly SWs may apply for money from the fund to help defray the cost of premiums for spousal and/or dependent coverage under the HU Student Health Plan.

Distribution of any funds shall be made in accordance with procedures, policies and requirements established by the Union, subject to approval by the University.

There shall be no rollover of any unexpended funds from one year to the next.

**Section 4**.  Eligible SWs and their dependents may elect the optional student dental insurance plan offered by the University provided they pay the full cost for such a plan.

Effective August 1, 2022, the University will offer a second preventative dental plan that student workers that are otherwise eligible for SHIP may select at their own cost during the open

53

enrollment period in the spring of 2022. The annual premium for this plan will be set by the carrier and may increase from year to year.

The University will contribute 75% of the premium for salaried Ph. D SWs who elect this new preventative plan effective August 1, 2022.

For those who elect the comprehensive dental plan instead, they may take the value of the 75% of the premium for the preventative plan and apply those dollars to the premium payments for the comprehensive plan.

Under the preventative plan, the following diagnostic services will be provided:

1.      One complete initial oral exam, including initial dental history and charting of the teeth and supporting structures.
2.      Single tooth radiographs (x-rays) as needed.
3.      Bite wing radiographs (x-rays of the crowns of the teeth), once each six months.
4.      Full mouth radiographs (x-rays), seven or more films, or panoramic radiograph (x-ray) with –bite wing radiographs (x-rays), once each 60 months.
5.      Study models and casts used in planning treatment, once each 60 months.
6.      Emergency exams.
7.      Periodic or routine oral exams, once each six months.

Under the plan, the following preventative services will be provided:

1.      Routine cleaning, scaling and polishing of the teeth, once each six months.
2.      Fluoride treatment for *members* under age 19, once each six months.
3.      Space maintainers required due to premature loss of teeth for *members* under age 19.
4.      Sealants applied to permanent premolar and molar surfaces for *members* under age14. *Blue Cross and Blue Shield* provides benefits for one application each 48 months for each premolar or molar surface.

Details in the final plan benefit document shall have precedence in case of any conflicts with the above.

Effective July 1, 2020, or upon ratification of this Agreement, whichever comes last, The University shall maintainestablish a Dental Health Plan Support Fund in the amount of $125,000 for FY21 but pro-rated for the balance of FY 21 based on the date of ratification. Salaried SWs and eligible hourly SWs who have elected the University's student dental insurance plan may apply for money from the fund to help defray the cost of premiums and co-pays under such plans for themselves and for covered spouses and/or dependents. Salaried SWs and eligible hourly SWs who have not elected the University student dental insurance may also apply for money from the fund to help defray dental expenses in general.

54

Distribution of any funds shall be made in accordance with procedures, policies and requirements established by the Union, subject to approval by the University.

There shall be no rollover of any unexpended funds from one year to the next.

**Section 5**. ~~Effective July 1, 2020 or upon ratification of this Agreement, whichever comes last,~~ The University shall <u>maintain</u> ~~establish~~ a SW Support Fund ~~in the amount of $125,000 but pro-rated for the balance of FY 21 based on the date of ratification~~. Salaried SWs <u>and eligible hourly SWs</u> may apply for reimbursement of any co-pays and other out-of-pocket medical expenses (as defined by Internal Revenue Service regulations) that they had to incur under the HU Student Health Plan<u>, including, but not limited to, the cost of specialist care, costs du to vision care (eg. contact lens fitting and contact lenses), and out-of-network providers</u>.

Distribution of any funds shall be made in accordance with procedures, policies and requirements established by the Union, subject to approval by the University.

There shall be no rollover of any unexpended funds from one year to the next.

<u>**Section 6. Mental Health Care**</u>

<u>A.        The Union and the University acknowledge a mutual desire to promote on-campus access to mental health resources for Student Workers.</u>
<u>B.        The University and the Union agree to utilize at least one meeting per year of the Union-Management Committee to discuss mental health and safety. These meetings will include representation from relevant University stakeholders and an agenda will be agreed upon by the University and Union at least three (3) weeks in advance.</u>
<u>C.        The University will provide the Union with a list of mental health resources on campus to the Union annually.</u>
<u>D.        If the University convenes any working group with student representation to address campus-wide mental health and/or safety policies, the University will provide at least one seat on the working group to the Union.</u>

## ARTICLE 22

## CHILD CARE FUND

~~Effective upon ratification of this Agreement, t~~<u>T</u>he University shall make a fund available to reimburse salaried bargaining unit members <u>and eligible hourly SWs</u> for child care expenses at licensed child care facilities (child care centers, family child care providers, after school programs, daytime summer camp programs) or an in-home provider with a Social Security or Tax I.D. number. <u>Eligible SWs may apply for a child care grant, to be determined by the fund rules, from the Childcare Fund.</u> ~~Commencing on July 1, 2020 or upon ratification of this Agreement, whichever comes last, the fund will be $350,000 for FY 21, but pro-rated for the~~

55

~~balance of FY 21 should ratification occur after July 1, 2020.~~ There shall be no rollover of any unexpended funds from one year to the next. Reimbursement for such child care expenses shall be made in accordance with procedures, policies and requirements established by the Union, subject to approval by the University.

## ARTICLE 23

## FAMILY FRIENDLY BENEFITS

Section 1.  Ph.D SWs shall be eligible for access to Care.com at no cost for such membership and subject to relevant rates and procedures. Under current policy, SWs have access to the Care.com providers for up to 10 days a year at a subsidized rate of $5 per hour. SWs may utilize Care.com for additional days at full provider rates.

Section 2. All Ph.D SWs shall be eligible for the Parental Accommodation and Financial Support program which provides a one-time stipend of ~~$6516~~ $6831 per child for the birth or adoption of a child. During the accommodation period, students may request and receive unpaid time off from their duties up to 12 weeks. ~~Effective July 1, 2020, the stipend will be raised to $6831.~~ Effective July 1, 2021, or upon ratification whichever comes last, the stipend will be raised to $7000 and shall be increased by an additional 2.25% on July 1, 2022, 2.25% on July 1, 2023 and 2.25% on July 1, 2024.

Section 3. Any Ph.D SW who notifies the University through a semesterly or yearly check-in or through the GSAS Financial Office about being a parent shall receive an email, within 30 days, with information about the benefits contained in this article,, including, but not limited to, clear directions on how to apply.

## Article 24

## LEAVE PROVISIONS

Section 1        Sick Leave

A.        SWs shall have a right to a reasonable number of days per semester or summer session of sick leave with no loss of compensation. SWs are permitted to use sick time for any of the following reasons:

1. Caring for their own physical or mental illness, injury or medical condition
2. Caring for a physical or mental illness, injury, or medical condition of their child, spouse or partner, immediate or chosen family member;
3. Attending their own routine medical appointment;
4. Attending a routine medical appointment for their child, spouse or partner, immediate or chosen family member, ~~parent, or spouse's parent~~ and members of the household regularly sharing the employee's residence
5. Addressing the psychological, physical, or legal effects of domestic violence; or

56

6. Travel necessitated by any of the above.

B. A SW who is using a sick day must inform their supervisor as soon as possible.

C. In no case shall the sick time provided be less than would be provided to an individual covered by the Massachusetts Sick Time Law.

Section 2. Family and Medical Leave of Absence

SWs may take an unpaid Family and Medical Leave of Absence of up to 12 weeks for the birth or adoption of a child, childcare, their own serious health condition or work-related disability, or care of an immediate family member with a serious health condition. "Immediate family members" include parents or step-parents, child or step-child or spouse. SWs are expected to notify their supervisors and directors of graduate studies at least four months in advance whenever possible of the anticipated birth or adoption of a child, so that appropriate arrangements can be made to cover any teaching or research responsibilities.

SWs who are Ph. D candidates are eligible to apply for financial assistance for the birth or adoption of a child under the Parental Accommodation and Financial Support.

A SW shall not be precluded from being appointed to a position comparable to the position they held before their leave solely because the SW took a leave under this section.

SWs may seek accommodations related to their employment responsibilities, including leaves of absence related to their employment responsibilities, by contacting University Disability Resources.

**Section 3.** Bereavement leave

All SWs ~~on a salaried appointment~~ may be absent without loss of pay or benefits for up to three (3) days when called for by a death in the immediate family or household. ~~A SW on an hourly basis may also be absent for the same purposes but without pay.~~ In circumstances of logistical difficulty or severe emotional distress or religious observance, a longer paid absence (up to seven (7) days) may be appropriate. Such requests will not be unreasonably denied.

~~A longer paid absence may be appropriate in circumstances of logistical difficulty or severe emotional distress or religious observance if approved by the supervisor. Such requests shall not be unreasonably denied.~~

For the purpose of this policy only, immediate family includes: the SW's spouse or partner, children (including stepchildren), grandchildren, children-in-law, parents (including step-parents), grandparents, parents in-law, siblings, (including step siblings) and siblings-in law, chosen family members, and household includes individuals regularly sharing the SW's residence.

**Section 4.** Civic Duty Leave

57

SWs who are on a salaried appointment shall retain all compensation and benefits during jury duty, serving as a witness in a court case, similar civic obligations, or other court appearances. A SW on an hourly basis may also be absent for the same purposes but without pay.

**Section 5.**     Military Leave

The University shall comply with any applicable state and federal laws governing military service and leaves. A SW may use this leave in addition to other leaves provided for under this Article.

**Section 6**.     Maintaining continuation of student benefits during leaves under this Article is conditioned on maintaining active student status with the University.

SWs shall retain any and all other rights under state and federal law regarding leaves of absence.

**Section 7.**     SWs shall make reasonable effort to provide as much advance notice as possible before taking any leave under this Article.

## ARTICLE 25

### HOLIDAYS, PERSONAL DAYS, AND VACATION

**Section 1**.  The University sets the academic calendar each year and designates official University holidays and recesses.   Currently, the following are designated as official University holidays. SWs shall not be required to work on the following holidays and designated recess, except as provided below in section 2.

New Year's Day
Martin Luther King, Jr. Day
Presidents' Day
Memorial Day
Juneteenth
Independence Day
Labor Day
Columbus Day (Federal) / Indigenous Peoples' Day (City of Cambridge)
Veterans Day
Thanksgiving
Friday after Thanksgiving
Christmas Eve 1/2 day
Christmas Day
Winter Recess (the period between Christmas and New Year's Day)

The University reserves the right to add other holidays and recesses in its discretion.

**Section 2**.   During a designated holiday or recess, SWs may be required to conduct work (such as laboratory work, teaching a section, or grading of assignments) only when determined to be necessary by the faculty member or supervisor. The faculty member or supervisor shall provide notice to the SW in advance when such work is deemed necessary. If a SW is required to work on a designated holiday or recess, the SW shall choose an alternate day(s) off with the supervisor's approval, which approval shall not be unreasonably denied.

**Section 3**.   The University recognizes that there are religious holidays that are not currently University holidays. The University will make reasonable accommodations to a SW to observe a religious holiday provided it does not create an undue burden for the University. SWs shall request such time off for religious observance with reasonable advance notice to their supervisor.

**Section 4**.   Personal Days

In addition to time off for designated holidays and recesses, SWs on a salaried appointment shall be entitled to one (1) personal day per semester without loss of compensation with, where possible, at least three (3) days advance notice to their supervisor. A salaried SW with a fall semester employment appointment may carry over and utilize their one personal day from the fall semester in the spring semester of the same fiscal year.  Personal days may not, however, be carried over from one fiscal year to another.

Those salaried SWs with 12-month appointments shall receive one (1) additional personal day in addition to two (2) personal days for the fiscal year.   Personal days may not be carried over from one fiscal year to another.

Personal days may be used for any purpose, including the SW's personal observance of special days in their cultural heritage.

**Section 5**.  Vacation Days for SWs with 10- and 12-month appointments

A.  SWs on a salaried 12-month appointment shall be entitled to ten (10) vacation days without loss of compensation to be used during their appointment period.

B.   A SW appointed to a position that would normally be 12 months, but initially appointed for 10-months (i.e. September through June) shall be entitled to eight (8) days off in that first employment appointment period without loss of compensation. If a SW on a 12-month appointment spends part of that appointment period on a non-University activity (such as accepting an external internship), they shall receive a pro-rated amount of vacation for the months actually worked for the University.

In order for a SW to be entitled to vacation, they must be working under an employment appointment that is for 10- or 12-months duration. Thus, two separate semester appointments cannot be considered a 10-month appointment, nor can two separate six-month appointments be considered a 12-month appointment.

59

C.  Vacation days must be used during the appointment period and may not be carried over from one fiscal year to the next.  Vacation days not used during the appointment period will be forfeited.

D.  Vacation time shall be scheduled in consultation with and approval of the supervisor/faculty member, which approval shall not be unreasonably denied.

E.  For SWs with curricular responsibilities, vacations should normally not be taken during the Fall or Spring academic semesters.

F.  A vacation request of more than two weeks by combining vacation time at the end of one fiscal year with vacation time at the beginning of the next fiscal year will only be allowed with the consent of the supervisor who shall be under no obligation to grant such request.

G.  If a designated University holiday or recess falls during an SW's vacation, the SW shall not be charged vacation time for that holiday or recess.

## ARTICLE 26

## PARKING AND TRANSIT

 **Section 1.**  All SWs are eligible for ~~one of~~ the three (3) parking/transit options below (1A or 1B or 1C) as outlined below ~~(1A or 1B or 1C)~~.

A.  Parking

1.    At all campuses, SWs shall have the option to have access to parking and parking-related services that are available to and on the same basis as University staff.

2.    The University will provide information to all incoming SWs about their parking options.

3.    SWs who opt for this option but are unable to secure their facility of choice shall remain eligible for the other transit benefits below provided any application deadlines are met.

B.  Transit - Public and Private

60

SWs will be provided with discounted MBTA passes per the Semester Pass Program.  Schools at their discretion may provide SW's additional discounts on MBTA passes and/or programs.

C.  Bicycling

1.  SWs are eligible for a bicycle benefit on the same basis and under the same terms and conditions as that offered to staff employees, except SWs are not required to be active employees through the submission deadlines in order to receive this benefit, but they are required to be active students through the submission deadlines.

2.  A qualified bicycle commuting month is one during which a SW is biking for a substantial portion of the commute and does not receive any parking permit or a transit pass through Harvard University.

3.  This benefit operates on the calendar year; the total reimbursement amount accrues over the calendar year and is paid back against the total eligible expenses incurred in the same year. Reimbursement claims are processed and paid in the beginning of the following year; paperwork must be submitted by the SW no later than January 31. If the SW is a new SW or uses a parking permit or transit pass through Harvard for some months of the year, your total reimbursement value is prorated based on your eligible months.

## ARTICLE 27

### TRAVEL

Section 1.  Unless otherwise restricted by provisions of a grant, the University shall directly pay preferred providers in advance for all authorized and approved lodging and transportation expenses, as well as directly paying for authorized and approved conference registration fees required for employment, following appropriate notice from the SW to the University. If expenses cannot be pre-paid because of the restrictions of a grant, the University shall pre-pay the expenses from another fund.

 Section 2.  Any other expenses incurred will be reimbursed upon the SW's return from the trip in accordance with the Harvard University travel and related policies. In all other respects, the Harvard University travel and related policies as may be amended from time to time shall apply.

## ARTICLE 28
### EMERGENCY GRANT

Section 1.  Effective upon ratification of this Agreement, the University shall make a fund available to assist SWs with a temporary hardship due to a significant emergency event

**Section 2**.  Commencing upon ratification of this Agreement, whichever comes last, the fund will be $25,000 for each year of this Agreement. Distribution of money from such fund shall be made in accordance with procedures, policies and requirements established by the Union, subject to approval by the University.

There shall be no rollover of any unexpended funds from one year to the next.

**Section 3**.  If the funds are exhausted in a given year, nothing shall preclude a SW from asking their School for additional funds to deal with emergency events recognizing, however, that any such distribution by the School is entirely discretionary and not a right or expectation.

## ARTICLE 29

## EMPLOYEE ASSISTANCE PROGRAM

Salaried SWs, their spouses and dependents, and adult household members shall be entitled to participate in the University's Employee Assistance Program, as may be modified from time to time.

## ARTICLE 30
## UNION MANAGEMENT COMMITTEE

Section 1. A joint Union-Management Committee (UMC) shall be formed with up to seven (7) members on each side that shall meet one (1) time each semester (fall and spring) in addition to all other union-management meetings that may be provided for in this Agreement.

Section 2. The purpose of the UMC will be to discuss matters of concern to either or both sides, including the administration of this agreement and other related issues that are not the subject of an active grievance. The parties also agree that such meetings shall not constitute nor be used for the purpose of negotiations. Each side shall select its own representatives. Union representatives shall suffer no loss of compensation to attend such meetings. Agendas shall be mutually agreed to at least seven (7) business days prior to the meeting. The UMC shall also convene at mutually agreed upon times and on an ad hoc basis as needed.

## ARTICLE 31

## UNION SECURITY

Section 1.  SWs are free to decide whether or not they wish to join the Union and pay membership dues and fees. The University shall not coerce or otherwise attempt to influence a SW about their decision to join or not join the Union and pay or not pay membership dues and/or fees.

Section 2.  Every SW will be given the choice to affirm choosing to join the union or not for each appointment period, or if already a member, if they wish to opt out.  There will be no fee or further consequences for the SW who chooses not to join the union.

The Union will draft a letter to be reviewed by the University to be sent to the SW if they fail to make a choice within 30 days of their employment appointment letter.

This will be implemented as soon as possible following discussions between the University and the Union.

Section 3.  If a SW is a member of the Union or if a SW decides to join the Union, they may choose to have their Union membership dues and fees deducted from each paycheck provided they have signed an authorization for such deductions in a paper or electronic form acceptable to the University as provided for in Appendix B. The Union shall provide the University with the amount of Union membership dues and fees that a SW who joins the Union must pay.

Section 4.  Upon receipt of such signed authorization from an eligible SW as defined in Section 2 above, the University shall deduct Union membership dues and fees from each paycheck. The University shall remit the dues and fees to the Union, together with an electronic list of names of the SWs from whom deductions were made. The electronic list shall contain the employee's name and NetID and the amount of dues/fees deducted, and gross wages.

Section 5.  Deductions shall commence for the first full pay period following receipt of the SWs written authorization and shall continue unless affirmatively revoked by the SW. The University is not required to make retroactive deductions. In order for the deductions to be made, the authorization cards must be received by the University's designated representative by at least seven (7) business days preceding the payday when the checkoff is to begin.

 Section 6. The University shall electronically transmit to the Union within fifteen (15) business days after the monthly payroll for the prior month, all dues and fees deducted for that pay period in accordance with Section 4 above.

Section 7. The Union agrees that it will reimburse the University for any costs and indemnify and hold the University harmless from any claims, actions, or proceedings by any person or entity or any action taken or not taken arising from any deductions made under this Article.

Section 8.  Upon presentation of an "Authorization and Checkoff of Contributions to UAW V-CAP" form executed by a SW who is a dues paying member of the Union, the University agrees to deduct from the pay of each SW voluntary contributions to UAW Voluntary Community Action Program (UAW V-CAP). The University agrees to provide a voluntary check off for the UAW. A SW may discontinue the V-CAP deductions at any time upon written

63

notification to the Union and the University Labor Relations Office. V-CAP collections will be remitted to the UAW V-CAP department monthly. The remittance listing shall be sent monthly to the UAW V-CAP department and to the Local Union and include the SW's name, NetID, amount deducted and the last date of authorization of those SWs for whom deductions have been made. The University further agrees to furnish the UAW V-CAP department and the Local Union with a monthly and year-to-date report of each SW's deductions.

# ARTICLE 32

## NO STRIKE/NO LOCKOUT

**Section 1.**  During the term of this Agreement or any extension thereof the Union,  its representatives, agents, and unit members will not call, condone, or engage in a strike, sympathy strike, slowdown, or withholding of grades or academic evaluations by SWs.

**Section 2.** Any unit member engaging in any conduct prohibited by this Article may be subject to disciplinary action in accordance with Article 19, Discipline and Discharge.

**Section 3.** In the event that any unit member violates the provisions of Section 1, the Union shall as soon as practicable, inform such unit member(s) through all reasonable means that such action is prohibited under this Agreement and that such unit member(s) should cease such action and return to full, normal, and timely work. The Union shall also distribute to the unit member(s) and the University a written notice, signed by an officer of the Union, that the work stoppage or other violation is not authorized by the Union. Such distribution shall be made within twenty-four (24) hours of notice to the Union from the University that there has been a violation of this Article.

**Section 4.** During the term of this Agreement, or any extension thereof, the University agrees that it will not lock out any of the unit members covered by this Agreement.

# ARTICLE 33

## SEVERABILITY

If any provision of this Agreement is found to be contrary to law by a court of competent jurisdiction, such provision shall be of no force or effect; but the remainder of this Agreement shall continue in full force and effect. The parties shall bargain in good faith with respect to any provision found to be in contravention of the law.

# ARTICLE 34:  Duration

64

This Agreement shall be in full force and effect from ~~July 1, 2020 or~~ [date of ratification] up to and including June 30, ~~2021~~2025 and thereafter shall continue in effect unless notice of a desire to modify or terminate the Agreement is given by either party to the other, in writing <u>no later than January 15, 2025</u> ~~at least sixty (60) calendar days prior to the expiration of the Agreement~~; provided, however, that where neither party gives such ~~sixth (60) calendar day~~ notice of modification or termination prior to the expiration of the Agreement, the Agreement shall continue in effect until terminated or modified following notice by either party to the other, in writing, of a desire to terminate or modify the Agreement, at least ninety (90) calendar days thereafter <u>(but no earlier than June 30, 2025).</u>

<u>It is further provided that it is the mutual goal of the parties to complete negotiations for any successor agreement prior to the expiration date of the contract. Accordingly, if this contract is reopened, and to provide sufficient time to meet that goal, negotiations shall begin no later than February 1, 2025 unless mutually agreed otherwise.</u>

IN WITNESS WHEREOF the parties hereto affix their signatures by their duly authorized representatives

For HGSU-UAW                                                  For Harvard University

## New Article XX

## Legal Expense Fund

1. Effective upon ratification, the University shall make a fund available to the Union to reimburse eligible bargaining unit members for legal expenses where counsel is retained for advising the SW on matters relating to their working conditions at the University. Commencing upon ratification, this fund shall be in the amount of **$100,000** for the remainder of FY 22 and then for each fiscal year thereafter for the life of the Agreement.

**1.    However, if the funds are exhausted in a given fiscal year, the fund may apply all or part of the ~~$50,000~~ $100,000 set aside for the following year to provide assistance to eligible bargaining unit members. In no event, however, will the University be obligated to provide more than a total amount of $400,000 over the four fiscal years covered by the Agreement.**

65

1.      Such funds may not be used, however, for reimbursement of attorney's fees relating to any legal action brought before any agency or court against the University.

1.      There shall be no rollover of any unexpended funds from one fiscal year to the next. Reimbursement for such legal expense shall be made in accordance with procedures.
policies and requirements established by the Union, subject to approval by the University.

**1.      Student workers do not need to have incurred expenses in order to access funds from this fund and may use lawyer bills (not yet paid) or retainer letters to receive money from the fund to cover their legal expenses.**

***IMPORTANT NOTE NOT FOR INCLUSION IN THE CONTRACT:*** While the contract language will make no reference to Title IX or related discrimination cases, a SW could access this Legal Expense Fund for assistance in paying an attorney who may represent or otherwise advise them in the investigation and processing of a complaint under Article 7.

**NEW ARTICLE XX.**
**HOURLY SW ACCESS TO BENEFIT POOLS**

Effective January 1, 2022, hourly workers who work a total of 280  hours between July 1 and December 31 are  able to receive reimbursements from the pools during the following six months (January 1 to June 30).   Hourly workers who work a total of 280 or more between January 1 and June 30 are able to receive reimbursements from the pools during the next six months (July 1 to December 31). In their final six months of employment with the University a SW may receive reimbursement from the pools during that final six month period if the University can determine that they have actually worked 280 or more hours based on pay stubs or other official records.

**APPENDIX A**

**NOTICE OF RIGHT TO UNION REPRESENTATION UNDER ARTICLE 7, NON-DISCRIMINATION AND HARASSMENT, AND ABUSE OR INTIMIDATION**

The Harvard Graduate Students Union-UAW Local 5118 and the University share a commitment to an inclusive campus community free of any form of discrimination or harassment. The union contract with the University, Article 7, Non-Discrimination, Harassment and Abuse or Intimidation ensures that student workers have the option of pursuing the following avenues of recourse in instances of discrimination, harassment or retaliation:

> ➢ The Grievance Procedure in the contract between the Union and the University in cases of discrimination on the basis of union activity or cases of workplace retaliation;

➢ The procedures administered by the University and its Title IX Office and Office of Dispute Resolution (ODR);

➢ State and Federal offices that handle complaints about discrimination, harassment, and retaliation.

You have the right to a Union representative when pursuing a complaint of any kind under Article 7 Non-Discrimination, Harassment and Abuse or Intimidation at the University or at any State or Federal agencies:

➢ A union representative can advocate on your behalf, including advocating for appropriate interim measures such as workplace or schedule changes, no-contact orders or other accommodations.

➢ A union representative can provide experience, support, and help navigating systems that otherwise can seem complex and confusing.

➢ The Title IX Office's and ODR's roles are investigatory and do not represent either the Complainant or the Respondent.

If you have experienced discrimination, harassment and/or retaliation, we encourage you to seek help from the Union.

For assistance from your Union, contact a trained member of our grievance committee confidentially at [E-mail Address]. You can also find a list of resources for help on our website at [URL].

## APPENDIX B

### DUES CHECK-OFF AUTHORIZATION

I hereby authorize and direct Harvard University ("the University") to deduct from my earnings—and to transmit to the Harvard Graduate Students Union-UAW Local 5118 ("HGSU-UAW")—dues in the amount established or revised by HGSU-UAW in accordance with its constitution and/or bylaws. If for any reason the University fails to make a deduction, I authorize the University to make such deduction in a subsequent payroll period. HGSU-UAW is authorized to deposit this authorization with the University, and is authorized to redeposit this authorization with the University if my employment terminates and I am later rehired.

This authorization is entirely voluntary on my part, and shall be irrevocable and automatically renewed every year for successive periods of one year each or for the duration of each succeeding collective bargaining agreement between the University and HGSU-UAW, whichever shall be shorter, unless revoked by me by signed notice sent to the University and HGSU-UAW,

67

and received by them not more than 20 days and not less than 10 days before the expiration of each period.

## SIDE LETTER TO BE ATTACHED TO THE AGREEMENT

## HOUSING

Effective with the fall semester 2020, student workers living in University-owned housing shall be able to pay rent on monthly basis without incurring fees.

## SIDE LETTER TO BE ATTACHED TO THE AGREEMENT

## ADDITIONAL TEMPORARY PRIVATE SPACE

Following ratification of the Agreement, the University and the Union will explore where additional temporary private space can be provided to SWs for them to address personal issues during work time. The University shall determine the location of such places with input from the Union within the first six months following ratification of the Agreement and will publish such locations in a mutually agreeable place.

## SIDE LETTER TO BE ATTACHED TO THE AGREEMENT (NEW)

## BENEFIT POOLS (For Inclusion in the contract)

No later than March 31 of each year, the Union shall send the University the allocation for the benefit funds for the upcoming fiscal year.

The University has allocated the following amounts to all the benefit funds in the Agreement, excluding the Legal Expense Fund.

| FY 22 | FY 23 | FY 24 | FY 25 |
|---|---|---|---|
| $1,550,000 | $2,150,00 | $2,750,000 | $2,750,000 |

Expenses that occurred between July 1, 2021 and ratification shall be eligible for reimbursement according to the fund rules for all funds, including the International Student Worker Assistance Fund and the new Legal Support Fund.

## SIDE LETTER TO BE ATTACHED TO THE AGREEMENT (NEW)

## CONFIDENTIALITY

Subject to state and federal law and the University's stated confidentiality rules in handling individual claims of discrimination, the University and the Union agree that nothing in this Agreement prevents SWs from discussing and disclosing information about unlawful acts in the

68

workplace, such as harassment or discrimination or any other conduct they have reason to believe is unlawful.

## SIDE LETTERS <u>NOT</u> FOR INCLUSION IN OR ATTACHMENT TO THE AGREEMENT

The parties agree that no reference to bargaining history from this 2021 round of bargaining will be made by either party in interpreting the following:

1.  Whether teaching appointments that are required in order to meet program requirements or fulfill funding letter requirements are covered by the Agreement or must be compensated according to Article 20.


1.      Whether or not top-up payments are compensation or a mandatory subject of bargaining between the parties

The University will write a letter to the Union not for inclusion in or attachment to the Agreement stating that:

> The University agrees that for the life of the Agreement, it will continue the top-up system in its current form for Ph.D students during their guaranteed funding period.

69

# EXHIBIT D

**This is the full draft of the Agreement.**

**TABLE OF CONTENTS**

ARTICLE 1    RECOGNITION ………………………………………    3

ARTICLE 2    TITLES AND CLASSIFICATIONS ………………………    3

ARTICLE 3    EMPLOYMENT APPOINTMENT LETTER  ……………..    7

ARTICLE 4    EMPLOYMENT APPOINTMENT SECURITY …………..    8

ARTICLE 5    JOB POSTING   …………………………………………    9

ARTICLE 6    GRIEVANCE AND ARBITRATION ………………………    10

ARTICLE 7    NON-DISCRIMINATION, HARASSMENT,
AND ABUSE OR INTIMIDATION ………………………………………    13

ARTICLE 8    ACADEMIC RETALIATION ………………………………    23

ARTICLE 9    INTELLECTUAL PROPERTY, SCHOLARLY
 AND RESEARCH MISCONDUCT …………………………………..    24

ARTICLE 10  HEALTH AND SAFETY …………………………………    25

ARTICLE 11  TRAINING  …………………………………………………    27

ARTICLE 12  EMPLOYMENT RECORDS …………………………………    28

ARTICLE 13  INTERNATIONAL STUDENT WORKER
RIGHTS AND WORK AUTHORIZATION  …………………………….    29

ARTICLE 14  TAX ASSISTANCE …………………………………………    31

ARTICLE 15  WORKSPACE AND MATERIALS ………………………….    31

ARTICLE 16  WORKLOAD …………………………………………………    33

ARTICLE 17  MANAGEMENT RIGHTS  ………………………………..    35

ARTICLE 18  UNION ACCESS AND RIGHTS …………………………….    37

ARTICLE 19  DISCIPLINE AND DISCHARGE …………………………….    40

ARTICLE 20  COMPENSATION  ……………………………………….    43

ARTICLE 21  HEALTH AND DENTAL INSURANCE  ……………………..  50

ARTICLE 22  CHILD CARE FUND …………………………………………..  52

ARTICLE 23  HOURLY SW ACCESS TO BENEFIT POOLS ………………..  52

ARTICLE 24  LEGAL DEFENSE FUND ………………………………………  52

ARTICLE 25  FAMILY FRIENDLY BENEFITS ………………………………  53

ARTICLE 26  LEAVE PROVISIONS …………………………………………..  54

ARTICLE 27  HOLIDAYS, PERSONAL DAYS, AND
VACATION ………………………………………………………………………  55

ARTICLE 28  PARKING AND TRANSIT ……………………………………  57

ARTICLE 29  TRAVEL ………………………………………………………..  58

ARTICLE 30  EMERGENCY GRANT  ………………………………………  59

ARTICLE 31  EMPLOYEE ASSISTANCE PROGRAM ………………………  59

ARTICLE 32  UNION-MANAGEMENT COMMITTEE ………………………  59

ARTICLE 33  UNION SECURITY …………………………………………….  60

ARTICLE 34  NO STRIKE/NO LOCKOUT ……………………………………  61

ARTICLE 35  SEVERABILITY ………………………………………………  62

ARTICLE 36  DURATION  …………………………………………………..  62

APPENDICES AND SIDE LETTERS ………………………………………..  63

# ARTICLE 1

## RECOGNITION

As reflected in the National Labor Relations Board Case 01-RC-186442, the University recognizes the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW), and its Local Union, Harvard Graduate Students Union-UAW Local 5118 (HGSU-UAW Local 5118), as the exclusive bargaining representative for employees in the bargaining unit. The bargaining unit shall include all students enrolled in Harvard degree programs employed by Harvard University who provide instructional services at Harvard University, including graduate and undergraduate Teaching Fellows (teaching assistants, teaching fellows, course assistants) and all students enrolled in Harvard degree programs (other than undergraduate students at Harvard College) employed by Harvard University who serve as Research Assistants (regardless of funding sources, including those compensated through Training Grants). This bargaining unit includes students employed by Harvard University and enrolled in the Harvard Graduate School of Arts and Sciences, Harvard Business School, the Division of Continuing Education, Harvard Graduate School of Design, Harvard Graduate School of Education, the Harvard John A. Paulson School of Engineering and Applied Sciences, the John F. Kennedy School of Government at Harvard University, Harvard Law School, Harvard Divinity School, Harvard Medical School, the Harvard T.H. Chan School of Public Health, and Harvard College.  Excluded: All undergraduate students serving as research assistants and all other employees, guards and supervisors as defined in the Act.

# ARTICLE 2

## TITLES AND CLASSIFICATIONS

**Section 1.**  As of the effective date of this Agreement, all Student Workers (SW) performing duties below shall be placed into titles and pay classifications based on the nature of duties and eligibility as follows:

**Salary/Stipended Positions**

| Title | Pay Classification | Pay Code | Duties | Eligibility |
|---|---|---|---|---|
| Research Assistant 1 | Article 20, Sections 2.A and 2.H | GSU001 | Performs research (including scientific rotations) under the supervision of faculty/principal investigator/museum curator | Harvard enrolled graduate students. |

3

| Research Assistant 2 | Article 20, Section 2.B and 2.H | GSU002 | Research Assistant 1 with a teaching position (research duties adjusted accordingly). | Harvard enrolled graduate students. |
|---|---|---|---|---|
| Teaching Fellow 1 | Article 20, Section 2.C | GSU003 | Provides instructional services which may include teaching, grading, coaching and/or other academic support services. | Harvard enrolled graduate students teaching at all schools and units. Undergraduate students teaching at all schools and units except the College. |
| Teaching Fellow 2 | Article 20, Section 2.C | GSU004 | Head TF is a Teaching Fellow 1 who in addition leads other TFs | Harvard enrolled graduate students teaching at all schools and units. Undergraduate students teaching at all schools and units except the College. |
| Pedagogical Fellow | Article 20, Section 2.C | GSU005 | Provides instructional services including but not limited to consulting with TFs, leading pedagogy seminars and workshops and developing resources/providing pedagogical support and guidance on teaching and professional development (currently based at the Bok Center) | Harvard enrolled graduate students. Prior Teaching Fellow experience. |
| Instructional Fellow | Article 20, Section 2.C | GSU006 | Leads course and is sole instructor/lecturer teaching outside of DCE. | Harvard enrolled graduate student. |
| Course Assistant 1 | Article 20, Section 2. C | GSU007 | Performs instructional support not including classroom or lab section time | Harvard enrolled undergraduate students. |
| Course Assistant 2 | Article 20, Section 2. C | GUS008 | Performs instructional support, plus classroom or lab section time. | Harvard enrolled undergraduate students |

4

**Hourly Positions**

| Title | Pay Classification | Pay Code | Duties | Eligibility |
|---|---|---|---|---|
| Hourly Research Assistant | Article 20, Sections 3.A and 3.C | GSU009 | Performs research under faculty/principal investigator supervision | Harvard enrolled graduate students. |
| Hourly Teaching Fellow | Article 20, Sections 3.A and 3. B | GSU010 | Provides instructional services including but not limited to teaching, grading, and/or other academic support services. | Harvard enrolled graduate students teaching at all schools and units. Undergraduate students teaching at all schools and units except the College. |
| Hourly Course Assistant 1 | Article 20, Sections 3.A and 3. B | GSU011 | Performs instructional support, not including classroom or lab section time | Harvard enrolled undergraduate students |
| Hourly Course Assistant 2 | Article 20, Sections 3.A and 3. B | GSU012 | Hourly CA 1 plus classroom or lab section time. | Harvard enrolled undergraduate students |

5

## Division of Continuing Education Positions

| Title | Pay Classification | Pay Code | Duties | Eligibility |
|---|---|---|---|---|
| DCE Lecturer/ Instructor | Article 20, Section 2.E | GSU013 | Leads course and is sole lecturer/instructor at DCE. | Harvard enrolled graduate and undergraduate students. |
| DCE Teaching Fellow | Article 20, Section 2.E | GSU014 | Provides instructional services which may include teaching, grading, and/or other academic support services at DCE. | Harvard enrolled graduate and undergraduate students. |
| DCE Head Teaching Fellow | Article 20, Section 2. E | GSU015 | Coordinates Teaching Fellows, performs administrative instructional support; does not include teaching sections. Head Teaching Fellow may also hold a Teaching Fellow Position. | Harvard enrolled graduate and undergraduate students. |
| DCE Course Assistant | Article 20, Section 2.E | GSU016 | Performs instructional support at DCE. | Harvard enrolled graduate and undergraduate students. |

**Section 2**. In courses that do not have a Head TF, faculty may designate a Teaching Fellow 1 with additional administrative duties.   Such designation will come with additional compensation.

**Section 3**. The University shall appoint the SW to the highest title and pay classification for which they are qualified based on the duties of their appointment and their eligibility. If the SW's duties change during their appointment the University may move a SW to a title with a higher pay classification. A SW may request to be moved to a lower pay classification.

**Section 4.** No modifications or deletions shall be made to the bargaining unit pay classifications and job titles in Section 1 unless they are agreed to by both parties.

6

**Section 5**. Definitions:

Rotation - Most commonly found in programs within the natural sciences, a rotation is a period of time, commonly shorter than a semester, in which a Ph. D student conducts research within an individual faculty member's research group. Within an academic year a student would perform multiple rotations within different faculty lab groups, most commonly within the student's academic program. The intent of a rotation is to assist the student and potential faculty advisor determine if the lab/research group is best suited to the student's doctoral research.

**Section 6.** It is not the intent of this article to convert previously salaried/stipended positions to hourly positions.  Such modifications shall not be made unless agreed to by both parties.

## ARTICLE 3

### EMPLOYMENT APPOINTMENT LETTER

**Section 1.** Prior to the start of the appointment, the University shall provide an employment appointment letter to salaried SWs, sent via email to the SW's email address. This letter shall be sent within a reasonable period of time in advance of the appointment starting date, preferably no later than 60 (sixty) days prior to the commencement of employment, recognizing that some departments and units may not be in a position to send such a letter that early due to uncertain enrollments or funding or other legitimate reasons. In such cases, the department or unit will send out the letter as soon as reasonable prior to the commencement of the SW's work.

SWs employed on an hourly basis will receive an employment appointment letter prior to the commencement of their work or as soon thereafter as is reasonable under the circumstances.

An example appointment letter is provided in Appendix C, the use of which shall be optional by departments.

**Section 2.** The letter of employment appointment shall include the following information:

1. Employment appointment title(s).
2. Effective starting date of the employment appointment and, if known, the termination date for the appointment.
3. The Employment unit contact and the faculty member(s) or the supervisor(s) to whom the SW will report.
4. For teaching appointments, the name of the course; the approximate number of students for which the SW will be responsible; a description of the required duties, including but not limited to: leading sections, holding office hours, grading assignments, attending lectures, etc. If known at the time of the employment appointment letter, any scheduled meetings or trainings and other duties as assigned.
5. For research appointments, a brief description of the required research or lab duties, including but not limited to: writing code, performing experiments, maintaining

7

equipment, teaching and mentoring lab members and other duties as assigned. If known at the time of the employment appointment letter, any scheduled meetings or trainings; and procedures for evaluation, if any.

6. For all other employment appointments, a brief description of required duties; including required meetings and trainings; and procedures for evaluation, if any.

7. Work location (i.e. which campus and, if known, building and room). For appointments where a remote work assignment has been approved prior to the commencement of work, the work location shall be listed as "remote."

8. Expected work schedule, including course meeting times and locations, if applicable. The parties recognize schedules and locations may change prior to the start of the semester or term. Where applicable for hourly SWs, any cap on the number of hours and the estimated average number of hours expected per week.

9. Pay classification as described in Article 2, Titles and Classifications.

10. Amount of compensation or hourly pay rate.

11. Benefits related to this employment appointment, if different from those described elsewhere in this contract.

12. Response requirements, if any.

13. A statement that the position is covered by this collective bargaining agreement and a link to this Agreement.

14. Union mailing address, phone number, and website address

If any of this information is not known at the time of notification, the SW will be informed as soon as is reasonable under the circumstances.

**Section 3.**  All employment appointment letters will include a FERPA Communication and FERPA Release Form, either in paper format or a format where the Form can be completed and submitted to the University electronically, as set forth in Article 18, Union Access and Rights.


**ARTICLE 4**

**EMPLOYMENT APPOINTMENT SECURITY**

**Section 1.**  For teaching appointments outside the guaranteed admissions offer period, if a Teaching Fellow's assigned course or section is cancelled due to insufficient enrollment or any other reason after the formal acceptance of a written employment appointment pursuant to Article 3, Employment Appointment Letter, or after the start of the appointment period, the department or unit shall notify the Teaching Fellow as soon as practicable. In such cases, the Teaching Fellow shall be offered an available alternative section that the Teaching Fellow is qualified to teach and that has not been assigned to another Teaching Fellow or other individual, or where appropriate an equivalent RA position for which the Teaching Fellow is qualified. However, if no other course or RA assignment can be made and the course or section is finally cancelled, the Teaching Fellow shall be paid 70% of the compensation they would have received had the course or section not been cancelled. If the cancellation results in loss of bargaining unit membership, the Teaching Fellow will nevertheless have access to the insurance pools,

emergency pool and child care pool established under this Agreement for the remainder of the semester.

**Section 2.**  If a Research Assistant I or II has their appointment end during their employment appointment period due to the departure of the faculty member to whom the SW is assigned or other circumstances where the appointment is ended by the University prior to its completion, and except in cases of discharge pursuant to Article 19, the department, program, or employing unit will work with the SW and endeavor to find work for the remainder of the 10 or 12 month employment appointment. Such replacement work is not guaranteed, however.

If no other appointment can be made, the Research Assistant, for the remainder of their 10 or 12 month appointment, shall be paid at least 75% of the remaining balance of the total compensation they would have received had their appointment not ended.  If the cancellation results in loss of bargaining unit membership, the Research Assistant will nevertheless have access to the insurance pools, emergency pool and child care pool established under this Agreement for the remainder of their appointment.

However, in cases where the Research Assistant chooses to leave their appointment due to their allegations of discrimination or harassment or abusive/intimidating behavior, and pursues formal or informal resolution of such allegations pursuant to Article 7 and/or under University policies, the department, program or employing unit will, as a supportive measure pending resolution or dismissal of the claim, either find replacement work for the Research Assistant or will provide continued compensation to the Research Assistant for the balance of the appointment.

## ARTICLE 5

## JOB POSTING

**Section 1.** Certain positions that would be in the bargaining unit if filled by a Harvard student are filled in the following manner:

A.      To fulfill a commitment of support made to a Harvard student at the time of admission; or
B.      As part of an existing or past teaching, research, or advisor/advisee relationship between a faculty member and a candidate for a position.

In cases where such positions are not filled in the aforementioned manner they will be considered "open positions" and the University will encourage, but will not require, employing units to post open positions on the central website described below. Between October 1 and December 31, 2022, the Union Management Committee will schedule a time to review and discuss the utilization of the web site and its effectiveness thus far. However, such discussions shall not require any particular changes during the life of the Agreement unless otherwise agreed. Nothing in this article prohibits an employing unit from advertising an open position in a location other than the common central website. The University encourages, but does not require, employing units to hire Harvard students over other candidates.

9

**Section 2.** The University shall maintain a common central website to host open positions as defined above. The University will issue periodic notices to employing units informing them of the website location and posting process. The University shall notify the Union of the address of the website within thirty (30) calendar days of ratification of this agreement.

**Section 3.** When posting an open position, the employing unit will specify whether the posting will be open for a specified period of time (e.g., 14 calendar days) or an unspecified period of time (e.g., until filled).

**Section 4**. Postings should provide the following information regarding the open position:

A. Position title and classification [per Article 2, Titles and Classifications]
B. Starting date of the position and, if known, the termination date for the position;
C. Supervisor and/or supervisory unit;
D. The assigned course or lab assignment where applicable;
E. Brief description of the required duties;
F. Basic and preferred qualifications;
G. Work location (Cambridge campus, Longwood campus, other location);
H. Expected pay rate or range;
I. Expected pay frequency;
J. Expected work schedule;
K. A statement that the position is covered by this collective bargaining agreement if filled by a Harvard student;
L. Information about how to apply for the position;
M. Deadline for applying;
N. Statement on non-discrimination.


## ARTICLE 6

## GRIEVANCE AND ARBITRATION

**Section 1**. A SW, a group of SWs, or the Union who have a complaint may process a grievance in accordance with the procedure outlined in this Article. A grievance is any dispute concerning the interpretation, the application, or claimed violation(s) of a specific provision(s) of this Agreement.

**Section 2**. Initial Oral Discussion

A. In order to facilitate a timely resolution on a SW, group of SWs, or the Union's complaint(s), the SW, group of SWs, or the Union are encouraged, but not required, to discuss the problems with the immediate supervisor or faculty member to whom they report. The SW or group of SWs shall have the right to union representation for such informal discussions as well as throughout any formal grievance procedure steps.

10

The parties are encouraged to attempt to resolve the problems informally but if they are unable or choose not to do so, a SW, group of SWs or the Union may file a grievance under Section 4 below.  The timeline set forth in Section 3 for filing a grievance is not tolled by any informal discussions that may have taken place under this section.

B. Mutual resolutions of the complaint at the initial oral discussion shall be in writing, and although final, shall not be precedential nor inconsistent with this Agreement.

**Section 3**.  Any formal grievance must be filed at Step One of this Article within thirty (30) business days after the event, or after the grievant should have become aware of the event, giving rise to the grievance.  A SW who is required by their employment or by their academic duties to be temporarily away from the Harvard campus may file their grievance within thirty (30) business days following their return to campus.

**Section 4**. Grievance Process

Step 1.

A.      The Step 1 grievance shall be in writing and state pertinent facts of the case as clearly and concisely as possible, the provision(s) of the Agreement alleged to have been violated; and a statement of the desired outcome. This written grievance shall be submitted to the appropriate department chair or comparable director in units with no department chair for resolution in accordance with this Article. If a SW or group of SWs files the grievance without the Union, the University will notify the Union of such filing.

B.      Within five (5) business days of receipt of the Step 1 grievance, the department chair, director or designee shall meet with the grievant(s) and the Union representative where the grievance will be presented in an effort to resolve the grievance.

C.      The department chair, director or designee shall have five (5) business days to provide a written response to the grievance.

D.      Mutual resolutions of the grievance at Step 1, although final, shall not be precedential. If the mutual resolution is between a SW or group of SWs without the Union being involved, then such resolution shall also not be inconsistent with this Agreement.

E.      If the grievance is against the Department Chair, or comparable director in units with no department chair, Step 1 may be filed with the relevant Dean or designee.

Step 2

A.      In the event the response to the Step 1 Grievance is unsatisfactory, the Union may appeal the grievance to the Dean of the School or designee within ten (10) business days of receiving

11

the written response.  The Dean or designee shall conduct a meeting to resolve the dispute within ten (10) business days of the receipt of the grievance.  However, if the grievance is filed at Step 1 to the Dean or designee per paragraph E, the Union may appeal the grievance to the Provost.

B.      The Dean or designee or Provost or designee shall provide the Union with a written response within ten (10) business days of the meeting.

Step 3. Arbitration

A.      A grievance not resolved at Step 2 may be appealed to arbitration by the Union provided the Union gives written notice to the University within thirty (30) business days of the Step 2 denial by the Dean or designee or Provost or designee. Only the Union may process a grievance to arbitration. The Union will request a list from the American Arbitration Association or the Labor Relations Connection within fifteen (15) business days from its notice of appeal to the University and selection shall be made in accordance with the voluntary labor arbitration rules of that body.

B.      Arbitration will be conducted in accordance with the rules of the American Arbitration Association or the Labor Relations Connection.

C.       Each party shall bear the expense of preparing and presenting its own case.  The compensation, fees, and expenses of the Arbitrator shall be borne equally by the Union and the University.  If the parties agree to have the hearing transcribed, the parties will share equally in the cost of the transcription.

D.      Unless otherwise mutually agreed, each arbitration hearing shall deal with no more than one (1) grievance.

E.      The Arbitrator shall have no power to add to, subtract from, modify or disregard any of the provisions of this Agreement. The Arbitrator shall have no jurisdiction or authority to issue any award changing, modifying, or restricting any action taken by the University on matters reserved to the University's discretion as per Article 17 (Management Rights) unless those actions are restricted by other terms of this Agreement.

F.       The decision of the arbitrator shall be final and binding on the parties, although each side retains whatever rights it has under state or federal law to challenge the decision and award.

G.      The arbitrator shall render a decision on the grievance within 30 calendar days of the close of the hearing, or the filing of briefs, whichever is later.

**Section 5**:  Time Limits

A.      Absent extraordinary circumstances, failure by the SW, group of SWs or the Union to comply with the time limitations of this Article at any of the Steps, including the initial filing of

12

the grievance, shall constitute a forfeiture of the right to pursue the grievance and shall preclude any further processing of the grievance.

B.      Unless the parties have agreed in writing to a specific extension of time, any grievance or demand for arbitration which is not filed at each Step within the time limits contained herein shall be deemed waived and there shall be no further processing of the grievance or any arbitration thereon.

C.      Failure by the University at any Step to communicate its response within the specified time limits shall permit the Union to proceed to the next Step.

D.      All time limits herein may be extended by mutual agreement expressed in writing.

**Section 6**.  The filing or pendency of a grievance under the provisions of this Article shall not prevent the University from taking the action complained of, subject, however, to the final decision of the Arbitrator.

**Section 7.**  Unless otherwise stated in writing by the University and Union, any mutual resolution of grievances at any step shall not be precedential nor inconsistent with this Agreement.

## ARTICLE 7

## NON-DISCRIMINATION, HARASSMENT, AND ABUSE OR INTIMIDATION

**Section 1**.  Prohibition of Discrimination, Harassment and Abusive or Intimidating Behavior

A.      Harvard University provides equal opportunity in employment for all qualified persons and shall not discriminate against any SW on the basis of race, color, religion, caste, creed, sex, sexual orientation, marital status, parental status, pregnancy and pregnancy-related conditions, gender identity, gender expression, genetic information, national origin, ancestry, age, veteran status, military service, physical or mental disability, political beliefs, union activity or membership, or membership in other protected status under Massachusetts, federal or local law, or any University Policy.

B.      The University shall not tolerate abusive or intimidating behavior by individuals who hold supervisory authority over SWs.

C.      For purposes of this Article, the term "caste" is defined as a system of rigid social stratification characterized by hereditary status, endogamy and social barriers sanctioned by custom, law, or religion, that originated in South Asia.

**Section 2.**  Definitions of Sexual Harassment and Other Sexual Misconduct and Abusive or Intimidating Behavior

A.   Sexual Harassment and Other Sexual Misconduct

13

Consistent with the University's policies on sexual harassment and other sexual misconduct and/or discrimination for students, faculty, staff and other Harvard appointees, Harvard University is committed to maintaining a safe and healthy educational and work environment in which no member of the University community is, on the basis of sex, sexual orientation, or gender identity or expression, excluded from participation in, denied the benefits of, or subjected to discrimination in any University program or activity. Sexual harassment, including sexual violence, is a form of sex discrimination in that it denies an individual's equal access to the University's programs or activities.

1.    Sexual harassment is unwelcome conduct of a sexual nature, on the basis of sex, including sexual orientation and gender identity. Sexual harassment includes unwelcome sexual advances; requests for sexual favors; and other verbal, nonverbal, graphic, or physical conduct of a sexual nature or based on sexual orientation or gender identity or expression, that satisfies one or more of the following:  (1) an employee of the University either explicitly or implicitly conditioning the provision of an aid, benefit, or services of the University, such as an individual's employment or academic standing (for example, academic evaluation, grades, or advancement) on an individual's participation in unwelcome sexual conduct(quid pro quo); quid pro quo sexual harassment can occur whether a person resists and suffers the threatened harm, or the person submits and avoids the threatened harm. Both situations could constitute discrimination on the basis of sex; or (2) unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the University's education or work programs or activities; or (3) sexual assault, dating violence, domestic violence, and stalking.

The University is completing the development of an updated definition of consent based on the Title IX Advisory Committee's recommendations. Until the University has enacted this update, consent is defined in the University's Interim Title IX Sexual Harassment Policy and Interim Other Sexual Misconduct Policy.

Other sexual misconduct is unwelcome conduct on the basis of sex, including sexual orientation and gender identity or expression. Other sexual misconduct includes unwelcome sexual advances; requests for sexual favors; and other verbal, nonverbal, graphic, or physical conduct of a sexual nature or based on sexual orientation or gender identity or expression, that satisfies one or more of the following: (1) an employee of the University either explicitly or implicitly conditioning the provision of an aid, benefit, or services of the University, such as an individual's employment or academic standing (for example, academic evaluation, grades, or advancement) on an individual's participation in unwelcome sexual conduct(quid pro quo), which may occur whether a person resists and suffers the threatened harm or the person submits and avoids the threatened harm; or (2) unwelcome conduct determined by a reasonable person to be so severe, persistent, or pervasive that it effectively denies a person access to the University's education or work programs or activities (hostile environment).

14

B.        Abusive or intimidating behavior (power-based harassment) by individuals who hold supervisory authority over SWs, when such conduct interferes with or limits a person's ability to participate in, or benefit from their employment at the University is prohibited.

**Section 3.** Sexual Harassment and Other Sexual Misconduct Training.

A.       It is the policy of the University to provide educational, preventative and training programs regarding sexual and other sexual misconduct; to encourage reporting of incidents; to prevent incidents of other sexual misconduct from denying or limiting an individual's ability to participate in or benefit from the University's programs or activities; to make available timely services for those who have been affected by discrimination; and to provide prompt and equitable methods of investigation and resolution to stop discrimination, remedy any harm, and prevent its recurrence.

B.       Consistent with current policy, all faculty, staff and students are required to take on-line training in sexual harassment and other sexual misconduct as determined by the University. The content and delivery of the training is reserved to and determined by the University. However, the Union is free at any time to offer suggestions on how such training can be improved.

**Section 4.**  Right to notice and representation

A.   SWs are free to have a Union representative accompany them in preliminary discussions about possible incidents of harassment and discrimination if they so choose.

B.   SWs have the right to be accompanied by a Union representative at any and all steps of the formal complaint procedures regarding any complaints of any type of alleged discrimination or harassment under Section 1 of this Article.

C.       The University shall notify any SW complainant in a University complaint procedure that the Office of Dispute Resolution (or any similar University office that might conduct investigations) has an investigatory role and, as such, does not represent the SW.

D.   The University shall also provide any SW complainant in a University Complaint procedure with a letter from the Union, incorporated herein as Appendix A, outlining the various avenues of recourse (including the ability to pursue a resolution through the Department of Education Office of Civil Rights), right to Union representation and contact information for the union.

E. SWs may consult with advisors of their choice, including an attorney, at any point in the formal/informal University resolution process. The University will notify SWs that they may consult with advisors (including an attorney), and the names of potential advisors (including attorneys). SWs have the right to have an advisor or attorney present in conversations with investigators.

F. The University will report to the Union, once a year, de-identified data on allegations of violations of university-wide non-discrimination and harassment policies that resulted

15

in formal complaints and involved SWs, including: complaint allegations by category; the University status of the parties (i.e. undergraduate student, graduate student, faculty member, staff member, post-doc, or third party); the status of the investigation and, where applicable, outcome of responsibility findings; if known, whether either party had an attorney as a personal advisor; and the academic year in which the complaint was made. The University will provide an annual list of individuals who are eligible to serve on hearing and appeals panels, and where applicable, the number of panels on which each served in the prior academic year.

G.      During the life of this Agreement, should the Department of Education issue new formal rules under its Title IX authority that require the University to modify its current Title IX policies and procedures, the University will notify the Union in advance of finalizing any such changes and provide an opportunity for the Union to meet and discuss in good faith the proposed changes.

The University will give the Union an opportunity to endorse recommendations on any such changes and provide an opportunity for the Union to meet and discuss changes in advance of implementing any such changes.

**Section 5.** Recourse

A.   Processes

1. A SW's complaint of discrimination based on union activity or membership shall be handled through the Grievance and Arbitration Procedure in Article 6 of this Agreement. A grievance alleging such discrimination based on union membership or activity may not include additional allegations of other forms of discrimination or abusive behavior as defined under this Article.

2.      All other SW complaints regarding discrimination or harassment in employment under this Article, as well as complaints regarding abusive or intimidating behavior that does not violate a discrimination policy will be processed in accordance with the internal policies and procedures developed by the University or the individual schools. Such claims shall not be processed under Article 6, Grievance and Arbitration, other than the exception noted below in Section C. (2-6) below.

3.      Under no circumstances should a SW in any of the Schools of the University be pressured by Title IX Resource Coordinators or staff or any other University officials to accept informal resolution of their complaint or supportive measures, in place of filing a formal complaint. Pressure to accept informal resolution may include (but is not limited to) telling the SW they will not win a formal resolution, providing misinformation about the formal resolution process, and telling the complainant that the resolution process will harm the academic opportunities of the respondent. Discussing in good faith the pros and cons of various approaches shall not be considered pressure to accept informal resolution. SWs are free to file a formal complaint at any time if they so choose.

16

4.    A SW also may contact the US Department of Education's Office for Civil Rights (OCR) or any state or federal agency that has jurisdiction over claims of discrimination.

B.    Internal University Processes for Claims of Sexual Harassment and Other Sexual Misconduct

1.    Complaints by SWs regarding sexual and gender-based harassment in employment shall be processed in accordance with the University's Interim Title IX Sexual Harassment Policy that addresses sexual conduct that falls within the parameters of Title IX and occurred after August 14, 2020; the Interim Other Sexual Misconduct Policy that addresses sexual conduct that falls outside the jurisdiction of the Interim Title IX Sexual Harassment Policy and occurred on or after August 14, 2020; the Sexual and Gender-based Harassment Policy that address sexual harassment and other sexual misconduct occurring before August 14, 2020 and after September 1, 2014 and other applicable University policies and related procedures, all of which may be amended from time to time by the University. The policies and procedures can be found on the Office of Gender Equity website. https://oge.harvard.edu/policies-procedures

These policies also provide definitions for terms such as Sexual Harassment, and Other Sexual Misconduct and Consent.

2.    The University encourages any SW to contact one of the School or Unit Title IX Resource Coordinators, or the Office of Gender Equity or ODR staff about any incidents of possible sexual harassment or other sexual misconduct and to learn about the options that are available to the SW if they wish to pursue that matter. Members of the bargaining unit are also free to have a Union representative accompany them in such discussions if they so choose.

3.    SWs may file formal complaints or seek informal resolution of violations of the University's policies on sexual harassment or other sexual misconduct and/or discrimination. There is no time limit for the filing of such a complaint under University policies or procedures. However, SWs are encouraged to file complaints as soon as reasonably possible. Such claims shall not be processed under Article 6, Grievance and Arbitration.

4.    Both the respondent and the complainant may appeal any final decision of the Investigative Team under the Sexual and Gender-Based Harassment Policy or the Interim Other Sexual Misconduct Policy or Hearing Panel's determination regarding responsibility under the Interim Title IX Sexual Harassment Policy or Interim Other Sexual Misconduct Policy (the latter in the case of consolidated allegations) to the Office for Gender Equity within one week of the date of the notice of dismissal or the determination. The Office of Gender Equity will assign the appeal to a panel drawn from a pool of trained faculty and administrators. All members of the appeals pool receive trauma-informed training from the Director of the Office of Dispute Resolution or designee, including training on the nature

17

of sexual harassment or other sexual misconduct and all relevant Title IX policies and procedures as well as the appeals process.

Impartial and unbiased panels of three members shall be drawn in each case from the standing committee.

Potential appeals panel members are provided with the names and affiliations of the individuals in the appeal and are asked to review to determine whether they have a potential conflict of interest. If so, they are removed from consideration for the appeals panel, and another member of the standing committee is selected for consideration. If there are any questions regarding conflicts of interest, the Office of General Counsel is engaged to help in a determination.

Both the complainant and respondent will be notified as to who will sit on the appeals panel. If a complainant or respondent believes that a particular member of the proposed appeals panel has a conflict of interest and cannot fairly sit upon the panel, such objection should be raised with the University Title IX Coordinator or designee and such objection will be considered in good faith. If the proposed panel member is removed, another member of the standing committee will be selected in their place.

5. Grounds for appeal shall be:

    a. A procedural irregularity that affected the outcome of the decision;

    b. The appellant has new evidence that was not reasonably available at the time the decision regarding responsibility or dismissal was made and that may change the outcome of the decision;

    c. The University Title IX Coordinator, School or unit Title IX Resource Coordinator, Investigative Team or Hearing Panel had a conflict of interest or bias for or against complainants or respondents generally or the individual Complainant or Respondent that affected the outcome of the matter; or

    d. On the record as a whole, no reasonable Hearing Panel or Investigative Team could have reached the same determination regarding responsibility.

The decision of the Appeals Panel shall be the final decision.

    6. <u>Mediation</u>. Following completion of the Appeals process by a SW, if the Union is dissatisfied with the final decision of the University and contends that it violates a provision of the collective bargaining agreement, the Union may take the matter to mediation by

18

serving notice on the University within 15 days of the final decision of the Appeals Panel.  As the parties to the mediation, the Union and University shall meet to mutually select a mediator. The Union and the University will split the costs of mediation evenly.

An individual SW shall not have the right to invoke mediation.

Any such mediation will be between the Union and the University.  Any action arising from a mediated agreement may not include remanding the matter or imposing a remedy that would make the University and parties to the underlying claim repeat the investigatory, adjudication, and appeal process. Any mediated agreement shall not impose anything on, or with respect to, the other party or parties from the underlying claim.

C. Process for Other forms of discrimination and abusive or intimidating behavior

1. If a SW has an allegation and/or allegations of harassment or discrimination in employment that are not covered, in part or in whole, by the Interim Title IX policy, the Interim Other Sexual Misconduct Policy, or the Sexual and Gender-based Harassment Policy, or if a SW has an allegation of abusive or intimidating behavior in employment, they must pursue such claims in accordance with School or University policy and procedures which may be amended from time to time by the University.

2. For allegations of other forms of discrimination (besides those covered, in part or in whole, by the Interim Title IX policy, the Interim Other Sexual Misconduct Policy or the Sexual and Gender-based Harassment Policy), or for allegations of  abusive or intimidating behavior under this Article, and only after exhausting the School or University policy and procedures other than appeal, the SW who disagrees with a decision related to a claim of discrimination or abusive or intimidating behavior in which they are either a Claimant or Respondent may either

(1) pursue an appeal through the School or University appeal procedures on any of the grounds provided for in the School or University procedures, or

(2) pursue a grievance under Article 6, Grievance and Arbitration, as modified below.

3. The two possible bases for a grievance under Article 6, Grievance and Arbitration, shall be:

A)  whether the investigator(s) or decision-makers(s) involved in the initial determination of the claim had a conflict of interest or bias for or against the complainant(s) or respondent(s) such that a reasonable person would conclude it influenced the outcome of the claim to the detriment of the SW; or

19

B)   whether the grievant has new evidence that was not reasonably available at the time the decision regarding responsibility or dismissal was made that could affect the determination.

4. Power of the Arbitrator

A. In cases involving allegations of conflict of interest or bias, and for the sake of all parties, the arbitrator will be asked to avoid an outcome that would make the University and parties repeat the investigatory and adjudication process unless no other remedy will address the arbitrator's findings.  Apart from ordering a new process for the grievant's claim, if the arbitrator finds there was a conflict or bias sufficient to influence the underlying decision to the detriment of the SW, the arbitrator may award a make whole and/or compensatory remedy to benefit the SW but shall have no power to impose any penalties on the other party or parties from the underlying claim. The arbitrator shall not be authorized to award punitive or emotional distress damages nor may the arbitrator award attorney's fees.

B. In cases involving allegations that the grievant has new evidence that was not reasonably available at the time the decision regarding responsibility or dismissal was made and that could affect the determination, the arbitrator's sole power if they agree with the grievant's position will be to remand the matter back to the University for consideration of the new evidence.

C. In all grievance cases, the arbitrator shall have no power to substitute their judgment for that of the University decision-makers with regard to findings of discrimination or abusive or intimidating behavior or lack thereof.

5. If the SW files such a grievance under Article 6, Grievance and Arbitration, any deadlines by which the other party or parties to the underlying claim must file an appeal will be tolled until resolution of the grievance. Any such grievance will be between the Union and the University.  The Union shall bear the burden of proof in the grievance process.

6.  Under no circumstances may the SW pursue both an appeal and a grievance option, except as noted in (b) below.

a) If the SW chooses to file a grievance under Article 6, Grievance and Arbitration, the SW must file such grievance within one week of the date of the final determination (other than appeal) of the internal University or School procedure. The grievance shall be filed at Step 2 (Dean's level). The Union shall decide within ten (10) business days of the Step 2

20

response whether to process such grievance to arbitration.  If the Union decides to pursue arbitration, the decision of the arbitrator shall be the final decision, subject to whatever rights either party may have under state or federal law to challenge the decision and award.

b) If the Union decides not to pursue arbitration, the SW may file an internal appeal instead.  In this event, the SW must file a notice of appeal consistent with the University's or School's appeal procedures within one week of the date of the notification that the Union will not pursue arbitration.

c) If the SW pursues an internal appeal, either initially or after a decision by the Union not to pursue arbitration, the decision of that appeal shall be the final decision.

7.    Mediation. Following completion of the internal Appeals process by a SW, if the Union is dissatisfied with the final decision of the University and contends that it violates a provision of the collective bargaining agreement, the Union may take the matter to mediation by serving notice on the University within 15 days of the final decision of the Appeals Panel.  As the parties to the mediation, the Union and University shall meet to mutually select a mediator. The Union and the University will split the costs of mediation evenly.

An individual SW shall not have the right to invoke mediation.

Any such mediation will be between the Union and the University.  Any action arising from a mediated agreement may not include remanding the matter or imposing a remedy that would make the University and parties to the underlying claim repeat the investigatory, adjudication, and appeal process. Any mediated agreement shall not impose anything on, or with respect to, the other party or parties from the underlying claim.

D.    While the University is developing university-wide procedures for all forms of harassment, discrimination and abusive or intimidating behavior, nothing in this Article shall preclude an individual School from establishing or following local procedures crafted to address identity-based harassment, discrimination and abusive or intimidating behavior.

E.    Supportive measures.  Supportive measures are individualized supports to help those who may have experienced incidents of sexual harassment or other sexual misconduct, participate in campus life at Harvard and continue with their work or studies.  Supportive measures may be implemented at any time, including but not limited to during the pendency of a formal complaint investigation or informal report. During the processing of complaints of any harassment and/or discrimination defined in Section 1, the University shall promptly provide, as appropriate supportive measures to individuals involved in a formal complaint or informal report. Possible supportive measures may include, but not be limited to: no-contact orders;

21

change to a different workstation or schedule for the SW; leave time; suspension of respondent without loss of pay while investigating the complaint; change of supervisor, unit, department, or position appropriate for the SW, provided that the change is voluntary and equitable; provision for medical services; provision for escort services. None of these measures shall result in loss of pay for the complainant, or for the respondent (if the respondent is a SW), except if a complainant or respondent chooses to take voluntary leave of absence and such leave is approved, that leave will be unpaid.

       F.      Non-Retaliation. Filing a complaint in good faith of sexual harassment or other sexual misconduct and/or discrimination, other forms of discrimination, or abusive or intimidating behavior or cooperating in an investigation shall be a protected activity. Retaliatory actions against any SW for initiating or otherwise participating in such protected activities shall be expressly forbidden.

       Retaliation against an individual for raising an allegation, for cooperating in an investigation of such a complaint, or for opposing discriminatory practices is prohibited.

       Knowingly or deliberately providing false or misleading information in any investigation is also prohibited.

       G.      Discipline. Sanctions for any respondent found to have violated policy shall be handled in accordance with the appropriate disciplinary procedures of the School or unit depending on whether the respondent is a student, faculty member, staff or other University appointee. Disagreement with the severity of any imposed sanction cannot be raised or contested in any way by the complainant.

       H.      It is understood that the determination of appropriate penalties for SWs, faculty, staff or other University appointees of the University found to have engaged in prohibited conduct under this Article or related policies is handled at the School level and in accordance with School policies and procedures. A SW who is disciplined for engaging in conduct prohibited under this Article or related policies may grieve the level of discipline imposed but neither the SW nor the Union may dispute the factual findings in the investigatory report.

**Section 6**. Pregnancy and Lactation. The University shall provide reasonable accommodations for pregnancy or pregnancy-related conditions (examples include but are not limited to, morning sickness and lactation) unless to do so would impose an undue hardship on the University. Examples of such accommodations include, but are not limited to, a modified work schedule; more frequent restroom, food, or water breaks; providing equipment for seating; limits on lifting; more frequent or longer paid or unpaid breaks; time off, with or without pay, to attend to a pregnancy-related complication; private non-bathroom space for expressing breast milk; and assistance with manual labor. No such accommodations can result in decreased pay or benefits for the SW.

       The University provides many lactation rooms across the University. Any nursing SW or their spouses/partners who are breastfeeding can register to use a Harvard lactation room. Locations of such lactation rooms can be found on the HARVie website.

22

**Section 7.**  <u>Bathroom Equity</u>. The University will work with local facilities management to label existing gender-neutral bathrooms in office, classroom and lab buildings. Gender-neutral bathrooms shall be posted on a central website. The University will not prevent SWs from using a workplace bathroom appropriate to the SW's gender identity.

**Section 8**.  <u>Gender Identity</u>. The University shall respect the SW's decision to choose to discuss their own sexual orientation, gender identity, or gender expression openly, or to keep that information private.

Upon request from the SW, the University will work to update aspects of a SW's employment record to reflect a change in name or gender. University and department-level records should accurately reflect SW pronouns and honorifics.  If an error is found in this regard, it will be promptly corrected when brought to the attention of the department.

**Section 9.**  <u>Disability</u>. Upon request from a SW with a disability, the University shall engage in an interactive process and will provide reasonable accommodation to enable SWs with disabilities to perform the essential functions of their job, consistent with state, federal and local law as well as the University's policies.

**Section 10**.  <u>Prayer Space</u>. The University shall maintain a central website with the location and hours of all known prayer spaces on campus.

**Section 11**. <u>Medical Confidentiality</u>. In accordance with the requirements of HIPAA and FERPA, the University shall respect the highly confidential status of all SWs' medical records maintained by the University, including those that contain information about their transgender status (such as the sex they were assigned at birth).

# ARTICLE  8

## ACADEMIC RETALIATION

**Section 1** The University shall not retaliate against a SW in an academic form for exercising a right under this Agreement or participating in any investigation or proceeding arising under this Agreement.  Academic retaliation can target grades, academic assessments, recommendation letters, or the denial of some academic opportunity.

**Section 2.** Claims of academic retaliation may not be processed through the standard Grievance and Arbitration provisions of this Agreement. Each School has a local policy and procedure in place for handling academic retaliation matters, and the Union will be provided with a copy of these policies.  Accordingly, a SW with a claim of academic retaliation may pursue such a claim through the applicable internal school policy and procedures.

The schools shall have six (6) months from the date of ratification of this Agreement to ensure that such internal school policies and procedures require that:

1. a written decision be rendered and provided to the SW and
2. there is a way for a SW to appeal or otherwise raise concerns with an initial decision by the University, on the basis of a procedural irregularity that affected the outcome of

23

the decision; new evidence that was not reasonably available at the time the determination was made and that could affect the outcome of the decision; or the investigator or decisionmaker had a conflict of interest or bias for or against the complainant or respondent that affected the outcome of the matter.

**Section 3.** The SW shall have the right to a HGSU-UAW student representative or UAW representative at any and all steps of the handling of such matters.

**Section 4.** It is understood that SWs may also have access to certain government agencies, both state and federal, and can file claims with those agencies regarding such claims.

## ARTICLE 9

## INTELLECTUAL PROPERTY, SCHOLARLY AND RESEARCH MISCONDUCT

**Section 1**.  SWs are covered by and subject to the University's policies and procedures on Intellectual Property and Scholarly and Research Misconduct, as may be amended from time to time. There is one University-wide policy on Intellectual Property at Harvard ("Statement of Policy in Regard to Intellectual Policy"), which applies to all faculty, students, and staff. Scholarly and research misconduct policies at Harvard are School-based. Issues and disputes arising under such policies are not subject to the Grievance and Arbitration provisions of this Agreement. Complaints regarding intellectual property or scholarly and research misconduct are processed in accordance with University or School policies and related procedures, which may be amended from time to time by the University or the School. SWs shall be entitled to Union representation during any investigation of a misconduct allegation.

**Section 2.**   The University shall not engage in any form of retaliation against a SW who engages in any good faith effort to assert rights under the Intellectual Property policy or who otherwise participates in any investigation into alleged scholarly misconduct by other faculty, students or University appointees.

 **Section 3**. ~~The University will promptly provide the Union with a copy of any ~~future~~ changes to the University's Statement of Policy in Regard to Intellectual Property and any University-wide Research Integrity/Misconduct policies. The current Intellectual Property Policy and all current Scholarly and Research Misconduct policies from the Schools are posted on the website of the Office of the Vice Provost for Research (vpr.harvard.edu)

The University will ensure that any School's Scholarly and Research Misconduct Policy makes it clear as to how disputes or reporting matters are processed under their policy.

The University will ensure that by September 1, 2021, each School has such a local policy in place for handling such matters and that the Union is provided with a copy of such policy.

24

Section 4. The University will maintain a reasonable "plain-language" summary of the University's "Statement of Policy in Regard to Intellectual Property" on an appropriate website with notice to the Union as to its location. The Union is also free to post the plain language summary on its own web site. The Intellectual Property Policy summary is only for general guidance and does not serve as a substitute for the actual Policy itself; in all cases, the language of the Policy itself will govern. Any SW with a question about the plain-language summary or the policy itself or with a question or concern about an invention or a copyright issue may contact the Office of Technology Development (otd@harvard.edu). Additional information as to how Harvard protects and commercializes Intellectual Property can be found on the OTD website. (otd.harvard.edu)

## ARTICLE 10

## HEALTH AND SAFETY

**Section 1.**  SWs will be provided with a safe University workspace and will not be required to work in conditions that pose an unnecessary threat to their health and safety. No SW will be required to act, nor will any SW act, in a manner which constitutes an unnecessary health or safety hazard. Towards that end, the University has policies in place to provide such a safe workplace; will maintain such policies during the life of this Agreement; and may improve such policies at its discretion. The University shall observe all applicable health and safety laws and regulations and will take all reasonable steps necessary to assure SW health and safety. Such reasonable steps shall include but not be limited to providing training in the safe and proper use of equipment necessary for the work.

**Section 2**. If a SW works outside of University workspaces, other than local remote home locations, prior to the beginning of the assignment the University shall:

A.        Provide the SWs with information about Global Support Services, if SWs have work that takes them outside the United States. SWs will receive this information as soon as possible and no later than 14 days before travel dates.  SWs should consult with the University's Global Support Services prior to undertaking such work for information and advice about risks and safety.

B.        Provide SWs performing field work in the United States information relevant to the safe performance of such work.

C.        Make SWs aware of all available resources they may need for the successful completion of the work assignment, including how to access or obtain these resources in the location of the work assignment.

**Section 3**.  Adequate first aid equipment will be provided in appropriate locations.  The University shall provide first aid information and training at no cost for all SWs in workplaces that involve the use of or exposure to hazardous materials or who work in a hazardous environment.

25

**Section 4**. The University shall supply and maintain all equipment, tools, materials, and personal protective equipment (PPE) to SWs needed to carry out job duties safely, including but not limited to protective safety glasses as may be required by applicable occupational safety regulations, University policy, or Standard Operating Procedures. The health and safety committee referenced in Section 8 may also make recommendations related to the supply and maintenance of all equipment, tools, materials, and personal protective equipment (PPE) for SWs. Such recommendations shall be considered by the University taking into account relevant factors, including cost, and shall not be unreasonably denied.

A SW may request prescription safety glasses from their supervisor, who shall consider such a request in good faith and decide whether or not to grant the request taking into account relevant factors including cost.

**Section 5**.  For a SW with a disability as defined by the Americans with Disabilities Act, the University will provide reasonable accommodations that do not pose an undue hardship to the University.

**Section 6**.  Workplace and Workstation Evaluations shall be provided by the University upon the request of either a SW, a group of SWs or a supervisor who believes that the nature of the work or workplace is exposing the SW(s) to health-related problems.

The nature of these evaluations will be determined based on the work location (i.e. remote or on campus), as agreed upon by the SW and supervisor or employing unit. While these are normally campus-based work station evaluations, a SW may request that Environmental Health & Safety (EH & S) conduct a virtual ergonomic review, and such request will be granted, consistent with EH & S and school policies and practices.

Such evaluations should involve experts such as occupational hygienists, occupational physicians, occupational health and safety professionals and/or environmental health and safety professionals, who shall make recommendations to the University to eliminate the problem or the risk of the health-related problem(s). The University shall consider the recommendations in good faith and will make reasonable efforts to implement those recommendations that are approved by local program administrators, which, if necessary, will include reimbursing a SW to implement approved recommendations to the workplace. A SW will not be reimbursed for implementation recommendations that the local program administrators did not previously approve. The University will also make reasonable effort to incorporate currently accepted ergonomic practices and guidelines into new and existing workplace and workstation designs.

**Section 7**.   Consistent with University procedures, the University will provide advance notice to affected SWs and other University building occupants for asbestos removal project(s) in their immediate work area.

**Section 8**.  The parties to this Agreement pledge themselves to a cooperative effort in the area of health and safety founded upon good faith communication and discussion of problems, solutions, and prevention. Accordingly, the University and the Union agree that, at least twice per contract year and additionally if mutually agreeable or if a health and safety issue is identified by a SW, an equal number of representatives of the Union and University will meet at a mutually

26

agreeable time and place as a health and safety committee to discuss matters relating to health and safety of SWs in the workplace. Union representatives shall not suffer any loss of compensation to attend such meetings. Such meetings shall not constitute nor be used for the purpose of negotiations or discussions of any active grievance.

The University shall endeavor to have representatives qualified to speak on the topics of interest at the meeting when the parties agree in advance on a particular agenda item for such meetings.

The parties agree that workplace health and safety include concerns regarding mental health and may implicate racial justice issues. The parties recognize that such issues are also being discussed, and will continue to be discussed, on a University-wide basis during the life of this Agreement and may result in specific recommendations for change and accordingly are beyond the health and safety committee's authority to resolve.

**Section 9.**  In cases of injury to a SW while at work, the SW shall assist their Supervisor to file an Incident Report as soon as possible in accordance with University procedures. The SW shall file a Worker's Compensation claim in accordance with University procedures and state law. The determination of Worker's Compensation will be made via the University third-party workers comp administrator.

**Section 10**.   SWs shall adhere to all health and safety policies and procedures and shall perform their duties in a safe manner, using appropriate health and safety equipment provided by the University in accordance with standard operating procedures. Should a SW become aware of conditions they believe to be unhealthy or dangerous to their health and safety, the SW shall report the condition immediately to the supervisor or the Harvard Environmental Health and Safety Department who shall take corrective action. In cases where there is an imminent danger to the SW, they shall not resume their work until appropriate corrective action is taken. The University shall not retaliate against any SW for such reporting. The University shall respond to reports within 30 days, either by confirming receipt of the report or by describing any corrective action(s).

# ARTICLE 11

## TRAINING

**Section 1.**  The University shall provide any training that it determines necessary in order for the SW to fulfill their work duties at no cost to the SW.  All such training shall be considered mandatory and shall be considered part of the required workload of the SW and shall, correspondingly, be listed among other work duties on the SW's appointment letter(s) to the extent such trainings are known at the time of the issuance of such letters.

**Section 2.**  If a SW identifies additional training that can enhance their work, they may propose such training to the University for good-faith consideration. If approved, such trainings will be at no cost to the SW and shall be considered part of the required workload of the SW.

27

**Section 3.** For these trainings, the University will determine the content and delivery of the trainings. The Union-Management committee may make recommendations to the University to address other training concerns brought to its attention by SWs or regarding the content and delivery of training related to workplace conditions. The University will give such recommendations good-faith consideration.

**Section 4**. The University shall notify all SWs of training and orientation required as part of their appointment notification or as soon as practicable once such new or additional training is set.

**Section 5**. Anti-bias Trainings

In keeping with the University's commitment to combatting racism, at least once for the duration of this contract, SWs and their faculty or staff supervisors are encouraged to avail themselves of the existing training courses and others that may be developed that address how to recognize and combat racism, ableism, bias, discrimination and harassment.

For these courses and any other trainings, the University will determine the content and delivery of such courses and trainings. However, the Union-Management Committee (UMC) shall be provided the opportunity to review the current training courses and give feedback on the content and delivery of the current and future training options. Such feedback will be considered in good faith by the University. The UMC shall meet within 90 days after ratification to discuss existing training courses, possible refinements to those courses and suggestions for additional courses and related contract  implementation issues.

## ARTICLE 12

## EMPLOYMENT RECORDS

**Section 1.** Employment records shall include records documenting a SW's employment, such as appointment letters, payroll records, disciplinary action, and Q and other work evaluations or their equivalent.  A SW's coursework or academic progress or other academic records shall not be considered employment records.

**Section 2**.   Upon request, SWs and the Union shall be notified as to the location(s) of the employment records of the SWs.

**Section 3.** SWs shall have the right to examine and copy all employment records. The University shall make such records available within a reasonable time, but no later than five (5) business days after a SW's request to review such records.

 **Section 4.**   SWs shall have the right to request removal or correction of any factually incorrect material from their employment record. The University shall correct any such factual errors or shall remove the factually incorrect material within seven (7) business days of the SW's request.

SWs shall also have the right to request in writing removal of inappropriate material from their employment record which will include an explanation as to why it should be removed. The University shall consider such a request, but shall not be obligated to remove such a

28

document.  SWs shall be notified of the University's decision and if it is a denial, the University shall include in the notice a written statement explaining the reason(s) for such denial.

SWs shall have the right to attach a statement in response to any employment record. The statement shall be included when the employment record is transmitted to a third party so long as the original material that was the subject of the statement remains in the SW's employment record.

**Section 5**.  Grievance documents and related materials involving a SW shall not be considered employment records. No reference to any grievances shall be placed in an individual's employment record.

**Section 6**.  SWs shall be notified within seven (7) business days of any information to the extent that the information is, has been used or may be used, to negatively affect the SW's qualification for employment, promotion, transfer, additional compensation or the possibility that the SW will be subject to disciplinary action. However, such information shall not include course work or academic progress or other academic records.

**Section 7**.  All employment records shall remain confidential. Neither the University nor the Union shall make any material public without the SW's written consent, unless due to subpoenas or other legal process.

**Section 8**.  Rights established in this article are conferred on SWs and former SWs regardless of current employment status. Former SWs shall have the right to file a grievance alleging violation of this article pursuant to Article 6, Grievance and Arbitration, within the timeframe set forth in the Grievance and Arbitration article. The University shall be obligated to keep employment records for a period of time consistent with the University's General Records Schedule.

## ARTICLE 13
## INTERNATIONAL STUDENT WORKER RIGHTS AND WORK AUTHORIZATION

**Section 1.** While the University does not offer legal advice to SWs, Harvard International Office can advise a SW generally on visa issues as they relate to the academic and/or employment relationship with the University. Harvard International Office shall maintain a list of attorneys and agencies for referral, including pro-bono agencies, if a SW has a complex immigration issue or if the SW is in need of immigration advice that is not related to the SW's academic and/or employment relationship with the University. Legal fees if the SW retains such an attorney would be borne by the SW and may be reimbursed under the International Student Worker Assistance Fund in Section 2 if the legal matter involves an immigration issue that directly affects the SW's ability to work at the University.

Additionally, HIO shall invite immigration attorneys to visit campus (Cambridge and Longwood), either in-person or virtually, once each semester to discuss H visas and green cards. The University agrees to take reasonable efforts to record any such presentation for additional

29

viewing and/or, in its sole discretion, make available live streaming, provided that the immigration attorney(s) consent(s) to such recording.

**Section 2.** International Student Worker Assistance Fund.

Effective upon ratification, the University shall establish an International Student Worker Assistance Fund in the amount of $30,000 for each fiscal year of this Agreement. SWs who are resident or non-resident aliens for tax purposes may apply for reimbursement of immigration and legal expenses if the legal matter involves an immigration issue that directly affects the SW's ability to work at the University.

Distribution of any funds shall be made in accordance with procedures, policies and requirements established by the Union, subject to approval by the University.

Unexpended funds may not be rolled over from one year to the next for the duration of this Agreement.

**Section 3**.  Immigration Leave.  Salaried SWs shall have a right to five (5) paid business days of leave per year in order to attend visa and immigration proceedings and any other related matters for the SW and the SW's family as defined in Section 2 of Article 24, Leave Provisions SWs employed on an hourly basis may also be absent for the same purposes without loss of pay if the attendance at the immigration proceeding occurs during hours when the SW is required to be working.

A SW may request additional days off from their supervisor(s), who may approve these on a discretionary basis.

**Section 4.**  In cases where a SW is unable to return to the United States as a result of their immigration status, and for reasons outside of their reasonable control (*e.g.,* administrative processing), the University shall undertake reasonable efforts to arrange for the SW to perform their duties outside the U.S. until such time as either the SW can no longer work effectively by remote or is not making sufficient academic progress to maintain student (and thus SW) status.  Any determination regarding such academic progress is not grievable.  This section does not preclude a School from categorizing certain work that a SW could do as only being performed on-campus. Additionally, permission to work remotely shall be reviewed periodically.

**Section 5**.  If the University is not able to lawfully employ or continue to employ a SW as a result of the SW's immigration status, the University agrees to meet with the Union and the SW to discuss potential re-employment into their prior position or another position if their previous position is unavailable. The University agrees to make reasonable efforts to re-employ the SW as soon as possible after that person obtains work authorization or immigration status that lawfully permits them to work as a SW.  Such timing of re-employment shall depend on several academic factors, which are not grievable, including the academic calendar. The timing of re-employment may also depend on other factors such as the availability of lab space and research funding.

**Section 6**.  Issues surrounding immigration and visa status that may affect SWs can be appropriate topics for the Union-Management Committee. In addition, to assure effective support services, foster good communications and better understanding between the University and its

30

international graduate employees, the University shall convene two meetings yearly between the University and the Union that will include staff from the HIO.

**Section 7**. The University shall maintain, until September 30, 2021 or until final recommendations are made**,** a University-wide Working Group with representatives from various constituencies, including at least 2 members of HGSU-UAW, to evaluate the English-language needs of SWs, and the availability and the effectiveness of resources currently available such as the English Language Program, the Center for Writing and Communicating Ideas, and the Professional Communication Program for International Teachers and Scholars at the Bok Center. SWs who are members of the Working Group will be provided release time to attend meetings of the Group without loss of pay.

The Working Group will produce a list of recommendations to improve ESL services at the University including but not limited to enhancing post-ELP resources, access to ELP or equivalent programs at all Schools, and affordable proof-reading resources for teaching and research work products before the dissolution of the working group. The University will also provide these recommendations to the Union.

**Section 8**. Except as required by law, legal process, or regulations governing the administration of F-1 student and J-1 exchange visitor programs, the University shall not disclose any SW's immigration information or personal information including, but not limited to: temporary or permanent home address, contact information, workplace, or work schedule to any government entity.

## ARTICLE 14

## TAX ASSISTANCE

**Section 1**. The Harvard International Office (HIO) offers resources to assist international student workers with their tax issues. For as long as such programs exist, HIO will continue to offer web-based tax software designed exclusively for international students, scholars, and their dependents who are non-residents for tax purposes. If such programs cease to exist, the University will notify the Union and, upon request of the Union, discuss possible alternatives to such programs.

## ARTICLE 15

## WORKSPACE, REMOTE WORK, AND MATERIALS

**Section 1.**  To carry out assigned duties as determined by the University, the University shall provide SWs, at no cost to the SW, reasonable access to University services, materials, and facilities necessary to carry out such duties, including but not limited to: desk space (individual or shared), after-hours and weekend building access, library privileges, studio space, storage space, campus mail, office supplies including chalk and dry-erase markers, office equipment, basic software and hardware, basic lab equipment, grading software, and audio/visual presentation equipment.

**Section 2.**  Nothing in Section 1 precludes the University or the supervisor from determining what specific software and hardware, lab equipment, grading software, and audio/visual presentation equipment are best suited or adequate to carry out assigned duties. However, the University shall consider in good faith any SW request for such specific equipment or materials not provided pursuant to Section 1 by the University. If a faculty member denies such a request, the SW may discuss the denial with the department chair or supervisor.

**Section 3.** To the extent available and consistent with the requirements of the departments or employing unit, SWs shall also have access to computers with internet access and printers.

**Section 4**.  With the supervisor's or employing unit's advance approval, the University shall reimburse SWs for required job-related materials, equipment, and services that are not otherwise provided to the SW by their department, including materials needed in on-campus spaces and, when approved, remote work locations. Requests for approval shall not be unreasonably denied.

**Section 5.**  If a SW's University work location is to be moved or if there is a substantial alteration of the SW's work space, the SW will be notified at least thirty (30) days before the move or alteration. In circumstances where it is not possible to provide thirty (30) days' notice, notice shall be given as soon as possible.

**Section 6.**  In the performance of their duties, SWs will have access to available University private space to advise students.

**Section 7**. Remote work

When requested by the SW and approved by the SW's supervisor or employing department/unit, or when required by the University, SWs may work remotely, which includes work from home.

In such cases, the University reserves the right to set the parameters for remote work by a SW, and the SW shall be subject to any procedures, restrictions, limitations and other guidelines on remote teaching and learning and remote work that may be set by the University in a given case.   The supervisor or employing department/unit head will discuss such matters with the SW in advance of the start of remote work and may recommend additional guidelines for particular situations.

Any remote work arrangement may be terminated at the sole discretion of the University at any time with reasonable notice to the employee taking into account the supervisor's or employing department/unit's needs and the SW's remote situation. Such reasonable notice shall normally be no less than 30 calendar days, instructional or research work needs permitting.

In the case of a SW working remotely, the SW may request assistance from the HUIT Service Desk or from the local School IT help desk with regard to internet access in accordance with University procedures.

The SW and the supervisor or employing department/unit shall discuss what particular University services, materials, and facilities necessary to carry out assigned duties the SW shall receive, at no cost to the SW, when working remotely, pursuant to Sections 1 and 2 of this Article. Computer and printer equipment, when not otherwise available to the SW, may be

32

provided after review on a case by case basis at the University's discretion. Ownership of any equipment that may be provided to a SW working remotely remains with the University.

A SW working remotely shall have the ability to request reimbursement for work-related materials consistent with Section 4 above and consistent with any University policies on expenses reimbursements.

Also, the SW will have access to Workers Compensation in the case of work-related injury that arises out of and is in the course of University employment and shall proceed in accordance with Section 9 of Article 10, Health and Safety.

## ARTICLE 16

## WORKLOAD

**Section 1**. The University maintains the right to define academic expectations and degree requirements. This Agreement should not in any way be construed as imposing a limit on the amount of this work necessary for a student to make satisfactory academic progress toward their degree. The parties agree that it is in the interest of the University and the student worker to define a SW's workload to be commensurate with the SW's appointment, title/classification, and compensation as well as their ability to make academic progress required by their program. Such workload is outlined below.

**Section 2**. Salaried / stipended appointments.  For all such appointments, the University will not require more than an average of twenty (20) hours per week of effort for students in their roles as student workers over the course of their employment appointment period where the appointment period is a traditional semester (fall/spring), academic year, or calendar year.

The time spent by a student worker on their academic efforts associated with degree requirements and academic expectations are not part of this collective bargaining agreement.

Teaching Fellows or other salaried SWs with instructional assignments shall not be required to take on a workload of more than two course sections per semester.  Minimum compensation rates for such work are set out in Article 20, Compensation.  As noted in that Article, each School may increase compensation beyond minimum teaching rates depending on, among other things: degree of difficulty of the course or section; class size; degree of independence and accountability for the SW; frequency of meetings; attendant course advising; and any oversight responsibilities.

For purposes of this Agreement, the workload of salaried/stipended Research Assistants (RA1 and RA2 in Article 2, Titles and Classifications), are the efforts they are expected to make to contribute toward support of general functions and activities within a research lab or program. These students are also expected to engage in course work, teaching, and/or research that will contribute to degree requirements, all of which are academic efforts that are not part of this collective bargaining agreement.  The combination of these efforts generally reflects a full-time commitment.

33

**Section 3**. <u>Hourly SWs</u>. SWs who are working on an hourly basis may have a variable number of hours of work that may be assigned during all or part of their appointment period, but in no event shall any SW be required to work more than an average of twenty (20) hours per week over the course of their employment appointment period where the appointment period is a traditional semester (fall/spring), academic year, or calendar year. When possible, such hours should be memorialized in writing by the supervisor when the assignment is made. When an appointment letter for an hourly SW sets the number of hours, such SWs will not be required to work more hours than may be specified in the appointment letter. Hourly SWs will not be required to work any hours for which they are not paid. Hourly SWs will be paid for all hours worked.

**Section 4**.   Workload assigned to any graduate SW under this Article is separate from the academic requirements associated with thesis and dissertation research that is expected pursuant to 300-level course work or its equivalents in other Schools. As previously stated, the University maintains the right to define academic expectations and degree requirements.

**Section 5**.   While the parties recognize that the content of work assigned to SWs may vary from week to week, SWs shall not be assigned job duties that cannot be reasonably performed within the workload average in Section 2, Section 3 or Section 7 of this Article.  Additionally, the University shall provide SWs with a reasonable amount of time in which to complete job duties, taking into consideration the relevant surrounding circumstances.  The workload must align with the levels of compensation presented in Article 20, Compensation, and Article 2, Titles and Classifications.

**Section 6.**  A SW who anticipates that their workload will exceed the workload average stated in Section 2, Section 3 or Section 7 of this Article or a SW who otherwise has concerns about the nature or amount of their employment workload may bring such concerns to their immediate supervisor. The supervisor shall discuss any such concerns with the SW and, as warranted, may make adjustments to workload requirements or compensation. If the SW is not satisfied with such discussions, or if they believe they have been misclassified or that their job duties are not commensurate with their employment appointment letter, they may file a grievance under Article 6, Grievance and Arbitration, over such matters.

**Section 7**.  Other appointment periods.

A.      Intersession and other similar shortened periods.  The parties recognize that, in addition to the more typical appointments of a traditional semester (fall/spring), academic year, or calendar year, a SW may be offered an appointment to work during an intersession or other similar shortened period. By design, such appointments may involve a more intense workload each week than typically associated with semester-long appointments. Therefore, the twenty (20) hour average in Section 2 and Section 3 shall not apply to such appointments. Rather, the University will not require more effort for students in their roles as student workers than is specified in the job posting and/or appointment letter.

B.      Summer.  The parties recognize that summer appointments are also different than the more typical appointments of a traditional semester (fall/spring), academic year or calendar

34

year.  Therefore, the twenty (20) hour average in Section 2 and Section 3 shall not apply to summer appointments.  Rather, the University will not require more effort for students in their roles as student workers than is specified in the job posting and/or appointment letter.

**Section 8.**  Any work assignment, required training, orientation, required meetings, required conferences, required office hours shall be included in the total workload for the appointment period. Hourly employees who participate in any job training or work orientation will be paid for their time at their normal hourly rate. Hours spent on individually assigned special preparation for teaching sections shall also be included in the total workload for the appointment period.

**Section 9.**  Required meetings will be held during the normal work hours at the SW's workplace, or at another location on campus with advance notice, or at another appropriate location with advanced notice to the SW.

**Section 10**.  In the case of a change of a SW's job assignment, any work completed in the original assignment will count toward the workload for the semester.

## ARTICLE 17

## MANAGEMENT RIGHTS

**Section 1**. All management functions, rights, and prerogatives, that have not been expressly modified or restricted by a specific provision of this Agreement, are retained and vested exclusively in the University and may be exercised by the University at its sole discretion. Such management functions, rights, and prerogatives include the right:

A.   to determine, establish, direct, and control the University's mission, objectives, priorities, organizational structure, programs, services, activities, operations and resources;
B.   to recruit, appoint and transfer unit members and to determine and modify the size and composition of the work force;
C.   to determine or modify the qualifications and responsibilities of unit members;
D.   to direct, assign, schedule and otherwise supervise unit employees:
E.   to train unit members subject to Article 11, Training;
F.    to establish new job classifications within the unit, subject to any restrictions in Article 2, Titles and Classifications;
G.   to establish and modify standards of conduct and to discipline or discharge unit members for just cause subject to Article 19, Discipline and Discharge;
H.   to establish and modify the processes and criteria by which unit members will be evaluated in their work performance;
I.    to establish and modify rules, regulations and policies;
J.    to alter, extend, or discontinue existing equipment, facilities, and location(s)of operations;
K.    to determine the academic calendar each year;
L.   to determine class and section size;

35

    M.   to subcontract all or any portion of any operations;

    N.   to take such action as is necessary to maintain the University's efficiencyand effectiveness, including determining the means, methods, personnel, budgetary and financial procedures by which the University's programs, services, and operations are to be conducted.

    O.   to determine and modify tuition and fees for all programs in which unit members are based and all matters affecting financial aid;

    P.   to determine and modify policies and financial costs and charges associated with University housing;

    Q.   to determine and modify what benefits will be offered to students, including health, dental, vision and other medical insurance and prescription drug policies, and to determine the student costs for such coverage;

    R.   to select all insurance carriers and to change carriers from time to time;

**Section 2**. Other questions of academic judgment and decision-making shall remain in the University's sole discretion and over which the University has no obligation to bargain. These include, but are not limited to, judgments and decisions regarding all matters affecting:

    A.   student admissions:

    B.   academic standards, and unit members' progress as students, including but not limited to the completion of degree requirements;

    C.   who is taught, what is taught, how it is taught and who does the teaching;

    D.   research methodology and materials;

    E.   external grants including application, selection, funding, administration, usage, accountability and termination;

    F.   the creation, elimination or modification of courses and curriculum;

    G.   instructional methods;

    H.   the content of courses, instructional materials, the nature and form of assignments required including examinations and other work;

    I.   grading policies and practices;

    J.   all other academic policies, procedures, rules and regulations in regard to unit members' status as students, including, but not limited to, all questions of academic standing, intellectual integrity, and any matter relating to academic progress in a University educational program;

**Section 3.** Any exercise of management rights shall be consistent with the terms and conditions of this Agreement. No action taken by the University with respect to a management or academic right shall be subject to the Grievance and Arbitration Procedures unless the exercise of such right violated an expressly written provision of this Agreement.

**Section 4**. The above enumeration of management and academic rights is not exhaustive and does not exclude other management or academic rights not specified above. The University, in not exercising any function hereby reserved to it in this Article, or in exercising any such function in a particular way, will not be deemed to have waived its right to exercise such function or preclude the University from exercising the same in some other way.

36

# ARTICLE 18

## UNION ACCESS AND RIGHTS

**Section 1**

A.    To the extent permitted by the Family Educational Rights and Privacy Act (FERPA), the University will provide to the Union a weekly electronic file containing the following directory information for each SW in the bargaining unit:

Name
Net ID
Permanent and local street address, city, state, zip code,
Job title
Date of birth
Place of birth
Dates of employment
Dates of enrollment
Anticipated or actual date of graduation
Enrollment status
Department mail code
The Directory Email address
The Directory Telephone number
Employing department or program
Department or program in which SW is enrolled
Position classification

This listing shall be provided to the Union at no cost. If the SW affirmatively consents to the disclosure of such information to the Union as provided for in Section B. below, the University will also include the SW's rate of pay for all pay codes. However, the rate of pay will be reported on the same basis as the pay period.

This listing shall include all SWs who were in the bargaining unit at any point in the intervening time since the production of the prior listing. If any item on this list is unavailable at the time of delivery, every effort shall be made to include this information in future lists.

B.    Additional non-directory information; FERPA Communication and FERPA Release.

Within, or as an enclosure to each SW's appointment letter, the University shall provide a FERPA Communication and a FERPA Release Form as described below, either in paper format or a format where the Form can be completed and submitted to the University electronically, or if a paper form is sent, scanned and returned electronically. The initial version of the FERPA Communication and the FERPA Release form, and any changes to either document, shall be shared with the Union prior to its initial dissemination.

1.    The FERPA Communication will include, at minimum, the following information:

    a.    The Union is the SW's exclusive bargaining representative;

    b.    The Union has a legal obligation to represent the SW when they are engaged in bargaining unit work and that to do so, the Union may need certain information about its unit members so that it is properly prepared to enforce the collective bargaining agreement, which covers pay and other terms and conditions of employment;

    c.    In order to avoid any conflict between the Union's right to access this information under the National Labor Relations Act, and FERPA, which regulates the disclosure of certain information in a SW's student records, the SW will be asked to complete and sign the FERPA Release Form and return the form along with all other on-boarding paperwork, such as an I-9, etc.; and,

    d.    Contact information of both the Union and the University for the SW to raise any questions about the FERPA Communication and FERPA Release Form and/or how the information shared with the Union may be used.

2.    The FERPA Release Form will contain, at minimum, the following:

    a.    An option for the SW to waive their privacy rights under the Family Education Rights and Privacy Act (FERPA) and affirm their consent to release non-directory information that may be sought by the Union for representational purposes and to which the Union would ordinarily be entitled under the National Labor Relations Act. This option will be accompanied by a statement that the Union, if provided access to such information by the SW, may use such information only for the purposes for which the disclosure was made and may not disclose the information to any other party without the prior consent of the SW.

    b.    An option for the SW to decline to waive their privacy rights under FERPA.

    c.    Information about how a student may change their selection in the future.

3.    In cases related to Article 19, Discipline and Discharge, if the SW has not permitted the disclosure of their non-directory information to the Union, the University, in accordance with the provisions of that Article, will inform the SW that they are entitled to Union representation, and the University shall give the SW the opportunity to voluntarily sign a FERPA Release Form.

38

4.    The Union agrees that it will not re-disclose any personally identifiable information that it receives pursuant to this article without the prior consent of the SW.

**Section 2**.  Union representatives shall be provided reasonable access to the University mail systems, including e-mail.

**Section 3.**  Following ratification and approval by the parties, the University shall publish the Agreement on a designated website.

**Section 4**. Recognizing the mutual benefit of the work done by SWs on the administration of the benefit pools, the University will provide the Union with $64,482 per fiscal year which the Union may distribute to students who administer the benefit pools on behalf of the Union. In the Union's discretion, they may use some of the funds for purchase of any software or other technical tools to aid in the administration of the funds. This amount shall increase each year according to the salaried percentage increase for that year.

**Section 5.** At the beginning of each academic year, the Union shall furnish the University with a written list of officers and other authorized representatives and shall update the list when changes occur. The University shall deal with such individuals as representatives of the Union for purposes of investigating, presenting and settling grievances in accordance with the provisions of the collective bargaining agreement.

Upon securing permission (such permission shall not be unreasonably delayed or denied) from a supervisor, such representatives shall be permitted reasonable release time to investigate, present and process grievances on University property during regular working hours without suffering a loss of pay.

Such activities cannot take place while a SW involved is conducting a class nor can such activities disrupt University operations.

The question of possible release time for any future collective bargaining will be left to the parties to address prior to the beginning of such negotiations.

**Section 6.**  Except for classrooms while class is in session and certain research labs or other areas designated by the relevant academic department, Institutional Animal Care and Use Committee, or the Environmental Health & Safety department as restricted due to safety concerns, provided that such designation shall not be made in a manner that discriminates against the Union. Union representatives, including International Union, UAW, shall have access to all SW workspaces on University premises to conduct any necessary Union business but only after advanced notice to the supervisor. Under no circumstances shall Union representatives interfere with programs, operations or the work of SWs or other University employees.

**Section 7. Orientation**

A.    **Notice**. To allow the Union time to address current and potential SWs, the University will provide the Union one week advance notice of any orientation(s):

39

a.    for incoming PhD students

b.    pertaining to bargaining unit positions at a School, Department, Program or other employing unit

The parties will draft a template notice that the University shall provide to Schools, Departments, Programs and other employing units on a semester basis (see Appendix __).

The Union-Management Committee will work in good-faith to create a list of such orientations for current and potential SWs. The list will be reviewed and updated on at least a yearly basis.

**B.**  The Union shall be provided up to thirty (30) minutes included within the orientation schedule or program. The Union shall promptly notify the University as to whether it wishes to use such time.

If, for any reason, the Union is not scheduled for an orientation time-slot with adequate notice, the relevant employing unit shall convene an additional union orientation session for their current and potential SWs during the semester.

**C.    Materials**. The Union is free to distribute a packet of Union materials at orientations. The University will include union materials (see Appendix XXX) in informational packet(s), if any, to incoming graduate students eligible for bargaining unit employment and alongside the appointment letter for other SWs.

**Section 7.**  The University agrees to furnish conference and/or meeting rooms (physical and virtual) at no cost for Union meetings upon prior request by the Union, on the same basis as recognized student organizations within a given school. The Union acknowledges that certain spaces on campus may require that a fee be paid by the Union consistent with what other recognized student organizations within a given school must pay. The Union agrees to comply with all University regulations and policies regarding the reservation and use of such facilities.

**Section 8.**  The Union shall have access to designated space on existing bulletin boards in University Schools, Departments, Programs, Institutes, and Centers that employ SWs. All postings by the Union shall be done in accordance with University policies regarding access and approval required for bulletin board use on the campus.

## ARTICLE 19

### DISCIPLINE AND DISCHARGE

**Section 1.**  SWs shall not be disciplined, suspended, or discharged from employment without just cause. Discharge, for purposes of this Agreement, shall mean the termination of a SW's employment appointment prior to the expiration of that appointment.

40

 Discipline as used in this Article refers to adverse employment actions taken based on job-related misconduct or job-related poor/non-performance,  and not to determinations by the University to dismiss a SW from the University or take an adverse action against a SW for academic reasons, including but not limited to grades, academic assessments, and authorship decisions or for non-job-related disciplinary reasons.  The Union acknowledges that an individual who ceases to be a graduate student cannot continue to serve as a SW.

**Section 2.**  Neither Discipline nor Discharge includes the non-reappointment of a SW or the failure to offer an employment appointment to a SW, nor does it include performance evaluations or performance.

**Section 3**. Prior to invoking suspension or discharge under this Article. the University shall:
1. Notify the SW (and Union pursuant to Section 12 of this Article) in writing about the proposed suspension or discharge. Such notice of intent shall state the reasons for the proposed suspension or discharge, including the nature of the alleged violation, level of intended discipline, and notice of the right to a hearing.   The notice shall also contain a statement indicating that as a member of the bargaining unit, the SW has the right to contact their Union and to have Union representation, along with contact information to reach a Union representative.
2.      Hold a disciplinary hearing with the SW, and the SW's supervisor or designee no sooner than seven (7) business days after the written notification is received by the SW.
3.      During the hearing, the SW shall be provided the opportunity to respond to the alleged violations.
4.      The SW shall have a right to a union representative, who shall be afforded the opportunity to represent and speak on behalf of the SW at the hearing.

A decision on suspension or discharge will be made within a reasonable time following the conclusion of the hearing. The Union will receive a copy of the final disciplinary action in accordance with Section 12 of this Article.

**Section 4**.  Prior to invoking discipline of a lower level than suspension or discharge, the University shall notify the SW (and Union pursuant to Section 12 of this Article) in writing. The written notice shall state the reasons for the proposed discipline, including the nature of the alleged misconduct or poor/non-performance; a brief statement of relevant facts; the level of intended discipline.

The notice shall also contain a statement indicating that as a member of the bargaining unit, the SW has the right to contact their Union and to have Union representation, along with contact information to reach a Union representative.

The Union may request additional information regarding the proposed discipline in accordance with the relevant case law under the National Labor Relations Act.

The University shall take any response by the SW into account before issuing any final disciplinary action. The Union will receive a copy of the final disciplinary action in accordance with Section 12 of this Article.

41

**Section 5.** There shall be no increase in the assigned level of discipline from the written notice of intent.

**Section 6**. The University may place a SW on paid administrative leave without prior notice, in order to investigate allegations of misconduct or dereliction of duty which, in the judgment of the University, warrant immediately relieving the SW from all work duties and/or require removing the SW from the premises.

A.      The SW (and Union pursuant to Section 12 of this Article) will be notified, as soon as practicable, in writing when a SW is being placed on paid administrative leave. The written notice shall state the reason the SW was placed on paid administrative leave. The notice shall also contain a statement indicating that as a member of the bargaining unit, the SW has the right to contact their Union and to have Union representation, along with contact information to reach a Union representative.

B.      Paid administrative leave is neither discipline nor discharge.

C.      At the conclusion of an investigation of an SW placed on administrative leave, where the University elects not to take disciplinary action, the SW (and Union pursuant to Section 12 of this Article) will be provided with a notification that the investigation is completed and that no discipline will be imposed.

D.      The University will place a record of administrative leave in the SW's employment record only if disciplinary action is taken. The University will transfer records of such administrative leave to a third party only if required by law or regulation.

**Section 7.** In the event that a SW is discharged, the SW shall be notified in writing as soon as practicable. In accordance with Section 12 of this Article, the Union shall also receive a copy of such written notice within three (3) business days of the discharge.

 **Section 8**. SWs who are disciplined or discharged shall be entitled to file a grievance against the disciplinary action at Step 2 of the Grievance Procedure within twenty (20) business days of the action. If the Union subsequently files for arbitration, the parties agree to use best efforts to secure an arbitration date as expeditiously as possible.

**Section 9.** If during the disciplinary hearing referred to in Section 3, the charges are dismissed, any material concerning the dismissed charges shall be removed from the SW's employment record. If any subsequent grievance results in a favorable decision for the grievant, then any material concerning the discipline shall not be considered part of the SW's employment record nor shall it be transferred to any third party unless required by law or regulation.

**Section 10**. As an alternative or in addition to issuing disciplinary action, the University may recommend reasonable remedial measures when appropriate. Such remedial measures must be rehabilitative rather than punitive and at no cost to the SW.

**Section 11**. The University and the Union shall maintain the confidentiality of all disciplinary actions except on a need-to-know basis or consistent with FERPA to the extent it applies.

**Section 12.** Notification to the Union. If the SW has consented to disclosure of non-directory information as provided in Article 18, Union Access and Rights, the University shall copy the Union on written notification to the SW regarding disciplinary matters outlined in this Article. If

the SW has not previously consented to such disclosure, the University shall supply a waiver form, accompanying any disciplinary notification, for the SW's consideration that, if signed, would allow written notice to be provided to the Union.

## ARTICLE 20

## COMPENSATION

**Section 1**.  It is understood that the Union has no authority, nor shall the University be obligated, to negotiate over stipends for graduate students, including the stipends of bargaining unit members, nor shall the University be obligated to negotiate over any other financial matters for graduate students who are not members of the bargaining unit. The provisions of this Article only apply when a student is working as a member of the bargaining unit.

**Section 2**.  Compensation for salaried SWs.

    A.   Research Assistant 1 –

    A Research Assistant 1-- A graduate student usually appointed on an annual basis for a 12-month period to perform research work under the supervision of a faculty/principal investigator**.** The parties understand that the work of a Research Assistant is a blend of academic and employment endeavors and that clear separation of each is difficult. The stipend that such an RA receives could be characterized as financial assistance or compensation or both. Thus, it is understood that for this category of SW and for purposes of this Agreement only, the stipend offered by the University is the functional equivalent of a salary and will be referred to as such in this Article only.

    The minimum salaries for all such SWs in FY 21 were:

| | | |
|---|---|---|
| Life Sciences | 12 months | $40,632 |
| Physical Sciences | 12 months | $39,000 |
| Other | 12 months | $36,672 |

10 month or shorter appointments for these three levels are pro-rated accordingly.

The above rates will increase by a total of 5.0% effective July 1, 2021 (3% plus a one-time 2% base salary additional adjustment.)

The rates will increase by a total of 4.0% effective July 1, 2022 (3% plus a one-time 1% base salary additional adjustment.)

The rates will increase by 3.0% effective July 1, 2023.

The rates will increase by 3.0% effective July 1, 2024.

43

Accordingly, the minimum pay rates for FY 22-25 will be as follows:

|  |  | FY22 | FY23 | FY24 | FY25 |
|---|---|---|---|---|---|
| Life Sciences | 12 months | $42,660 | $44,376 | $45,696 | $47,076 |
| Physical Sciences | 12 months | $40,956 | $42,588 | $43,860 | $45,180 |
| Other | 12 months | $38,508 | $40,044 | $41,244 | $42,480 |

B.    Research Assistant 2 –

A Research Assistant 2 -- In addition to their research work, a graduate student who also has a teaching assignment.

Provided such a teaching appointment is approved by their faculty advisor, the SW will have an appropriate adjustment in their research workload. If in discussions with the faculty advisor and/or principal investigator such an adjustment is not possible or not mutually desirous, the Research Assistant II will receive additional compensation in accordance with department or program guidelines.

The minimum salaries for Research Assistants 2 will be the same as for Research Assistants 1.

C.    Teaching Fellows

1. There are four types of salaried teaching fellows (TFs) throughout the University who perform instructional duties:

1. Teaching Fellow 1
2. Teaching Fellow 2
3. Instructional Fellow
4. Pedagogical Fellow

44

General descriptions of the duties and eligibility for such positions are found in Article 2, Titles and Classifications and Article 16, Workload. More particularized duties may be found in individual employment appointment letters.

2.  Teaching Fellow categories when the TF is teaching a single standard University course or section under the direction of a full-time faculty member or when teaching a course independently. Compensation may be pro-rated for courses that run for less than a full semester.

The minimum pay rates for FY 21 were as follows:

|  | Junior rate | Senior rate |
|---|---|---|
| Teaching rate A | $3,598 | $3,598 |

The minimum rate for any Teaching Fellow in the School of Public Health or any SW teaching in the School of Public Health.

Effective on July 1, 2021 Teaching Rate A will be eliminated Teaching Fellows in the School of Public Health will receive compensation commensurate with Teaching Rate B.

| Teaching rate B | $5,058 | $5,675 |
|---|---|---|

The minimum rate for Teaching Fellow I or Pedagogical Fellow or a CA 1 or CA 2 for teaching a section in any School or College that usually although not always accompany lectures given by faculty members.

A Teaching Fellow 2 (Head Teaching Fellow) does not have section teaching responsibilities. Teaching Rate B is the rate for a Teaching Fellow 2. If a TF2 were to also lead a section, they would receive an additional TF1 appointment and be paid the TF1 compensation in addition to the TF2 compensation.

| Teaching rate C | $10,116 | $11,349 |
|---|---|---|

The minimum rate for any Instructional Fellow. An Instructional Fellow has primary instructional responsibilities for a course, under the supervision of a faculty member.

The above FY 21 rates will increase by a total of 5.0% effective July 1, 2021 (3% plus a one-time 2% base salary additional adjustment.)

The rates will increase by a total of 4.0% effective July 1, 2022 (3% plus a one-time 1% base salary additional adjustment.)

45

The rates will increase by 3.0% effective July 1, 2023.

The rates will increase by 3.0% effective July 1, 2024.

Accordingly, the minimum teaching rates for FY 22-25 will be as follows:

| Teaching rate B | Junior rate | Senior rate |
|---|---|---|
| FY 22 | $5,310 | $5,960 |
| FY 23 | $5,525 | $6,195 |
| FY 24 | $5,690 | $6,385 |
| FY 25 | $5,860 | $6,575 |

| Teaching rate C | Junior Rate | Senior Rate |
|---|---|---|
| FY 22 | $10,620 | $11,920 |
| FY 23 | $11,045 | $12,395 |
| FY 24 | $11,380 | $12,765 |
| FY 25 | $11,720 | $13,150 |

Except as minimally provided above, variation between and within Teaching Rates B and C will be determined by each School. While the School must pay the minimum rates above, the School has the discretion to pay more than this rate based on a variety of factors. In deciding whether more than the minimum should be paid, the School shall take into account various factors including but not limited to degree of difficulty of the course or section; class size; degree of independence and accountability for the SW; frequency of meetings; attendant course advising; and any oversight responsibilities. Such determination shall not be grievable.

Each School is required to publish which rate applies for particular courses and particular teaching activities.

All such rates may be pro-rated accordingly for courses with less than a full semester's (term's) duration.

3. The Senior Rates will be applied for any Ph. D SW who has successfully completed their first two years of their Ph. D program. The Junior Rates will be applied for all other SWs. The parties agree that there are currently some

46

situations where a School has stated in writing that it will pay the Senior Rate to SWs who would ordinarily be paid at the Junior Rate. Those situations will continue during the life of this Agreement. Determination of successful completion of the first two years is based on academic progress and is not grievable.

4. In courses that do not have a TF 2, faculty may, but are not required, to designate a TF 1 to carry out some additional administrative duties. If such duties are beyond the scope of the appointment, additional compensation will be provided to the SW.

5. For SWs within their admissions offer period, (normally, in their third and fourth year of graduate work), the minimum rates described above for teaching will be considered compensation and will be separately paid to the SW. However, such compensation is not an addition to the SW's stipend. During the admissions offer period, the total amount of funding to the SW, including the compensation for teaching, will be equal to the amount specified in the admissions offer letter.

D. Other Teaching Rates

Full-time graduate students teaching in any School of the University will be paid under the Junior or Senior Teaching Rates B or C categories in Section C above, except for Lecturer/Instructors, Teaching Assistants and Salaried Course Assistants in the Division of Continuing Education (DCE).

Nothing shall preclude the University from paying higher compensation rates in its discretion.

E.   Division of Continuing Education (DCE)

As an exception to the rates in Section C above unit members teaching in DCE were paid at the following minimum compensation rates depending on title during FY 21

| | |
|---|---|
| DCE- Lecturer/instructor | $7800 per 4 credit course |
| DCE- Teaching Assistant | $3900 per 4 credit course |
| DCE- Head Teaching Assistant | $1950 for such work |
| DCE- Salaried Course Assistant | $850 per 4 credit course |

The above FY 21 rates will increase by a total of 5.0% effective July 1, 2021 (3% plus a one-time 2% base salary additional adjustment.)

The rates will increase by a total of 4.0% effective July 1, 2022 (3% plus a one-time 1% base salary additional adjustment.)

The rates will increase by 3.0% effective July 1, 2023.

The rates will increase by 3.0% effective July 1, 2024.

Accordingly, DCE rates for FY 22-25 will be:

|  | FY 22 | FY 23 | FY24 | FY 25 |
|---|---|---|---|---|
| DCE- Lecturer/instructor | $8190 | $8518 | $8774 | $9037 |
| (4-credit course) | | | | |
| DCE- Teaching Assistant | $4095 | $4259 | $4387 | $4519 |
| (4-credit course) | | | | |
| DCE- Head Teaching Asst. | $2048 | $2130 | $2194 | $2260 |
| (For such work) | | | | |
| DCE- Salaried Course Asst. | $893 | $928 | $956 | $985 |
| (per 4-credit course) | | | | |

F.        Other instructional work besides teaching.  It is understood that programs may offer differing amounts of compensation for other instructional work besides teaching a course or section of a course, such as tutoring, thesis advising, leading practicums and other instructional work.

The rates for these appointments will be dependent on the duration and scope of the work. Work expectations, anticipated time commitments, and rate of pay must be detailed and explicit in the employment appointment letter, and such expectations should not reasonably imply an hourly wage less than the minimum hourly rate specified in this agreement. Any increase to those expectations will require additional compensation.

G.        The teaching rates delineated in Section C. above for teaching courses includes, in addition to class time, preparation, grading, meeting with and advising students on course work and all other matters attendant to teaching the course. No additional compensation is paid for any such attendant work other than the course rate except as provided in Section C. d. above.

H.        Limited Research Assistant Appointments

SWs may have short duration, limited scope salaried research assistant appointments. These appointments may be for work that is not directly related to

48

the student's academic endeavors. The rates for these appointments will be dependent on the duration and scope of the work. Work expectations, anticipated time commitments, and rate of pay must be detailed and explicit in the employment appointment letter and such expectations should not reasonably imply an hourly wage less than the minimum hourly rate specified in this agreement. Any increase to those expectations will require additional compensation.

**Section 3**.      Compensation for Hourly SWs

A.  It is recognized that hourly rates of pay for hourly Research Assistant, Course Assistants, hourly Teaching Fellows and other hourly workers vary greatly throughout the University. Some Schools have specific rates of pay for their hourly workers. Some hourly rates vary depending on the amount of available funds in a faculty member's grant.

B.  However, all hourly SWs who perform instructional or research work regardless of School will receive at least the minimum hourly rate of pay of $20.00 effective July 1, 2021. This minimum rate will be raised to $20.50 per hour on July 1, 2022 and to $21.00 per hour on July 1, 2023.

C. Where a School has a publicized standard hourly rate of pay that $20.00 the minimum per hour rate for FY 22, the University agrees that for the life of this Agreement, such standard hourly rate will not be reduced below what it was in FY 21.

**Section 4**. A SW shall be paid on a timely basis, in accordance with the University's normal business operations, for the teaching and other compensable duties they performed, provided the SW has submitted to the University, in a timely fashion, all documentation or information necessary for the processing of said payment. In no case shall a SW be paid less frequently than on a monthly basis.

**Section 5**. If the University, in error, overpays wages to a SW in a given pay period, the University, once it discovers the error, will promptly notify the SW of the amount of the overpayment and the date on which the overpayment occurred. In such a case, the University and the SW will work out a repayment plan for the overage. If they wish, the SW may seek the help of the Union in negotiating over the repayment plan. Such repayment plan shall be consistent with applicable federal and state wage law.

In cases of overpayment, the University will not put a registration hold on student transcripts and records while repayment is pending.

 If the University, in error, underpays a student worker, it shall promptly correct the error and pay any back wages owed. SWs shall endeavor to report to the University any possible overpayments, or underpayments, so they may be corrected as soon as possible.

The University will process any retroactive checks no later than 90 business days from ratification of this Agreement.

49

# ARTICLE  21

## HEALTH AND DENTAL INSURANCE

**Section 1.**  All students are required to participate in the Harvard University Student Health Plan or to otherwise be covered by a health insurance program. The University will continue for the life of this Agreement to provide individual coverage at no premium cost to the student for all GSAS Ph. D student workers as may be guaranteed in their offer letter.

**Section 2**.  Nothing in this Agreement shall affect the University's right to modify the plan or plan design or premium rates or to change insurance carriers or administrators in its discretion.

**Section 3**   The University shall maintain a SW Health Insurance Premium Support Fund. Salaried SWs and eligible hourly SWs may apply for money from the fund to help defray the cost of premiums for spousal and/or dependent coverage under the HU Student Health Plan.

Distribution of any funds shall be made in accordance with procedures, policies and requirements established by the Union, subject to approval by the University.

There shall be no rollover of any unexpended funds from one year to the next.

**Section 4**.  Eligible SWs and their dependents may elect the optional student dental insurance plan offered by the University provided they pay the full cost for such a plan.

Effective August 1, 2022, the University will offer a second preventative dental plan that student workers that are otherwise eligible for SHIP may select at their own cost during the open enrollment period in the spring of 2022. The annual premium for this plan will be set by the carrier and may increase from year to year.

The University will contribute 75% of the premium for salaried Ph. D SWs who elect this new preventative plan effective August 1, 2022.

For those who elect the comprehensive dental plan instead, they may take the value of the 75% of the premium for the preventative plan and apply those dollars to the premium payments for the comprehensive plan.

Under the preventative plan, the following diagnostic services will be provided:

1.      One complete initial oral exam, including initial dental history and charting of the teeth and supporting structures.
2.      Single tooth radiographs (x-rays) as needed.
3.      Bite wing radiographs (x-rays of the crowns of the teeth), once each six months.
4.      Full mouth radiographs (x-rays), seven or more films, or panoramic radiograph (x-ray) with –bite wing radiographs (x-rays), once each 60 months.
5.      Study models and casts used in planning treatment, once each 60 months.

50

6.      Emergency exams.
7.      Periodic or routine oral exams, once each six months.

Under the plan, the following preventative services will be provided:

1.      Routine cleaning, scaling and polishing of the teeth, once each six months.
2.      Fluoride treatment for *members* under age 19, once each six months.
3.      Space maintainers required due to premature loss of teeth for *members* under age 19.
4.      Sealants applied to permanent premolar and molar surfaces for *members* under age14. *Blue Cross and Blue Shield* provides benefits for one application each 48 months for each premolar or molar surface.

Details in the final plan benefit document shall have precedence in case of any conflicts with the above.

The University shall maintain a Dental Health Plan Support Fund. Salaried SWs and eligible hourly SWs who have elected the University's student dental insurance plan may apply for money from the fund to help defray the cost of premiums and co-pays under such plans for themselves and for covered spouses and/or dependents. Salaried SWs and eligible hourly SWs who have not elected the University student dental insurance may also apply for money from the fund to help defray dental expenses in general.

Distribution of any funds shall be made in accordance with procedures, policies and requirements established by the Union, subject to approval by the University.

There shall be no rollover of any unexpended funds from one year to the next.

**Section 5**.  The University shall maintain a SW Support Fund. Salaried SWs and eligible hourly SWs may apply for reimbursement of any co-pays and other out-of-pocket medical expenses (as defined by Internal Revenue Service regulations) that they had to incur under the HU Student Health Plan, including, but not limited to, the cost of specialist care, costs du to vision care (eg. contact lens fitting and contact lenses), and out of-network providers.

Distribution of any funds shall be made in accordance with procedures, policies and requirements established by the Union, subject to approval by the University.

There shall be no rollover of any unexpended funds from one year to the next.


**Section 6. Mental Health Care**

A.      The Union and the University acknowledge a mutual desire to promote on-campus access to mental health resources for Student Workers.

B.      The University and the Union agree to utilize at least one meeting per year of the Union-Management Committee to discuss mental health and safety. These meetings will

51

include representation from relevant University stakeholders and an agenda will be agreed upon by the University and Union at least three (3) weeks in advance.

C.       The University will provide the Union with a list of mental health resources on campus to the Union annually.

D.       If the University convenes any working group with student representation to address campus-wide mental health and/or safety policies, the University will provide at least one seat on the working group to the Union.

## ARTICLE 22

### CHILD CARE FUND

The University shall make a fund available to reimburse salaried bargaining unit members and eligible hourly SWs for child care expenses at licensed child care facilities (child care centers, family child care providers, after school programs, daytime summer camp programs) or an in-home provider with a Social Security or Tax I.D. number. Eligible SWs may apply for a child care grant, to be determined by the fund rules, from the Childcare Fund. There shall be no rollover of any unexpended funds from one year to the next. Reimbursement for such child care expenses shall be made in accordance with procedures, policies and requirements established by the Union, subject to approval by the University.

## ARTICLE 23

### HOURLY SW ACCESS TO BENEFIT POOLS

Effective January 1, 2022, hourly workers who work a total of 280 hours between July 1 and December 31 are able to receive reimbursements from the pools during the following six months (January 1 to June 30). Hourly workers who work a total of 280 or more between January 1 and June 30 are able to receive reimbursements from the pools during the next six months (July 1 to December 31). In their final six months of employment with the University a SW may receive reimbursement from the pools during that final six month period if the University can determine that they have actually worked 280 or more hours based on pay stubs or other official records.

## ARTICLE 24

### LEGAL EXPENSE FUND

**Section 1**      Effective upon ratification, the University shall make a fund available to the Union to reimburse eligible bargaining unit members for legal expenses where counsel is retained for advising the SW on matters relating to their working conditions at the University.

52

Commencing upon ratification, this fund shall be in the amount of $100,000 for the remainder of FY 22 and then for each fiscal year thereafter for the life of the Agreement.

**Section 2**      However, if the funds are exhausted in a given fiscal year, the fund may apply all or part of the $100,000 set aside for the following year to provide assistance to eligible bargaining unit members. In no event, however, will the University be obligated to provide more than a total amount of $400,000 over the four fiscal years covered by the Agreement.

**Section 3**      Such funds may not be used, however, for reimbursement of attorney's fees relating to any legal action brought before any agency or court against the University.

**Section 4**      There shall be no rollover of any unexpended funds from one fiscal year to the next. Reimbursement for such legal expense shall be made in accordance with procedures, policies and requirements established by the Union, subject to approval by the University.

**Section 5**      Student workers do not need to have incurred expenses in order to access funds from this fund and may use lawyer bills (not yet paid) or retainer letters to receive money from the fund to cover their legal expenses.

## ARTICLE 25

## FAMILY FRIENDLY BENEFITS

**Section 1.**      Ph.D SWs shall be eligible for access to Care.com at no cost for such membership and subject to relevant rates and procedures. Under current policy, SWs have access to the Care.com providers for up to 10 days a year at a subsidized rate of $5 per hour. SWs may utilize Care.com for additional days at full provider rates.

**Section 2.**      All Ph.D SWs shall be eligible for the Parental Accommodation and Financial Support program which provides a one-time stipend of $6831 per child for the birth or adoption of a child. During the accommodation period, students may request and receive unpaid time off from their duties up to 12 weeks. Effective July 1, 2021, or upon ratification whichever comes last, the stipend will be raised to $7000 and shall be increased by an additional 2.25% on July 1, 2022, 2.25% on July 1, 2023 and 2.25% on July 1, 2024.

**Section 3**.      Any Ph.D SW who notifies the University through a semesterly or yearly check-in or through the GSAS Financial Office about being a parent shall receive an email, within 30 days, with information about the benefits contained in this article,, including, but not limited to, clear directions on how to apply.

53

**ARTICLE 26**

**LEAVE PROVISIONS**

**Section 1**      Sick Leave

A.      SWs shall have a right to a reasonable number of days per semester or summer session of sick leave with no loss of compensation. SWs are permitted to use sick time for any of the following reasons:

1.  Caring for their own physical or mental illness, injury or medical condition
2.  Caring for a physical or mental illness, injury, or medical condition of their child, spouse or partner, immediate or chosen family member;
3.  Attending their own routine medical appointment;
4.  Attending a routine medical appointment for their child, spouse or partner, immediate or chosen family member, and members of the household regularly sharing the employee's residence
5.  Addressing the psychological, physical, or legal effects of domestic violence; or
6.  Travel necessitated by any of the above.

B.      A SW who is using a sick day must inform their supervisor as soon as possible.

C.      In no case shall the sick time provided be less than would be provided to an individual covered by the Massachusetts Sick Time Law.

**Section 2.** Family and Medical Leave of Absence

SWs may take an unpaid Family and Medical Leave of Absence of up to 12 weeks for the birth or adoption of a child, childcare, their own serious health condition or work-related disability, or care of an immediate family member with a serious health condition. "Immediate family members" include parents or step-parents, child or step-child or spouse. SWs are expected to notify their supervisors and directors of graduate studies at least four months in advance whenever possible of the anticipated birth or adoption of a child, so that appropriate arrangements can be made to cover any teaching or research responsibilities.

SWs who are Ph. D candidates are eligible to apply for financial assistance for the birth or adoption of a child under the Parental Accommodation and Financial Support.

A SW shall not be precluded from being appointed to a position comparable to the position they held before their leave solely because the SW took a leave under this section.

SWs may seek accommodations related to their employment responsibilities, including leaves of absence related to their employment responsibilities, by contacting University Disability Resources.

54

**Section 3.**    Bereavement leave

All SWs may be absent without loss of pay or benefits for up to three (3) days when called for by a death in the immediate family or household. In circumstances of logistical difficulty or severe emotional distress or religious observance, a longer paid absence (up to seven (7) days) may be appropriate. Such requests will not be unreasonably denied.

For the purpose of this policy only, immediate family includes: the SW's spouse or partner, children (including stepchildren), grandchildren, children-in-law, parents (including step-parents), grandparents, parents in-law, siblings, (including step siblings) and siblings-in law, chosen family members, and household includes individuals regularly sharing the SW's residence.

**Section 4.**    Civic Duty Leave

SWs who are on a salaried appointment shall retain all compensation and benefits during jury duty, serving as a witness in a court case, similar civic obligations, or other court appearances. A SW on an hourly basis may also be absent for the same purposes but without pay.

**Section 5.**    Military Leave

The University shall comply with any applicable state and federal laws governing military service and leaves. A SW may use this leave in addition to other leaves provided for under this Article.

**Section 6**.    Maintaining continuation of student benefits during leaves under this Article is conditioned on maintaining active student status with the University.

SWs shall retain any and all other rights under state and federal law regarding leaves of absence.

**Section 7.**    SWs shall make reasonable effort to provide as much advance notice as possible before taking any leave under this Article.

## ARTICLE 27

## HOLIDAYS, PERSONAL DAYS, AND VACATION

**Section 1**. The University sets the academic calendar each year and designates official University holidays and recesses. Currently, the following are designated as official University holidays. SWs shall not be required to work on the following holidays and designated recess, except as provided below in section 2.

New Year's Day

55

Martin Luther King, Jr. Day
Presidents' Day
Memorial Day
Juneteenth
Independence Day
Labor Day
Columbus Day (Federal) / Indigenous Peoples' Day (City of Cambridge)
Veterans Day
Thanksgiving
Friday after Thanksgiving
Christmas Eve 1/2 day
Christmas Day
Winter Recess (the period between Christmas and New Year's Day)

The University reserves the right to add other holidays and recesses in its discretion.

**Section 2**.   During a designated holiday or recess, SWs may be required to conduct work (such as laboratory work, teaching a section, or grading of assignments) only when determined to be necessary by the faculty member or supervisor. The faculty member or supervisor shall provide notice to the SW in advance when such work is deemed necessary. If a SW is required to work on a designated holiday or recess, the SW shall choose an alternate day(s) off with the supervisor's approval, which approval shall not be unreasonably denied.

**Section 3**.  The University recognizes that there are religious holidays that are not currently University holidays. The University will make reasonable accommodations to a SW to observe a religious holiday provided it does not create an undue burden for the University. SWs shall request such time off for religious observance with reasonable advance notice to their supervisor.

**Section 4**.  Personal Days

In addition to time off for designated holidays and recesses, SWs on a salaried appointment shall be entitled to one (1) personal day per semester without loss of compensation with, where possible, at least three (3) days advance notice to their supervisor. A salaried SW with a fall semester employment appointment may carry over and utilize their one personal day from the fall semester in the spring semester of the same fiscal year.  Personal days may not, however, be carried over from one fiscal year to another.

Those salaried SWs with 12-month appointments shall receive one (1) additional personal day in addition to two (2) personal days for the fiscal year.   Personal days may not be carried over from one fiscal year to another.

Personal days may be used for any purpose, including the SW's personal observance of special days in their cultural heritage.

**Section 5**.  Vacation Days for SWs with 10- and 12-month appointments

56

A.  SWs on a salaried 12-month appointment shall be entitled to ten (10) vacation days without loss of compensation to be used during their appointment period.

B.   A SW appointed to a position that would normally be 12 months, but initially appointed for 10-months (i.e. September through June) shall be entitled to eight (8) days off in that first employment appointment period without loss of compensation. If a SW on a 12-month appointment spends part of that appointment period on a non-University activity (such as accepting an external internship), they shall receive a pro-rated amount of vacation for the months actually worked for the University.

In order for a SW to be entitled to vacation, they must be working under an employment appointment that is for 10- or 12-months duration. Thus, two separate semester appointments cannot be considered a 10-month appointment, nor can two separate six-month appointments be considered a 12-month appointment.

C.  Vacation days must be used during the appointment period and may not be carried over from one fiscal year to the next.  Vacation days not used during the appointment period will be forfeited.

D.  Vacation time shall be scheduled in consultation with and approval of the supervisor/faculty member, which approval shall not be unreasonably denied.

E.  For SWs with curricular responsibilities, vacations should normally not be taken during the Fall or Spring academic semesters.

F.  A vacation request of more than two weeks by combining vacation time at the end of one fiscal year with vacation time at the beginning of the next fiscal year will only be allowed with the consent of the supervisor who shall be under no obligation to grant such request.

G.  If a designated University holiday or recess falls during an SW's vacation, the SW shall not be charged vacation time for that holiday or recess.

## ARTICLE 28

## PARKING AND TRANSIT

 Section 1.  All SWs are eligible for the three (3) parking/transit options below (1A or 1B or 1C) as outlined below.

A.  Parking

57

1.    At all campuses, SWs shall have the option to have access to parking and parking-related services that are available to and on the same basis as University staff.

2.    The University will provide information to all incoming SWs about their parking options.

3.    SWs who opt for this option but are unable to secure their facility of choice shall remain eligible for the other transit benefits below provided any application deadlines are met.

B.    Transit - Public and Private

SWs will be provided with discounted MBTA passes per the Semester Pass Program.  Schools at their discretion may provide SW's additional discounts on MBTA passes and/or programs.

C.    Bicycling

1.    SWs are eligible for a bicycle benefit on the same basis and under the same terms and conditions as that offered to staff employees, except SWs are not required to be active employees through the submission deadlines in order to receive this benefit, but they are required to be active students through the submission deadlines.

2.    A qualified bicycle commuting month is one during which a SW is biking for a substantial portion of the commute and does not receive any parking permit or a transit pass through Harvard University.

3.    This benefit operates on the calendar year; the total reimbursement amount accrues over the calendar year and is paid back against the total eligible expenses incurred in the same year. Reimbursement claims are processed and paid in the beginning of the following year; paperwork must be submitted by the SW no later than January 31. If the SW is a new SW or uses a parking permit or transit pass through Harvard for some months of the year, your total reimbursement value is prorated based on your eligible months.

## ARTICLE 29

### TRAVEL

**Section 1.**  Unless otherwise restricted by provisions of a grant, the University shall directly pay preferred providers in advance for all authorized and approved lodging and transportation

58

expenses, as well as directly paying for authorized and approved conference registration fees required for employment, following appropriate notice from the SW to the University. If expenses cannot be pre-paid because of the restrictions of a grant, the University shall pre-pay the expenses from another fund.

 **Section 2**.  Any other expenses incurred will be reimbursed upon the SW's return from the trip in accordance with the Harvard University travel and related policies. In all other respects, the Harvard University travel and related policies as may be amended from time to time shall apply.

## ARTICLE 30

### EMERGENCY GRANT

**Section 1.**  Effective upon ratification of this Agreement, the University shall make a fund available to assist SWs with a temporary hardship due to a significant emergency event

**Section 2**.  Commencing upon ratification of this Agreement, whichever comes last, the fund will be $25,000 for each year of this Agreement. Distribution of money from such fund shall be made in accordance with procedures, policies and requirements established by the Union, subject to approval by the University.

There shall be no rollover of any unexpended funds from one year to the next.

**Section 3**.  If the funds are exhausted in a given year, nothing shall preclude a SW from asking their School for additional funds to deal with emergency events recognizing, however, that any such distribution by the School is entirely discretionary and not a right or expectation.

## ARTICLE 31

### EMPLOYEE ASSISTANCE PROGRAM

Salaried SWs, their spouses and dependents, and adult household members shall be entitled to participate in the University's Employee Assistance Program, as may be modified from time to time.

## ARTICLE 32

### UNION MANAGEMENT COMMITTEE

**Section 1.** A joint Union-Management Committee (UMC) shall be formed with up to seven (7) members on each side that shall meet one (1) time each semester (fall and spring) in addition to all other union-management meetings that may be provided for in this Agreement.

**Section 2**. The purpose of the UMC will be to discuss matters of concern to either or both sides, including the administration of this agreement and other related issues that are not the subject of an active grievance. The parties also agree that such meetings shall not constitute nor be used for the purpose of negotiations. Each side shall select its own representatives. Union representatives shall suffer no loss of compensation to attend such meetings. Agendas shall be mutually agreed to at least seven (7) business days prior to the meeting. The UMC shall also convene at mutually agreed upon times and on an ad hoc basis as needed.

## ARTICLE 33

## UNION SECURITY

**Section 1.**  SWs are free to decide whether or not they wish to join the Union and pay membership dues and fees. The University shall not coerce or otherwise attempt to influence a SW about their decision to join or not join the Union and pay or not pay membership dues and/or fees.

**Section 2**. Every SW will be given the choice to affirm choosing to join the union or not for each appointment period, or if already a member, if they wish to opt out.  There will be no fee or further consequences for the SW who chooses not to join the union.

The Union will draft a letter to be reviewed by the University to be sent to the SW if they fail to make a choice within 30 days of their employment appointment letter.

This will be implemented as soon as possible following discussions between the University and the Union.

**Section 3**.  If a SW is a member of the Union or if a SW decides to join the Union, they may choose to have their Union membership dues and fees deducted from each paycheck provided they have signed an authorization for such deductions in a paper or electronic form acceptable to the University as provided for in Appendix B. The Union shall provide the University with the amount of Union membership dues and fees that a SW who joins the Union must pay.

**Section 4.**  Upon receipt of such signed authorization from an eligible SW as defined in Section 2 above, the University shall deduct Union membership dues and fees from each paycheck. The University shall remit the dues and fees to the Union, together with an electronic list of names of the SWs from whom deductions were made. The electronic list shall contain the employee's name and NetID and the amount of dues/fees deducted, and gross wages.

**Section 5.**  Deductions shall commence for the first full pay period following receipt of the SWs written authorization and shall continue unless affirmatively revoked by the SW. The University is not required to make retroactive deductions. In order for the deductions to be made, the authorization cards must be received by the University's designated representative by at least seven (7) business days preceding the payday when the checkoff is to begin.

60

**Section 6.** The University shall electronically transmit to the Union within fifteen (15) business days after the monthly payroll for the prior month, all dues and fees deducted for that pay period in accordance with Section 4 above.

**Section 7.** The Union agrees that it will reimburse the University for any costs and indemnify and hold the University harmless from any claims, actions, or proceedings by any person or entity or any action taken or not taken arising from any deductions made under this Article.

**Section 8**.  Upon presentation of an "Authorization and Checkoff of Contributions to UAW V-CAP" form executed by a SW who is a dues paying member of the Union, the University agrees to deduct from the pay of each SW voluntary contributions to UAW Voluntary Community Action Program (UAW V-CAP). The University agrees to provide a voluntary check off for the UAW. A SW may discontinue the V-CAP deductions at any time upon written notification to the Union and the University Labor Relations Office. V-CAP collections will be remitted to the UAW V-CAP department monthly. The remittance listing shall be sent monthly to the UAW V-CAP department and to the Local Union and include the SW's name, NetID, amount deducted and the last date of authorization of those SWs for whom deductions have been made. The University further agrees to furnish the UAW V-CAP department and the Local Union with a monthly and year-to-date report of each SW's deductions.


# ARTICLE 34

## NO STRIKE/NO LOCKOUT

**Section 1.**  During the term of this Agreement or any extension thereof the Union,  its representatives, agents, and unit members will not call, condone, or engage in a strike, sympathy strike, slowdown, or withholding of grades or academic evaluations by SWs.

**Section 2.** Any unit member engaging in any conduct prohibited by this Article may be subject to disciplinary action in accordance with Article 19, Discipline and Discharge.

**Section 3.** In the event that any unit member violates the provisions of Section 1, the Union shall as soon as practicable, inform such unit member(s) through all reasonable means that such action is prohibited under this Agreement and that such unit member(s) should cease such action and return to full, normal, and timely work. The Union shall also distribute to the unit member(s) and the University a written notice, signed by an officer of the Union, that the work stoppage or other violation is not authorized by the Union. Such distribution shall be made within twenty-four (24) hours of notice to the Union from the University that there has been a violation of this Article.

**Section 4.** During the term of this Agreement, or any extension thereof, the University agrees that it will not lock out any of the unit members covered by this Agreement.

61

# ARTICLE 35

## SEVERABILITY

If any provision of this Agreement is found to be contrary to law by a court of competent jurisdiction, such provision shall be of no force or effect; but the remainder of this Agreement shall continue in full force and effect. The parties shall bargain in good faith with respect to any provision found to be in contravention of the law.

# ARTICLE 36

## DURATION

This Agreement shall be in full force and effect from November 27, 2021 up to and including June 30, 2025 and thereafter shall continue in effect unless notice of a desire to modify or terminate the Agreement is given by either party to the other, in writing  no later than January 15, 2025; provided, however, that where neither party gives such notice of modification or termination prior to the expiration of the Agreement, the Agreement shall continue in effect until terminated or modified following notice by either party to the other, in writing, of a desire to terminate or modify the Agreement, at least ninety (90) calendar days thereafter (but no earlier than June 30, 2025).

It is further provided that it is the mutual goal of the parties to complete negotiations for any successor agreement prior to the expiration date of the contract. Accordingly, if this contract is reopened, and to provide sufficient time to meet that goal, negotiations shall begin no later than February 1, 2025 unless mutually agreed otherwise.

IN WITNESS WHEREOF the parties hereto affix their signatures by their duly authorized representatives

For HGSU-UAW                                        For Harvard University

62

**APPENDIX A**

**NOTICE OF RIGHT TO UNION REPRESENTATION UNDER ARTICLE 7, NON-DISCRIMINATION AND HARASSMENT, AND ABUSE OR INTIMIDATION**

The Harvard Graduate Students Union-UAW Local 5118 and the University share a commitment to an inclusive campus community free of any form of discrimination or harassment. The union contract with the University, Article 7, Non-Discrimination, Harassment and Abuse or Intimidation ensures that student workers have the option of pursuing the following avenues of recourse in instances of discrimination, harassment or retaliation:

> ➤ The Grievance Procedure in the contract between the Union and the University in cases of discrimination on the basis of union activity or cases of workplace retaliation;
> ➤ The procedures administered by the University and its Title IX Office and Office of Dispute Resolution (ODR);
> ➤ State and Federal offices that handle complaints about discrimination, harassment, and retaliation.

You have the right to a Union representative when pursuing a complaint of any kind under Article 7 Non-Discrimination, Harassment and Abuse or Intimidation at the University or at any State or Federal agencies:

> ➤ A union representative can advocate on your behalf, including advocating for appropriate interim measures such as workplace or schedule changes, no-contact orders or other accommodations.
> ➤ A union representative can provide experience, support, and help navigating systems that otherwise can seem complex and confusing.
> ➤ The Title IX Office's and ODR's roles are investigatory and do not represent either the Complainant or the Respondent.

If you have experienced discrimination, harassment and/or retaliation, we encourage you to seek help from the Union.

For assistance from your Union, contact a trained member of our grievance committee confidentially at [E-mail Address]. You can also find a list of resources for help on our website at [URL].

63

## APPENDIX B

### DUES CHECK-OFF AUTHORIZATION

I hereby authorize and direct Harvard University ("the University") to deduct from my earnings—and to transmit to the Harvard Graduate Students Union-UAW Local 5118 ("HGSU-UAW")—dues in the amount established or revised by HGSU-UAW in accordance with its constitution and/or bylaws. If for any reason the University fails to make a deduction, I authorize the University to make such deduction in a subsequent payroll period. HGSU-UAW is authorized to deposit this authorization with the University, and is authorized to redeposit this authorization with the University if my employment terminates and I am later rehired.

 This authorization is entirely voluntary on my part, and shall be irrevocable and automatically renewed every year for successive periods of one year each or for the duration of each succeeding collective bargaining agreement between the University and HGSU-UAW, whichever shall be shorter, unless revoked by me by signed notice sent to the University and HGSU-UAW, and received by them not more than 20 days and not less than 10 days before the expiration of each period.

## APPENDIX C

### TEMPLATE APPOINTMENT LETTER

### EMPLOYMENT APPOINTMENT LETTER for

### HGSU-UAW STUDENT WORKER

### <APPOINTMENT TITLE HERE>

| | | | |
|---|---|---|---|
| **Student Name** | | | |
| **Employment appointment title** | | | |
| **Business Title (if applicable)** | | | |
| **Appointment start date** | | **Appointment end date** | |
| **Hourly or salaried appointment** | | | |

64

| | | |
|---|---|---|
| **Supervisor(s)** *Please include faculty supervisors and/or any other supervisors* | | |
| 1 | Name | |
| 2 | Name | Click or tap here to enter text. |

| | | | |
|---|---|---|---|
| **Administrative contact(s)** *(Employment Unit Contact)* | | | |
| 1 | Name | | |
| | Phone | | Email | |
| 2 | Name | Click or tap here to enter text. | |
| | Phone | Click or tap here to enter text. | Email | Click or tap here to enter text. |

| | |
|---|---|
| **Course name** (if applicable) | |
| | |

| | |
|---|---|
| **Approx. number of students for which SW would be responsible** (if applicable) | |

**Description of duties for <appointment type> appointments**

- **For teaching appointments**, the name of the course; the approximate number of students for which the SW will be responsible; a description of the required duties, including but not limited to: leading sections, holding office hours, grading assignments, attending lectures, etc. If known at the time of the employment appointment letter, any scheduled meetings or trainings and other duties as assigned.
- **For research appointments**, a brief description of the required research or lab duties, including but not limited to: writing code, performing experiments, maintaining equipment, teaching and mentoring lab members and other duties as assigned. If known at the time of the employment appointment letter, any scheduled meetings or trainings; and procedures for evaluation, if any.
- **For all other employment appointments**, a brief description of required duties; including required meetings and trainings; and procedures for evaluation, if any.

65

| | |
|---|---|
| | |
| **Work location (if known)**<br><br>*If remote work has been approved for all or some of the appointment, please list "remote".* | |
| **Expected work schedule** *Please include course meeting times and locations, if applicable.*<br>**For hourly SWs**, *please include an estimated average number of hours expected per week.* | |
| | |
| **If hourly, cap on total hours** (if applicable) | |
| **Pay classification** *Please see Titles and Classifications, Article 2 of contract for details* | |
| | |
| **Amount of compensation or hourly rate** | |
| **Additional benefits beyond those required by the HGSU-UAW Collective Bargaining Agreement, if applicable** | |
| Click or tap here to enter text. | |

| |
|---|
| **If the Student Worker is required to respond to this appointment letter in any way, that will be indicated below** |

66

No response is required unless there are questions

This position is covered by the HGSU-UAW Collective Bargaining Agreement with Harvard University

**Union mailing address:**

HGSU-UAW

522 Massachusetts Avenue

Suite 209

Cambridge, MA 02139

**Phone:** (617) 475 0677

**Website:** http://harvardgradunion.org/join/

To get started, check out the "Resources" page (LINK HERE), which includes

an explanation of benefits (and how to apply) and other workplace resources.

If any of this information is not known at the time of notification, the SW will be informed as soon as is reasonable under the circumstances.

Dear Colleague,

As you may already know, Harvard Graduate Students Union – United Auto Workers ("HGSU UAW" or the "Union") is the exclusive bargaining representative for Harvard students serving in certain research and teaching positions, including the position you have been offered in the attached appointment letter.

The Union has a legal obligation under the National Labor Relations Act ("NLRA") to represent you and other members of the bargaining unit when engaged in bargaining unit work. The Union may need certain information about members of the bargaining unit, including you, so that it may properly represent its bargaining unit members and enforce the collective bargaining agreement, which covers pay and other terms and conditions of employment.

The Family Educational Rights and Privacy Act ("FERPA") is a federal law which prohibits the University from disclosing certain information from your education records to third-parties –

67

including the Union – unless you consent to such a release or it is otherwise permitted or required by law. For example, the University is permitted to and does share your "directory information" with the Union unless you have a "FERPA block" in place. Sometimes, however, the Union may need additional information, beyond this directory information, for representational purposes. Under FERPA, the University may be prohibited from providing such information to the Union unless you consent to such a release or it is otherwise required by law.

In order to avoid any conflict between the Union's right to access this information and FERPA, you are being provided with the option of signing a voluntary waiver of your FERPA rights for the exclusive purpose of sharing such information with the Union so that it may use the information in its representation of you. Please complete and submit the Student Authorization for the Release of Education Records form ("Authorization Form") on my.harvard according to its instructions (simply click the link above or visit https://hrvd.me/hgsu-ferpa). There are a few  important things to note:

> The Authorization Form provides you with the option to authorize or not authorize the release of certain information from your education records to the Union.

> If you choose to authorize the release of such information, the authorization will be valid  until you revoke it and can be used to properly share your FERPA protected information  with the Union. You may revoke your authorization at any time by changing your  selection from "authorize" to "not authorize" and resubmitting the Authorization Form.

> If you choose to not authorize the release of such information, the University will not share your FERPA protected information with the Union unless otherwise permitted or required by law. You may modify this selection at any time by changing your selection from "not authorize" to "authorize" and resubmitting the Authorization Form.

> If you do not complete and submit the Authorization Form, the University must assume  that you do not authorize the release of such information to the Union. Therefore, the  University will not share your FERPA protected information with the Union unless  otherwise permitted or required by law.

If you have any questions about this communication, the Authorization Form, and/or how any  information shared with the Union may be used, you may reach out to:

Harvard's Office of Labor and Employee Relations:

> Eliza Brown, Senior Analyst

> Email: studentunionization@harvard.edu

> Phone: 617-496-5774

HGSU-UAW:

> Email: hgsu.general@gmail.com

68

Phone: 617-475-0677

**SIDE LETTER TO BE ATTACHED TO THE AGREEMENT**

**HOUSING**

Effective with the fall semester 2020, student workers living in University-owned housing shall be able to pay rent on monthly basis without incurring fees.

**SIDE LETTER TO BE ATTACHED TO THE AGREEMENT**

**ADDITIONAL TEMPORARY PRIVATE SPACE**

Following ratification of the Agreement, the University and the Union will explore where additional temporary private space can be provided to SWs for them to address personal issues during work time. The University shall determine the location of such places with input from the Union within the first six months following ratification of the Agreement and will publish such locations in a mutually agreeable place.

**SIDE LETTER TO BE ATTACHED TO THE AGREEMENT**

**BENEFIT POOLS (For Inclusion in the contract)**

No later than March 31 of each year, the Union shall send the University the allocation for the benefit funds for the upcoming fiscal year.

The University has allocated the following amounts to all the benefit funds in the Agreement, excluding the Legal Expense Fund.

| FY 22 | FY 23 | FY 24 | FY 25 |
|---|---|---|---|
| $1,550,000 | $2,150,00 | $2,750,000 | $2,750,000 |

69

Expenses that occurred between July 1, 2021 and ratification shall be eligible for reimbursement according to the fund rules for all funds, including the International Student Worker Assistance Fund and the new Legal Support Fund.

## SIDE LETTER TO BE ATTACHED TO THE AGREEMENT (NEW)

**CONFIDENTIALITY**

Subject to state and federal law and the University's stated confidentiality rules in handling individual claims of discrimination, the University and the Union agree that nothing in this Agreement prevents SWs from discussing and disclosing information about unlawful acts in the workplace, such as harassment or discrimination or any other conduct they have reason to believe is unlawful.

## SIDE LETTERS NOT FOR INCLUSION IN OR ATTACHMENT TO THE AGREEMENT

The parties agree that no reference to bargaining history from this 2021 round of bargaining will be made by either party in interpreting the following:

1.  Whether teaching appointments that are required in order to meet program requirements or fulfill funding letter requirements are covered by the Agreement or must be compensated according to Article 20.

2.      Whether or not top-up payments are compensation or a mandatory subject of bargaining between the parties

The University will write a letter to the Union not for inclusion in or attachment to the Agreement stating that:

> The University agrees that for the life of the Agreement, it will continue the top-up system in its current form for Ph.D students during their guaranteed funding period.

 **ALSO:**

 *IMPORTANT NOTE NOT FOR INCLUSION IN THE CONTRACT*:  While the contract language will make no reference to Title IX or related discrimination cases, a SW could access this Legal Expense Fund for assistance in paying an attorney who may represent or otherwise advise them in the investigation and processing of a complaint under Article 7.

# EXHIBIT E

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 01**

---

**MASSACHUSETTS INSTITUTE OF TECHNOLOGY**

        **Employer**

    **and**

**UNITED ELECTRICAL, RADIO AND MACHINE WORKERS OF AMERICA (UE), LOCAL 106**

        **Petitioner**

**Case 01-RC-304042**

---

## DECISION AND ORDER[1]

Massachusetts Institute of Technology (the Employer or MIT) operates a private, non-profit teaching and research university in Cambridge, Massachusetts.

The Petitioner, United Electrical, Radio and Machine Workers of America (UE), Local 106, presently represents a bargaining unit comprised of approximately 3,700 graduate students enrolled in MIT degree programs who are employed to provide instructional or research services, including research assistants, teaching assistants, and instructor Gs.

In this matter, the Petitioner seeks a self-determination election in which a group of roughly 1,500 graduate fellows enrolled in MIT degree programs who provide instructional or research services and are not also employed as either research assistants (RAs) or teaching assistants (TAs) would be permitted to vote as to whether or not they wish to be included in the existing bargaining unit. The existing unit was certified on April 19, 2022, following an election held on April 4 and 5, 2022.[2] The Petitioner initially sought to include the graduate fellows at issue here in the unit, but stipulated to their exclusion in order to allow the teaching assistants and research assistants to vote without having to await litigation with respect to the graduate fellows. Those graduate fellows who are also employed as either research assistants or teaching assistants are already included in the existing unit.

---

[1] The petition in this case was filed under Section 9(c) of the Act. The parties were provided opportunity to present evidence on the issues raised by the petition at a hearing held via videoconference before a hearing officer of the National Labor Relations Board (the Board). I have the authority to hear and decide this matter on behalf of the Board under Section 3(b) of the Act. I find that the hearing officer's rulings are free from prejudicial error and are affirmed; that the Employer is engaged in commerce within the meaning of the Act, and it will effectuate the purposes of the Act to assert jurisdiction; that the Petitioner is a labor organization within the meaning of the Act; and that a question affecting commerce exists concerning the representation of certain employees of the Employer. Parties were given the opportunity to file post-hearing briefs, and both parties did so.

[2] Case No. 01-RC-289879

Massachusetts Institute of Technology
Case 01-RC-304042

The parties have stipulated that, should I direct an election, any unit found appropriate should be added to the existing unit if employees vote in favor of representation.[3]

The Employer takes the position that the petitioned-for graduate fellows are not employees because their fellowship funding is akin to a scholarship which they receive to pursue their own academic programs and objectives. The Petitioner, meanwhile, argues that the graduate fellows are employees, regardless of the source of their funding, where they perform the same work, under the same conditions, as the student-employees in the existing bargaining unit.

As set forth below, I find that the petitioned-for graduate fellows are not employees because they do not perform work controlled by the Employer in exchange for compensation. Rather, they perform research (or, occasionally, teach) to further their own academic purposes and are provided with funding to do so regardless of whether their activities also benefit the Employer.

**FACTS**

*Employer's Structure and Business*

MIT's mission is "to advance knowledge and educate students in science, technology, and other areas of scholarship that will best serve the nation and the world in the 21st century." It is divided into five schools and one college: the School of Architecture and Planning; the School of Engineering; the School of Humanities, Arts and Social Sciences; the Sloan School of Management; the School of Science; and the Schwarzman College of Computing. In addition to the departments that fall within each of the schools,[4] MIT also operates research labs, centers, and institutes. The smallest labs are associated with an individual faculty member. Other labs include multiple faculty members. The Computer Science and Artificial Intelligence Lab, which is presently MIT's largest lab, includes more than 1,000 participants.[5]

In total, about 12,000 students attend MIT, including 4,600 undergraduates and 7,100 graduate students. At the time of the hearing, 4,105 graduate students were seeking doctoral degrees and 2,981 graduate students were seeking master's degrees. The School of Engineering enrolled the most graduate students (3,182) while the Schwarzman College of Computing enrolled the fewest (120). About 40 percent of graduate students are international students. The vast majority of graduate students are based in Cambridge, although about 100 are employees of the Woods Hole Oceanographic Institution and about 100 are conducting field research in laboratories located elsewhere.

---

[3] In so stipulating, the Employer did not waive any appeal rights.

[4] For example, the School of Engineering includes the following: Aeronautics and Astronautics Department; Biological Engineering Department; Chemical Engineering Department; Civil and Environmental Engineering Department; Electrical Engineering and Computer Science Department (also a part of the Schwarzman College of Computing); Institute for Medical Engineering and Science; Materials Science and Engineering Department; Mechanical Engineering Department; and Nuclear Science and Engineering Department.

[5] A principal investigator (PI) has the ability to independently direct research at MIT, including by signing off on charges to individual research contracts and grants. All faculty members are accorded principal investigator status.

Massachusetts Institute of Technology
Case 01-RC-304042

MIT offers 55 master's programs, of which 48 require research. All doctoral programs require research. Students enrolled in research-intensive degree programs take fewer classes as they progress and spend the majority of their time actively engaged in research. Typically, a doctoral student makes a formal thesis proposal after two or three years. The proposal is developed in collaboration with faculty members, and the thesis (sometimes called a dissertation) reflects the student's original research done under the guidance of faculty. On average, students complete a doctoral thesis in six years. A master's thesis is typically completed in two years; it is more limited in scope and requires more directed faculty guidance.

Thesis are generally made available to the public. MIT does not generate revenues by distributing the thesis, but rather hopes to contribute to scientific discourse by sharing information.

Teaching is an academic requirement for students in ten graduate programs, including biology, chemistry, and computer science. Students in those programs may receive academic credit, rather than financial compensation, for teaching. Students in this situation may be funded by fellowships.

*Graduate Student Funding*

Tuition for most MIT graduate students is set at about $60,000 per year. Graduate students finance their educations in various ways, often combining several different methods to secure sufficient funding. Dr. Ian Waitz, MIT's Vice Chancellor for Undergraduate and Graduate Education, testified that, because MIT wishes to compete with other universities for talented students, an offer of admission to one of MIT's graduate programs usually comes with some assurance of financial assistance in the form of a fellowship or an assistantship.

About 2,000 graduate students do not receive financial assistance from or through MIT. These students may have the financial resources to fund their own educations, may be funded by foreign governments, or may have received financial grants from other sources unbeknownst to MIT.

Many graduate students receive tuition and a salary in exchange for working on a specific project and its associated objectives and deliverables. Other graduate students receive tuition and a salary in exchange for teaching. These 3,700 research assistants and teaching assistants comprise the existing bargaining unit.

Graduate education is also financed through fellowships. Fellowships are funds paid to individual students for the purpose of study or research.[6] Fellowships may be internal (offered by

---

[6] MIT uses the term "scholarship" at the undergraduate level to refer to funds that cover tuition and/or living expenses. At the graduate level, funds that cover tuition are generally called "scholarships" while funds that defray living expenses are called "fellowships." However, some "tuition-only fellowships" are indistinguishable from scholarships.

Massachusetts Institute of Technology
Case 01-RC-304042

MIT itself) or external (offered by, for example, a private company).[7] Some graduate students' educations are wholly funded by fellowships, while other graduate students' educations are only partially funded by fellowships. MIT may determine that a student's external fellowship is insufficient to cover the student's tuition and living expenses and respond by granting that student an additional fellowship to make up the difference. A fellowship recipient, unlike a research assistant, does not have formal research obligations to a sponsored research grant.

Dr. Waitz testified that MIT formally draws a distinction between an award (a fellowship) and an appointment (a research assistantship or teaching assistantship). However, colloquially, the terms "award" and "appointment" are often used interchangeably.

International students must comply with immigration requirements which do not allow them to pursue full-time work in the United States. Accordingly, MIT, like other educational institutions, limits work hours in research assistantships and teaching assistantships to twenty hours per week.[8] Although the exact amount of coursework varies by student and program, students are generally expected to register for fifty units—that is, fifty hours of coursework—per week, in addition to twenty hours of employment as a TA or an RA, for a total of seventy hours.

### The Existing Bargaining Unit: Teaching Assistants and Research Assistants[9]

Although ten programs include a teaching requirement, in most other cases teaching assistant work is separate from graduate students' academic requirements.[10] Thus, most graduate students prefer a research assistantship to a teaching assistantship, although some graduate students are eager to gain teaching experience or simply enjoy teaching.

A teaching assistant works to support faculty in both undergraduate and graduate classes. Teaching assistants teach recitation sections; offer office hours (tutorials); grade problem sets and exams; and develop questions for problem sets and exams. Duties are assigned by the instructor in charge of the class. For the most part, teaching assistants do not actually teach classes, although

---

[7] However, MIT disperses the funds to all fellows at issue here. If a fellowship provides funds directly to a student, MIT may be unaware of the fellowship and view the student as self-funded. The Petitioner does not seek to represent graduate students who are self-funded.

[8] Where a department has an academic requirement for teaching, a teaching assistant may be expected to devote 24 hours per week to full-time teaching assistant duties.

[9] The existing bargaining unit also includes a position known as "Instructor G." An Instructor G is a graduate student with significant teaching experience who is permitted more independent control over a class than a TA. Instructor Gs can also be compensated at a higher rate than TAs, but their terms and conditions of employment are otherwise identical to those of a TA. At the time of the hearing, only three graduate students were titled "Instructor G."

[10] It is technically possible for a graduate student to act as a teaching assistant in a course taught by his or her thesis advisor, but this arrangement is unusual. For the most part, a student-employee's thesis advisor and work supervisor are not the same person.

Massachusetts Institute of Technology
Case 01-RC-304042

students are given the opportunity to comment on teaching assistants' performances in course evaluations.

A research assistant is a student who is working on a particular aspect of research under the direction of a supervisor, most typically within a sponsored research grant or contract which defines the objectives and deliverables of the research. Faculty solicit grants (or respond to requests for proposals) from government agencies or private entities to fund the research, and then assign research assistants to perform work pursuant to those grants. A student funded by a research assistantship is part of the research group's budget.

Research assistants' work is usually suitable to be used as part of their theses, to the extent that this is approved by their thesis supervisors. Research assistants are also assigned other tasks which may not contribute to their theses, including writing reports to sponsors or giving presentations. In some cases, nothing a student does in conjunction with an RA appointment ever appears in that student's thesis document.

An appointment to an assistantship can be cancelled at any time if progress in the graduate program is unsatisfactory or if the student is not carrying out the duties assigned in a specific manner. It is unusual, but possible, for an assistant to be terminated in the middle of an appointment due to unsatisfactory performance of duties. It is somewhat more common for a graduate student not to be reappointed to an assistantship for a new term. This may occur because a department has fewer positions available than qualified applicants or because the student-employee's performance declined due to health or personal challenges. If an assistant's funding is terminated under these circumstances, many departments place the individual on a fellowship so that the student can refocus on academics with fewer time constraints.

TAs and RAs receive two weeks' vacation with pay as approved by their employment supervisors. In addition to their tuition subsidy and stipend, they receive medical insurance for an overall compensation package of about $120,000 per year. MIT withholds federal and Massachusetts income tax from teaching and research assistants' stipends, and the teaching and research assistants receive W-2s at the end of the year. The stipends are paid twice monthly, following the completion of the students' work. Compensation is processed through MIT's payroll department.

Some departments set a maximum on the number of units for which graduate students on assistantships may register. Exceptions are permitted where there is significant overlap between a research assistant's assigned research and his academic/thesis research.

*Fellowship Funding*

Fellowships are financed in several ways. Internally, MIT allocates money for fellowships from unrestricted funds at the department level, the school level, and the institute level. MIT also funds fellowships through department-controlled endowed accounts. Frequently, a donor (often an alumnus) makes a gift to MIT which specifies that the money is to be spent on, for example, a graduate student fellowship in a particular department.

Massachusetts Institute of Technology
Case 01-RC-304042

Students also receive federally-sponsored fellowships which come with their own restrictions. Currently, 600 MIT graduate students have National Science Foundation fellowship awards, although only 350 students are currently utilizing them. Approximately 75 students are currently using other federally-sponsored fellowships, including fellowships awarded by the National Institutes of Health (NIH) and the National Aeronautics and Space Administration (NASA). The NIH also awards specialized grants, known as training grants, given to a university to provide training for students. Forty MIT graduate students currently receive NIH training grants. Some NIH training grants also come with specific requirements beyond academic requirements, and MIT is responsible for ensuring that students meet all terms and conditions of the grant.

In addition, some graduate students' educations are financed by corporate-sponsored fellowships funded by private companies. Some corporate-sponsored fellowships are short-term agreements (such as sponsoring a student for three years) while others are evergreen. Likewise, nonprofit sponsored fellowships may be provided by foundations or foreign governments. In some cases, the funds go directly to the students, while in other cases, the funds are administrated by MIT.[11] At the time of the hearing, eighteen students were receiving nonprofit sponsored fellowships.

Because the sources of fellowship funding vary widely, the requirements which must be met by graduate students to receive and maintain their awards also vary widely. All students do need to maintain good academic standing in order to receive fellowship funding, and good academic standing frequently requires engaging in research. Some graduate students need not perform any research in order to maintain their fellowships, and indeed do not engage in any research. The Petitioner does not seek to represent students who are funded by fellowships but who are not conducting research.

*Graduate Fellows in Research Groups*

The vast majority of MIT's graduate programs are research-intensive, and graduate students are likely to spend significantly more time learning in a laboratory than in a classroom. MIT's smallest labs may include one faculty member, while the largest labs include upwards of 1,000 participants. Principal investigators solicit grants from government agencies or private entities to fund the research, and then assign members of the research group to perform work pursuant to those grants.

Dr. Waitz testified that fellowships are "by far" the most attractive and prestigious form of financial assistance because they allow the student to choose to work in any area or with any faculty member. A student may enroll expecting to work in a particular professor's lab but discover a preference for a different area of research. A fellowship allows the student the flexibility to make that change without losing funding. In addition, a fellowship does not come with additional work requirements. A letter offering admission to a student who has been offered a research assistantship

---

[11] The Petitioner does not seek to represent fellows who receive their funding directly from an external source rather than through MIT's payment portal.

Massachusetts Institute of Technology
Case 01-RC-304042

explicitly states which project the RA will work on, as well as the supervising faculty member. Because RAs are attached to specific supervisors and specific projects, there is no guarantee that an RA may switch to a different supervisor or project upon request. In the case of a fellowship, though, funding attaches to a particular student rather than a particular project.

Any given research group is likely to include students supported by many different contracts or grants, including assistantships, department fellowships, institute fellowships, and external fellowships. Regardless of the origin of their funding, all of them are classified as MIT students and all are pursing research-intensive degrees by working within the learning environment of a research group or a lab. Fellows, like any other member of a research group, may be credited as authors in published articles resulting from the research performed. For example, one witness performed research as a fellow which led to her inclusion as an author of an article later published in the prestigious journal *Nature*. All graduate students, including RAs and fellows, are required to sign MIT's Proprietary Information Agreement, which is also required of faculty and other research staff. Several graduate students testified that, although they are classified as fellows, their principal investigators meet with them regularly and give them feedback on their progress.

Multiple graduate students testified that their experiences in their research groups did not change as they moved between classification as a fellow and classification as a research assistant. Such changes in classification are common because many fellowships support students for a certain number of academic terms, leaving the students to finance the balance of their educations through other means, including assistantships. Financial assistance of all kinds is administered by the Office of Graduate Education, which issues stipend payments from a single bank account to both fellows and research assistants every two weeks. Like TAs and RAs, fellows receive tuition assistance and health insurance in addition to stipends.

Unlike a research assistant, though, a fellow's funding is not a part of the research group's budget. Thus, unlike a research assistant, a fellow may not be assigned to certain non-research tasks—such as writing reports to sponsors—although a fellow may volunteer to perform this work.[12] Likewise, while TAs and RAs are limited to taking a certain number of courses per term, this limit on courseload does not apply to fellows. Nor do limits on hours worked and vacation policies apply to fellows.[13] Income taxes are withheld from funds disbursed to RAs but not from funds disbursed to fellows. Fellows also do not receive W-2 forms and are not required to complete I-9 forms.

Research groups also include self-funded graduate students, who have the same academic relationship with the professors as students whose funding stems from other sources.

---

[12] Multiple graduate students testified that they are nonetheless regularly asked to perform work unrelated to their own research. Multiple MIT managers also testified that professors are instructed to stop making such requests if the requests come to the attention of the administration.

[13] Fellows do not accrue vacation time but may take time away from their research the same way another student may take time away from a classroom: with potential academic consequences, but with no change to income.

Massachusetts Institute of Technology
Case 01-RC-304042

Further, some students—including more than 200 fellows—do not conduct their research in a group or laboratory setting. In disciplines such as economics, graduate students conducting thesis research do not require the use of lab equipment and other research facilities. These students generally do not work side by side with other researchers as students who are part of a lab group do.

## ANALYSIS AND CONCLUSION

In *Columbia University,* 364 NLRB 1080 (2016), the Board considered and rejected its prior holding in *Brown University* that "the graduate assistants *cannot* be statutory employees because they 'are primarily students and have a primarily educational, not economic, relationship with their university.'" *Id.* (quoting *Brown University*, 342 NLRB 483, 487 (2004)). The *Columbia* Board concluded that "it is appropriate to extend statutory coverage to students working for universities covered by the Act unless there are strong reasons not to do so." *Id.* at 1081.

In reaching this finding, the Board relied on the common-law definition of employment, which "generally requires that the employer have the right to control the employee's work, and that that work be performed in exchange for compensation." *Id.* at 1094. The Board explicitly held that "the fact that a research assistant's work might advance his own educational interests as well as the University's interests is not a barrier to finding statutory employee status." *Id.* at 1096.

The Board proceeded to contemplate the possibility that a student in receipt of a particular sort of funding might have the unfettered ability to pursue his own goals without regard to his benefactor's goals, although it found that this was not the case with the research assistants at issue in *Columbia*:

> It is theoretically possible that funders may wish to further a student's education by effectively giving the student unconditional scholarship aid and allowing the student to pursue educational goals without regard to achieving any of the funder's own particular research goals. But where a university exerts the requisite control over the research assistant's work, and specific work is performed as a condition of receiving the financial award, a research assistant is properly treated as an employee under the Act.

> The research assistants here clearly fall into this latter category of common-law employees. The research of Columbia's student assistants, while advancing the assistants' doctoral theses, also meets research goals associated with grants from which the University receives substantial income. The research assistants here work under the direction of their departments to ensure that particular grant specifications are met. Indeed, another feature of such funding is that the University typically receives a benefit from the research assistant's work, as it receives a share of the grant as revenue, and it is relieved of any need to find other sources of funding for graduate students under a research grant; thus it has an incentive to ensure proper completion of the work in accordance with the grant. Further, a research assistant's aid package requires fulfillment of the duties defined in the grant, notwithstanding that the duties may also advance the assistant's thesis, and thus the award is compensation. Students, when working as research assistants, are not permitted to simply

- 8 -

Massachusetts Institute of Technology
Case 01-RC-304042

pursue their educational goals at their own discretion, subject only to the general requirement that they make academic progress, as they would be in semesters where they were under some form of financial aid other than a research grant.

The funding here is thus not akin to scholarship aid merely passed through the University by a grantor without specific expectations of the recipients. Because Columbia directs the student research assistants' work and the performance of defined tasks is a condition of the grant aid, we conclude that the research assistants in this case are employees under the Act.

*Ibid*. at 1096-1097, footnotes omitted.

Finally, the *Columbia* Board specifically addressed the university's argument that research assistants funded by training grants lack the characteristics of common-law employment. The Board noted that the university receives revenue from the training grants, is charged with ensuring the research assistants receive appropriate training, and accordingly oversees and directs the research assistants who receive the grants. Thus, the Board held that research assistants funded by training grants are also employees. *Ibid*. at 1097.

### *The Petitioner's Argument*

The Petitioner argues that, at root, fellows are distinguished from the members of the existing bargaining unit only by the source of their funding.

The Petitioner takes the position that fellows are statutory employees under *Columbia*, firstly, because they conduct research in connection with their studies, thereby furthering the mission of MIT to advance human knowledge and "performing services" for MIT. Further, the Petitioner emphasizes that fellows are directed and supervised by the Employer as they conduct their research. Faculty members and PIs meet with graduate students, regardless of funding status, to offer feedback on their progress. The Petitioner asserts that, because all research is work, the professors' guidance of fellows cannot be viewed solely as academic mentorship. Finally, the Petitioner notes that the fellows receive compensation from the same MIT bank account used to disperse funds to the research assistants who are already a part of the bargaining unit. Thus, the Petitioner concludes that the fellows, like all employees, perform work controlled by their employer and are compensated in return.

With respect to the fellows' flexibility in choosing their own areas of research, the Petitioner notes that specialized workers often have significant say over what tasks they will perform but are nonetheless legally classified as employees.

### *The Employer's Argument*

The Employer contends that the fellows cannot be employees under common law or under *Columbia* because they have no employment responsibilities to MIT. Rather, the Employer views the fellows as akin to the hypothetical students contemplated by the *Columbia* Board who receive unconditional scholarship aid and need not perform work in return.

- 9 -

Massachusetts Institute of Technology
Case 01-RC-304042

The Employer further contends that MIT's fellowships are not the functional equivalent of the training grants described in *Columbia* because training grants at MIT involve academic work, not service to the university. MIT submits that, where a training grant student is not required to engage in specific training activities over and above the student's core academic requirements, the student does not meet the common law employee test.

In addition, the Employer highlights the fact that fellows, unlike the members of the existing bargaining unit, do not fill out I-9 forms, do not receive vacation, need not request time off, and are not issued W-2 forms. The *Columbia* Board noted that the graduate assistants at issue in that case also filled out I-9 forms and were issued W-2 forms.

Lastly, the Employer notes that equating research with employment could have unintended consequences. The distinction between RAs and fellows is made in federal immigration law, federal tax rules, and federal regulations concerning the administration of sponsored research at universities. With respect to immigration regulations, there are strict rules regarding a 20-hour cap per week of on-campus employment during academic terms. If all thesis research performed by graduate students constitutes service to MIT, then hours previously deemed academic in nature will be counted against the 20-hour employment caps set by federal immigration regulations. Further, the Internal Revenue Service defines a fellowship as tax free, so long as the funding is not conditioned on the student providing any services to the academic institution. The Employer argues that if the Board holds that there is no distinction between academic research and services to MIT, MIT would be required to start withholding and reporting income taxes for fellows as it does for RAs and TAs, contradicting the tax code in the process. The distinction between fellows and RAs is also recognized in the regulations governing the administration of federally-sponsored research awards. In this context, fellowships are considered student aid and generally not chargeable to federal awards. If fellows were also conducting work, MIT would be permitted to charge federal research sponsors millions of dollars for the fellows' stipends unexpectedly.

### *Conclusion*

The *Columbia* Board held that graduate students are employees despite the fact that a graduate assistant's work might advance his own educational interests as well as the University's interests. Here, the petitioned-for fellows' research might advance the University's interests as well as their own, particularly where the University's interests include the broadly defined goal of "advancing knowledge." However, the common-law definition of employment requires that the students perform work, directed by the university, in exchange for compensation. Here, the work performed is indistinguishable from academic work and the direction is indistinguishable from academic direction. However, the compensation received by the fellows is not directly tied to completing particular tasks, as directed; rather, it is tied to maintaining academic good standing.

While fellows conduct academic research alongside RAs, they also conduct research alongside students who are self-funded. All are required to conduct thesis research to earn their degrees, but only the RAs are under the direct supervision of a faculty member who controls their funding and makes certain that that their RA work aligns with the objectives in the contract on

- 10 -

Massachusetts Institute of Technology
Case 01-RC-304042

which they are supported. Additionally, fellows, in contrast to RAs, do not receive paid vacation time. Unlike the student-employees at issue in *Columbia*, fellows do not receive W-2 forms and need not fill out I-9 employment verification requirements. It is evident that, contrary to the Petitioner's assertion, all thesis research performed by graduate students cannot constitute service to MIT, lest international students be placed at a grave disadvantage by the 20-hour employment caps set by federal immigration regulations.

The fact that fellows must meet no employment responsibilities or service requirements to receive or maintain their fellowship awards supports a finding of non-employee status.

## **ORDER**

IT IS HEREBY ORDERED that the petition is dismissed.

## **RIGHT TO REQUEST REVIEW**

Pursuant to Section 102.67 of the Board's Rules and Regulations, a request for review may be filed with the Board at any time following the issuance of this Decision until 10 business days after a final disposition of the proceeding by the Regional Director. Accordingly, a party is not precluded from filing a request for review of this decision after the election on the grounds that it did not file a request for review of this Decision prior to the election. The request for review must conform to the requirements of Section 102.67 of the Board's Rules and Regulations.

A request for review must be E-Filed through the Agency's website and may not be filed by facsimile. To E-File the request for review, go to www.nlrb.gov, select E-File Documents, enter the NLRB Case Number, and follow the detailed instructions. If not E-Filed, the request for review should be addressed to the Executive Secretary, National Labor Relations Board, 1015 Half Street SE, Washington, DC 20570-0001, and must be accompanied by a statement explaining the circumstances concerning not having access to the Agency's E-Filing system or why filing electronically would impose an undue burden. A party filing a request for review must serve a copy of the request on the other parties and file a copy with the Regional Director. A certificate of service must be filed with the Board together with the request for review.

Neither the filing of a request for review nor the Board's granting a request for review will stay the election in this matter unless specifically ordered by the Board. If a request for review of a pre-election decision and direction of election is filed within 10 business days after issuance of the decision and if the Board has not already ruled on the request and therefore the issue under review remains unresolved, all ballots will be impounded. Nonetheless, parties retain the right to file a request for review at any subsequent time until 10 business days following final disposition of the proceeding, but without automatic impoundment of ballots.

Massachusetts Institute of Technology
Case 01-RC-304042

Dated:  March 13, 2023

Laura A. Sacks, Regional Director
National Labor Relations Board
Region 01

# EXHIBIT F

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD

MASSACHUSETTS INSTITUTE OF
TECHNOLOGY
      Employer

     and                                       Case 01-RC-304042

UNITED ELECTRICAL, RADIO AND MACHINE
WORKERS OF AMERICA (UE), LOCAL 106
      Petitioner

ORDER

      The Petitioner's Request for Review of the Regional Director's Decision and Order is denied as it raises no substantial issues warranting review.[1]

                    MARVIN E. KAPLAN,        MEMBER

                    DAVID M. PROUTY,         MEMBER

                    GWYNNE A. WILCOX,     MEMBER

---

[1]     The Board has exercised its discretion to read the entire record.  See Sec. 102.67(e) of the Board's Rules and Regulations.

     In denying review, we rely on the Regional Director's finding that the petitioned-for graduate fellows, as a whole, "do not perform work controlled by the Employer in exchange for compensation.  Rather, they perform research (or, occasionally, teach) to further their own academic purposes and are provided with funding to do so regardless of whether their activities also benefit the Employer."  The Regional Director therefore correctly found that the record shows that most of the fellows "must meet no employment responsibilities or service requirements to receive or maintain their fellowship awards."  Accordingly, the Regional Director properly dismissed the petition.  See *Columbia University*, 364 NLRB 1080, 1094 & 1096-1097 (2016) (distinguishing student assistants satisfying the common-law employment standard from nonemployees who "simply pursue their educational goals at their own discretion, subject only to the general requirement that they make academic progress").  We therefore do not rely on the Regional Director's further finding that the fellows are not statutory employees because "the compensation received by the fellows is not directly tied to completing particular tasks."

     Our denial of review of the Regional Director's dismissal of the petition is based on the Petitioner's argument that the petitioned-for fellows are, as a whole, statutory employees and is without prejudice to the Petitioner filing a new petition seeking to represent particular subclassifications of graduate fellows who are statutory employees within the meaning of Sec. 2(3) of the Act under the common-law standard set forth in *Columbia University*, supra.

1

Dated, Washington, D.C. July 17, 2024.

# EXHIBIT G






Just one day after HGSU's contract expired, Harvard announced they **removed** stipend-based research assistants from the unit. During a period of funding cuts, visa revocations, and threats of deportation for graduate student workers, this carveout strips these student workers of all union protections, and creates inequities in which student workers in the same labs performing the same types of work as one another will be given unequal access to crucial workplace protections and benefits.

The agreed-upon unit has expressly included these workers since its founding, including all researcher assistants regardless of their funding sources (on stipend vs salaried). While Harvard claims this removal is legally justified, the University has fought and lost multiple **arbitrations** and **appeals** on this exact issue. Now, during active contract negotiations, Harvard is attempting to rewrite the unit's composition and undercut the union's power by fiat.

On this page, you'll find testimonials from student workers across campus about Harvard's decision.
If you or someone you know has been affected by the carveout, sign on to our open letter!
And you can **submit your testimonial here**.

"The carving out of over a thousand graduate workers is only possible in the current political environment, where Harvard can take advantage of the turmoil and uncertainty to avoid recourse for this illegal and unfair labor practice. I grew up in the Heartland of our country, and I directly benefited from my family's membership in a trade union, which afforded me the socioeconomic mobility to attend graduate school. As a Midwesterner, loyalty to my friends and allies has been instilled in me from a young age. I chose Harvard because I believed that the most prestigious university in the world, in the most American city in the world, could and would uphold the values that enabled the most prosperous post-war middle class ever seen and would be loyal to

its graduate workers. Instead, I have watched our leadership posture and virtue signal, sending us long, winding paragraphs about how they are standing up to the government with no tangible action to support graduate workers. They tell us they are creating new departments, offices, and initiatives that they claim will protect our interests; however, they merely create new administrative positions. In the same breath, Harvard representatives will inform us during contract negotiations that fair wages are not feasible and that graduate workers must continue to be paid below the poverty level, despite having an endowment exceeding $53,000,000,000. We fundamentally live in a society and a world that we create: there is no a priori reason Harvard is unable to compensate the people who make this university great fairly. It is now clear to me that the administration's primary interest is in protecting itself and maximizing the efficient extraction of labor from graduate workers. Perhaps it was naïve of me to have expected anything else.



I applied for the NSF Graduate Research Fellowship (GRFP) to support my research. I observe supermassive black holes millions of light-years away that are burping as they finish consuming their meal of a star that got a little too close. I combine signals from telescopes across the world to create a synthetic telescope the size of our globe. Such a telescope, located in Boston, would be capable of imaging a dime in Los Angeles and measuring its position to an accuracy of less than the width of a human hair. Had I been awarded the GRFP, I would no longer be eligible for union membership, according to Harvard. Fundamentally, nothing would have changed about my labor as a graduate worker had I been awarded this prestigious fellowship. Instead, Harvard has created a new DIS-incentive to apply for external funding by refusing to allow their most high-achieving students to benefit from union protections." —**Will Golay, G3 in Astrophysics**

"I needed reconstructive orthopedic surgery this year. My membership in the union supported me both financially and emotionally through the recovery. Because of my membership, I was never in fear of repercussions for prioritizing my health, as I knew the union would defend me. Financially, reimbursements from union funds allowed me to pay for equipment and medical care that greatly aided my recovery, despite them not being fully covered by insurance. Being carved out of the union because the services I do are not considered valuable labor is an extremely upsetting prospect. I have dedicated half of my 20s to pursuing biomedical research, and to be told that it is not valuable to the university that will benefit from my future grants, fellowships, IP, or patents, is extraordinarily disheartening." — **Ben, G2 in DMS**

"The primary feeling I have in response to nearly 1,000 workers being carved out of our union is one of disbelief and deep concern. I struggle to understand why the university would take such an aggressive stance against its own students. Students who are here not only to learn, but also to contribute meaningful, often urgent research. My research focuses on the measles virus and how it produces proteins necessary for infection and dissemination. This is especially relevant now, as the U.S. faces its largest outbreak of measles since 1992. Harvard was the place I chose for this work because I believed it would support not only scientific inquiry, but also the people who carry it out. That belief is being tested. The union has played a vital role in securing the foundation that allows me to focus on research: emergency financial support, predictable pay, grievance procedures, and protections against overwork. Losing those protections means increased stress, uncertainty, and vulnerability, both academically and personally. It directly affects our ability to do our jobs well. *What makes Harvard's decision*



*especially painful is that it contradicts the values the university has claimed to uphold. I was proud of how Harvard leadership stood up for students when the Trump administration targeted our colleagues. I believed that leadership understood the importance of protecting academic freedom and student worker rights. Now, it feels like that same leadership is using the anti-labor climate of the current administration as cover to quietly divide and weaken us from within.* It's not just disillusioning, it's destabilizing. I still want to believe that Harvard values its students and workers. But that belief becomes harder to hold onto as leadership takes actions that suggest otherwise. These decisions aren't abstract. They're hurting our friends, colleagues, and the research we're all here to pursue." — **Wesley Hanson, G4 in Virology**

"*I feel like I've been backstabbed* and that Harvard is no better than the administration in the way they treat the scientists who work for them." — **G3 PhD Student**

"I consider the union as my only advocate against Harvard. I've experienced medical emergencies and have received faster advice and assistance from the union than from the university officials. Another aspect – if you are in an PhD program, other U.S. universities won't offer you a Ph.D position. So, if you are an international student, Harvard exerts total control over your presence in the U.S. Even if you can convince your P.I., you are very limited in income sources, too. How can anyone negotiate with their only possible employer? There is nothing about TFing that changes my status as a Ph.D. candidate doing research in a lab. Even when I TF, it is a 10-hour/week task in a 100 hr/wk job. My pay changes by less than 10 percent, too. So why would that 10% change my status? Harvard exerts total control over my income and presence in the country. I can't work if they say no. I can't stay if they say no. The only party whose incentives align with mine, regardless of those 10 hours spent TFing, is the union of fellow graduate students. Simply put, graduate students turn money into papers. That's our central relationship with the university. That unites all Ph.D. candidates together. Harvard's TFing condition for the union is embarrassingly disingenuous. They won't find a single P.I. that is OK with their Ph.D. students spending 40+ hours a week studying rather than doing research." — **G3 in SEAS**

"It is terrifying to see my friends and colleagues lose their access to union benefits and fear for their future in graduate school. I myself fear being carved out and what that would mean for paying for medical expenses. I greatly value the comfort of knowing I can access union benefit funds if I need help paying for medical and dental expenses. Just this year I have had a number of unforeseen medical and dental issues for which I have used or plan to apply for benefits to help cover, as these expenses far exceed my budget I live by based on my graduate student stipend. I feel a great amount of stress around paying for these upcoming procedures that I need to have done and it does feel like it has reduced my ability to work effectively some days." — **Student Worker in DMS**

"I was extremely upset and angry when I heard that I and most of my peers in OEB have been carved out of the union. The union has helped me financially and physically over the course of my PhD and I do not think I would have a sense of Harvard community without the union. Not only has the union helped me pay for dental each year, but they have been extremely kind and generous on two different occasions when I applied to the emergency benefits fund to help me



handle unexpected vet bills. In particular, the union significantly helped me earlier this year when I was dealing with one of the worst moments of my life – my beloved cat Fig was unexpectedly diagnosed with widespread lymphoma, leaving me with $7,000 in vet bills from a single day of diagnostic imaging and the rapid passing of my sweet baby. I applied for emergency financial support from both the union and from the FAS emergency fund, and while FAS/Harvard told me they didn't cover vet bills and couldn't help me, the union stepped up and helped offset some of these unexpected and horrible costs, providing me significant financial and emotional support and even greater piece of mind when I was at my lowest. This allowed me to spend Fig's final days being present with her rather than panicking about how I was going to cover what was the equivalent of a car down payment to be told my cat was dying of cancer. I will forever be grateful to the union for this and am angered that other student workers have now lost access to such emergency funds when they are at their lowest and most financially vulnerable. *When I read that Harvard's reason for carving us out of the union was because we "do not perform services for the university in exchange for compensation" (Judith Singer), it felt like a slap in the face.* Harvard University does not believe our research to be work, to be something the University considers valuable enough to compensate. And yet Harvard's reputation is built on research, on the backs of the very graduate students Harvard has decided to eliminate from the union. It feels underhanded that Harvard proclaims our research worthless while continuing to benefit from the status graduate student worker research provides." — **Sophie, G6 in OEB, studying plant physiology & anatomy**

To treat an RA appointment as "not labor" is absurd. The physics department simply would not exist if there weren't graduate students doing research and being paid as RAs. Without graduate researchers, professors would not have papers published, and thus would struggle to get funding. That funding keeps the lights on in the building and ultimately supports 90% of departmental operational costs in the physics department. *Taking students out of the union creates a sense of uncertainty and fear that hard won raises could be stripped away and hard won workplace protections could be stripped away.* This also impacts our ability to apply for benefit funds to cover out of pocket medical expenses. I have a lot of health conditions, and I typically spend close to $4,000 per year on out of pocket medical expenses. Being able to apply to the benefit pool made it possible for me to have access to weekly therapy. If I have to cover the co-pay on my own, I can't afford to continue in weekly therapy. The cost of living is high in Boston, and I've only just gotten to a place of being somewhat financially stable because of union won raises and things like the benefit pool. I would also lose my access to the bike benefit. Given that I have to bike to campus everyday for my research, and the cost of bike maintenance can be quite high, having that benefit is really helpful. The vast majority of people in my physics department are paid through RA appointments, so this has a widespread impact. I also think it feels quite dishonest and suspicious that they have done so and not sent any official correspondence to anyone about it. It seems many people in my physics department (faculty and administrative people) still don't understand what is going on or why this has happened. My specific research is within physics education research. This means I work closely with instructors and professors helping them to improve their teaching in undergraduate physics classes. Given Harvard's commitment to high quality education for their undergraduate population, my research is closely aligned with the goals of the institution. To consider this important work as "not labor" is nonsensical." — **Ri Dresser, G6 in Physics**



"It deeply saddens me to see nearly 1,000 workers carved out of the union, stripped of the safety nets they rely on: such as union representation, childcare, healthcare, dependent insurance, emergency funds, and many other essential benefits. These are not luxuries; they are promises made to us, and for many, they are lifelines that help keep ourselves and our families financially afloat. This decision is especially devastating given the already high cost of living in the Boston area. I know that many of the affected workers are now facing profound financial and emotional stress. These new burdens inevitably spill over into their academic lives, making it harder to focus on groundbreaking research and academic progress. As these workers are forced to navigate new obstacles, their capacity to continue the work they came to Harvard to do is diminished. Personally, I have relied heavily on these union-secured benefits. As a new father to a 9-month-old daughter, the childcare benefit has been critical for me. It allows me to focus on my research by providing access to more affordable childcare despite the extremely high cost of living in the greater Boston area. I have also used the emergency fund in moments of crisis, such as the death of my grandfather and a hospitalization in my immediate family. Without this support, the cost of emergency travel to visit family in critical moments would have created significant financial hardship. Harvard's decision to exclude these workers from such protections and support systems is not just disappointing, I believe it's deeply harmful. I know firsthand what it means to lean on these benefits in difficult times. To deny others that same support is to break a promise, and to leave many of our colleagues more vulnerable than ever. I am a graduate student researcher in the field of pharmacology at Harvard Medical School and my research focuses on using antibodies to study receptors that are therapeutically relevant. This research, provides a new understanding of how we can harness protein engineering of antibodies to innovate and develop new therapeutic strategies." — **G6 in Chemical Biology**

As a graduate student conducting research at the intersection of mental health, ethics, and systemic healthcare inequities, I know firsthand how essential it is for our labor to be protected—regardless of where the funding comes from. The decision to carve out nearly 1,000 of our colleagues from the union feels like a targeted attempt to undermine our collective power and has left many of us feeling disposable and devalued. Union representation is not a luxury—it's what ensures fair wages, protections against exploitation, and accountability from an institution as large as Harvard. I've personally benefited from the union's advocacy, which has helped create safer, more equitable working and learning environments. For Harvard to claim its place as a global leader in education, justice, and research while stripping student workers of fundamental labor protections is not only hypocritical—it's reprehensible. It reveals a deep disconnect between the institution's public values and its treatment of the very people who carry forward its research and teaching mission. Our research IS labor. And any institution that

truly values innovation and academic excellence must also value and protect the people behind it." — **LA, G4 in DCE**

"My two young kids will be severely impacted, including my less than 1yo young kid who has been on medical support since birth. This is especially hard for a PhD student dad." — **G4 in Government**



"I am a musicologist researching questions of music, nature, and climate change, and I'm also a proud organizer with HGSU. As someone working in a turf who is not eligible for benefits from the Union for the majority of my time at Harvard, despite my being a member, *it is frustrating to see the University eroding the union's power in this way: without meaningfully discussing the matter with HGSU, and with no regard for the material impacts it could have on workers' lives*. I have only been eligible for union benefits for a small portion of my time at Harvard, and it has been a great help to have access to benefits and representation in the event of workplace challenges. Harvard's decision to carve out nearly 1000 workers means that these workers no longer have the option to benefit from HGSU's support. But more existentially, it means that the University is refusing to acknowledge the full extent of the vital work we do as researchers and teachers, labor that helps maintain the University's cutting edge status across many fields." — **Cana, G7 in Music**

"It appears *I have been carved out of the union because, for the first time after 4 semesters of heavy teaching loads (plus research and classes), I have won a fellowship that grants me a semester to focus only on research.* Applying for fellowships is something my department and professors encourage us to do. But by carving me out of the union, Harvard is also effectively punishing me for winning the fellowship, both psychologically, by putting me on more unsure footing, and financially, as I will no longer have access to benefits. For example, the dental fund has been important to me in the last year as I had some unexpected dental problems that incurred high costs (despite my having dental insurance), and the dental fund covered these costs. There is still a possibility that I will need a root canal in the future. If I am so unlucky as to need it this fall, I will suddenly not have access to the benefit fund. Why? Because I won a fellowship! How does that make sense? Moving between research, teaching, and learning roles is a fundamental feature of academic jobs. By carving out students who are, for some time, doing one part of their job and not another, Harvard is not just devaluing our contributions and hard work but punishing us for moving through the natural rhythms of our jobs." — **G4 PhD Student**

"I have definitely benefited from the union in the past with emergency fund used. Additionally, I don't think I would be able to financially survive being a PhD without what the union has fought for in wages, health insurance, and dental insurance. Without this layer of the union, it is scary what the future holds and if I will be able to afford rent increases every year now without the support of the union." — **G2 in BBS**

"Despite not being able to get involved, being in a union has meant so much to me! One moment that stands out is being able to reach out and speak to a union rep easily / quickly to strategize on how to help a friend / fellow student & union member facing health issues. They were so knowledgeable and helpful in thinking through how to navigate institutional processes to get the

care / support he needs. Everyone deserves to be in a union, and I hope Harvard reverses its carve-out immediately." — **Anonymous Student Worker**



## Contact us

📞 (617) 475-0677

✉ general@hgsu.org

🏠 552 Massachusetts Avenue, Suite 209 Cambridge, MA 02139

## Useful links

> Home

> About Us

> Workplace Issue Form

> Contact Us

## Newsletter

| Email |
| --- |

**SUBSCRIBE**

## Social Media



Copyright © 2021 HGSU-UAW. All rights reserved.

# EXHIBIT H

# UAW LOCAL 5118 STEP 1 GRIEVANCE FORM

| GRIEVANT'S NAME*<br>**HGSU-UAW Local 5118** | | GRIEVANCE NUMBER (INTERNAL USE) |
|---|---|---|
| EMAIL<br>**hgsu.grievance@protonmail.com, general@hgsu.org** | | TODAY'S DATE (MM/DD/YYYY):<br>**07/21/2025** |
| POSITION/TITLE*<br>**N/a** | GRIEVANT'S HIRING DEPARTMENT*<br>**N/a** | GRIEVANT'S PHONE NUMBER*<br>**(617) 475-0677** |
| NAME OF GRIEVANT'S IMMEDIATE SUPERVISOR, TITLE, TELEPHONE NUMBER*<br><br>**N/a** | ADDRESS & EMAIL FOR CORRESPONDENCE<br><br>**HGSU-UAW Local 5118<br>Suite 209<br>552 Mass. Ave, Cambridge, MA 02139<br>hgsu.grievance@protonmail.com** | |

| HGSU-UAW REPRESENTATIVE NAMES<br>**Sinclair Emans**<br><br>**Sara Speller**<br><br>**Sudipta Saha** | HGSU-UAW REPRESENTATIVE EMAILS<br>**hgsu.grievance@protonmail.com**<br><br>**president@hgsu.org**<br><br>**vp@hgsu.org** | HGSU-UAW REPRESENTATIVE CELL |
|---|---|---|
| DATE OF ALLEGED VIOLATION<br><br>**Unknown, Ongoing** | DATE OF INFORMAL MEETING WITH SUPERVISOR<br><br>**N/a** | RESPONSE FROM SUPERVISOR:<br><br>**N/a** |
| TYPE OF GRIEVANCE*<br>**Union** | | |

DESCRIPTION OF ALLEGED VIOLATION OF THE AGREEMENT.* PLEASE DESCRIBE THE FACTS AND CIRCUMSTANCES (INCLUDING DATES) THAT EXPLAIN HOW THE ARTICLE(S) AND SECTION(S) WERE VIOLATED. (ATTACH SEPARATE SHEET OF PAPER IF NEEDED.)

**The Employer violated the Agreement when, leading up to the July 1, 2025, payroll date it instructed its agents to remove approximately 900 members from the bargaining unit entirely, with an estimated total of 2,000 members being removed from the unit either fully or partially.  The Union was not notified of this violation until on or about July 2, 2025.  On or about July 3, 2025, the Employer provided the Union with a list of members that excluded those who the Employer unilaterally removed from the bargaining unit in violation of the Agreement. Harvard's removal of individuals from the bargaining unit violated the obligation to provide at least 60 days notice of employment and/or the terms of the appointment letters. Additionally, Harvard's action inappropriately determined retroactively that certain SWs did not qualify as SWs during the CBA (e.g., Articles 1 and 2), were ineligible for terms and conditions, and ineligible to be subject to successor contract bargaining (Article 36). Harvard's actions suggest that the Union inappropriately received dues or fees of persons not in the bargaining unit. The action also inappropriately rescinded all rights that accrued or vested during the CBA. Further, the University unilaterally ceased deducting dues or fees of individuals who did not revoke authorization.**

**The Employer's actions are in violation of Articles 1, 2, 3, 12, 16, 18, 19, 31, 33, and 36 of the Agreement and all others which may apply.**

REMEDY REQUESTED:

**The Employer shall return any, and all members to the bargaining unit who were unilaterally removed in violation of the Agreement.  The Employer shall make any member who has been impacted by the Employer's violation of the Agreement whole in all regards, including by not limited to lost wages, benefits, or other rights and privileges afforded to them under the Agreement. The Employer shall make the Union whole in all regards, including but not limited to loss of dues, fees, and other remittances properly due to the Union that have been denied as a result of the Employer's violation of the Agreement.  The Employer shall cease and desist violating the Agreement.**

| GRIEVANT'S SIGNATURE*<br>**Union** | DATE (MM/DD/YYYY)<br><br>**07/21/2025** |
|---|---|

| HGSU-UAW REPRESENTATIVE SIGNATURE<br>**Sinclair Emans**<br>**Sara Speller**<br>**Sudipta Saha** | DATE (MM/DD/YYYY)<br><br>**07/21/2025** |
|---|---|

# EXHIBIT I

**DEMAND FOR ARBITRATION**

Date: __2025/10/14___

To: Name _____Harvard University_____
(Opposing party)
Address _____Massachusetts Hall_____
City and State _____Cambridge, MA_____ Zip Code_02138_
Telephone ____(617) 495-1000_____ Fax _____

Name of Counsel/Representative _____N/A_____
Address _____
City and State _____ Zip Code_____
Telephone _____ Fax _____

Grievance:

Alleged violations include but are not limited to:

The Employer violated the Agreement when, leading up to the July 1, 2025, payroll date it instructed its agents to remove approximately 900 members from the bargaining unit entirely, with an estimated total of 2,000 members being removed from the unit either fully or partially. The Union was not notified of this violation until on or about July 2, 2025.  On or about July 3, 2025, the Employer provided the Union with a list of members that excluded those who the Employer unilaterally removed from the bargaining unit in violation of the Agreement. Harvard's removal of individuals from the bargaining unit violated the obligation to provide at least 60 days notice of employment and/or the terms of the appointment letters. Additionally, Harvard's action inappropriately determined retroactively that certain SWs did not qualify as SWs during the CBA (e.g., Articles 1 and 2), were ineligible for terms and conditions, and ineligible to be subject to successor contract bargaining (Article 36). Harvard's actions suggest that the Union inappropriately received dues or fees of persons not in the bargaining unit. The action also inappropriately rescinded all rights that accrued or vested during the CBA. Further, the University unilaterally ceased deducting dues or fees of individuals who did not revoke authorization.

The Employer's actions are in violation of Articles 1, 2, 3, 12, 16, 18, 19, 31, 33, and 36 of the Agreement and all others which may apply.

Remedy sought:

The Employer shall return any, and all members to the bargaining unit who were unilaterally removed in violation of the Agreement.  The Employer shall make any member who has been impacted by the Employer's violation of the Agreement whole in all regards, including by not limited to lost wages, benefits, or other rights and privileges afforded to them under the Agreement. The Employer shall make the Union whole in all regards, including but not limited to loss of dues, fees, and other remittances properly due to the Union that have been denied as a result of the Employer's violation of the Agreement.  The Employer shall cease and desist violating the Agreement

This serves as notice that a Demand for Arbitration is being filed with the Labor Relations Connection, requesting assistance with the administration of the above referenced grievance, in accordance with its Labor Arbitration Rules.

The foregoing is merely a brief summary of the grievance. The Union reserves the right to supplement, amend and modify the facts, applicable provisions, and remedies set forth above.

Signed

Sara Speller, HGSU president
(Representative of filing party)

Name of Claimant _____HGSU-UAW Local 5118_____
Address _____552 Massachusetts Ave. Suite 209_____
City and State _____Cambridge, MA_____ Zip Code_02138_
Telephone_____(617) 475-0677_____ Fax _____

Name of Counsel/Representative _____Patrick Bryant_____
Address _____2 Liberty Square, 10th Floor_____
City and State _____Boston, MA_____ Zip Code_02109_
Telephone ____617 367-7200_____ Fax ____617 367-4820_____

Note: To initiate proceedings, please send one copy of this Demand to the Labor Relations Connection at the address below, and one copy to the opposing party.

# EXHIBIT J

**Ricker, Nicole**

| | |
|---|---|
| **From:** | Fisher, Robert A |
| **Sent:** | Wednesday, January 7, 2026 3:09 PM |
| **To:** | Ricker, Nicole |
| **Subject:** | FW: Harvard Graduate Student Union Case#729-25 |

**Robert A Fisher** | Partner
Boston | Extension: 724996 (+1-617-946-4996) | Mobile: +1-617-970-8284 | RFisher@seyfarth.com

**From:** Howard Lenow <lenow@masslaborlaw.com>
**Sent:** Thursday, October 30, 2025 11:33 AM
**To:** pbryant@pylerome.com; Fisher, Robert A <RFisher@seyfarth.com>
**Cc:** Jan Teehan <janteehan@the-lrc.com>
**Subject:** Harvard Graduate Student Union Case#729-25

> **This Message Is From an Untrusted Sender**
> You have not previously corresponded with this sender.

To Attorneys Fisher and Bryant:

I serve as legal counsel to The Labor Relations Connection. I sent out an email several days ago, but it appears to have been lost in the sending.  I am sending this again and would appreciate confirmation of receipt.

The Labor Relations Connection has reviewed the parties' correspondence regarding the employer's objection to the appointment of an arbitrator and the union's demand that an arbitrator be appointed.  As the neutral grievance/arbitration administrator,The LRC does not make substantive or legal decisions regarding these disputes between the parties.  As such, given that the parties provided in their collective bargaining agreement that The Labor Relations Connection was chosen as the arbitration administrator, The LRC has no choice but to move forward with the appointment of an arbitrator under The Labor Relations Connection's rules. The substantive decision as to whether the grievance is arbitrable and should or can be decided by the arbitrator or whether this decision should be determined by a court with jurisdiction, is a substantive matter which is outside The Labor Relations Connection's limited jurisdiction.   Obviously, the parties are free to pursue any legal remedies that might affect this decision and The Labor Relations Connection will comply with whatever decision is imposed the parties.

Please only communicate with me about this matter gong forward, with the exception routine calls or emails about arbitrator selection or scheduling. If you have any questions, please contact me

Howard Lenow

Howard B. Lenow
Lenow & McCarthy
310 Washington Street,
Suite 203
Wellesley, MA. 02481
508.358.8181 (office)
508.358.8989 (fax)
www.masslaborlaw.com [masslaborlaw.com]



Privileged/Confidential Information may be contained in this message.  If you are not the addressee indicated in this message (or responsible for delivery of the message to such person), you may not copy or deliver this message to anyone.  In such case, you should destroy this message and kindly notify the sender by reply email.  Please advise immediately if you or your employer do not consent to Internet email for messages of this kind.

2