

**Pyle Rome Ehrenberg PC**

Terence E. Coles
Alfred Gordon O'Connell
Patrick N. Bryant
Ian O. Russell
James Hykel
Jillian M. Bertrand
G. Alexander Robertson
Catherine A. Terrell
Anita J. Nyberg

_____

*Warren H. Pyle (1933-2019)*
*David B. Rome, retired*
*Betsy Ehrenberg, retired*

January 20, 2026

***VIA EMAIL ONLY***
Mary Jeanne Tufano, Esq.
c/o Labor Relations Connection
P.O. Box 333
28 Route 6A
Sandwich, MA 02563

      Re: Harvard Graduate Students Union, UAW Local 5118 and Harvard University
          unilateral removal of members from bargaining unit (LRC #729-25)

Dear Arbitrator Tufano,

      The Harvard Graduate Students Union-UAW 5118 responds to Harvard College's January 7, 2026 Position Statement and respectfully requests that you ignore or reject its arguments on arbitrability, much as Harvard itself promises to ignore or reject any ruling you issue. In addressing Harvard's pointless objection to your authority and expressing its contempt for labor arbitration, you will not be able to ignore Havard's implausible and shifting characterizations for why it decided to substantially decimate a bargaining unit in contravention of negotiated definitions of "research assistants," or its imperious and incorrect descriptions of the grievance and the law.

      In any event, the grievance, Attachment 1[1] is arbitrable regardless of whether the Arbitrator agrees that five years of practice and Harvard's own admissions establish that the disputed positions are bargaining unit "research assistants." The grievance also remains arbitrable regardless of whether the Arbitrator finds Harvard's decision was implemented on or after July 1, 2025, when the collective bargaining agreement (CBA) expired. The expiration of the CBA does not alter your authority to resolve this grievance, which pertains to facts and circumstances and/or rights that arose or vested during the life of the CBA or survived its expiration. The Arbitrator thus should convene a hearing on the merits, regardless of whether

_____

[1] Enumerated Attachments refer to items attached to this position statement, whereas Alphabetical Attachments refer to items attached to Harvard's Position Statement.

Mailing Address:

| | | | |
|---|---|---|---|
| 2 Liberty Square, 10th Floor | 100 Main Street, 3rd Floor | 93 Main Street, Ste. E201 | pylerome.com |
| Boston, MA 02109 | Northampton, MA 01060 | Brattleboro, VT 05301 | |
| 617.367.7200 (tel) | 413.586.5097 (tel) | 802.652.5124 (tel) | |
| 617.367.4820 (fax) | 413.584.1529 (fax) | 802.652.5125 (fax) | |





you deign to dismiss this argument.[2] Should you deny Harvard's frivolous request, Harvard has vowed to run into federal court to obtain relief from the only tribunal it asserts it empowered to address its argument. You should, for practical reasons, demure on the request to support Harvard's court pleadings.

### I.    Harvard's Shifting, Implausible Explanations for Unilaterally Removing 900 Positions Long Acknowledged as Bargaining Unit "Research Assistants."

This case stems from Harvard's notification to the Union on or about July 2, 2025, one day after the expiration of the CBA, that "some students" (!) had "erroneously been included in the bargaining unit represented by HGSU in years past. Students receiving financial support in the form of a stipend to pursue research toward their degrees are not employees under the NLRA and do not have the right to unionize." Attachment 2. The class of student workers (SWs) newly excluded principally are believed to be Science Technology Engineering and Mathematics (STEM) laboratory doctoral students who conduct research pursuant to a grant or fellowship under supervision of a faculty member.[3] They normally work July 1 to June 30. They have been regarded by Harvard as bargaining unit research assistants since the inception of the first CBA, and includes Organismic and Evolutionary Biology (OEB) graduate students that the NLRB specifically determined to be bargaining unit employees. These disputed SWs have received benefits under the CBA, including access to funds for emergencies, child care, legal defense, health care, dental and international students. See CBA, Attachment C. They also were eligible to authorize the deduction and transmission of dues to the Union, to join and represent the Union, and to participate in successor contract bargaining. Such individuals have served in leadership positions, including as President. And these individuals received appointment letters approximately 60 days prior to the commencement of their employment year (i.e., July 1). Nonetheless, Harvard sought to characterize the deliberate exclusion of 900 individuals, or 20 percent of the bargaining unit – knowingly and consciously included in the unit for five years – as some kind of clerical oversight.

Harvard's surprise announcement meant that 900 individuals no longer qualified for representation by HGSU, or for terms and conditions of employment that includes access to

---

[2] It seems unnecessary to state that Harvard, in challenging the inarbitrability of this matter, has the burden to establish to a court that the parties intentionally deprived you of authority. Harvard's protestations however require a restatement of basic principles including the law's abhorrence of a forfeiture and that circumstances should be construed in favor of arbitrability. See, e.g., Johnson Controls Sec. Sols., LLC v. Int'l Bhd. of Elec. Workers, Loc. 103, 24 F.4th 87, 90 (1st Cir. 2022); United Gov't Sec. Officers of Am. Int'l Union v. G4S Regulated Sec. Sols., No. 19-CV-10373-ADB, 2020 WL 5502223, at *1 (D. Mass. Sept. 11, 2020) (strong presumption of arbitrability may be rebutted only with "forceful evidence of a purpose to exclude the claim from arbitration") (citations omitted).

[3] There may be other categories of employees or individuals who have been excluded, as Harvard has not provided a list of individuals excluded.



numerous benefits pools and timely notices of appointments. Overnight, these summarily ostracized SW's overnight became ineligible to have dues deducted and transmitted to the Union, to join the Union or to serve in leadership positions, or to bargain for a successor agreement. This action also meant that if, as Harvard suggested, they had been improperly included as bargaining unit student workers (SWs), then these individuals were, during the life of the CBA, improperly included on weekly bargaining unit lists, had dues improperly deducted and transmitted (if authorized), and received benefits in various funds to the detriment of actual SWs.

It defies common sense to suggest that Harvard, given its vast expanse and the employment of thousands of SWs, decided to carve out 20 percent of the unit only on July 1. Harvard also avoids noting when it made the decision, only contending it was not "final" until that date. The Union continues to discover, as any rational person would expect, that Harvard made and implemented the decision prior to July 1. For instance, Article 3 of the CBA required that Harvard send appointment letters to SWs no later than 60 days prior to commencement of employment. The disputed individuals commence work on July 1 and therefore were entitled to receive appointment letters 60 days prior to that, or in other words prior to the CBA expiration. Harvard intentionally withheld appointment letters until July 1 because it had already decided to unilaterally remove 900 individuals from the bargaining unit. Attachment 3. Harvard thus removed these disputed while the CBA was in effect, violated their right to receive a timely appointment letter prior.[4]

Also, prior to expiration, Harvard staff were changing the pay and benefits of disputed individuals. See Attachment 4 ("Prior to the July stipend payroll open, I manually changed any stipend recipient who had been hired into the GSU job code in PeopleSoft. They now appear as a non union stipend."). The Union is also aware that many individuals in these disputed positions received payment notifications prior to July 1 that documented their newfound exclusion of the unit and failure to deduct dues. See Attachment 5 (pay deposited on June 30, 2025 failed to deduct dues).

Harvard's explanations as to this sudden and dramatic change in its interpretation of bargaining unit "research assistants" including why it made the decision, when it made the decision, when it implemented the decision, are utterly lacking in credibility. Harvard now appears to concede that it deliberately, intentionally, and knowingly waited until the CBA expired to notify the Union of its changed interpretation and exclusion of bargaining unit employees. The Position Statement claims that Harvard delayed announcement until the CBA expired out of some deference to its legal obligations, rather than its contempt for them. Footnote 1 asserts that Harvard waited until July 1, 2025, when the contract expired, to

---

[4] The 60 days' notice requirement is stated as a strong but not irrebuttable presumption. As such, every day less than 60 days a letter is not issued represents a continuing violation.



announce its decision because "The NLRB has taken the position that an employer may not make mid-term modifications to a bargaining unit. See, e.g., <u>Arizona Elec. Power</u>, 250 NLRB 1132, 1132-33 (1980)." Position Statement at 6. This contention however directly contradicts other explanations Harvard has given for why Harvard delayed its announcement as well as its position on whether the disputed positions meet the collectively bargained definition of "research assistants." Harvard seeks to have it both ways –the positions never met the collectively bargained definition of research assistants and at the same time met the definition and could not be removed during the life of the CBA. Moreover, Harvard's citation to this case demonstrates its respect for the law has its limits. The NLRB ruled in that case, "once a unit is certified, it may be changed only by mutual agreement of the parties or by Board action." 250 NLRB at 1133. Harvard has obtained neither. It acted by fiat.

This argument also flatly contradicts other explanations for the timing of Harvard's decimation of the bargaining unit. In response to a Union information request, Attachment 6, Harvard never claimed its respect for federal labor law's ban on unilateral mid-term modifications explained the delay between the Regional Director decision on <u>Mass. Inst. of Tech ("MIT")</u>, 01-RC-304042 (March 13, 2023), <u>request for rev. den.</u>, 2024 WL 3455477 (N.L.R.B. July 17, 2024), and Harvard's extraction of the positions from the bargaining unit more than two years later. Harvard instead blamed the 28-month delay on the NLRB appellate process[5] and its own methodical bureaucracy.[6][7] These explanations, however, also are entirely inconsistent with Harvard's unwavering and unconditional reliance on the *MIT* decision since it was first issued.

In Summer 2023, the parties participated in arbitration hearings about certain laboratory-based psychology doctoral students conducting research funded by fellowships under the supervision of faculty. See Attachments 7 (Timeliness Decision) and 8 (Merits Decision and Award). The parties disputed whether these individuals qualified as research assistants under the CBA. Harvard repeatedly cited the *MIT* decision,[8] including in its post-

---

[5] See Attachment 6 at 2: "Harvard understood from that decision that the fellows received a fellowship for purposes of supporting their academic study or research, like the stipendees here at Harvard. However, the union requested that the NLRB review that decision and that request remained pending for over a year until July 2024."

[6] See Attachment 6 at 2: "once it became clear that the NLRB agreed that these students were not employees, OLER began to review whether non-employee grad students were erroneously included in the unit. This took some time, and the University decided to correct these errors as a whole after the conclusion of the 24-25 academic year in order to avoid any mid-year disruptions."

[7] Harvard asserts "*many* appointments had already been made for the 2024-2025 year." Position Statement at 3 (emphasis added). This characterization lacks foundation or clarity on the size and scope of appointment letters issued in a bargaining unit of several thousand SWs.

[8] Perhaps Harvard's bannering of the decision stemmed from using the same law firm that represented MIT in the representation hearing. This same law firm also represented Harvard College in its



hearing brief, despite the pendency of the appeal or the ongoing vitality of the CBA. Likewise, the Union repeatedly analogized the psychology researchers at issue to the SWs who, coincidentally, are the subject of dispute here - laboratory-based STEM doctoral students conducting research funded by a fellowship or grant under supervision of faculty long acknowledged to be "research assistants." Harvard did not dispute, despite its familiarity with the *MIT* decision, that the STEM SWs cited by the Union qualified as bargaining unit "research assistants." This similarity between STEM research assistants and psychology researchers as well as Harvard's unreserved acceptance of the former as bargaining unit "research assistants," were material to the Arbitrator's conclusion that exclusion of psychology doctoral students violated Articles 1 and 2 of the CBA.[9] When Harvard lost the arbitration, it cited the *MIT* decision in its appeal to federal district court. When Harvard lost at the federal district court, it again cited the *MIT* case in its appellate briefing. See, e.g., Attachment 9.

Harvard's suggestion that federal law forbade it from removing the positions during the life of the CBA is flatly contradictory to Harvard's never-ending opposition to Arbitrator Brynie's award. In federal court, Harvard has asserted that individuals who are not employees under the NLRA cannot be in a bargaining unit. See id. at 22 ("The basic premise of the National Labor Relations Act is that only 'employees' under the Act may unionize and only 'employees' may be in a bargaining unit.").

## II.    Harvard's Gaslighting Arguments About Arbitrability

Harvard propounds repeatedly in its position statement that only a court may determine arbitrability and yet makes that argument exclusively to an arbitrator whose ruling it promises to ignore. As Harvard contends only a court can determine arbitrability and Havard is the party contending the matter is inarbitrable, it is incumbent upon Harvard to seek relief from a court, as it is now doing in a related matter. Nonetheless. Harvard suggests that simply because Harvard objects to arbitrability and participates under protest, it somehow is the

---

representation hearings, collective bargaining concerning student workers, and arbitration about psychology doctoral students. It is a different law firm than the one objection now.
"[9] See Attachment 8 at 32-33:

> In contrast, within other science or STEM programs, students engage in rotations during their first year, before selecting a lab/research group. Yet, they are already considered bargaining unit employees, while lab-based psychology students, who are already settled in a long-term lab assignment, are not."
>
> ...
>
> And, more broadly, the record does not reflect demonstrable differences between the STEM disciplines (and OEB) students' and the lab-based psychology graduate students' research expectations and obligations that would warrant a distinction in their bargaining unit status.



obligation of the Union to obtain a judicial ruling in favor of arbitrability. Unsurprisingly, Harvard offers no authority for this proposition other than its own bluster.

This argument is not merely unsupported and wrong but is an example of the type of rhetorical gaslighting favored by political nemeses of higher education. Harvard preposterously implies that the party filing the grievance and demanding arbitration bears the burden, given that Harvard neither filed a grievance nor demanded arbitration. Employers rarely do, but many execute agreements with broad arbitration clauses that obligate them to participate in alternative dispute resolution. The party contesting arbitrability normally has the burden. Overstreet v. Contigroup Companies, Inc., 462 F.3d 409, 412 (5th Cir. 2006); Wynn MA, LLC v. Unite Here!, Loc. 26, No. 23-CV-11223-ADB, 2024 WL 2962805, at *6 (D. Mass. June 12, 2024); Teamsters Loc. Union No. 42 v. Supervalu, Inc., 212 F.3d 59, 65 (1st Cir. 2000). Harvard can go into court to seek a stay of arbitration, as it has intimated it will eventually do. Or Harvard could choose, consistent with its objections, not to participate in this proceeding. Then the Union could seek a motion to compel. See, e.g., United Gov't Sec. Officers of Am. Int'l Union v. G4S Regulated Sec. Sols., No. 19-CV-10373-ADB, 2020 WL 5502223, at *6 (D. Mass. Sept. 11, 2020). The Union was not required to do so. Where one party objects to arbitrability and chooses not to participate, the other party is not required to seek an order compelling their participation. NE. Reg'l Council of Carpenters v. KRS Constr. Grp., LLC, No. CIV.A. 15-0047 FLW, 2015 WL 4773367, at *6 (D.N.J. Aug. 13, 2015). The Union can pursue ex parte arbitration. Joint Bd. of Cloak, Skirt & Dressmakers Union of Int'l Ladies' Garment Workers Union, AFL-CIO v. Senco, Inc., 289 F. Supp. 513, 522 (D. Mass. 1968). Thus, there is no burden or requirement for a union, when presented with arbitrability challenges, to seek judicial refutation of those affirmative defenses, even if they are credible. It is folly for the Union to seek a motion to compel Harvard to participate in a matter in which it is already participating, albeit under protest. This argument is yet another in a series of reality-defying arguments by Harvard to avoid review of its evisceration of a collective bargaining unit.[10]

## III.   Harvard's Mischaracterization of the Nature of Dispute

Harvard's disputatious contentions extend beyond its revisionist history of the underlying actions triggering this grievance and the relative burdens in arbitrability disputes. It also extends to erroneous characterization of the dispute at issue. This matter concerns whether certain positions meet the bargaining unit definition of "research assistants," a

---

[10] This argument is of a kind with Harvard's contention that it is incumbent upon the Union to file a unit clarification petition with the Board. Position Statement at 7. That is contrary to the case cited by Harvard. Arizona Elec. Power, 250 NLRB 1132, 1133 (1980) (and that once a unit is certified, it may be changed only by mutual agreement of the parties or by Board action). It is the University that seeks to have the unit clarified, not the Union, and thus Harvard is required to obtain agreement or Board approval. Harvard understandably does not seek the aid of a political administration that has the University in its crosshairs on other matters.



dispute triggered by Harvard's July 2, 2025 announcement. The issue is not whether the individuals in dispute are employees under the NLRA or whether the announcement or purported implementation on July 2 violated the CBA.

Disputes about recognition clauses are not reserved to the National Labor Relations Board and no authority holds that determination of employee status under the NLRA is a necessary precondition. Moreover, the evidence demonstrates conclusively that the parties intended to define bargaining unit status without the confines of the NLRA (even if the disputed employees also satisfy requirements under the NLRA)

### a. The Case Does Not Concern Employee Status Under the NLRA

The issue of whether a group of employees fall within a recognition clause is a classic question of contract and is "not the unique province of the Board." <u>Appollo Sys</u>., 360 NLRB 687, 688 (2014). The NLRB has expressly endorsed arbitration in representational and jurisdictional disputes. See <u>id</u>.; <u>St. Mary's Med. Ctr.</u>, 322 NLRB 954 (1997) (agreeing to defer, in unit clarification matter, to arbitral determination of whether contractual recognition clause excluded new position). The First Circuit compelled arbitration where the parties disputed whether certain individuals were included in the CBA or excluded by the NLRB certification. <u>Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO (Loc. 2201) v. Int'l Air Serv. of Puerto Rico, Inc.</u>, 636 F.2d 848, 849 (1st Cir. 1980).

Bargaining unit agreements are enforceable even if they include individuals who are not "employees" under the NLRA and/or involve a unit not permitted by the NLRA. Though confidential employees, supervisors and managers, inter alia, are excluded from the NLRA's definition of "employee," agreements to include those positions, whether pursuant to a Board process or a private agreement, are enforceable. Once agreements or certifications have issued, neither party may collaterally attack the validity of said certification or agreement. <u>Arizona Elec. Power</u>, 250 NLRB 1132, 1133 (1980). The certified unit may be changed only by mutual agreement or Board action. <u>Id</u>. For instance, the NLRB has determined that an employer may not withdraw recognition from a union even if some unit employees are confidential employees excluded from the Act's coverage, <u>Carolina Tel. & Tel.</u>, 258 NLRB 1387 (1981). See also <u>Motor Rim & Wheel Serv.</u>, 273 NLRB 866 (1984) (unfair labor practice for employer to unilaterally remove confidential employee midterm).

The example of supervisors fundamentally illustrates the University's misleading suggestion that what is not required by the NLRA is thereby prohibited by it. Supervisors are excluded, expressly so, from the definition of employees. 29 U.S.C. §152(3). Thus supervisors as defined by the NLRA have no federal right to join a union or engage in concerted activities for other mutual aid or protection, 29 U.S.C. § 157, and concomitantly, employers subject to the NLRA cannot be compelled to include these non-employees in a bargaining unit. It does not



necessarily follow that supervisors, or other non-employees, are prohibited from being in a bargaining unit or subject to a CBA. See 29 USC § 164(a) (supervisors do not become "employees" if permitted to remain in union or unit). Employers have the freedom of contract to recognize a unit that includes supervisors. See Loc. Union No. 1055, IBEW, AFL-CIO v. Gulf Power Co., 175 F. Supp. 315, 319-20 (N.D. Fla. 1959) ("Nor can it be said that compulsion will result in requiring the Company to arbitrate with the Union relative to foremen, where the Company has, in fact, so contracted."); E.G. & H. Inc. v. NLRB, 949 F.2d 276, 279 (9th Cir. 1991), as amended (Dec. 19, 1991) (where employer consents to a bargaining unit that includes supervisors, NLRB may find employer guilty of an unfair labor practice with respect to that unit); Arizona Elec. Power, 250 NLRB at 1134 n.10 (inclusion of managerial or supervisory employees enforceable during life of CBA).

Employers who stipulate to bargaining units are precluded from questioning the employee status of individuals who meet the bargaining unit definition. In United Dairies, Inc., 144 NLRB 153, 154 (1963), enf., N.L.R.B. v. United Dairies, 337 F2.d 283 (10th Cir. 1964), the employer stipulated, prior to an election, to a bargaining unit including retail route drivers and "distributors and/or owner-operator drivers." Following the certification of the union, the employer refused to bargain about "distributers," contending that they were independent contractors and not NLRA "employees." The NLRB ruled it was unlawful for the employer to refuse to bargain about the disputed employees even if they were not, in actuality, employees under the Act.

> We find it unnecessary to make a determination as to whether on the evidence adduced the distributors were employees or independent contractors. Rather, we find that since the Respondent in a consent-election agreement agreed to the inclusion of these distributors as employees in a unit appropriate for collective bargaining and did not challenge the right of its distributors to vote in a Board-conducted election, it cannot in the instant proceeding, in which it is charged with a refusal to bargain with the Union as the representative of these distributors, contend that they are not employees or that they must be excluded from that unit.

Id. The 10th Circuit concurred. "We agree that it is not necessary to determine the status of respondent's distributors, i.e., whether they are employees or independent contractors, on the basis of the evidence adduced at the unfair labor practices hearing." 337 F.2d at 286. Thus, neither the NLRA nor NLRB forbids parties from including non-employees in a bargaining unit arising under the NLRA, or requiring, as a condition of inclusion, an affirmative determination that individuals are NLRA-defined employees.[11]

---

[11] The NLRA takes a similarly approving posture toward units not permitted or required by the Act such as mixed guard and mixed professional units. Though the underlying case does not involve a mixture of units contrary to 29 USC § 159(b), the cases discussed herein affirm the NLRB's generally permissive



### b. The Bargaining History Demonstrates the Parties Did Not Tether Definition of Research Assistants to "Employee" Status

This case is whether STEM laboratory-based doctoral students conducting research pursuant to a grant or fellowship under the supervision of faculty meet the definition of research assistants under Articles 1 or 2 of the CBA and the consequences of that determination. Given that there is no real dispute that the positions did qualify as such during the life of the CBA, the Arbitrator should presume that they continue to do so, particularly at the arbitrability stage.

Moreover, the Arbitrator should consider, as Arbitrator Brynie did, that the parties intentionally did not tie bargaining unit inclusion to NLRA employee status. While the NLRA is not controlling of this dispute about contract language the Union agrees that the bargaining unit definition arose amidst the backdrop of *Trustees of Columbia Univ.*, 364 NLRB 1080, 1083 (2016), which held that student workers may qualify as employees under the Act if they meet the common law definition of employee, which is a "person who works for another in return for financial or other compensation." Id. at 1083, reversing Brown Univ., 342 NLRB 483 (2004). The NLRB determined that student research assistants at Columbia, including those whose research was funded by external or training grants, were statutory employees. The Board demurred on the employee status of research assistants who did not meet the common law test or whose external funding was unrestricted.

> it remains the case that if a student research assistant is not an employee under the common-law test, we would *not normally find* the assistant to be an employee under the Act. But there is nothing about the nature of student-assistant research that would automatically imply an absence of the requisite control under the common-law test. It is theoretically possible that funders may wish to further a student's education by effectively giving the student

_____

view of agreements about representational issues disallowed by the Act. Notwithstanding the NLRA's prohibition on units that mix guards and non-guards or to certify a non-guard union as representing guard units, Colon Velez v. Puerto Rico Marine Mgmt., Inc., 957 F.2d 933, 937 (1st Cir. 1992), or certifying a mixed professional/non-professional unit without the assent of the former. 29 USC § 159(b), agreements on these non-conforming units are enforceable and not a defense to unfair labor practices. Integrated Health Servs., 336 NLRB 575, 580 (2001). As the First Circuit stated: "Clearly, no employer can be compelled to recognize and bargain with a mixed guard unit. This concern, however, is not implicated when an employer voluntarily enters into an agreement, as is the case here." Colon Velez 957 F.2d at 939. See also Truck Drivers Local Union No. 807 v. NLRB, 755 F.2d 5, 8 (2d. Cir. 1985) (employer cannot be compelled to recognize a mixed guard union, but may do so and if so, "may not discontinue the relationship during the contract period"); Sunrise Operations, LLC, 373 NLRB No. 30 (2024) (mixed unit not a defense to ULP).



> unconditional scholarship aid, and allowing the student to pursue educational goals without regard to achieving any of the funder's own particular research goals. *But where a university exerts the requisite control over the research assistant's work, and specific work is performed as a condition of receiving the financial award, a research assistant is properly treated as an employee under the Act.*

Id. at 1096 (emphasis added). Subsequent to this decision, the Union petitioned the NLRB to represent certain graduate and undergraduate workers at Harvard. It entered into a stipulated election agreement with Harvard and the NLRB on a broadly defined bargaining unit of:

> all students enrolled in Harvard degree programs employed by Harvard University who provide instructional services at Harvard University, including graduate and undergraduate Teaching Fellows (teaching assistants, teaching fellows, course assistants) and all students enrolled in Harvard degree programs (other than undergraduate students at Harvard College) employed by Harvard University who serve as Research Assistants (*regardless of funding sources*, including those compensated through Training Grants).

See Exhibit A (emphasis added). Note that italicized language powerfully indicates the parties intended to resolve the issue reserved in *Columbia* in favor of inclusion. It also is important to note that parties agreed during the election that graduate students on laboratory, or scientific, rotations were not included in the unit or eligible to vote.  Attachment B at 13 n.29.

The NLRB Regional Director ordered a second election after determining that Harvard improperly omitted 530 individuals, or more than eight percent of the unit, from voter lists. Id. at 42. Twelve improperly excluded individuals were first-year graduate students in the Department of Organismic and Evolutionary Biology (OEB) who conducted research in assigned labs. Id. at 13-14. The Regional Director rejected the University's claim that these individuals were not employees, based in part on testimony from an OEB student that all 12 first-year students conducted research in collaboration with other laboratory members, including faculty and fellow graduate students. (Harvard has now largely removed these SWs from the unit).

Following the second election, the Union was certified by the NLRB as the exclusive bargaining representative of several thousand student workers at Harvard performing various instructional and research activities. The parties negotiated a CBA that incorporated the NLRB certification into Article 1 and defined "research assistant 1" in Article 2 as someone who "performs research (including scientific rotations) under the supervision of faculty/principal investigator [PI]/museum curator." Attachment C. The latter language *included* employees on scientific rotations who previously were regarded as ineligible to vote or otherwise determined





not to be employees under the NLRA. Compare Attachment B at 13 n.29. Additionally, Article 20, Section 2 acknowledges the porous boundaries between work and education for research assistants:

> A graduate student usually appointed on an annual basis for a 12-month period to perform research work under the supervision of a faculty/principal investigator. The parties understand that the work of a Research Assistant is a blend of academic and employment endeavors and that clear separation of each is difficult. The stipend that such an RA receives could be characterized as financial assistance or compensation or both.

Attachment C. By including individuals who previously agreed not to be employees under the NLRA or in the unit, the CBA demonstrated a clear intent that NLRA employee status is not the lodestar for determining bargaining unit status.

## IV. The Union's Grievance Pertaining to Harvard's Determination that Fellow-funded Lab-Based Doctoral Students Conducting Research Under Faculty Supervision Never Qualified as "Research Assistants" Is Arbitrable.

The dispute concerns whether disputed research positions qualify as bargaining unit research assistants. The precipitating event is Harvard's post-expiration announcement of its unilateral exclusion of 900 individuals from the bargaining unit. But the issue is not confined to whether such announcement or implemented violated the CBA. The expiration of the CBA is without significance to arbitrability, as the grievance alleges that Harvard violated the CBA if the positions met the definition of research assistants, if they did not meet the definition, and even if the decision was not implemented until July 1, 2025, or after expiration of the CBA. Just as Harvard's incredulous explanations for why and when it took the action underlying the grievance should be rejected, so too should its bullying challenges to your authority based on expiration of the CBA.

A grievance is arbitrable even after the expiration of the CBA if it involves: a) facts and occurrences that arose before expiration; b) an action taken after expiration infringes a right that accrued or vested under the agreement, or c) the disputed contractual right, under normal principles of arbitration, survives expiration of the remainder of the agreement. <u>Litton Fin. Printing Div., a Div. of Litton Bus. Sys., Inc. v. N.L.R.B.</u>, 501 U.S. 190, 205-06 (1991).[12] The expired CBA required that any grievance be filed within 30 business days "after the event, or after the grievant should have become aware of the event, giving rise to the grievance." The

---

[12] Harvard does not assert that arbitrability was negated by express language or implication. <u>S. Bay Bos. Mgmt. v. Unite Here, Loc. 26</u>, 587 F.3d 35, 42 (1st Cir. 2009)





grievance filed July 21, Attachment 1, thus reaches back into at least June 2025, when the CBA indubitably existed.

We hope the Arbitrator ultimately agrees, in line with bargaining history, Harvard's admission, and five years of inclusion, that the disputed positions meet the collectively-bargained definition of "research assistants." If, as the common sense and aforementioned evidence make clear, the University removed positions from the unit and ceased dues deductions prior to July 1, 2025, then even the University acknowledges, as it must, that the CBA's subsequent expiration does not render the grievance inarbitrable.[13] Implementation of the decision involves more than the notification to the Union, but removal of the positions from protections by administrators and faculty, and anticipatory denial of benefits and appointments. Harvard implemented the decision prior to July 1, by denying appointment letters and unilaterally ceasing dues deductions. See Attachments 3-5. This is sufficient evidence to support a hearing, and the issuance of a subpoena about when and how such a decision was communicated and implement.

Even if one believes that Harvard magically implemented a wholesale extraction of 900 individuals from the bargaining unit on July 1, 2025, the grievance remains arbitrable. And arbitrability remains even if the Arbitrator agrees that the positions never qualified as "research assistants."  If the positions qualified as bargaining unit research assistants and they were not excluded until July 1, then Harvard violated rights of these SWs during the life of the agreement or rights that vested during the life, or rights that otherwise survived expiration.

The CBA required Harvard issue Appointment Letters to bargaining unit employees about 60 days prior to an employment period. Attachment C, Article 3, §1. Individuals who met the definition in the bargaining unit research assistants, who start employment on July 1, were thus entitled to receive an appointment letter about 60 days prior, i.e., during the life of the CBA. Harvard failed to issue appointment letters to these individuals during the life of the CBA or otherwise. The grievance filed July 21, 2025, within 30 business days of when the CBA remained vital.

For instance, the CBA provides a right for bargaining unit employees to authorize dues deductions to be transmitted to the unit. Attachment C, Art. 33. The authorizations do not expire on contract expiration; they "continue unless affirmatively revoked by the SW." Attachment C, Art. 33, §5. For instance, Harvard continues to deduct and transmit dues for individuals it agrees meet the contractual definition of research assistants. Yet Harvard has unilaterally ceased deductions for newly-excluded research assistants at issue here. If they are research assistants as defined under the CBA, then Harvard violated the contractual right that

---

[13] The no-strike clause, notwithstanding its expiration, continues to serve as a quid-pro quo for post-expiration arbitration where the facts, circumstances or rights occurred or became vested during the life of a CBA that prohibited striking.



vested during the CBA or otherwise survived expiration, to transmit and receive dues. <u>Newspaper Guild/CWA of Albany v. Hearst Corp.</u>, 645 F.3d 527, 531 (2d Cir. 2011) ("Accordingly, we hold, "under normal principles of contract interpretation," <u>Litton</u>, 501 U.S. at 206, that the Guild's right to checkoff of union dues survives expiration of the CBA"). Harvard also ceased deducting dues from earnings of fellowships and grants of SWs included in the unit.

Harvard also violated the obligation to bargain in good faith for a successor agreement, Attachment C, Arts. 1, 36, during the life CBA for all bargaining unit positions. Harvard did not do so because it was refusing to bargain about these positions. Additionally, Articles 1 and 36 imposed an ongoing duty to bargain in good faith for all positions in Articles 1 and 2, until a successor agreement is reached, unless Harvard obtained agreement or Board action to change the scope of successor bargaining.[14].

Just as the timing of Harvard's implementation is not determinative of arbitrability, neither is the Arbitrator's resolution of whether the disputed positions qualify as "bargaining unit" research assistants. Harvard violated the CBA even if, as Harvard claims to have discovered on July 1, these positions never qualified as "research assistants." Harvard provided these individuals with benefits reserved for SWs, included them on weekly bargaining unit lists, inappropriately deducting and transmitting dues, including them in successor bargaining, and so on.  Harvard provided non-SWs access to various benefits funds that, in the event they received monies from any or all funds, necessarily diluted contractual benefits reserved for SWs. For the disputed employees who executed dues authorizations, if they were not bargaining unit research assistants, then Harvard inappropriately deducted and transmitted their dues to HGSU, subjecting both the University and the Union to potential liability and obligations. The grievance therefore must consider a remedy for positions not subject to dues authorizations. Such actions occurred during the life of the CBA.[15]

Hence, the resolution of issues pertaining to whether the positions are bargaining unit research assistants and when Harvard unilaterally ejected them from the unit is not determinative of whether Harvard violated the CBA. As shown above, the resolution issues pertain to which provisions Harvard violated.

## V.    Conclusion

The Union respectfully requests that you treat Harvard's arbitrability challenge with the same contempt Harvard has for your authority. Harvard already has promised to go to court to obtain its desired relief from the only tribunal empowered to do so. There is no purpose or

---

[14] The Union expressly reserves the right to supplement or modify arguments and evidence in support of the grievance.

[15] The Union's failure to file a grievance during the life of the CBA obviously is excused because it had no reason to know the positions were erroneously excluded until July 2, 2025.



merit in entertaining Harvard's request for an advisory attachment to its pleadings. The Arbitrator should decline Harvard's arguments.

Very truly yours,

Patrick N. Bryant

Enclosures

cc:    Robert A. Fisher
       Nicole Ricker